# EXHIBIT "E"

# Associated Neurologists, P.C.

69 Sand Pit Road • Suite 300 • Danbury, Connecticut 06810-4088 • (203) 748-2551

October 27, 2000

L. Robert Rubin, M.D.
41 Germantown Road
Danbury, CT 06810



RECEIVED

NOV - 7 2000

DEPT. OF PUPIL
PERSONNEL

Re:    Travis Myslow

Dear Bob,

Thank you for referring Travis Myslow for neurological consultation. He was seen today accompanied by his mother with concerns of his difficulties at school.

History was obtained from his mother. I was able to review the psychological and learning assessment which was done for Travis in the second grade.

Apparently, difficulties with attending his reading skills and written language became apparent since the beginning of elementary school. He also has had difficulty focusing, inattentiveness, motor hyperactivity and impulsivity which were noted by the teacher since at least the first grade. The symptoms appeared to interfere with his social functioning including communication with his peers early on and learning.

He also developed low self-esteem and became very frustrated with academic tasks. In a home setting his mother noticed similar signs but to much less degree. She described Travis as having difficulty paying close attention to details and making careless mistakes, having difficulty sustaining attention of tasks, being easily distractible and trying to avoid the activities which require sustained mental effort, mostly school work. He is also described as fidgety with increased levels of motor hyperactivity and signs of impulsivity. This is also noted at home setting, although to much less a degree in comparison to the school.

Review of his psychological evaluation from 1998, revealed his verbal IQ at 115, performance IQ of 86, with a full scale IQ of 108. His nonverbal difficulties were related to his poor organizational abilities and solving problem activities, as well as visual perceptual deficits. His coding ability was normal. His verbal ability was his strong point.

On the learning assessment, he demonstrated excellent broad knowledge. In comparison his basic reading and basic writing skills were inadequate although fall within the average range for a child of his age.

Behavior check lists filled out by the teachers were suggestive of inattentiveness, hyperactivity and impulsivity. The teachers also felt social skills to be inadequate and reported signs of oppositional behavior.

On the basis of this evaluation, the patient was diagnosed with attention deficit hyperactivity

B-19, Page 1 of 5

JAN MASHMAN, M.D.    MARTIN W. KREMENITZER, M.D.    DIANE WARZ, M.D.    JOHN M. MURPHY, M.D.
SAMUEL H. MARKIND, M.D.    NEIL W. CULUGAN, M.D.    ANNA ALSHANSKY, M.D.
Adult & Pediatric Neurology    Electroencephalography    Electromyography    Intraoperative Monitoring
HARRY M. ONG, M.A., R.P.T.    SARAH LINDBLOM, R.P.T.    PAULETTE CORSAK, R.EEG.T
Cortical Evoked Potentials    Physical Therapy

Re:    Travis Myslow
       10/27/00
       Page 2

disorder and was placed on Ritalin with a maximal dose of 10 mg. in the morning and 5 mg. at noon. He continued Ritalin for about three years and the mother discontinued the medication, secondary to a lack of effectiveness in her opinion. Travis also reported subjective feeling of hyperactivity. As per Mrs. Myslow reports, the teachers felt that the medication did provide improvement in Travis' behavior.

Over the years, Travis continued having significant problems with reading and writing. His current reading level is 1.8 grade. Recently, he was evaluated by Sylvan Learning Center and a diagnosis of dyslexia was confirmed as per his mother's report. He was able to do much better on the one-on-one supervision in regards to his level of attention and hyperactivity.

Currently at school, he receives one-on-one reading. He also has sessions with a school psychologist.

His mood is described as happy at home and sad at school. Frequently he is heard saying, "I am stupid, I will never learn how to read". There are no features of obsessive compulsive disorder found. He is described as a child prone to anxiety especially in regards to his academic performance. He tends to worry a lot.

His appetite is normal. He has difficulty falling asleep;it usually takes him 1 to 1 ½ hours. He, however, does not have significant difficulties waking up in the morning and does not complain of generalized fatigue or napping throughout the day.

**Past Medical History:** Includes normal pregnancy full term, vaginal delivery, birth weight of 6 lbs. 8 oz. There were no neonatal problems reported. During the first year of life, there were no signs of excessive irritability or spitting up. He psychomotor development was appropriate for his age. As a toddler, he was described as very active. There were minor difficulties attaining toilet training skills. His mother had concerns about his motor hyperactivity in the nursery school. As per her report, the evaluation was done at that time. When he was in the elementary school, his fine motor function skills were felt to be delayed and he received occupational therapy during his first year of schooling.

He has history of chronic constipation and currently he is being evaluated for thyroid problems.

There were no hospitalizations.

**Past Surgical History:** Negative.

**Medications:** He is currently on no medications.

**Allergies:** No known drug allergies.

**Family History:** Significant for a mother with a learning disability and learning difficulties similar to Travis. She also describes herself as prone to anxiety and worrying. His 18 year

B-19, page 2 of 5

Re:   Travis Myslow
      10/27/00
      Page 3

old sister has depression.

**Social History:** Travis lives with both of his parents and 18 year old older brother at home. Overall the atmosphere in the family is described as stable and supportive, however, Travis ha problems with his older brother related to sibling rivalry and feeling of chronic under-achievement.

**Review of Systems:** Negative for double vision, headaches, focal weakness, numbness, ataxia of the gait, abdominal pains, appetite disturbances, rashes, fevers, arthralgias. There are no chest pains or difficulty breathing.

**Neurological Examination:** Travis is awake, alert and appears in no acute distress. His eye contact is appropriate and he participates willingly in the discussion and appears to be very honest about his difficulties. He does report having one friend, although feels that it is not easy to communicate with his peers. He appears to be anxious and is reluctant to leave the room for my private conversation with his mother. His speech is clear and fluent.

Cranial nerves II-XII are intact including normal funduscopic examination. There is no facial asymmetry. His tongue is in the midline. Soft palate movements are intact. His neck is supple. He has full range of motion of the extremities with a mild diffuse muscle hypotonia. His DTRs are 2+ bilaterally. Plantar responses are downgoing with no evidence of clonus. There are no tremors or dysmetria on the coordination examination. He demonstrated clumsiness and immaturity upon performance of rapid alternating finger movement test and test for adiadokokinesia. His gait is stable but he has difficulties performing tandem gait. His heel walking and toe walking are intact.

There are no dysmorphic features or skin stigmata.

**Physical Examination:** Reveals normal HEENT examination. Chest is clear to auscultation. Cardiac rhythm is regular with no evidence of murmurs. Blood pressure 90/65. Pulse: 80. We discussed diagnostic criteria of attention deficit hyperactivity disorder with his mother and her opinion. He satisfies four out of nine symptoms of inattentiveness and four out of nine symptoms of hyperactivity and impulsivity.

**IMPRESSION:**

1.   Given all the information provided to me, I agree with the diagnosis of attention deficit hyperactivity disorder.
2.   In my opinion, the patient does have a learning disability affecting his reading and writing skills.
3.   Given significant discrepancy between his verbal and nonverbal abilities, the possibility of a nonverbal learning disability is also considered.
4.   The patient has signs of poor self-esteem and features of anxiety which can be secondary to his chronic under-achievement.

B-19, page 3 of 5

Re:    Travis Myslow
       10/27/00
       Page 4

5.      Developmental disorder of motor incoordination and fine motor function delays.

**RECOMMENDATIONS:**

1.      Full psychoeducational reevaluation as well as language evaluation is recommended.
2.      Intensive support system, including special services in his reading and writing and help with organizational skills and strategies should be based upon the results of the psychoeducational evaluation.
3.      We had an extended discussion today (more than 50% of this 60 minute visit was spent in counseling in regards to definition of ADHD, clinical symptoms, and management. We also talked about various comorbid conditions which are seen frequently with ADHD which include learning disabilities, anxiety, and poor self-esteem as well as depression.
4.      I recommend a trial of Adderall since Travis had unpleasant side effects on the Ritalin. We will proceed with 5 mg. of Adderall in the morning for one week with a further gradual increase to 7.5 mg. and 10 mg. We discussed side effects of the medication. I also suggested to be in close contact with the teachers for evaluation of the most effective dose for Travis.
5.      Travis would benefit from psychological counseling in regards to understanding his problems, improvement of his communicational skills, self-esteem and anxiety.
6.      In my opinion, his insomnia can be related to the above described problems.
7.      I would like to see him back for neurological follow up in about one month for assessment of the effectiveness of the Adderall. *School Called Saying*
*Was Sick, then claimed - - - while was in the med*
Should any new problems appear meanwhile, the patient was instructed to get in touch with me in the office.

Thanks again for allowing me to participate in the care of this patient.

                                With kind regards,

le                              Anna Alshansky, M.D.

*B-19, page 4 of 5*

# EXHIBIT "F"

# AUTHORIZATION FOR THE ADMINISTRATION OF MEDICINES
## BY SCHOOL PERSONNEL

The Connecticut State Law and Regulations require a physician's or dentist's written order and parent or guardian's authorization for a nurse to administer medications or, in her absence, the principal or teacher to administer medications. Medications must be in pharmacy-prepared containers and labeled with name of the child, and name of the drug, strength, dosage, frequency, physician's or dentist's name and date of original prescription.

Physician's/Dentist's Name __ALSHANSKY__ ___036864___ ___TEL. 748-2551__
                          (Type or print)      license #

### Physician or Dentist's order

Name of Child _Wysław  Travis_ Date_____

Address_____

_____ Date of Birth_____

Condition for which drug is being administered during school hours _ADD_

_____

Drug: name, dose, and method of administration _Dexedorn 6mg_

_____

Is this a controlled drug? __Yes__

Time of administration_____ _1/2 tab  at noon_

Medication shall be administered from_ _12/5/00_ _to_ _further notice_

Relevant side effects to be observed, if any__ Ø __

_____

If there are any side effects, plan for management _Ø_

_____

Physician or Dentist's signature___ _AAS_ ___Date _12/4/00_

## AUTHORIZATION BY PARENT/GUARDIAN FOR THE ADMINISTRATION OF THE ABOVE MEDICATION BY SCHOOL PERSONNEL

Date_____
To: School Health Services/board of education:
I hereby request that the above medication, ordered by the physician/dentist for my child_____ be administered by school personnel. I understand that I must supply the school with the prescribed medication in the original container dispensed and properly labeled by a physician or pharmacist and will  provide no more than 45 school day supply of said medication. I understand that this medication will be destroyed if it is not picked up within one week following termination of the order or at the close of school.

Signature:_____Relationship to child_____

Address_____Telephone_____

# EXHIBIT "G"

*Dalia Badillo Martinez, Ph.D.*

NEUROPSYCHOLOGIST
GREENKNOLL PROFESSIONAL BUILDING
60 OLD NEW MILFORD ROAD, SUITE 3E
BROOKFIELD, CONNECTICUT 06804
—
TELEPHONE (203) 775-5193
CT. LIC. #1212

## Psychological Evaluation Report

**Patient Name:** Travis Myslow
**Date of Birth:** July 17, 1990
**Referral Source:** JeanAnn C. Paddyfote, Ph.D. Director of Pupil Personnel and Special Services New Milford Public Schools
**Dates of Evaluation:** February 14, March 9, 21, 28, 2001
**Date of Report:** March 29, 2001

## TESTS & PROCEDURES

Clinical Interview
Attention Deficit Hyperactivity Test Mother and Teacher
Children's Category Test
Children's Memory Scale
California Verbal Learning Scale-Children
Stroop Word Color Test
Vigil Continuous Performance Test Single and Double Stimulation
Wechsler Intelligence Scale for Children-III
Wechsler Individual Achievement Test Reading decoding, reading comprehension; listening, spelling and mathematics
Report
Feedback to mother

## History & Reason for Referral

Travis is a 10 year old male currently in the fifth grade within a contained classroom setting. He is referred for a neuropsychological evaluation to identify factors influencing his new learning, social adaptive skills and functional abilities. Travis is noted to become easily frustrated, becomes very oppositional, does not follow instructions well and does not adhere to instructions provided

*The contents of this report are confidential, intended solely for your professional use.*

P14
1 of 13

Myslow, Travis

Page: 2

to assist him effectively develop new learning skills. Travis indicates he is often made fun of and teased in school. Travis' academic achievement is marked by difficulty reading and the mother feels Travis has Dyslexia. However, his behaviors are reportedly very different in the school an at home. The mother indicates he is able to work independently and do homework independently. At school, he is oppositional and not able to work independently.

**Medical History:** Travis is reportedly in good health and does not take medication. In the past he was prescribed Ritalin which contributed to increased hyperactivity. However, Travis has much difficulty sleeping and it may take him about an hour to fall asleep. He also has constipation. Travis was reportedly born full term, without difficulties. He weighted six pounds eight ounces and was 19 inches long. His development progressed well, without difficulties and along expected lines.

**Social History:** Travis is in the fifth grade and receives one-to-one assistance. He does not like being in school, feels embarrassed and singled out because he receives one-to-one attention and blames the teachers for his difficulty. He states "the teachers do not listen". Reportedly, he has difficulty reading and writes backwards. He is the third of three children and lives with his mother and step-father who has adopted him. He has no relationship with his biological father.

## Behavioral Observations

Travis arrives promptly, accompanied by his mother. Attire and grooming are neat and clean,. He is of average stature and weight, but appears somewhat younger than his years. He is visibly apprehensive and refuses to remain alone with the examiner. During the first session, he remains alone with the examiner briefly and becomes extremely oppositional and resistive. Travis becomes very imposing and authoritarian with the examiner. He reveals a commanding manner, clearly unbecoming to a child his years who has minimal awareness of boundaries and generational hierarchies. Consistently, he projects an entitled, openly defiant and oppositional manner. The testing was discontinued and the behaviors addressed with the mother. In the discussion, Travis comments he is being physically abused within the home. Travis was informed that a report to DCF would be filed. He becomes very tearful, but never states his comments are untrue. A report was filed. The father, promptly called, and expressed deep interest in helping his son, who he feels has significant behavior difficulties. He acknowledges that the behaviors induce much frustration. Throughout the other sessions Travis insists that his mother remain in the room while he is being tested. His behaviors and investment is variable, but greater than during the first session. Sessions are done in two hour spurts as Travis' tolerance is very low and

*The contents of this report are confidential,*
*intended solely for your professional use.*

P 14     PX 2 of 13

Myslow, Travis                                                                    Page: 3

he is resistive to continue. Towards the last session, and for a period of time, Travis displayed an affable, engageable and sociable side. He engaged in spontaneous conversation and revealed his interest in reading certain adventure stories, his favorites. He is interested in attending the feedback session, but despite his interest, he is noted to become very defensive and have much difficulty clearly understanding what is being said. As his anxiety and arousal escalate regarding the uncertainty of the session, he attempts to engage in play, and restlessness. He easily feels attacked and belittled, and then presents an oppositional attitude. With clear explanations, the defensiveness lessens, and he adheres to "the rules of the session" and does not interrupt. 1

Initially, Travis is very distractible and restless. He moves constantly, and when asked to stop, because it interferes with his performance, he defiantly moves more and adamantly refuses to comply. His oppositional defiant manner is evident and will significantly interfere with his performance. The mother in turn, relates to him in a sheepish, soft tone, as if fearful of provoking his anger. She is highly tolerant of his inappropriate behaviors and projects the belief that his behaviors have a primary medical basis. She does acknowledge that she and the husband have different views on how to discipline Travis. She is informed this is a major problem that requires to be incorporated into the treatment plan, if there are going to be significant changes in Travis' behaviors and academic achievement. She acknowledges that she requires assistance learning to manage his behaviors.

Travis' ability to understand and follow instructions is adequate, but limited by variations in mood and motivation. He is typically irritable, easily annoyed. He often heaves and sighs when presented with a task, will often devalue the test or state that he does not know how to perform. He needs constant and direct statements to sustain his performance. However, it is noted that with a direct manner, that confronts him on his behaviors and the impact it will have on him, does exert a mild influence. —

Speech is clear and fluent. Language is coherent and logical without thought disorder or delusional ideas. Yet, his manner is entitled and self-centered. He tends to blame others for his errors. He works slowly and has mild difficulty implementing trial and errors. Thinking is rigid and he becomes "stuck" when he has made a mistake and cannot find alternative solutions. He is left hand dominant and tends to miss objects on the right visual field.

---

### Intellectual Abilities

---

Travis' WISC-III scores indicate his intellectual abilities fall within the Average range, but that

---

*The contents of this report are confidential,*
*intended solely for your professional use.*

---

P14  ☞, 3 of 13

Myslow, Travis

Page: 4

there is a large disparity between the Verbal and Performance Scale. However, evaluating the factors reveals that his verbal abilities (Index: 106) and Perceptual Organization (index: 91) as well as ability to focus attention (Freedom from Distractibility (Index: 98) are all well within the average. Yet, Travis' resistant manner and tendency to work very slowly, are factors that contributed to depress his performance on the Performance Scale. The summary scores are presented below:

| | IQ Scale Score | Percentile | Range |
|---|---|---|---|
| Verbal IQ: | 102 | 55 | Average |
| Performance IQ: | 81 | 10 | Low Average |
| Full Scale IQ: | 92 | 30 | Average |

*Test scores change over time due to chance, error, and many other factors. IQ scores are presented as Standard Scores with a mean = 100, and a standard deviation = 15. Scores above 110 are considered above average, and scores lower than 90 are considered below average.*

Travis demonstrates strengths with tasks demanding verbal reasoning and abstraction, language expression, understanding of social rules and conventions, and visual-motor constructional tasks.

However, he was very slow when required to integrate visual-motor cues and does display mild weakness with visual-spatial integration and sequencing tasks. He appeared very invested when performing the latter two tasks which suggests that this may be a true weakness, rather than one influenced by low motivation and opposition.

The overall fund of information is within the average indicating that Travis has been learning at an expected rate. Yet, variations in level of motivation is a factor that will adversely affect his performance. The specific WISC III subtest scores are presented in the following table:

*The contents of this report are confidential, intended solely for your professional use.*

P14   PF, 4 of 13

Myslow, Travis

## WISC III SUBTEST SCORES & ANALYSIS

| SUBTEST | SCALED SCORE | PERCENTILE RANK | STRENGTH WEAKNESS |
|---|---|---|---|
| *Verbal Subtests* | | | |
| Information | 9 | 37 | |
| Similarities | 13 | 84 | |
| Arithmetic | 8 | 25 | |
| Vocabulary | 11 | 63 | |
| Comprehension | 11 | 63 | |
| Digit Span | 11 | 63 | |
| *Performance Subtests* | | | |
| Picture Completion | 9 | 37 | |
| Coding | 1 | <1 | |
| Picture Arrangement | 8 | 25 | |
| Object Assembly | 10 | 50 | |
| Block Design | 7 | 16 | |

## WISC III SUBTEST DESCRIPTIONS

- **Information:** general knowledge, long-term memory.
- **Similarities:** abstract reasoning, categories and relationships.
- **Arithmetic:** concentration, numerical reasoning.
- **Vocabulary:** word knowledge, verbal fluency.
- **Comprehension:** social judgement, common sense reasoning.
- **Digit Span:** short-term auditory memory, concentration.
- **Picture Completion:** alertness to essential details.
- **Picture Arrangement:** sequential, logical thinking.
- **Block Design:** spatial, abstract visual problem solving.
- **Object Assembly:** visual analysis, construction of objects.

*The contents of this report are confidential,*
*intended solely for your professional use.*

5 of 13

Myslow, Travis

2) *Coding: visual-motor coordination, speed, concentration.*
2) *Symbol Search: visual scanning and discrimination.*

---

*A Scaled Score has a mean = 10 and a standard deviation = 3. The Percentile indicates where Travis' score places his among other test takers his age. A Percentile of his means that he scored better than 75% of other test takers his age. Strength/ Weakness indicates whether a SUBTEST score is significantly different from the other scores on that scale.*

**Sensory-Receptive & Motor Functions:**    Gross  visual discrimination and perceptual development are immature for his age. Perceptual accuracy is poor as he tends to rotate, distort and simplify designs. Moreover, the quality of the visual-motor integration is affected by the poor fine motor coordination. Movements are impulsive and lack dexterity. He has much difficulty integrating visual-motor cues, and becomes very frustrated with his own performance. He also tends to make unusual movements when making circles or "round" letters, revealing immaturities of motor development. This is an aspect that will affect his academic achievement, particularly penmanship. Perceptual readiness is essential for developing reading skills. The immaturity will compromise this area of academic achievement. Travis is left hand dominant. Auditory acuity is adequate for the information provided at conversational voice volume.

---

### Attention, Concentration, & Memory Functions

Travis' performance on the Children's Memory Scale is presented below:

---

*The contents of this report are confidential, intended solely for your professional use.*

P14    6 of 13

Myslow, Travis

## CHILDREN'S MEMORY SCALE

| SUBTEST | INDEX | PERCENTILE | RANGE |
|---|---|---|---|
| Visual Immediate | 85 | 16 | Low Average |
| Visual Delayed | 115 | 84 | High Average |
| Verbal Immediate | 106 | 66 | Average |
| Verbal Delayed | 115 | 84 | Average |
| General Memory | 109 | 73 | Average |
| Attention Concentration | 94 | 34 | Average |
| Learning | 66 | 1 | Extremely Low |
| Delayed Recognition | 88 | 21 | Low Average |

*Test scores change over time due to chance, error, and many other factors. Index scores are presented as Standard Scores with a mean = 100, and a standard deviation = 15. Scores above 110 are considered above average, and scores lower than 90 are considered below average.*

**Attention and Concentration:** Ability to perform mental operations and auditory attention span are within the average. Travis is able to sustain mental concentration to perform tasks he is invested in well. He did not perform simpler tasks stating he did not know, but was able to perform a harder one e.g., could not add by two, but is able to add by four and six. Visual vigilance attention appears to be very impaired. He misses many targets and makes many commission errors. However, given the oppositional behaviors, the results are likely confounded and not a true measurement. Rate of mental processing is within the lower end of the average with both visual and verbal tasks (Stroop Word T: 39; Color T: 39; mean T: 50).

**Recall:** Travis' performance on the Children's Memory Test indicates that immediate and delayed memory are within the average. Immediate visual memory is mildly lower, but again was greatly affected by his willful, oppositional manner. He displays very high and strong ability to retain meaningful verbal information (SS: 18). He was able to recall the whole story in it's entirety. After an interval, there is mild decay, suggesting to some loss of information. However, the performance

*The contents of this report are confidential, intended solely for your professional use.*

P14    PT, 7 of 13

Myslow, Travis                                                                    Page: 8

is still well within the average.   Yet, when require to learn rote, concrete material that does not offer meaningful content, the learning is very slow and below the average (SS: 5). This appears to be a valid indicator of his abilities, as although he was frustrated, he was attempting to perform well. With frequent repetition, he learns well and retains very effectively over time.

Visual immediate memory, particularly, spatial memory, is very impaired (SS: 4). He struggles to be able to effectively retain visual information.  Even with more meaningful visual material, the performance is still below the average (Family Pictures SS: 7). He also does retain effectively all the material previously learned.  Recognition of faces is well within the average (SS: 11).

The results reveal Travis has mildly greater weakness recalling verbal information that is devoid of meaning, and has moderate difficulty recalling visual information, particularly visual-spatial information.

## ACADEMIC ACHIEVEMENT

Travis' reading decoding (SS: 74), and spelling skills (SS: 70) are significantly lower than expectation given the intellectual abilities (p < .05 and .01, respectively).   Overall reading skills are weak (SS: 74) and below grade and age expectations. Travis is embarrassed to read out loud, but does so with prompting. Reading comprehension (SS: 86) is mildly below average, whereas listening skills (SS: 122) is significantly above the average.  This disparity indicates that Travis has marked deficits that compromise his ability to understand and ascribe meaning to what he is reading.  Numerical Operations (SS: 80) are also below  the average. Yet, Travis makes many errors that indicate he does not pay attention to the operation sign that indicates the operation to engage in e.g., he subtracts when he should add, or vice versa.

## EMOTIONAL FACTORS

Travis is a highly oppositional and unhappy child, who is very easily frustrated and is clearly fending off situations that will compromise his sense of worth and exacerbate his anxiety.  He clearly feels embarrassed and shamed over his placement and low achievement. However,  he tends to fend off anxiety and shame by becoming oppositional and resistive. He does not accept guidance easily and sets himself up for the rejection he deeply fears and that further fuels his anger and anxiety.  He feels rejected by peers and does not like being "different" in school.

*The contents of this report are confidential,*
*intended solely for your professional use.*

Myslow, Travis

Travis impresses to be a fearful child who is at the mercy of his emotions due to low regulatory mechanisms. The intense arousal is also compromising his ability to sleep. He will require intense assistance from the parents and teachers to appease his fears, slowly develop trust and promote a cooperative stance to achieve the desired goals of participating in the regular classroom and working independently. Of primary relevance is that both parents participate with the school to develop disciplinary rules and consistency among the adults that manage his behaviors. Teachers will require to be active participants such that Travis will be able to develop and attitude of collaboration and work to achieve independence and achievement consistent with his abilities.

Travis is very restless, overly aroused, has difficulty sleeping and becomes extremely agitated in situations that challenge his adequacy. He is impulsive, intrusive and does not complete projects. The behaviors are frequently noted in individuals with Attention Deficit Disorder and Anxiety. Clearly anxiety may exacerbate attention deficit. However, Travis did not do well on medication for Attention Deficit. He may benefit from a trial of anti-anxiety to assist him during the process in which his behaviors are being addressed. Travis will require to develop awareness of his behaviors such that he may begin to internalize control and develop impulse control. He is at high risk for continued underachievement and escalating behavior difficulties.

## SUMMARY

Travis is a 10 year old whose intellectual abilities are consistently within the average range. However, while the intellectual abilities are within the average he works very slowly, reveals mild deficits of visual-spatial analysis, weaknesses of fine motor coordination, and, despite strong verbal immediate memory, has marked weakness of initial new learning with material that offers low meaningfulness. In addition, visual immediate memory, particularly visual information loaded with visual-spatial information, is very weak. Consistently, he reveals marked reading decoding and comprehension deficits, particularly when contrasted to the very superior listening skills. As new learning most often does not provide meaningfulness, he may find himself struggling often. Feeling inadequate or the anticipation or threat of feeling inadequate is a significant trigger that Travis copes with by becoming greatly oppositional. The performance is consistent with cognitive disparities often seen in children with neurological immaturities.

Travis displays marked difficulty regulating himself, is restlessness, impulsive and has low frustration tolerance. Travis has very low ability to regulate and modulate his emotions. He harbors deep anger, shame and is easily provoked. These behaviors are common in people who are in situations they are having difficulty coping with, who have Attention Deficits, Impulse

*The contents of this report are confidential,*
*intended solely for your professional use.*

P4, 9 of 13

Myslow, Travis

Control disorder, Neurological Deficits or Anxiety. He does have many signs at one time recognized as "soft signs of neurological compromise". The oppositional, defiant and wilful behaviors greatly interfere with his ability to be taught and thereby to learn. These must be addressed directly. In addition, careful consideration should be given to the medication regimen provided as Travis may benefit from medication that facilitates impulse control and anxiety, rather than medication that facilitates attention. Very likely Travis' anxiety is contributing to break through of impulses that are being regulated by an already weak inhibitory system.

Given the multiple disparities and variety of aspects that affect his performance, Travis will require a multi modal approach that addresses the disciplinary aspect, educational, emotional and cognitive, a sequential evaluations as he gains control and improves. Travis is at grave risk to engage in self-destructive activities and to drop out from school. His manner is abrasive and will easily provoke others to assume the path of less resistance, i.e, let him have his way or ignore him. In the process, he will keep his anxiety at bay, but will not gain academic, social or intellectual adaptive skills.

Travis will require a comprehensive visual examination to rule out visual deficits that may be interfering with his visual processes. Strong, consistent disciplinary guidance to modify his behaviors and promote cooperation and independent learning skills. The parents require to develop a more consistent and predictable management pattern, as well as to model self-regulation to assist Travis internalize greater controls. Educational interventions that enhance his strong auditory skills, and assist him to compensate for weaker visual processing deficits.

Diagnosis:    Axis I:   Cognitive Disorder NOS 294.9
                     Generalized Anxiety Disorder 300.02
                     Oppositional Defiant Disorder 313.81
                     Monitor to R/O Attention Deficit Disorder

              Axis II: Reading Disorder 315.0

## RECOMMENDATIONS

1.   While Travis' parents are very invested in his progress, they will benefit from behavior management courses to develop greater understanding of ways of increasing consistency and structure. Management strategies to contain his behaviors and improve self-regulation are necessary. A behavioral approach may be most efficacious. He is very reactive and restless.

*The contents of this report are confidential,
intended solely for your professional use.*

P 14                    Pt, 10 of 13

Myslow, Travis

A very well structured approach is necessary to ensure he remains task oriented. Assist the parents to develop verbal problem solving techniques. Travis will require to moderate the reactivity and internalize responsibility for his behaviors. Assist the parents and teachers to develop mutually consistent rules and modes of interacting with Travis. Travis should be an active participant of any rules that are agreed upon. The parents will benefit from developing child management strategies to facilitate controlling and guiding Travis. The mother may benefit from considering providing Travis with immediate behavior input, direction and charting progress of behaviors in school.

2. Educational Input: Travis will require multi modality interventions. He performs best with verbal auditory input/receptive skills. He will benefit from outlines and visual aides to follow tasks. He has greater visual processing deficits. He will benefit from understanding problem solving strategies to decrease frustrations when learning a new task and ways of increasing meaningfulness. Travis has great difficulty with initial encoding. He will have to be able to rehearse and repeat in order to learn well. This contributes to frustrations, he will also have to learn to cope with. Given the low frustration tolerance, he may tend to withdraw and give up. Teachers will have to be sensitive to this and provide him with rest intervals and an agreement, whereby he may appropriately indicate when he requires a "rest" interval. To push him to perform will likely elicit behavior explosions.

Educational interventions:

A.  Patience and tolerance with clear boundaries and rules regarding the consequences of his actions.

B.  Assist Travis to develop problem solving, learning-to-learn skills, mnemonics to increased meaningfulness of new material he is to learn. Encourage verbal mediation, to check work and to consider multiple solutions before responding. Cue to check work in progress, encouraged drilling, repeat instructions.

C. Provide shortened tasks and options regarding mode of handling a task e.g.," by yourself or with a person assisting you". Provide a timer such that he may monitor the time independently.

D. He works very slowly and requires more time to work.

E. Grade effort, quantity of work and quality of work. Arrange for a mutually agreeable behavior contract with Travis. Provide daily positive feedback, when applicable, in a neutral manner. Cue expected behaviors. Parents may be encouraged to chart and monitor

*The contents of this report are confidential,*
*intended solely for your professional use.*

P 14        EF, 11 of 13

Myslow, Travis                                    Page: 12

school behaviors at home. If time out is necessary, it should be provided in a manner that does not enhance the sense of shame or embarrassment. Neutral statements that reference the rules and provide privacy.

      F.  Minimize distractions in work area.  Provide rest periods or breaks.

  3.  Visual Examination to R/O any underlying peripheral problems.

  4.  Occupational Therapy Evaluation: develop visual discrimination and visual-motor integration.  Address Travis' motor control.

  5.  Travis will benefit from medication to ameliorate anxiety, improve sleep and improve behavior controls.

  6.  Given the current attitudes and oppositionality  , Travis should be re-evaluated within a year to reassess his intellectual, cognitive potential and further elucidate the presence of a true Attention Deficit Disorder.  The magnitude of the behaviors interfere with obtaining an indication of his highest potential and a clearer diagnostic picture.

  7.  When behaviors are stabilized, Travis may benefit from counseling to promote trust of others and verbalizing of feelings of embarrassment and shame and to develop alternative coping skills.

Diana Badillo Martinez, Ph.D.
  Neuropsychologist

*The contents of this report are confidential,*
*intended solely for your professional use.*

P 14

PG 12 of 13

# EXHIBIT "H"

MYSLOW, Travis
4/24/01

**History:**  Travis returns today after a considerable period of time.

It appears as if both Adderall and Dexedrine, as well as Regular Ritalin, seem to make him hyperactive.

I had the opportunity of reviewing the psychoeducational testing performed by Dr. Martinez. It indicates a young man quite in the category of dyslexia with perceptual motor dysfunction, difficulty with immediate visual memory, and problems with adapting to new tasks.

Special Educational assistance is needed.

Apparently Travis is also felt by Dr. Martinez to have a significant underlying level of anxiety. An attentional problem is also under consideration.

Travis still has some oppositional behavior, although that is not paramount.

**Examination:**  On examination today, he appeared in no apparent distress and appropriate for age. He was oriented as to person, time, and place. Recent and remote memory were intact. Concentration and attention were intact.  He was able to name, repeat, and comprehend without difficulty and with clear speech.  Fund of knowledge was normal.  Cranial nerve examination revealed intact visual fields, intact extraocular movements, symmetric facial sensation and strength, and intact hearing. The palate moved symmetrically.  Shoulder shrug was intact, and tongue protrusion was symmetric.  Gait and station were normal.

**IMPRESSION:**       Learning disability in the area of dyslexia
                     Possible ADD
                     Generalized anxiety disorder

**PLAN:**
1.     This was a half-hour meeting.
2.     Concerta, 18 mg., 1 q.a.m.
2.     Refer for psychotherapeutic evaluation to determine the level of anxiety.
4.     Consider a medication such as Clonidine.
5.     Return in one month.

                              Martin W. Kremenitzer, M.D.

DBNR:kk

# EXHIBIT "I"

STATE OF CONNECTICUT
DEPARTMENT OF EDUCATION

CASE # 01-294    (Consolidated with Case No. 01-305)

New Milford Board of Education v. T. (Student)

T. (Student) v. New Milford Board of Education

| | |
|---|---|
| Appearing on behalf of the Parents: | Attorney Deborah G. Stevenson<br>226 East Flag Swamp Road<br>Southbury, CT 06488 |
| Appearing on behalf of the Board of Education: | Attorney Nicole A. Bernabo<br>Sullivan, Schoen, Campane &<br>Connon, LLC<br>646 Prospect Avenue<br>Hartford, CT 06105 |
| Appearing before: | Attorney Gail K. Mangs,<br>Hearing Officer |

## FINAL DECISION AND ORDER

### ISSUES:

**Board issues:**
1. Was the neuropsychological evaluation performed by Dr. Diana Badillo-Martinez appropriate? If not, should the Board reimburse the parents for the evaluation performed by Dr. Armin Thies?
2. Did the Board offer an appropriate program for the 2001-2002 school year?
3. Is a psychiatric evaluation necessary and appropriate?

**Parent issues:**
1. Did the Board offer a free and appropriate public education to T. in the June 14, 2001 IEP? If not, is homebound instruction appropriate?
2. Should the Parents be reimbursed for Dr. Thies' evaluation?
3. Were procedural violations committed by the Board?

### PROCEDURAL HISTORY:

This hearing was requested by the Board on September 4, 2001 and assigned Case No. 01-294. The prehearing conference was convened on September 12, 2001. On September 8, 2001, the Parents filed for due process; this case was assigned to a different

hearing officer under Case No. 01-305. A prehearing conference was held in Case No. 01-305 during which that hearing officer directed the parties to file motions to consolidate the two cases. Both parties filed motions and on September 26, 2001, the hearing officer in Case No. 01-305 issued an order granting the motion to consolidate the two cases. Also on September 26, 2001, the current hearing officer agreed to the consolidation of the two matters under Case No. 01-294. This case was convened on October 18, October 25, October 30, November 1, November 2, and November 7, 2001. The matter was also set down for October 17, 2001, but due to a misunderstanding, all parties did not appear. Final arguments were made and the hearing closed on November 7, 2001.

## SUMMARY:

T., who is now eleven years old, entered the Board's school district early in second grade. His teacher quickly observed that T. was working below grade level, had a poor attention span, frustrated easily, and became obstinate when confronted with work he felt unable to do. After evaluations were performed, T. was identified as learning disabled and began receiving special education services. From second grade through the end of fifth grade, T.'s academic difficulties persisted, especially in the areas of reading and writing. Always somewhat oppositional and easily frustrated, T.'s behavior markedly declined during the fourth and fifth grades. He resisted academic tasks and often refused to comply with directions or complete assigned work. T.'s behavior did not improve with the use of behavior plans or contracts. In addition, T.'s reading skills never advanced much beyond an early second grade level. The PPT responded by increasing T.'s special education hours until he was receiving virtually all of his academic instruction in a self-contained special education classroom. The PPT also recommended that T. receive a psychiatric evaluation. T.'s parents refused to consent to a psychiatric evaluation. They also disagreed with the PPT recommendation to promote T. to the sixth grade in the Board's middle school for the 2001-2002 school year and requested homebound instruction and independent reading and neuropsychological evaluations. During the summer of 2001, counsel for the parties attempted to resolve the dispute but were unable to reach any resolution, although the Board eventually agreed to fund an independent reading evaluation about the time this hearing convened. The parents have kept T. at home since the school year opened and have provided two hours of tutoring per week during this time. In addition, they provided some evidence that T. has been receiving counseling and is now undergoing a psychiatric evaluation.

## FINDINGS OF FACT:

1. The student began attending Board schools during the fall of second grade (the 1997-1998 school year). In January, 1998, his teacher referred him for testing due to his inability to do grade level work, difficulty focusing, frustration, and obstinate behavior. (Exhibit P-3)

2. Psychoeducational testing performed during February and March of 1998 revealed that T. was reading and writing at a 1.4 grade level equivalent. In addition, on the WISC-III, he received a verbal score of 115, performance score of 86, and a full scale

score of 108. The PPT identified T. as learning disabled and recommended that he receive twelve hours per week of special education services. During second grade, T. also began taking Ritalin to treat his attentional difficulties. This program was continued for T.'s third grade year (the 1998-1999 school year). The PPT recommended 6 hours of special education services for fourth grade (the 1999-2000 school year) noting T.'s "high frustration" during writing. (Exhibits P-5, P-6, P-7, Testimony of Mother)

3.  While T. had previously displayed periods of frustration and obstinate behavior, his behavior became a major issue during fourth grade. At PPTs convened in September, 1999, the student's regular education teacher described T. as exhibiting frustration and low self confidence. The school psychologist suggested that T.'s oppositional behavior was a reflection of his frustration. The PPT increased T.'s special education hours to 7.5 and exempted T. from standardized testing in reading and writing. During the fall of 1999, T. also began receiving reading instruction with the "Let's Read " program, a structured multisensory, language based, sequential reading program. (Exhibits P-8, P-9, Testimony of School Psychologist and Middle School Special Education Chair)

4.  Teachers continued to report a deterioration in T.'s behavior and work completion during the 1999-2000 school year. His behavior plan was rewritten to describe appropriate and inappropriate behaviors and their consequences. Due to continuing concerns about T.'s oppositional behavior, low frustration tolerance and lack of self esteem, the PPT recommended a psychiatric evaluation at a PPT convened on March 21, 2000. The PPT reiterated their request for a psychiatric evaluation at most of the ensuing PPT meetings. The Board believes that only a psychiatrist can comprehensively evaluate and make recommendations regarding both the psychological and medical issues that may be causing T.'s frustration, anxiety, oppositional behavior, and possible depression. The Parents have never agreed to an independent psychiatric evaluation. (Exhibit B-2, Testimony of School Psychologist, Assistant Superintendent, Mother)

5.  On May 8, 2000, the annual PPT was convened. The team discussed T.'s continuing impulsive and oppositional behavior and also noted that he displayed periods of anger and feelings of adequacy. The team recommended that T. receive 7.5 hours of special education services during the 2000-2001 school year (fifth grade) and that the triennial evaluation be administered prior to March, 2001. The parents refused the psychiatric evaluation that had been recommended at the March, 2000 PPT. (Exhibit B-4)

6.  In September, 2000, the student's parents brought him to the Sylvan Learning Center for additional reading and writing assistance. The Sylvan Learning Center assessed T.'s reading ability as falling at the 1.8 grade equivalent level. (Exhibit P-11)

7.  The PPT met on October 5, 2000 to discuss T.'s lack of progress in reading and writing and his ongoing sense of discouragement. T.'s parents questioned why the PPT had continued to promote T. from grade to grade, but they rejected counseling

believing that it would be useless if T. did not also make progress in reading. His parents also reported that medication for T.'s attentional difficulties had been discontinued as they felt it had not provided any benefit. The IEP was revised to increase T.'s special education services to 12.5 hours per week and to include special education instruction in math and one on one reading instruction (with the "Let's Read" program). The reading program was provided by a certified paraprofessional under the special education teacher's supervision; the teacher had received several days of instruction on presenting the "Let's Read" program. (Exhibits B-13, P-19, Testimony of School Psychologist and Kathleen Taylor, Fifth Grade Special Education Teacher)

8.  Concerns about T.'s lack of progress and increasing behavioral issues continued. T. persisted in oppositional behavior, inattention, and work refusals. He also had difficulty completing assigned tasks and following directions. At a PPT convened on October 26, 2000, the PPT increased T.'s special education services to 17.5 hours per week although goals and objectives remained the same. In addition, the parents requested and the PPT agreed to provide a neurological evaluation. Questions were prepared for Dr. Anna Alshansky who evaluated T. and provided a report dated October 27, 2000. Dr. Alshansky concluded that T. satisfied the criteria for attention deficit hyperactivity disorder and was learning disabled; in addition, she determined that T. had fine motor function delays and poor self-esteem and anxiety possibly due to his under-achievement. She recommended full psychoeducational and language evaluations, intensive educational supports, psychological counseling, and a trial of Adderall. This report was discussed at a PPT convened on December 12, 2000, at which time the PPT recommended neuropsychological, achievement, cognition, and occupational therapy evaluations. Members of the PPT also questioned whether Dr. Alshansky's report had satisfactorily answered their questions. (Exhibits B-15, B-16, B-19, B-24, Testimony of Kathleen Taylor)

9.  T. received most of his educational program during fifth grade in a small classroom at the end of the fifth grade hall; the adjoining group of classrooms housed the kindergartens. T. apparently felt that the classroom's location meant he had been relegated to the kindergarten wing. He received some mainstream instruction in science and social studies when hands-on projects, which T. enjoyed, were presented, and also had recess, lunch, and specials with regular education students. Due to the increasing class size, the Board hired another special education teacher in March, 2001; T. was placed with the new teacher. Both special education teachers testified that T.'s behavior was completely inconsistent and never really improved despite their use of behavior plans and behavior contracts. They were unable to link his behavior to any particular activity or subject. (Testimony of Mother, Kathleen Taylor and Deborah Shelley, Fifth Grade Special Education Teacher from March - June, 2001)

10. Occupational therapy, auditory, reading, cognitive and achievement tests were performed by Board personnel during the winter of 2001. The examiner who performed the learning assessment reported that T. often exhibited oppositional and uncooperative behavior during the testing. It was concluded that T. did not have a deficiency in the auditory perception and conceptualization of speech sounds. While

T.'s overall cognitive ability fell within the average range, his broad reading scores were equivalent to a student of 7 years, 10 months; his basic reading skills score fell at a level equivalent to a student of 7 years, 9 months (T. was 10 years, 6 months at the time of this testing). His broad written language score was equivalent to a student of 7 years, 2 months. His math and broad knowledge scores fell within the average range. T.'s processing speed was within the low range. On the Gray Oral Reading Test, T. scored at a 1.9 grade equivalent level. His comprehension score fell at a grade equivalent level of 3.5 (based on a subtest where the examiner reads the passage and questions aloud to the student). The occupational therapy evaluator found that T. was generally within the average range and did not require services. (Exhibits B-30, B-33, B-34, B-39A)

11. The PPT submitted questions to Dr. Diana Badillo-Martinez in preparation for the neuropsychological evaluation she administered to T. in March, 2001. Dr. Martinez testified that T. was resistant to the testing and easily frustrated; his attitude made testing somewhat difficult and therefore she was not able to answer all the questions that were posed. She concluded that T.'s intellectual abilities fell with the average range but that he learned new material slowly, worked very slowly, and had marked reading decoding and comprehension deficits. She also stated that T. becomes oppositional when he feels inadequate or thinks he might feel inadequate due to the demands that may be placed upon him. Dr. Martinez concluded that these oppositional behaviors interfere with his ability to learn and must be dealt with if he is to progress in school. She was not able to determine why T. reads so poorly. She diagnosed T. as having a Cognitive Disorder NOS, Generalized Anxiety Disorder (for which she recommended medication), Oppositional Defiant Disorder, and a Reading Disorder; she did not believe that T. had ADD but recommended that T. be monitored in order to rule out ADD. During testimony, Dr. Martinez suggested that T. needs a specific, clear behavior program that will help him learn to control his behavior and deal with his frustration. Homebound instruction will only delay his social growth and reinforce his oppositionality. (Exhibits B-29, B-37, Testimony of Dr. Martinez)

12. Dr. Martinez' report was discussed by the PPT on April 5, 2001. The PPT determined that T. continued to qualify for special education services as a learning disabled student and recommended that the IEP be continued without change for the remainder of the school year. In addition, T.'s behavior plan, as revised in March, 2001, was incorporated into the IEP. The plan called for three warnings and a time-out when T. refused to follow directions. (Exhibits B-38, B-39, Testimony of Assistant Superintendent)

13. On June 14, 2001, the PPT convened to plan for the 2001-2002 school. This meeting was quite long and characterized by many disagreements between the Board, the parents, and their respective counsel. The Board members of the PPT proposed an IEP that would promote T. to the sixth grade in the Board's middle school where he would receive 22.5 hours of special education services per week: T. would receive English, reading and math instruction in the resource room, and science and social studies instruction in collaborative mainstream classrooms. T.'s reading instruction would be provided by the Wilson program, a reading program similar to "Let's Read"

but with a more mature presentation; reading instruction would be in a group of 5 or 6 students. T.'s parents rejected the promotion to sixth grade on the basis of T.'s inability to read at grade level. They also objected to the PPT being convened on June 14 as they did not feel there was sufficient information to plan an IEP; they believed that further independent evaluations were necessary in order to appropriately program for T., although they did not seem certain as to which evaluations were needed. The Board proposed a reading evaluation and reiterated their past request for a psychiatric evaluation. Towards the end of this extended meeting, the parents' attorney presented the Board members of the PPT with a letter that essentially revoked consent or agreement with any evaluations, diagnoses, behavior plans, or materials and methods of instruction heretofore proposed or supported by the Board including the IEP of April 5, 2001. There is some disagreement as to whether the parents requested any specific evaluations at this meeting, but in any case, there was great discord and the PPT ended with an agreement that the attorneys for the Board and the parents would discuss the issue of independent evaluations outside the PPT and attempt to reconcile their opposing views. (Exhibit B-50, Testimony of Middle School Special Education Chair, Kathleen Taylor, and T.'s Mother)

14. On July 9, 2001, the student's parents, through their attorney, requested a neuropsychological evaluation by Dr. Armin Thies, and a reading evaluation by Dr. Mary White-Roath. They again rejected a psychiatric evaluation. The Board refused the neuropsychological evaluation based upon the evaluation completed by Dr. Martinez, but requested further information about Dr. White-Roath. The parents responded that Dr. Thies would perform only tests that were not duplicative of those administered by Dr. Martinez; they requested an immediate response as T. was scheduled to see Dr. Thies. The parents also stated that they would allow the Board to speak with Dr. White-Roath prior to the evaluation, but only if the parents participated in the conversation. (Exhibits B-57 through B-70)

15. Despite extensive correspondence between counsel for the Board and parents during the summer of 2001, decisions were not made regarding evaluations until a PPT convened on August 23, 2001. During this PPT meeting, the Board agreed to pay for a reading evaluation by Dr. Mary White-Roath (although only if the parents allowed them to speak to her first without the parents or their attorney present). To minimize conflict and possibly avoid due process, the Board also offered to pay half the cost of Dr. Thies' evaluation. The parents rejected this offer of partial payment. Toward the end of the meeting, the parents also requested homebound instruction for T. They offered a letter dated August 22, 2001 from T.'s pediatrician, Dr. Robert Rubin, which stated "I recommend a trial of homebound instruction for T. due to his current emotional condition affecting his mental welfare. Follow-up would be very important in determining when he can return to the traditional classroom setting." In a form received on August 31, 2001, Dr. Rubin further stated the duration of homebound instruction to be "until satisfactory resolution between school, parents and physician." The Board members of the PPT rejected the request for homebound instruction based upon insufficient information. Although a date and time were arranged for the Assistant Superintendent to speak with Dr. Rubin, she was not available at that time; the Assistant Superintendent did not contact the parents to schedule another date and

time for a conversation with Dr. Rubin. (Exhibits B-77, B-78, B-79, B-89, Testimony of Assistant Superintendent)

16. Dr. Armin Thies, a clinical neuropsychologist, performed a neuropsychological evaluation in July, 2001. He reported that T. became resistive toward the end of his testing. Dr. Thies reviewed T.'s previous evaluations and found that T. works very slowly but has average to superior cognitive ability. His reading and writing fall significantly below his measured intelligence. Dr. Thies concurred with Dr. Martinez that there was little evidence of ADD but that T.'s inattention was a likely result of his emotional condition when confronted with academic tasks. Dr. Thies recommended (stating that many of the recommendations were elaborations or modifications of Dr. Martinez' recommendations) that the management of T.'s behaviors be included in his educational plan; T. must learn to manage his frustration. He also recommended a medication trial to reduce T.'s anxiety, the use of a computer for word processing, building a sight recognition vocabulary (since T. had not been successful with phonological instruction), one on one or small group reading and writing instruction, and modifications in the regular curriculum that would enable T. to participate in the regular curriculum. (Exhibit B-75)

17. On September 4, 2001, the Board requested Due Process. (Exhibits B-91, H.O.-1)

18. On September 4, 2001, the parents agreed to let the Assistant Superintendent speak to Dr. White-Roath without the participation of the parents or their attorney. (Exhibit B-92)

19. Also on September 4, 2001, T. began receiving regularly scheduled therapy from Dr. D.A. Begelman, a clinical psychologist. T. has also seen Dr. Simon B. Sobo, a psychiatrist. In addition, T.'s parents have brought him to the Center for Attention and Related Disorders for a psychiatric evaluation and psycho-social assessment. (Exhibits P-55, P-57, P-67)

20. Dr. John G. Gelinas, a child, adolescent and adult psychiatrist, was asked by the Board to review T.'s records. In a letter dated October 26, 2001, he stated that a psychiatric evaluation was warranted due to T.'s history of learning disabilities and behavioral difficulties at school. Dr. Gelinas testified that only a psychiatric evaluation can assess medical and psychiatric issues. He also testified that Dr. Martinez' evaluation not only raised more questions than it answered, but that her diagnosis of "Cognitive Disorder NOS" was meaningless and therefore useless for educational planning purposes. (Exhibit B-111, Testimony of Dr. Gelinas)

21. T.'s reading level has shown little progress since he has been a student in the Board's school. In grade 2, his reading comprehension reached the 1.4 grade equivalent level. In third grade, he reached the 2.5 grade equivalent level. In grade 4, his reading comprehension was at a 4.2 grade level, although this was based upon an administration of the Gray Oral Reading Test where the examiner reads the material and questions to the child; T.'s own reading accuracy fell at the 2.3 grade level equivalent. Finally, in fifth grade, T.'s broad reading on the Woodcock-Johnson-