revised test fell at the 2.2 grade level, his basic reading at the 2.1 grade level, and his accuracy at less than the 1.9 grade level. T.'s written expression tested at the 1.8 grade level when he was in the fifth grade. This was after T. had been individually instructed for almost two years with the "Let's Read" program and had moved from book 4 to book 5 in the program (although Board personnel testified that the "Let's read" program sets forth reading instruction in such a way that reading growth may not be seen on standardized tests until the entire program is completed). T.'s Mother testified that T.'s current home tutor tested T. and found him to be reading at a grade equivalent level of 2.3. Therefore, in four years, T. has made less than one year's reading progress. (Exhibit B-115, Testimony of Middle School's Special Education Chair, Kathleen Taylor, and Mother)

22. The student has not attended school since the end of the 2000-2001 school year. His parents have arranged for T. to receive tutoring for 2 hours per week and to volunteer at a local nursing home. T.'s father testified that they did not want T. in school until a program they deemed appropriate was in place. (Testimony of Mother and Father)

23. Dr. White-Roath completed her evaluation after almost a year of Parent/Board disagreement over who should administer the independent reading evaluation to T. In the late fall of 2000, the Board and parents agreed that the evaluation would be completed by Elaine Cheeseman. However, as Elaine Cheeseman had trained the teachers who implemented the "Let's Read" program, she no longer performed student evaluations. The parents proposed Susan Wiggins, but the Board would not agree to hiring her. The Board proposed Miriam Cherkes-Julkowski, Risa Davidson, and David Zena, but the parents were unwilling to travel outside the immediate area due to their work commitments. The parents later recommended Dr. Pogge of Katonah, New York but it is unclear whether they sent his resume to the Board. As described above, the Board eventually contracted with Dr. Mary White-Roath although even after agreement had been reached and the parents allowed the Board to contact Dr. White-Roath on September 4, 2001, the Board did not officially agree to fund the evaluation until October, 2001. (Exhibits B-47, B-92, Testimony of Mother and Assistant Superintendent)

24. Dr. White-Roath tested T. during September and October, 2001. She found that T. processes very slowly, but is of average cognitive ability. Many of his reading skills tested significantly below average and his writing sample could not be scored. Dr. White-Roath's report states that T. requires a structured, intensive, comprehensive and systematic reading/spelling program which should be presented in a one to one or small group setting. Direct instruction by a trained teacher is essential. Dr. White-Roath also recommended intensive remedial instruction in reading comprehension and writing. (Exhibit B-116)

## CONCLUSIONS OF LAW:

1. The parties do not dispute that T. is a learning disabled student entitled to a free and appropriate public education ("FAPE") with special education and related services as provided for under the provisions of Connecticut General Statutes 10-76 et seq., and

the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. 1401 et seq. T.'s learning disability lies in the areas of written language and reading, including encoding, decoding and comprehension.

2. The standard for determining whether FAPE has been provided begins with the test established by Supreme Court in Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176 (1982). First, the procedural requirements of the IDEA must have been met by the school district. Second, the individualized program must be reasonably calculated to enable the child to receive educational benefit. This test has been subsequently clarified to hold that FAPE requires that the individualized educational program offered to a child must provide a more than trivial educational benefit. (See Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3rd Cir. 1988), cert denied, 488 U.S. 1030 (1989)).

3. T. is an extremely complex student who has presented great challenges to the Board. Why does this child, who has at least average cognitive ability, have such difficulty with reading and writing? And why has his oppositional behavior become worse over time? This hearing transpired because with all the evaluations to which T. has been subjected, there is no concrete answer to these questions. The Board has concluded that if T.'s behavior is controlled, he will learn to read. T.'s Parents believe that if T. learns to read, his difficult behaviors will disappear. Both views are overly simplistic. It is uncertain which came first, the academic difficulties or the problem behaviors, but it is clear that they are intertwined and must both be dealt with.

4. Under 34 C.F.R. Section 300.502(b)(2), if a parent requests an independent educational evaluation, the public agency must, without unnecessary delay, either initiate a hearing to show that its evaluation is appropriate, or ensure that the independent evaluation is provided at public expense. Here, the Board has not met their burden of proof. The neuropsychological evaluation performed by Dr. Martinez gave some insight into T. but was insufficient to support any real educational planning. She could not answer all the questions posed to her and was unable to determine why T. could not read. Dr. Gelinas testified that at least part of her diagnosis was meaningless. Her evaluation provided so few answers that in response to the report, the PPT did not make any changes to T.'s IEP (an IEP that was not working). Finally, the fact that the Board still felt the need for further evaluations even after Dr. Martinez completed her report is a further indication that Dr. Martinez' evaluation, standing alone, was not sufficient or appropriate. With Dr. Martinez' evaluation providing so little assistance to the PPT, it was natural that the parents would request what they felt would be a more comprehensive neuopsychological evaluation. Dr. Thies' evaluation relied heavily on Dr. Martinez' evaluation; he did, however, supplement her testing and recommendations and made suggestions that were more specific and useful in an educational setting. Therefore, the Board must reimburse the Parents for the Thies evaluation.

5. T.'s oppositional behavior is getting in the way of his educational progress. Almost every teacher and evaluator who worked with T. reported some difficulty with T.'s behavior. As T.'s behavior and academic performance deteriorated, the Board sought

a psychiatric evaluation. Both Dr. Martinez and Dr. Thies indicated that T.'s behavior was interfering with his educational progress and both recommended a trial of medication for anxiety. The possibility that anxiety plays a role in the behaviors that are interfering with T.'s educational progress must be investigated. Under C.F.R. 300.532(g), each Public Agency must ensure that children are assessed in all areas related to the suspected disability. In addition, one of the related services available to children who have been identified under the special education statutes is medical; under 34 C.F.R. Section 300.24(b)(4) medical services are defined as "...services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services." Therefore, the Board's request for a psychiatric evaluation was reasonable and necessary. However, as it now appears that T.'s parents are in the process of obtaining a psychiatric evaluation, further evaluation *may* be unnecessary as discussed in the final order.

6. The Board did not, however, do enough to modify T.'s behavior. Practical strategies for working with T. were never developed. As T.'s oppositional behaviors continued to escalate, PPTs were convened; but for the most part, no specific usable behavior interventions emerged from these meetings. Behavior plans were written (see Finding of Fact No. 12) and behavior contracts were employed (Finding of Fact No. 9), but to no avail. T.'s teachers were unable to link instances of his resistant behavior to any particular activity or subject. They suggested that T.'s problem behaviors just appeared from nowhere; this seems somewhat unlikely. The PPT should have obtained a functional behavior assessment; when completed by a qualified individual, such assessments often yield information that can be translated into useful, successful behavior plans. A functional behavior assessment is still in order.

7. Throughout the 2000-2001 school year, the Board's response to T.'s negligible academic progress and escalating behavior difficulties was to increase his time in the self contained special education classroom. Even though the increased hours did not seem to ease the situation, they continued to decrease the amount of time T. spent in the regular education classroom (see Findings of Fact Nos. 7 and 8). It is not clear that T. ever had an integrated, comprehensive educational program that exposed him in any meaningful way to the grade level content he was cognitively capable of handling. The IDEA requires that children with disabilities are educated in the least restrictive environment ("LRE"); that is, with children who are not disabled, and, that children with disabilities are to be removed from the regular education environment "...only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." (20 U.S.C. Section 1412 (a)(5)). 34 C.F.R. Section 300.552(e) also requires school districts to ensure that "A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modification in the general curriculum." It is clear that T.'s instruction was provided in an increasingly restrictive environment that did not meet his needs and provided negligible educational benefit.

8. The Parents have argued that the PPT's decision to promote T. each year was not appropriate. Although T. does not work at grade level and has never made the expected progress each year, the issue is not the grade to which T. is assigned; it is whether his educational program was appropriate.

9. The program offered by the Board for the fall of 2001 as contained in the IEP dated June 14, 2001 is really more of what T. received during the 2000-2001 school year. Although little reading progress could be demonstrated by T. after two years with "Let's Read" (see Finding of Fact No. 21), the Board proposed that he receive educational instruction with the Wilson program, which, as described by Board witnesses, is quite similar. The IEP contains no new behavior initiatives and, as in the previous year, most of T.'s academic instruction would take place in the resource room. Placement in collaborative classrooms for social studies and science was a positive change, but without viable behavioral or reading programs in place, it is unlikely that T. would have experienced much success in those classes. While this IEP looks good on paper, it does not meet T.'s individual needs and therefore is not calculated to provide educational benefit as required by Rowley.

10. The Parents' response to this IEP, however, can not be supported. Homebound instruction is described in the Regulations of Connecticut State Agencies Section 10-76d-15, which states that such instruction shall be provided only when the PPT finds that at least one of the following conditions applies: "(1) A physician has certified in writing that the child is unable to attend school for medical reasons and has stated the expected date the child will be able to return to the school. (2) The child has a handicap so severe that it prevents the child from learning in a school setting, or the child's presence in school endangers the health, safety or welfare of the child or others. (3) A special education program recommendation is pending and the child was at home at the time of referral. (4) The child is pregnant or has given birth and a physician has certified that home bound or hospitalized instruction is in the child's best interest and should continue for a specified period of time." (Section 10-76d-15(b) In addition, the regulation states that homebound instruction "...shall be provided when a child's condition will cause an absence of at least three weeks' duration." (Section 10-76d-15(c)) Conditions 2, 3 and 4 can be eliminated immediately. As to the first condition, the letter sent by Dr. Rubin is overly vague and broad (see Finding of Fact No. 15). The PPT could not make a decision based upon such insufficient information. Also, there was no suggested date on which T. could return to school, nor was there any reason to believe his absence would last at least three weeks. Most telling is Dr. Rubin's second communication which suggests that the real explanation for the absence was the lack of agreement between the Parents and the PPT. Also worth noting is the fact that no other evaluator, including Dr. Thies, suggested that T. would benefit from homebound instruction. Finally, home bound instruction would not meet the LRE requirements as applied to T.'s individualized needs. While the Board did not overextend itself in its efforts to discuss the situation with Dr. Rubin, neither did the Parents request that Dr. Rubin send a more detailed explanation of the need for homebound instruction.

-12-

Final Decision and Order 01-294

11. The Parents have alleged several procedural violations on the part of the Board. While the Supreme Court in Rowley recognized the importance of meeting all procedural requirements, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991).

12. The Parents have argued that the PPT meeting of June 14, 2001 should not have gone forward as they were not yet prepared. They also argued that the IEP was prepared before the meeting and that other forms were filled out after the meeting when they were not present. While Boards must make every effort to ensure parental attendance at PPT meetings, even if a parent objects to the PPT meeting, there is nothing to prevent a Board from going forward with the meeting without the parents in attendance so long as they have made a good faith effort to obtain the parents' attendance. In addition, Board members of a PPT may meet before the meeting to prepare a draft IEP as long as the parents have the opportunity to provide input and recommend and discuss changes. Here, the Parents did attend the meeting, but as was discussed in Finding of Fact No. 13, the meeting was characterized by dissension and culminated in the Parents' presentation of a letter revoking any and all consents and agreements they had ever granted. There was ample opportunity to reconvene the PPT and to rewrite the IEP, but communication between the parties continued to deteriorate during the summer. Therefore, a procedural violation can not be found with relation to this PPT/IEP.

13. The Parents have also argued that procedural violations exist with relation to the provision of evaluations. During the summer, the Parents requested that the Board pay for Dr. Thies' evaluation and demanded an almost immediate answer (see Finding of Fact No. 14). An immediate answer is not a reasonable expectation; the Parents did receive their answer at the August 23, 2001 PPT, after which the Board appropriately requested this hearing. The situation is somewhat different with Dr. Mary White-Roath. As described in Finding of Fact No. 23, the issue of the reading evaluation languished for almost a year due to the disagreement between the parties. Even after the Board finally agreed to Dr. White-Roath, the actual payment decision was delayed for another month. At that point, however, the Parents were holding T. out of school so the Parents cannot claim that this delay contributed to a deprivation of educational benefit.

14. The parties have clearly reached a point where trust is lacking and communication has broken down. However, it is essential that T. be immediately returned to school before he loses any more academic ground or his social skills experience any further deterioration. Therefore, a third party must be brought in to help the parties plan for T.'s educational future. This consultant will assist the PPT in planning an IEP that places T. in the sixth grade at the middle school and balances T.'s time in the mainstream with the need to remediate his reading and writing skills. In addition, the team will insure that appropriate supplementary aids and services are in place to help T. succeed in the mainstream and that the entire IEP is appropriately implemented.

If the local or regional board of education or the unified school district responsible for providing special education for the student requiring special education does not take action on the findings or prescription of the hearing officer, within fifteen days after receipt thereof, the State Board of Education shall take appropriate action to enforce the findings or prescription of the hearing officer.

Appeals from the hearing decision of the hearing officer may be made to state or federal court by either party in accordance with the provisions of Section 4-183, Connecticut General Statutes, and Section 20, United States Code 1415(i)(2)(A).

_____
Hearing Officer Signature

_____
Hearing Officer        Name in Print

Gail K. Mangs

signpage.doc (ho disk)
11/96

The independent consultant will help the PPT review all evaluations done to date and determine if any other evaluations are required. To prevent any unnecessary evaluations, the Parents will submit to the PPT the psychiatric evaluation they are currently obtaining. The consultant will assist the PPT in determining if this psychiatric evaluation is sufficient for educational planning. If not, another psychiatric evaluation will be obtained by the PPT. The consultant will also facilitate the completion of a functional behavior assessment and the creation of a behavior support plan by an individual trained in this area. The consultant will facilitate all communications with other professionals as necessary. Finally, in the event of any disagreement between the parties or within the PPT, the decision of the consultant shall be final.

## FINAL DECISION AND ORDER:

1. Dr. Martinez' evaluation was not appropriate. The Board will reimburse the Parents for the evaluation performed by Dr. Thies.

2. A psychiatric evaluation is necessary and appropriate. A psychiatric evaluation will be obtained by the Board as detailed in Conclusion of Law No. 14.

3. The Board did not commit any procedural violations.

4. The program offered by the Board in the June 14, 2001 PPT for the 2001-2002 school year was not appropriate. The PPT will convene within one week of receipt of this decision to select an independent consultant who is to be paid by the Board and is agreeable to both the Parents and the Board. If the parties are unable to agree on a consultant, then each party will select a consultant; together, the two consultants will select the independent educational consultant. It is expected that this process will be completed before the end of the calendar year. It is also expected that T. will be returned to school as soon as possible. Until this occurs, the Board will provide homebound instruction.

5. The independent consultant will assist the PPT in planning an appropriate IEP that will allow for T.'s transition back to school. The various details of this task are detailed in Conclusion of Law No. 14; the consultant will make certain that the PPT addresses each of these components. The consultant's hours shall be determined by the agreement of the Board and the Parents. The educational consultant shall remain in place until both the Board and Parents agree that his or her services are no longer needed by the PPT, but at least through the 2001-2002 school year.

# EXHIBIT "J"



RECEIVED

AUG

OFFICE FOR STUDENT AFFAIRS

A. HERBERT SCHWARTZ, M.D.
P.O. Box 3801
Woodbridge, Ct 06525
TELEPHONE (203) 387-7751

Fax 203-389-0135
E-Mail psymd@aol.com

JeanAnn Paddyfote, Ph.D                 8-22-02
Assistant Superintendent, New Milford Public Schools
50 East Street
New Milford, CT 06776

Re; Your letter of May 30, 2002       Ph-860-354-2654   Fax 860-210-2682 A,J

Re: Travis Myslow , DOB: 7-17-90

In order to respond to your request of May 30, 2002, the following information is provided. On June 9, the entire school record was briefly reviewed in preparation for the initial evaluation sessions with both Travis and his parents. Travis was seen for five sessions often for an hour and one half. He easily separated from his parent(s) and appeared his stated age in appropriate clothing was polite, respectful and well oriented to time, place,person and understood he was being evaluated in order to help him, his parents and the school. He readily told me his date of birth,his address, phone number, age, grade, and readily gave accurate factual information regarding his family. When asked what his difficulty was, he said he had "Trouble reading ..........his whole life........ and writing too.". He was both left handed and appeared to be left eyed. He was interested in the puzzles on the table but readily gave up when he encountered the slightest difficulty stating it was not possible. My response was "everything is possible" and asked if he wanted help and how he wanted the help—i.e. a start,hints, show him or?. A simple back and forth question and answer approach seemed to often engender his continued participation. He learned quickly.

At any time in the ensuing four sessions if he were asked to read or write or if one said he was obviously reading he would often just stop what he was doing and change activity or topic. With much encouragement he wrote his name in cursive( "Thats all I can write"). He worked at the puzzles in the room with interest but often giving up when it was clear he could with a little hint do the task. He enjoyed the _Living Book_ on the computer[ _Jack Prelutski's Poems_ ]with an ability to read the words but again if said he was reading would be disinterested. The same with Nintendo on screen instructions. He enjoyed the _Simple Text_ writing and the computer reading back to us in his choice of a variety of voices. During these sessions he described frequently being "embarrassed" , at not being able to read, at being in the "stupid class", at being in the kindergarden hallway with an x kindergarden teacher trying to help him read [?], at being seen as a "retard", at being in "aide c", and said he could do more "If you don't make me feel like an idiot". He is "sick of seeing people" which I understood that he was tired of evaluations which addresses his difficulties.

At various times during the course of these sessions the school record, various reports, phone calls re information or confirmation of information were made.

Travis is a 12 year old boy who is allegedly going into 7th grade who reads far below grade level and writes almost illegibly who has been in the New Milford schools since second grade with apparently little change in his ability in these areas who is now easily frustrated, oppositional,

_INFORMATION IN THIS REPORT IS CONFIDENTIAL UNDER CHAPTER 899_
_CONNECTICUT GENERAL STATUTE_

angered, and anxious when attention is given to his inabilities. To date the programs applied seem to have done little to alleviate his marked inabilities. Although he seems bright and is maturing in other ways these inabilities and the lack of progress and in both the nature and setting may have added to his anxiety and have created a Situational Anxiety Disorder akin to an Adjustment Reaction with both emotional and conduct components [ICD-9-[309.4]]

In response to your specific questions:

1. +2. The primary psychiatric diagnoses is as stated above is Situational Anxiety Disorder secondary to inability to read and write with repeated stressful experiences in the educational setting. The primary focus should be enlisting both his and his families enthusiasm for an educational program which not only would give promise with appropriate frequent monitoring of his progress with his educational inabilities as well as not provide further trauma. Psychotherapy with a skilled child psychiatrist might provide an additional source of reducing anxiety, conflict and lack of participation. Medication is currently not indicated.

3. Travis as described above can become so anxious he may exhibit what might appear to be inappropriate in behaviour and attitudes.

4.+ 5. It is not clear to me what "pushed" means. If his "avoidance/oppositional pattern" is seen it may well be related to his anxiety and lack of self esteem in the school setting particularly when a reading or writing ability is needed. The "triggers within his learning environment" Travis seemed to comment on when he said "If you don't make me feel like an idiot".

6. The functional behaviour plan does not adequately address his primary difficulties. At points with the use of plastic letter blocks as well as the suggestions for student strategies i.e. Travis will do in-seat relaxation/positive self-talk , etc ---- ----------probably will add to his difficulties.

7. The answers to these questions seem self evident from the above. Travis 's self esteem seems to be built on his identification with his father, his mother's support, his cognitive ability in other than a school setting, and his motor ability. The past school settings seemed to often provide him with a high level of anxiety from which he could not escape nor cope with without a loss of selfesteem. Unless the regimen suggested in answers to question one is instituted, I suspect that "being held responsible" and "traditional consequences" will do nothing to alleviate his difficulties.

A. HERBERT SCHWARTZ M.D.
L.FAPA-LFAACAP
ASSOC. CLIN. PROFESSOR
YALE UNIVERSITY

*LFAPA-Life fellow of the American Psychiatric Association
*LFAACAP-Life Fellow of the American Academy of Child and Adolescent Psychiatric Association
*Certified by the American Board of Psychiatry and Neurology in Psychiatry and Child Psychiatry

THE INFORMATION IN THIS REPORT I S CONFIDENTIAL UNDER CHAPTER 899 CONNECTICUT GENERAL STATUTE

CURRENT BILL ENCLOSED

# EXHIBIT "K"

# Armin Paul Thies, Ph.D.
### ABPP/ABCN Board Certified Clinical Neuropsychologist
### Associate Clinical Professor - Yale Medical School

## Neuropsychological Report

Name:   Travis Myslow
Age:   11 years 0 months
DOB:   7/17/1990
Education: completed 5th grade
Dates of Examination: 7/23, 7/26/2001
Date of Report:  August 10, 2001
Date of Feedback: 8/13/2001

## Assessment Procedures

Beery-Buktenica Test of Visual Motor Integration (VMI)
Behavior Assessment System for Children (BASC)
      Parent Rating Scale
      Self Report Rating Scale
Comprehensive Assessment of Spoken Language (CASL)
      Antonyms          Grammatical Judgment
      Synonyms          Nonliteral Language
      Sentence Completion  Inference
      Syntax Construction
Connor's Continuous Performance Test (CPT)
NEPSY
Rey-Osterreith Complex Figure
Symptom Checklist
Warshak Inventory for Child and Adolescent Assessment - Second Edition

## Background

      Travis was referred for a neuropsychological examination as a second opinion to a neuropsychological examination performed earlier this year and to supplement those previous findings. In addition, there have been several, recent evaluations performed at school. The findings from those previous examinations will be discussed in the report of findings from the present examination in the report to follow. His parents do not want Travis to be promoted to the

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

P.O. Box 906, Orange, Connecticut 06477-0906  -  Phone: (203) 891-8762 - Fax: (203) 891-8794
Stamford Phone: (203) 968-8241

sixth grade, because he does not appear to be functioning at that level.

At the time of this examination, Mr. and Ms. Myslow reported the following presenting problems:

1.  A history of writing mirror reversals of number and letters, which is now controlled by tracing his work;
2.  High anxiety related to school work;
3.  Low self esteem related to school work;
4.  "Shuts down" when confronted with challenging material;
5.  Poor penmanship;
6.  Is not functioning at the fifth grade level in any academic area;
7.  Presently reads at approximately the 2.1 grade level.

Travis is reportedly good in math, however, word problems are difficult for him. He was not in the regular classroom for both social studies and science this past year. Rather, he remained in one classroom with three other students for instruction. Phonetic instruction in reading has been provided for four to five years now, with limited effect.

Travis has received 15 mg/day of Ritalin for three years to treat hyperactivity. He has also been medicated with Adderal, 5 mg. per day, however, he became pale, grey, and lethargic on that medication. However, with medication, he was able to focus on projects and complete his homework.

Prenatal and perinatal history is unremarkable. Both motor and language developmental milestones were attained at normal times. At approximately two or three years of age, Travis fell and required three stitches on the back of his head. There were no post concussion symptoms evidenced subsequent to the accident. Academic problems began in kindergarten. Restless behavior and inattention were problems during the third grade. Travis has been in special education since the first grade.

This examination was complicated by the recent history of extensive testing. Not only had most of the principal measures of mental abilities already been administered, but Travis was not eager to engage in yet more testing. Therefore, it was necessary to supplement the previous examinations in order not to elicit practice effects or undue frustration. Despite the history of difficulty in previous examinations, Travis was remarkably cooperative during this examination and seemed to enjoy tasks and challenges that where not similar to school work. Only towards the end of the last testing session did he begin to refuse tests.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

## Assessment Findings

Above average to superior cognitive potential was evidenced in the following measures of mental abilities:

1. Similarities subtest score of the WISC-III;
2. Verbal Immediate and Verbal Delayed Memory Indices of the CMS;
3. Tests of sentence recall in the W/J-R and NEPSY;
4. The Picture Vocabulary subtest of the W/J-R, a test of naming vocabulary;
5. Tests of synonyms and antonyms from the W/J-R and CASL.

Therefore, selecting the appropriate baseline against which to compare performance in specific, cognitive domains becomes important. Even so, his achievement in reading, as measured by the W/J-R Written Language subtests is significantly below even measured intelligence even when corrected for regression towards the mean.

The general pattern of findings indicates some weakness in basic linguistic processes to reading, i.e., phonological processing and speeded naming, even when compared to his average peers. However, the impairment to functional reading and especially writing is greater than the deficiencies evidenced in the assessments of the individual skills required for those activities. Language deficits are circumscribed in that verbal memory and syntactic and pragmatic aspects of language are quite strong. Writing is also largely impeded by severely deficient penmanship. Again, individual motor skills are poor compared to even measured intelligence, but the functional expression using fine motor skills in writing is even more impaired.

Regarding the findings of the previous neuropsychological examination, I concur with Dr. Martinez the following of her findings:

1. Slow rate of work;
2. Poor fine motor coordination (but primarily while writing);
3. Deficient learning across multiple learning trials;
4. Functionally impaired reading and writing.

However, poor facial recognition during the previous examination was not replicated during this examination, therefore, it is not clear whether nonverbal/visual memory is deficient. Poor performance during the Dot Location subtest of the CMS may be the result of poor visual spatial processing, however, the findings are not completely consistent in that regard. In addition, the fact that delayed memory was significantly stronger than immediate memory indicates that the Visual Immediate Memory Index was spuriously depressed. There is some evidence of consistently weaker nonverbal processing compared to verbal processing, however, the degree of

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

Page 4

this discrepancy is within normal limits.

Regarding the question of an attention disorder. There is not much supporting evidence, either observational or psychometric, during this examination for ADD or ADHD. It is more probable that inattention occurs primarily in the form of difficulty sustaining vigilance. However, it is more likely that inattention is a manifestation of his emotional condition, particularly in reaction to academic tasks.

Delineating Travis' cognitive processing deficits is made more difficult by the variability of his performance across measures of similar mental abilities and across examinations. It is likely that his emotional condition exacerbates the variability of his performance, depending upon the immediate conditions under which the task is being performed. His presentation during this examination was not as troubled as described during the previous neuropsychological assessment. However, during this examination, an effort was made to avoid academic tasks, such as reading and writing, because they had already, recently, been extensively assessed. Even so, there were tasks during this examination that were refused, after hours of testing.

In light of the above discussion, the following are recommended, many of which are elaborations or modifications of the recommendations by Dr. Martinez:

1.  Management of impeding emotions and behaviors must be part of the educational plan, including:
    a.  Instructing Travis in ways to manage frustration;
    b.  Intervening when symptoms of frustration and failure avoidance first appear;
    c.  Provide opportunities to display competencies;
    d.  Provide encouragement and expressions of confidence in his abilities;
    e.  Chart progress and otherwise make progress salient to him;
    f.  Institute behavior management plans to reward desired behaviors which are mutually exclusive of undesired behaviors, with criteria for success that insures that he will receive at least a moderate number of reinforcements.

2.  Travis needs to be taught mnemonic strategies and to actively employ them when learning information. However, the fact that his delayed recall is so much better than immediate recall suggests that consolidation is delayed and that during the task of acquiring knowledge, immediate recall is impeded. Spaced practice rather than massed practices, e.g., "cramming," is particularly necessary. It also seems evident that he remembers better during tasks that involve auditory-visual or verbal-graphic associations.

3.  I concur with Dr. Martinez that the focus of medication trials should be on reducing anxiety rather than reducing inattention.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

4.  An alternative form of written expression should be found to avoid the need for writing by hand, given his poor fine motor control during this activity. Dictation should be permitted, and voice recognition programs with word processing may be helpful, if Travis is unable to demonstrate sufficient motor coordination to employ a keyboard efficiently. If he can learn to type, then he should be permitted to use word processing for all written assignments.

5.  Vocabulary development is superior. Given the limited success after years of instruction in phonological decoding, it may be beneficial to focus on building sight recognition vocabulary. Whether his visual discrimination for letters and words is poor still remains a question. He performed poorly during the Visual Matching subtest of the W/J-R, however, slow performance may have depressed his score. Nevertheless, training in sight recognition may require visual discrimination training as well. For example, a pair of words such as *was* and *war* can be presented on flash cards with the final letters in red or with some other distinguishing feature. Then, as the discrimination is mastered, the discriminating feature is gradually "faded" until he can rapidly discriminate the words in normal print.

6.  Ultimately, once adequate word recognition is attained, reading for comprehension rather than accuracy may have to be emphasized.

7.  The functional activities of reading and writing must be closely monitored during any attempts to remedy his difficulties in these activities. For that reason 1:1 or small group treatment is indicated. Treatment interventions will likely have to be tailored to the problems as they present themselves. Therefore, published curriculum will probably have to be modified in order to assist Travis to integrate his basic skills into the functional activities. In addition, he should be trained by a skilled and experienced reading specialist.

8.  For the present, requirements for reading in content classes will have to be supplemented by graphic illustrations, books on tape, and other means to compensate for limited reading ability.

9.  Travis shows avid interest in the construction trade and feels competent in his ability to operate heavy machinery. These interests can be incorporated into classroom activities to increase motivation.

10. In addition, it appears that he can learn even nonverbal, manipulative tasks rather easily, suggesting that experiential learning is the preferred mode of instruction whenever possible.

11. Given his age, the desire to improve his functional reading and writing have to be balanced against the participation in learning academic subjects which is the normal expectation for his age. In content courses, curriculum and instructional modification will have to be made in order not to depend upon or to require reading and writing. In other words, Travis will have to be considered to be a dyslexic and

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

    dysgraphic student.
12. In content courses, he will require additional, tutorial support to the extent that grade appropriate curriculum depends upon mastery of material taught in previous grades.

Additional recommendations to address specific problems can be provided in dialogue with parents or teachers, if requested.


Armin Paul Thies, Ph.D., ABPP
Board Certified Clinical Neuropsychologist

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

## Appendix - Test Findings and Observations

### Intelligence and Conceptual Reasoning

There are three baselines against which performance can be compared. The first baseline is the average for the normal population of the same age or other demographic variable. The second baseline is the average level of performance for the individual child, and the third baseline is the estimated potential capabilities of the child. The first baseline is reflected in standard scores and percentile scores. The second baseline is determined by the administration of an individual test of intelligence, and the third baseline is estimated from the highest levels of performance on specific measures of mental abilities. Unless otherwise indicated, scores reported here are determined according to age norms. Grade norms are not used, because, in many cases, grade placement is determined by factors other than normal development.

The Wechsler Intelligence Scale for Children - Third Edition (WISC-III) was previously administered by Dr. Martinez, earlier this year. Scores for the WISC-III subtests are reported as scaled scores which have an average of 10 and a standard deviation of 3. The subtest scaled scores from the present administration of the WISC-III are presented in the bar graph below.



| | Key for Subtest Abbreviations | | |
|---|---|---|---|
| INF | Information | PC | Picture Completion |
| SIM | Similarities | COD | Coding |
| ARI | Arithmetic | PA | Picture Arrangement |
| VOC | Vocabulary | BD | Block Design |
| COM | Comprehension | OA | Object Assembly |
| DS | Digit Span | SS | Symbol Search |

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

The IQ scores are standard scores with an average of 100 and a standard deviation of 15. Scores from 90 to 110 are within the average range. The IQ scores from the previous administration of the WISC-III are compared in the table below.

| Previous WISC-III IQ Index | Standard Score | Percentile Score | 90% Confidence Interval |
|---|---|---|---|
| Verbal | 102 | 55 | 97 - 107 |
| Performance | 81 | 10 | 76 - 89 |
| Full Scale | 92 | 30 | 88 - 97 |

The 90 % confidence interval is the range within which one can be 90 % certain the true ability is contained.

Because the Performance IQ score was depressed by his significantly poorer performance during the Coding subtest, a comparison of the supplementary indices of the WISC-III gives a more accurate comparison of verbal versus nonverbal processing. Those indices are compared in the table below.

| WISC-III Index | Standard Score | Percentile Score | 90% Confidence Interval |
|---|---|---|---|
| Verbal Comprehension | 106 | 66 | 100 - 111 |
| Perceptual Organization | 91 | 27 | 85 - 99 |

The difference between these two indices is significant at the 0.05 level of probability. In other words, a difference of this magnitude or greater would occur by chance in less than 5 out of 100 random samples. Although the difference is probably not the result of chance or error, a difference of this magnitude or greater occurred in 26 % of the normal sample. Therefore, the difference rather commonly occurs amongst normals.

His ability to solve discrete problems requiring either analytical-sequential reasoning or gestalt perception of conceptual relationships was below average to low average. Accuracy of performance during the Analysis-Synthesis subtest of the W/J-R, administered in January of this year, was equal to a standard score of only 81, at the 10th %tile. Notable better, performance during the Concept Formation subtest was equal to a standard score of 99, at the 46th %tile. These two subtests comprise the Fluid Reasoning Factor of the W/J-R, which was equal to a standard

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

Page 9

score of 89, at the 23rd %tile.

## Executive Functions and Attention

Attention and executive processing was assessed by means of the subtests of the Attention/Executive Domain of the NEPSY. The subtest scores are presented in the graph below.



Key to Subtest Abbreviations

| Tower | = | Tower Test |
| Aud Att | = | Auditory Attention and Response Set |
| Vis Att | = | Visual Attention |



Exec/Attn Subtest Scores

These subtests comprise the domain score which was equal to a standard score of 93, at the 30th %tile (90% confidence interval = 85 - 102). The results of previous measures of attention and impulse control are presented below.

### Attention - Sensory Selection

— Travis was not distracted by external stimuli during the examination and was able to focus attention adequately to remain on task during this examination. These observations are consistent with previously administered tests that measure attention. The indices derived from those tests are presented in the table below.

| Previously Administered Attention Index | Standard Score | Percentile Score | 90% Confidence Interval |
|---|---|---|---|
| WISC-III Freedom from Distractibility | 98 | 45 | 91 - 106 |
| CMS Attention/Concentration | 94 | 34 | not reported |
| Previously Administered Attention Index | Standard Score | Percentile Score | Standard Error of Measurement |
| W/J-R Processing Speed | 76 | 6 | 70 - 82 |

A comparison between his performance during the CPT during this examination and the

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow                                    Page 10

his CPT performance during the previous neuropsychological examination could not be made, because the previous scores are not available to me. The present indices from the CPT indicating inattention are presented in the table below.

| CPT Scoring Dimension | T Score | Percentile Score | Description of Performance |
|---|---|---|---|
| # Hits |  | 98.50 | Markedly Atypical |
| # Omissions |  | 98.50 | Markedly Atypical |
| Attentiveness (d') | 66.38 | 94.91 | Markedly Atypical |

The indices from the CPT indicating the level of impulsive responding are presented in the table below. T scores have an average of 50 and a standard deviation of 10.

| CPT Scoring Dimension | T Score | Percentile Score | Description of Performance |
|---|---|---|---|
| # Commissions | 57.28 | 76.66 | Average |
| Hit Reaction Time | 32.67 | 5.14 | Atypically slow |
| B' (Risk Taking) | 100.00 | 99.00 | Atypically cautious |

CPT performance, in general, indicates slow reactions during tasks that require sustained vigilance. However, the BASC profile from the ratings by Travis' mother indicated normal attention and normal levels of activity at home.

## Memory and Learning

In order to assess memory, the Children's Memory Scale (CMS) was administered during the previous neuropsychological examination. The subtest scores are reported as scaled scores which have the same psychometric properties as the WISC-III subtest scores, i.e., an average of 10 and a standard deviation of 3. The subtest scores for the CMS that were reported in the previous neuropsychological report are compared in the bar graph on the following page.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow



Key for Subtest Abbreviations

| DOT | = Dot Location | STO | = Stories |
|-----|----------------|-----|-----------|
| FAC | = Faces | PA | = Paired Associates. |
| FP | = Family Pictures | | |

The memory indices are standard scores which are comparable to IQ scores.  The memory indices from the CMS are presented in the table below.

| Previous CMS Memory Index | Standard Score | Percentile Score |
|---------------------------|----------------|------------------|
| Verbal Immediate | 106 | 66 |
| Visual Immediate | 85 | 16 |
| Verbal Delayed | 115 | 84 |
| Visual Delayed | 115 | 84 |
| General Memory (all of above) | 109 | 73 |
| Learning | 66 | 1 |
| Delayed Recognition Recall | 88 | 21 |

An analysis of the statistical significance of differences among memory indices could not be performed, because the raw data was not available.  However, the discrepancy between verbal and nonverbal memory indices parallels the IQ differences previously obtained.   The fact that the Delayed Recognition Recall Index is significantly lower than the Verbal Delayed (recall) Index is

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow                                    Page 12

anomalous and suggests that recognition recall was depressed by factors other than memory.

In addition, various memory measures from the Woodcock-Johnson Psychoeducational Battery - Revised (W/J-R) were administered at school in the beginning of this year. Those findings are presented in the table below.

| 3/2001 W/J-R Subtest/Cluster | Standard Score | Percentile Score | Standard Error of Measurement |
|---|---|---|---|
| Memory for Names | 101 | 54 | 97 - 105 |
| Visual-Auditory Learning | 98 | 45 | 93 - 103 |
| Long Term Retrieval Cluster | 100 | 50 | 96 - 104 |
| Memory for Sentences | 128 | 97 | 122 - 134 |
| Memory for Words | 96 | 41 | 89 - 103 |
| Short Term Memory Cluster | 111 | 78 | 106 - 116 |
| Picture Recognition | 104 | 61 | 97 - 111 |

During this examination, various subtests of memory and learning from the NEPSY were administered. The scaled scores from those subtests are presented in the bar graph below.



Subtest Abbreviations

| Faces | = Memory for Faces |
| Names | = Memory for Names |
| Narrative | = Narrative Memory |
| Sentences | = Memory for Sentences |
| List | = List Learning |



NEPSY Memory Subtests

These scores are generally consistent with those previously obtained from the W/J-R. Sentence repetition is consistent with the W/J-R Memory for Sentences. In a similar manner, his list learning during the NEPSY showed the same failure to benefit from repeated learning trials, as evidenced in the deficient learning index from the CMS. In addition, his narrative recall during the NEPSY is consistent with the Verbal Memory Index from the CMS. However, face recognition during the NEPSY was high average in contrast to impaired recognition during the

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

CMS. Therefore, the latter is not a reliable finding. The Memory Domain score for the NEPSY was equal to a standard score of 88, at the 21st %tile.

## Language

Rapid scanning and visual matching of numbers was equal to a standard score of only 74, at the 4th %tile, as measured by the W/J-R subtest administered earlier this year. These scores may merely result from slow performance. Auditory perception of incomplete phonemic strings and subsequent word recognition were equal to a standard score of 117, at the 88th %tile. Consistent with this finding, blending of phonemic strings and subsequent word identification were equal to a standard score of 91, at the 27th %tile. These two subtests of the W/J-R comprise the Auditory Processing Factor which was equal to a standard score of 100, at the 50th %tile.

Phonological processing, as measured by the NEPSY subtest was low average (scaled score = 8). This finding was consistent with his verbal fluency during the Speeded Naming subtest (scaled score = 8). Phonological decoding was previously administered by means of the Word Attack subtest of the W/J-R, which was equal to a standard score of only 82, at the 11th %tile. However, Travis' parents report that he has still not mastered letter combinations for phonetic decoding.

The achievement scores previously obtained for the subtests of the Wechsler Individual Achievement Test (WIAT) are presented in the table below.

| Previous WIAT Subtest/Composite | Standard Score | Percentile Score |
|---|---|---|
| Reading Decoding | 74 | 4 |
| Reading Comprehension | 86 | 18 |
| Reading Composite | 74 | 4 |
| Spelling | 70 | 2 |
| Numerical Operations | 80 | 9 |

These achievement scores are lower than his measured intelligence.

Achievement subtests of the W/J-R were also administered earlier this year. Those findings are presented in the table on the following page.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

| Previous W/J-R Subtest/Cluster | Standard Score | Percentile Score | Standard Error of Measurement |
|---|---|---|---|
| Letter-Word Identification | 75 | 5 | 71 - 79 |
| Passage Comprehension | 84 | 14 | 79 - 89 |
| Broad Reading Cluster | 77 | 6 | 74 - 80 |
| Dictation | 78 | 7 | 73 - 83 |
| Writing Samples | 48 | 0.1 | 43 - 53 |
| Broad Written Language Cluster | 58 | 0.3 | 54 - 62 |
| Calculation | 78 | 7 | 74 - 82 |
| Applied Problems | 108 | 69 | 103 - 113 |
| Broad Math Cluster | 92 | 29 | 88 - 96 |

Subtests from the WIAT and W/J-R which are most similar have yielded similar findings. Writing ability is clearly significantly poorer than expected from his measured intelligence, even when corrected for regression towards the mean.

Earlier this year, fluent oral reading was assessed by a reading specialist, using the Gray Oral Reading Test - Third Edition (GORT-3). Rate , accuracy, and comprehension were markedly deficient (scaled scores of 2, 3, and 3, respectively). The Oral Reading Quotient was previously incorrectly calculated. Erroneously adding the scaled scores for Rate, Accuracy, Passage Score, and Comprehension results in a grossly inflated reading quotient. Only the Passage Score and Comprehension scores are supposed to be added to derive the Oral Reading Quotient. The correct quotient is equal to a standard score of 70, at the 2nd %tile. Thus, fluent reading is consistent with measures of word recognition.

Receptive comprehension of speech was grossly adequate in terms of following test instructions and responding in a relevant manner to test items. Accuracy during the Comprehension of Instructions subtest of the NEPSY was high average (scaled score = 11).

Articulation was grossly normal with fluent speech. The nonverbal attributes of communication were also grossly normal, e.g., intonation, prosody, volume, and the expression of affect in tone of voice. No literal paraphasic errors (mispronunciations) or verbal paraphasic errors (word substitutions) were heard during fluent speech. No significant word finding difficulties or symptoms of dysnomia were heard either during fluent speech or during a test of confrontation naming. Earlier this year, naming vocabulary was equal to a standard score of 110, at the 74th %tile. In contrast, verbal fluency in terms of generating antonyms and synonyms was

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

Page 15

equal to a standard score of 135, the 99th %tile. These two subtests comprise the Comprehension-Knowledge Factor of the W/J-R, which was equal to a standard score of 124, at the 94th %tile.

During this examination, linguistic processing, as revealed in speech, was assessed at three level: (1) the lexical/semantic; (2) the syntactic; and (3) the pragmatic, by means of the CASL. The findings from the CASL are presented in the table below.

| CASL subtest/index | Standard Score | Percentile Score | 90 % Confidence Interval |
|---|---|---|---|
| Anonyms | 119 | 90 | 111 - 127 |
| Synonyms | 116 | 86 | 106 - 126 |
| Sentence Completion | 123 | 94 | 113 - 133 |
| Lexical/Semantic Index | 121 | 92 | 114 - 128 |
| Syntax Construction | 104 | 61 | 95 - 113 |
| Grammatical Judgment | 111 | 77 | 104 - 118 |
| Nonliteral Language | 106 | 66 | 99 - 113 |
| Inferences | 111 | 77 | 102 - 120 |
| Supralinguistic Index | 109 | 73 | 103 - 115 |

Consistent with previous measures of vocabulary and the semantic matrix of his vocabulary, performance during subtests of the Lexical/Semantic Index were above average. Measures of syntactic and pragmatic processes were consistently, although not significantly, lower, in the average range.

As reported above, his writing ability is significantly compromised. In addition, penmanship is extremely poor. A sample of his writing is presented below.
The small printing at the top is partial translation. The sentence reads: *"I got a note." said Ted.*



*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

## Perceptual and Motor Functions

Visual perception, as measured by a combination of items requiring visual closure, object constancy, and figure-ground discrimination, was equal to a standard score of 107, at the 68th %tile, during the previously administered Visual Closure subtest of the W/J-R. His accuracy of spatial directionality during the Arrows subtest of the NEPSY was low average (scaled score = 8). This finding is consistent with his performance during the Developmental Test of Visual-Perception, administered earlier this year. His performance during that test was equal to a standard score of 105, at the 63rd %tile.

Duplication of designs using anagram blocks, during the previously administered Block Design subtest of the WISC-III, was borderline deficient (scaled score = 7). In contrast, his ability to assemble puzzles was average (scaled score = 10). In general, the Perceptual Organization Factor of the WISC-III, which contains this subtest, was equal to a standard score of 91, at the 27th %tile, as previously reported. During this examination, visual construction during the Design Copy subtest of the NEPSY was deficient (scaled score = 4). As a result, the Visuospatial Domain score from the NEPSY was equal to a standard score of only 76, at the 4th %tile. An attempt was made to administer the Rey-Osterreith Complex Figure, however, Travis quickly refused to draw the design after making an adequate, though brief, initial attempt. However, earlier this year, his accuracy during the Developmental Test f Visual-Motor Integration was equal to a standard score of 100, at the 50th %tile for his age.

The graph below depicts the levels of performance during the various subtests of the NEPSY that comprise the Sensorimotor Domain.



The Sensorimotor Domain score was equal to a standard score of 82, at the 12th %tile for his age. Travis is left hand dominant, however, there is a familial history of left hand dominance.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

## Social/Emotional Behavior

The BASC profile of Travis' behavior at home, as reported by his parents, was totally within normal limits, except for borderline significant depression and anxiety, indicating psychological distress. Travis' self report resulted in a BASC profile was within normal limits for the scales reflecting psychological adjustment and adaptive skills but was significantly elevated for scales reflecting maladjustment in school. Conflicts with teachers were particularly an area of difficulty reported. Otherwise, his parents report adequate peer relations and that Travis is well behaved.

Travis' parents reported by means of the WICAA that the following adjustment problems are of moderate severity:

1. Often loses temper;
2. Often argues with adults;
3. Often deliberately annoys people;
4. Often touchy, cranky, or easily annoyed by others;
5. Very stubborn;
6. Handles frustration poorly;
7. Often tries to avoid responsibility;
8. Has few, if any, real friends;
9. Plays alone too much; does not seek friendships;
10. Is teased or bullied by other children;
11. Often feels cheated, gypped, or persecuted
12. Shy or withdrawn; easily embarrassed at school;
13. Gets along poorly with brothers and sisters.

In general, these problems are not prominent at home.

The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes

# Armin Paul Thies, Ph.D.
ABPP/ABCN Board Certified Clinical Neuropsychologist
Associate Clinical Professor - Yale Medical School

Comments regarding draft Behavior Plan for Travis Myslow - September 12, 2002

Plan does not incorporate the following elements from my recommendations:

1. Management of impeding emotions and behaviors must be part of the educational plan, including:

   1. Instructing Travis in ways to manage frustration;
   2. Intervening when symptoms of frustration and failure avoidance first appear;
   3. Provide opportunities to display competencies;
   4. Chart progress and otherwise make progress salient to him;
   5. Institute behavior management plans to reward desired behaviors which are mutually exclusive of undesired behaviors, with criteria for success that insures that he will receive at least a moderate number of reinforcements.

The second point above was not clearly stated. The interventions are to prevent an increase in anxiety and to precempt behaviors that interfere with achievement, not to move towards the completion of the assigned task. In this regard, the plan places too much emphasis on avoiding unintentional reinforcement of avoidance behaviors by permitting him to escape from the task demands. The "desired behaviors" in item 5 above include:

   1. use of verbal report in the service of self advocacy, e.g., reporting difficulty and requesting help;
   2. Perseverance for a time longer in the task, starting with short durations and increasing the duration as frustration tolerance increases;
   3. Attempting alternative to task avoidance, e.g., problem solving.

Furthermore, it is essential that task demands not create a high probability of failure or anxiety, e.g., asking him to write with a production demand that exceeds his abilities.

I take issue with the following statement: "the Functional Behavior Assessment suggests that behaviors of concern....are maintained by negative reinforcement. Travis might engage in these behaviors in order to distance himself from potentially aversive consequences.." Negative reinforcement is the withdrawal of a negative stimulus which results in an increase in the frequency and intensity of the behavior. This is a classic avoidance paradigm. Certain task characteristics in the classroom, e.g., writing, induce anxiety, which is relieved by avoidance behaviors. The appropriate intervention is to increase the perceived probability of success, by developing in him

P.O. Box 906, Orange, Connecticut 06477-0906 • Phone: (203) 968-8241 (Automatic Fax Detection)
E-mail: apthies@iconn.net

Comments regarding the draft I.E.P. for Travis Myslow - September 12, 2002          Page 2

The following recommendations from my report do not seem to be addressed by the I.E.P.

1.  Travis needs to be taught mnemonic strategies and to actively employ them when learning information. However, the fact that his delayed recall is so much better than immediate recall suggests that consolidation is delayed and that during the task of acquiring knowledge, immediate recall is impeded. Spaced practice rather than massed practices, e.g., "cramming," is particularly necessary. It also seems evident that he remembers better during tasks that involve auditory-visual or verbal-graphic associations.

2.  An alternative form of written expression should be found to avoid the need for writing by hand, given his poor fine motor control during this activity. Dictation should be permitted, and voice recognition programs with word processing may be helpful, if Travis is unable to demonstrate sufficient motor coordination to employ a keyboard efficiently. If he can learn to type, then he should be permitted to use word processing for all written assignments.

3.  Vocabulary development is superior. Given the limited success after years of instruction in phonological decoding, it may be beneficial to focus on building sight recognition vocabulary. Whether his visual discrimination for letters and words is poor still remains a question. He performed poorly during the Visual Matching subtest of the W/J-R, however, slow performance may have depressed his score. Nevertheless, training in sight recognition may require visual discrimination training as well. For example, a pair of words such as war and war can be presented on flash cards with the final letters in red or with some other distinguishing feature. Then, as the discrimination is mastered, the discriminating feature is gradually "faded" until he can rapidly discriminate the words in normal print.

4.  The functional activities of reading and writing must be closely monitored during any attempts to remedy his difficulties in these activities. For that reason 1:1 or small group treatment is indicated. Treatment interventions will likely have to be tailored to the problems as they present themselves. Therefore, published curriculum will probably have to be modified in order to assist Travis to integrate his basic skills into the functional activities. In addition, he should be trained by a skilled and experienced reading specialist.

5.  For the present, requirements for reading in content classes will have to be supplemented by graphic illustrations, books on tape, and other means to compensate for limited reading ability.

6.  Travis shows avid interest in the construction trade and feels competent in his ability to operate heavy machinery. These interests can be incorporated into classroom activities to increase motivation.

7.  In addition, it appears that he can learn even nonverbal, manipulative tasks rather easily, suggesting that experiential learning is the preferred mode of instruction whenever possible.

8.  Given his age, the desire to improve his functional reading and writing have to be balanced against the participation in learning academic subjects, which is the normal