# EXHIBIT "H"

P.03/08

MYSLOW, Travis
4/24/01

**History:**   Travis returns today after a considerable period of time.

It appears as if both Adderall and Dexedrine, as well as Regular Ritalin, seem to make him hyperactive.

I had the opportunity of reviewing the psychoeducational testing performed by Dr. Martinez. It indicates a young man quite in the category of dyslexia with perceptual motor dysfunction, difficulty with immediate visual memory, and problems with adapting to new tasks.

Special Educational assistance is needed.

Apparently Travis is also felt by Dr. Martinez to have a significant underlying level of anxiety. An attentional problem is also under consideration.

Travis still has some oppositional behavior, although that is not paramount.

**Examination:**   On examination today, he appeared in no apparent distress and appropriate for age. He was oriented as to person, time, and place. Recent and remote memory were intact. Concentration and attention were intact.  He was able to name, repeat, and comprehend without difficulty and with clear speech.  Fund of knowledge was normal.  Cranial nerve examination revealed intact visual fields, intact extraocular movements, symmetric facial sensation and strength, and intact hearing. The palate moved symmetrically. Shoulder shrug was intact, and tongue protrusion was symmetric. Gait and station were normal.

**IMPRESSION:**       Learning disability in the area of dyslexia
                     Possible ADD
                     Generalized anxiety disorder

**PLAN:**
1.     This was a half-hour meeting.
2.     Concerta, 18 mg., 1 q.a.m.
2.     Refer for psychotherapeutic evaluation to determine the level of anxiety.
4.     Consider a medication such as Clonidine.
5.     Return in one month.

                          Martin W. Kremenitzer, M.D.

DBNR:kk

# EXHIBIT "I"

STATE OF CONNECTICUT
DEPARTMENT OF EDUCATION

CASE # 01-294    (Consolidated with Case No. 01-305)

New Milford Board of Education v. T. (Student)

T. (Student) v. New Milford Board of Education

Appearing on behalf of the Parents:

Attorney Deborah G. Stevenson
226 East Flag Swamp Road
Southbury, CT 06488

Appearing on behalf of the Board of Education:

Attorney Nicole A. Bernabo
Sullivan, Schoen, Campane &
                    Connon, LLC
646 Prospect Avenue
Hartford, CT 06105

Appearing before:

Attorney Gail K. Mangs,
Hearing Officer

## FINAL DECISION AND ORDER

### ISSUES:

**Board issues:**
1. Was the neuropsychological evaluation performed by Dr. Diana Badillo-Martinez appropriate? If not, should the Board reimburse the parents for the evaluation performed by Dr. Armin Thies?
2. Did the Board offer an appropriate program for the 2001-2002 school year?
3. Is a psychiatric evaluation necessary and appropriate?

**Parent issues:**
1. Did the Board offer a free and appropriate public education to T. in the June 14, 2001 IEP? If not, is homebound instruction appropriate?
2. Should the Parents be reimbursed for Dr. Thies' evaluation?
3. Were procedural violations committed by the Board?

### PROCEDURAL HISTORY:

This hearing was requested by the Board on September 4, 2001 and assigned Case No. 01-294. The prehearing conference was convened on September 12, 2001. On September 8, 2001, the Parents filed for due process; this case was assigned to a different

hearing officer under Case No. 01-305. A prehearing conference was held in Case No. 01-305 during which that hearing officer directed the parties to file motions to consolidate the two cases. Both parties filed motions and on September 26, 2001, the hearing officer in Case No. 01-305 issued an order granting the motion to consolidate the two cases. Also on September 26, 2001, the current hearing officer agreed to the consolidation of the two matters under Case No. 01-294. This case was convened on October 18, October 25, October 30, November 1, November 2, and November 7, 2001. The matter was also set down for October 17, 2001, but due to a misunderstanding, all parties did not appear. Final arguments were made and the hearing closed on November 7, 2001.

## SUMMARY:

T., who is now eleven years old, entered the Board's school district early in second grade. His teacher quickly observed that T. was working below grade level, had a poor attention span, frustrated easily, and became obstinate when confronted with work he felt unable to do. After evaluations were performed, T. was identified as learning disabled and began receiving special education services. From second grade through the end of fifth grade, T.'s academic difficulties persisted, especially in the areas of reading and writing. Always somewhat oppositional and easily frustrated, T.'s behavior markedly declined during the fourth and fifth grades. He resisted academic tasks and often refused to comply with directions or complete assigned work. T.'s behavior did not improve with the use of behavior plans or contracts. In addition, T.'s reading skills never advanced much beyond an early second grade level. The PPT responded by increasing T.'s special education hours until he was receiving virtually all of his academic instruction in a self-contained special education classroom. The PPT also recommended that T. receive a psychiatric evaluation. T.'s parents refused to consent to a psychiatric evaluation. They also disagreed with the PPT recommendation to promote T. to the sixth grade in the Board's middle school for the 2001-2002 school year and requested homebound instruction and independent reading and neuropsychological evaluations. During the summer of 2001, counsel for the parties attempted to resolve the dispute but were unable to reach any resolution, although the Board eventually agreed to fund an independent reading evaluation about the time this hearing convened. The parents have kept T. at home since the school year opened and have provided two hours of tutoring per week during this time. In addition, they provided some evidence that T. has been receiving counseling and is now undergoing a psychiatric evaluation.

## FINDINGS OF FACT:

1. The student began attending Board schools during the fall of second grade (the 1997-1998 school year). In January, 1998, his teacher referred him for testing due to his inability to do grade level work, difficulty focusing, frustration, and obstinate behavior. (Exhibit P-3)

2. Psychoeducational testing performed during February and March of 1998 revealed that T. was reading and writing at a 1.4 grade level equivalent. In addition, on the WISC-III, he received a verbal score of 115, performance score of 86, and a full scale

Case 3:03-cv-00496-MRK    Document 70-4    Filed 12/22/2003    Page 6 of 26

score of 108. The PPT identified T. as learning disabled and recommended that he receive twelve hours per week of special education services. During second grade, T. also began taking Ritalin to treat his attentional difficulties. This program was continued for T.'s third grade year (the 1998-1999 school year). The PPT recommended 6 hours of special education services for fourth grade (the 1999-2000 school year) noting T.'s "high frustration" during writing. (Exhibits P-5, P-6, P-7, Testimony of Mother)

3.   While T. had previously displayed periods of frustration and obstinate behavior, his behavior became a major issue during fourth grade. At PPTs convened in September, 1999, the student's regular education teacher described T. as exhibiting frustration and low self confidence. The school psychologist suggested that T.'s oppositional behavior was a reflection of his frustration. The PPT increased T.'s special education hours to 7.5 and exempted T. from standardized testing in reading and writing. During the fall of 1999, T. also began receiving reading instruction with the "Let's Read " program, a structured multisensory, language based, sequential reading program. (Exhibits P-8, P-9, Testimony of School Psychologist and Middle School Special Education Chair)

4.   Teachers continued to report a deterioration in T.'s behavior and work completion during the 1999-2000 school year. His behavior plan was rewritten to describe appropriate and inappropriate behaviors and their consequences. Due to continuing concerns about T.'s oppositional behavior, low frustration tolerance and lack of self esteem, the PPT recommended a psychiatric evaluation at a PPT convened on March 21, 2000. The PPT reiterated their request for a psychiatric evaluation at most of the ensuing PPT meetings. The Board believes that only a psychiatrist can comprehensively evaluate and make recommendations regarding both the psychological and medical issues that may be causing T.'s frustration, anxiety, oppositional behavior, and possible depression. The Parents have never agreed to an independent psychiatric evaluation. (Exhibit B-2, Testimony of School Psychologist, Assistant Superintendent, Mother)

5.   On May 8, 2000, the annual PPT was convened. The team discussed T.'s continuing impulsive and oppositional behavior and also noted that he displayed periods of anger and feelings of adequacy. The team recommended that T. receive 7.5 hours of special education services during the 2000-2001 school year (fifth grade) and that the triennial evaluation be administered prior to March, 2001. The parents refused the psychiatric evaluation that had been recommended at the March, 2000 PPT. (Exhibit B-4)

6.   In September, 2000, the student's parents brought him to the Sylvan Learning Center for additional reading and writing assistance. The Sylvan Learning Center assessed T.'s reading ability as falling at the 1.8 grade equivalent level. (Exhibit P-11)

7.   The PPT met on October 5, 2000 to discuss T.'s lack of progress in reading and writing and his ongoing sense of discouragement. T.'s parents questioned why the PPT had continued to promote T. from grade to grade, but they rejected counseling

believing that it would be useless if T. did not also make progress in reading. His parents also reported that medication for T.'s attentional difficulties had been discontinued as they felt it had not provided any benefit. The IEP was revised to increase T.'s special education services to 12.5 hours per week and to include special education instruction in math and one on one reading instruction (with the "Let's Read" program). The reading program was provided by a certified paraprofessional under the special education teacher's supervision; the teacher had received several days of instruction on presenting the "Let's Read" program. (Exhibits B-13, P-19, Testimony of School Psychologist and Kathleen Taylor, Fifth Grade Special Education Teacher)

8. Concerns about T.'s lack of progress and increasing behavioral issues continued. T. persisted in oppositional behavior, inattention, and work refusals. He also had difficulty completing assigned tasks and following directions. At a PPT convened on October 26, 2000, the PPT increased T.'s special education services to 17.5 hours per week although goals and objectives remained the same. In addition, the parents requested and the PPT agreed to provide a neurological evaluation. Questions were prepared for Dr. Anna Alshansky who evaluated T. and provided a report dated October 27, 2000. Dr. Alshansky concluded that T. satisfied the criteria for attention deficit hyperactivity disorder and was learning disabled; in addition, she determined that T. had fine motor function delays and poor self-esteem and anxiety possibly due to his under-achievement. She recommended full psychoeducational and language evaluations, intensive educational supports, psychological counseling, and a trial of Adderall. This report was discussed at a PPT convened on December 12, 2000, at which time the PPT recommended neuropsychological, achievement, cognition, and occupational therapy evaluations. Members of the PPT also questioned whether Dr. Alshansky's report had satisfactorily answered their questions. (Exhibits B-15, B-16, B-19, B-24, Testimony of Kathleen Taylor)

9. T. received most of his educational program during fifth grade in a small classroom at the end of the fifth grade hall; the adjoining group of classrooms housed the kindergartens. T. apparently felt that the classroom's location meant he had been relegated to the kindergarten wing. He received some mainstream instruction in science and social studies when hands-on projects, which T. enjoyed, were presented, and also had recess, lunch, and specials with regular education students. Due to the increasing class size, the Board hired another special education teacher in March, 2001; T. was placed with the new teacher. Both special education teachers testified that T.'s behavior was completely inconsistent and never really improved despite their use of behavior plans and behavior contracts. They were unable to link his behavior to any particular activity or subject. (Testimony of Mother, Kathleen Taylor and Deborah Shelley, Fifth Grade Special Education Teacher from March - June, 2001)

10. Occupational therapy, auditory, reading, cognitive and achievement tests were performed by Board personnel during the winter of 2001. The examiner who performed the learning assessment reported that T. often exhibited oppositional and uncooperative behavior during the testing. It was concluded that T. did not have a deficiency in the auditory perception and conceptualization of speech sounds. While

T.'s overall cognitive ability fell within the average range, his broad reading scores were equivalent to a student of 7 years, 10 months; his basic reading skills score fell at a level equivalent to a student of 7 years, 9 months (T. was 10 years, 6 months at the time of this testing). His broad written language score was equivalent to a student of 7 years, 2 months. His math and broad knowledge scores fell within the average range. T.'s processing speed was within the low range. On the Gray Oral Reading Test, T. scored at a 1.9 grade equivalent level. His comprehension score fell at a grade equivalent level of 3.5 (based on a subtest where the examiner reads the passage and questions aloud to the student). The occupational therapy evaluator found that T. was generally within the average range and did not require services. (Exhibits B-30, B-33, B-34, B-39A)

11. The PPT submitted questions to Dr. Diana Badillo-Martinez in preparation for the neuropsychological evaluation she administered to T. in March, 2001. Dr. Martinez testified that T. was resistant to the testing and easily frustrated; his attitude made testing somewhat difficult and therefore she was not able to answer all the questions that were posed. She concluded that T.'s intellectual abilities fell with the average range but that he learned new material slowly, worked very slowly, and had marked reading decoding and comprehension deficits. She also stated that T. becomes oppositional when he feels inadequate or thinks he might feel inadequate due to the demands that may be placed upon him. Dr. Martinez concluded that these oppositional behaviors interfere with his ability to learn and must be dealt with if he is to progress in school. She was not able to determine why T. reads so poorly. She diagnosed T. as having a Cognitive Disorder NOS, Generalized Anxiety Disorder (for which she recommended medication), Oppositional Defiant Disorder, and a Reading Disorder; she did not believe that T. had ADD but recommended that T. be monitored in order to rule out ADD. During testimony, Dr. Martinez suggested that T. needs a specific, clear behavior program that will help him learn to control his behavior and deal with his frustration. Homebound instruction will only delay his social growth and reinforce his oppositionality. (Exhibits B-29, B-37, Testimony of Dr. Martinez)

12. Dr. Martinez' report was discussed by the PPT on April 5, 2001. The PPT determined that T. continued to qualify for special education services as a learning disabled student and recommended that the IEP be continued without change for the remainder of the school year. In addition, T.'s behavior plan, as revised in March, 2001, was incorporated into the IEP. The plan called for three warnings and a time-out when T. refused to follow directions. (Exhibits B-38, B-39, Testimony of Assistant Superintendent)

13. On June 14, 2001, the PPT convened to plan for the 2001-2002 school. This meeting was quite long and characterized by many disagreements between the Board, the parents, and their respective counsel. The Board members of the PPT proposed an IEP that would promote T. to the sixth grade in the Board's middle school where he would receive 22.5 hours of special education services per week: T. would receive English, reading and math instruction in the resource room, and science and social studies instruction in collaborative mainstream classrooms. T.'s reading instruction would be provided by the Wilson program, a reading program similar to "Let's Read"

but with a more mature presentation; reading instruction would be in a group of 5 or 6 students. T.'s parents rejected the promotion to sixth grade on the basis of T.'s inability to read at grade level. They also objected to the PPT being convened on June 14 as they did not feel there was sufficient information to plan an IEP; they believed that further independent evaluations were necessary in order to appropriately program for T., although they did not seem certain as to which evaluations were needed. The Board proposed a reading evaluation and reiterated their past request for a psychiatric evaluation. Towards the end of this extended meeting, the parents' attorney presented the Board members of the PPT with a letter that essentially revoked consent or agreement with any evaluations, diagnoses, behavior plans, or materials and methods of instruction heretofore proposed or supported by the Board including the IEP of April 5, 2001. There is some disagreement as to whether the parents requested any specific evaluations at this meeting, but in any case, there was great discord and the PPT ended with an agreement that the attorneys for the Board and the parents would discuss the issue of independent evaluations outside the PPT and attempt to reconcile their opposing views. (Exhibit B-50, Testimony of Middle School Special Education Chair, Kathleen Taylor, and T.'s Mother).

14. On July 9, 2001, the student's parents, through their attorney, requested a neuropsychological evaluation by Dr. Armin Thies, and a reading evaluation by Dr. Mary White-Roath. They again rejected a psychiatric evaluation. The Board refused the neuropsychological evaluation based upon the evaluation completed by Dr. Martinez, but requested further information about Dr. White-Roath. The parents responded that Dr. Thies would perform only tests that were not duplicative of those administered by Dr. Martinez; they requested an immediate response as T. was scheduled to see Dr. Thies. The parents also stated that they would allow the Board to speak with Dr. White-Roath prior to the evaluation, but only if the parents participated in the conversation. (Exhibits B-57 through B-70)

15. Despite extensive correspondence between counsel for the Board and parents during the summer of 2001, decisions were not made regarding evaluations until a PPT convened on August 23, 2001. During this PPT meeting, the Board agreed to pay for a reading evaluation by Dr. Mary White-Roath (although only if the parents allowed them to speak to her first without the parents or their attorney present). To minimize conflict and possibly avoid due process, the Board also offered to pay half the cost of Dr. Thies' evaluation. The parents rejected this offer of partial payment. Toward the end of the meeting, the parents also requested homebound instruction for T. They offered a letter dated August 22, 2001 from T.'s pediatrician, Dr. Robert Rubin, which stated "I recommend a trial of homebound instruction for T. due to his current emotional condition affecting his mental welfare. Follow-up would be very important in determining when he can return to the traditional classroom setting." In a form received on August 31, 2001, Dr. Rubin further stated the duration of homebound instruction to be "until satisfactory resolution between school, parents and physician." The Board members of the PPT rejected the request for homebound instruction based upon insufficient information. Although a date and time were arranged for the Assistant Superintendent to speak with Dr. Rubin, she was not available at that time; the Assistant Superintendent did not contact the parents to schedule another date and

time for a conversation with Dr. Rubin. (Exhibits B-77, B-78, B-79, B-89, Testimony of Assistant Superintendent)

16. Dr. Armin Thies, a clinical neuropsychologist, performed a neuropsychological evaluation in July, 2001. He reported that T. became resistive toward the end of his testing. Dr. Thies reviewed T.'s previous evaluations and found that T. works very slowly but has average to superior cognitive ability. His reading and writing fall significantly below his measured intelligence. Dr. Thies concurred with Dr. Martinez that there was little evidence of ADD but that T.'s inattention was a likely result of his emotional condition when confronted with academic tasks. Dr. Thies recommended (stating that many of the recommendations were elaborations or modifications of Dr. Martinez' recommendations) that the management of T.'s behaviors be included in his educational plan; T. must learn to manage his frustration. He also recommended a medication trial to reduce T.'s anxiety, the use of a computer for word processing, building a sight recognition vocabulary (since T. had not been successful with phonological instruction), one on one or small group reading and writing instruction, and modifications that would enable T. to participate in the regular curriculum. (Exhibit B-75)

17. On September 4, 2001, the Board requested Due Process. (Exhibits B-91, H.O.-1)

18. On September 4, 2001, the parents agreed to let the Assistant Superintendent speak to Dr. White-Roath without the participation of the parents or their attorney. (Exhibit B-92)

19. Also on September 4, 2001, T. began receiving regularly scheduled therapy from Dr. D.A. Begelman, a clinical psychologist. T. has also seen Dr. Simon B. Sobo, a psychiatrist. In addition, T.'s parents have brought him to the Center for Attention and Related Disorders for a psychiatric evaluation and psycho-social assessment. (Exhibits P-55, P-57, P-67)

20. Dr. John G. Gelinas, a child, adolescent and adult psychiatrist, was asked by the Board to review T.'s records. In a letter dated October 26, 2001, he stated that a psychiatric evaluation was warranted due to T.'s history of learning disabilities and behavioral difficulties at school. Dr. Gelinas testified that only a psychiatric evaluation can assess medical and psychiatric issues. He also testified that Dr. Martinez' evaluation not only raised more questions than it answered, but that her diagnosis of "Cognitive Disorder NOS" was meaningless and therefore useless for educational planning purposes. (Exhibit B-111, Testimony of Dr. Gelinas)

21. T.'s reading level has shown little progress since he has been a student in the Board's school. In grade 2, his reading comprehension reached the 1.4 grade equivalent level. In third grade, he reached the 2.5 grade equivalent level. In grade 4, his reading comprehension was at a 4.2 grade level, although this was based upon an administration of the Gray Oral Reading Test where the examiner reads the material and questions to the child; T.'s own reading accuracy fell at the 2.3 grade level equivalent. Finally, in fifth grade, T.'s broad reading on the Woodcock-Johnson-

-8-

revised test fell at the 2.2 grade level, his basic reading at the 2.1 grade level, and his accuracy at less than the 1.9 grade level. T.'s written expression tested at the 1.8 grade level when he was in the fifth grade. This was after T. had been individually instructed for almost two years with the "Let's Read" program and had moved from book 4 to book 5 in the program (although Board personnel testified that the "Let's read" program sets forth reading instruction in such a way that reading growth may not be seen on standardized tests until the entire program is completed). T.'s Mother testified that T.'s current home tutor tested T. and found him to be reading at a grade equivalent level of 2.3. Therefore, in four years, T. has made less than one year's reading progress. (Exhibit B-115, Testimony of Middle School's Special Education Chair, Kathleen Taylor, and Mother)

22. The student has not attended school since the end of the 2000-2001 school year. His parents have arranged for T. to receive tutoring for 2 hours per week and to volunteer at a local nursing home. T.'s father testified that they did not want T. in school until a program they deemed appropriate was in place. (Testimony of Mother and Father)

23. Dr. White-Roath completed her evaluation after almost a year of Parent/Board disagreement over who should administer the independent reading evaluation to T. In the late fall of 2000, the Board and parents agreed that the evaluation would be completed by Elaine Cheeseman. However, as Elaine Cheeseman had trained the teachers who implemented the "Let's Read" program, she no longer performed student evaluations. The parents proposed Susan Wiggins, but the Board would not agree to hiring her. The Board proposed Miriam Cherkes-Julkowski, Risa Davidson, and David Zena, but the parents were unwilling to travel outside the immediate area due to their work commitments. The parents later recommended Dr. Pogge of Katonah, New York but it is unclear whether they sent his resume to the Board. As described above, the Board eventually contracted with Dr. Mary White-Roath although even after agreement had been reached and the parents allowed the Board to contact Dr. White-Roath on September 4, 2001, the Board did not officially agree to fund the evaluation until October, 2001. (Exhibits B-47, B-92, Testimony of Mother and Assistant Superintendent)

24. Dr. White-Roath tested T. during September and October, 2001. She found that T. processes very slowly, but is of average cognitive ability. Many of his reading skills tested significantly below average and his writing sample could not be scored. Dr. White-Roath's report states that T. requires a structured, intensive, comprehensive and systematic reading/spelling program which should be presented in a one to one or small group setting. Direct instruction by a trained teacher is essential. Dr. White-Roath also recommended intensive remedial instruction in reading comprehension and writing. (Exhibit B-116)

## CONCLUSIONS OF LAW:

1. The parties do not dispute that T. is a learning disabled student entitled to a free and appropriate public education ("FAPE") with special education and related services as provided for under the provisions of Connecticut General Statutes 10-76 et seq., and

the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. 1401 et seq. T.'s learning disability lies in the areas of written language and reading, including encoding, decoding and comprehension.

2. The standard for determining whether FAPE has been provided begins with the test established by <u>Supreme Court in Board of Education of the Hendrick Hudson Central School District v. Rowley</u>, 458 U.S. 176 (1982). First, the procedural requirements of the IDEA must have been met by the school district. Second, the individualized program must be reasonably calculated to enable the child to receive educational benefit. This test has been subsequently clarified to hold that FAPE requires that the individualized educational program offered to a child must provide a more than trivial educational benefit. (See <u>Polk v. Central Susquehanna Intermediate Unit 16</u>, 853 F.2d 171 (3rd Cir. 1988), cert denied, 488 U.S. 1030 (1989)).

3. T. is an extremely complex student who has presented great challenges to the Board. Why does this child, who has at least average cognitive ability, have such difficulty with reading and writing? And why has his oppositional behavior become worse over time? This hearing transpired because with all the evaluations to which T. has been subjected, there is no concrete answer to these questions. The Board has concluded that if T.'s behavior is controlled, he will learn to read. T.'s Parents believe that if T. learns to read, his difficult behaviors will disappear. Both views are overly simplistic. It is uncertain which came first, the academic difficulties or the problem behaviors, but it is clear that they are intertwined and must both be dealt with.

4. Under 34 C.F.R. Section 300.502(b)(2), if a parent requests an independent educational evaluation, the public agency must, without unnecessary delay, either initiate a hearing to show that its evaluation is appropriate, or ensure that the independent evaluation is provided at public expense. Here, the Board has not met their burden of proof. The neuropsychological evaluation performed by Dr. Martinez gave some insight into T. but was insufficient to support any real educational planning. She could not answer all the questions posed to her and was unable to determine why T. could not read. Dr. Gelinas testified that at least part of her diagnosis was meaningless. Her evaluation provided so few answers that in response to the report, the PPT did not make any changes to T.'s IEP (an IEP that was not working). Finally, the fact that the Board still felt the need for further evaluations even after Dr. Martinez completed her report is a further indication that Dr. Martinez' evaluation, standing alone, was not sufficient or appropriate. With Dr. Martinez' evaluation providing so little assistance to the PPT, it was natural that the parents would request what they felt would be a more comprehensive neuopsychological evaluation. Dr. Thies' evaluation relied heavily on Dr. Martinez' evaluation; he did, however, supplement her testing and recommendations and made suggestions that were more specific and useful in an educational setting. Therefore, the Board must reimburse the Parents for the Thies evaluation.

5. T.'s oppositional behavior is getting in the way of his educational progress. Almost every teacher and evaluator who worked with T. reported some difficulty with T.'s behavior. As T.'s behavior and academic performance deteriorated, the Board sought

a psychiatric evaluation. Both Dr. Martinez and Dr. Thies indicated that T.'s behavior
was interfering with his educational progress and both recommended a trial of
medication for anxiety. The possibility that anxiety plays a role in the behaviors that
are interfering with T.'s educational progress must be investigated. Under C.F.R.
300.532(g), each Public Agency must ensure that children are assessed in all areas
related to the suspected disability. In addition, one of the related services available to
children who have been identified under the special education statutes is medical;
under 34 C.F.R. Section 300.24(b)(4) medical services are defined as "...services
provided by a licensed physician to determine a child's medically related disability
that results in the child's need for special education and related services." Therefore,
the Board's request for a psychiatric evaluation was reasonable and necessary.
However, as it now appears that T.'s parents are in the process of obtaining a
psychiatric evaluation, further evaluation *may* be unnecessary as discussed in the final
order.

6. The Board did not, however, do enough to modify T.'s behavior. Practical strategies
for working with T. were never developed. As T.'s oppositional behaviors continued
to escalate, PPTs were convened; but for the most part, no specific usable behavior
interventions emerged from these meetings. Behavior plans were written (see Finding
of Fact No. 12) and behavior contracts were employed (Finding of Fact No. 9), but to
no avail. T.'s teachers were unable to link instances of his resistant behavior to any
particular activity or subject. They suggested that T.'s problem behaviors just
appeared from nowhere; this seems somewhat unlikely. The PPT should have
obtained a functional behavior assessment; when completed by a qualified individual,
such assessments often yield information that can be translated into useful, successful
behavior plans. A functional behavior assessment is still in order.

7. Throughout the 2000-2001 school year, the Board's response to T.'s negligible
academic progress and escalating behavior difficulties was to increase his time in the
self contained special education classroom. Even though the increased hours did not
seem to ease the situation, they continued to decrease the amount of time T. spent in
the regular education classroom (see Findings of Fact Nos. 7 and 8). It is not clear
that T. ever had an integrated, comprehensive educational program that exposed him
in any meaningful way to the grade level content he was cognitively capable of
handling. The IDEA requires that children with disabilities are educated in the least
restrictive environment ("LRE"); that is, with children who are not disabled, and, that
children with disabilities are to be removed from the regular education environment
"...only when the nature or severity of the disability of a child is such that education in
regular classes with the use of supplementary aids and services cannot be achieved
satisfactorily." (20 U.S.C. Section 1412 (a)(5)). 34 C.F.R. Section 300.552(e) also
requires school districts to ensure that "A child with a disability is not removed from
education in age-appropriate regular classrooms solely because of needed
modification in the general curriculum." It is clear that T.'s instruction was provided
in an increasingly restrictive environment that did not meet his needs and provided
negligible educational benefit.

8. The Parents have argued that the PPT's decision to promote T. each year was not appropriate. Although T. does not work at grade level and has never made the expected progress each year, the issue is not the grade to which T. is assigned; it is whether his educational program was appropriate.

9. The program offered by the Board for the fall of 2001 as contained in the IEP dated June 14, 2001 is really more of what T. received during the 2000-2001 school year. Although little reading progress could be demonstrated by T. after two years with "Let's Read" (see Finding of Fact No. 21), the Board proposed that he receive educational instruction with the Wilson program, which, as described by Board witnesses, is quite similar. The IEP contains no new behavior initiatives and, as in the previous year, most of T.'s academic instruction would take place in the resource room. Placement in collaborative classrooms for social studies and science was a positive change, but without viable behavioral or reading programs in place, it is unlikely that T. would have experienced much success in those classes. While this IEP looks good on paper, it does not meet T.'s individual needs and therefore is not calculated to provide educational benefit as required by Rowley.

10. The Parents' response to this IEP, however, can not be supported. Homebound instruction is described in the Regulations of Connecticut State Agencies Section 10-76d-15, which states that such instruction shall be provided only when the PPT finds that at least one of the following conditions applies: "(1) A physician has certified in writing that the child is unable to attend school for medical reasons and has stated the expected date the child will be able to return to the school. (2) The child has a handicap so severe that it prevents the child from learning in a school setting, or the child's presence in school endangers the health, safety or welfare of the child or others. (3) A special education program recommendation is pending and the child was at home at the time of referral. (4) The child is pregnant or has given birth and a physician has certified that home bound or hospitalized instruction is in the child's best interest and should continue for a specified period of time." (Section 10-76d-15(b) In addition, the regulation states that homebound instruction "...shall be provided when a child's condition will cause an absence of at least three weeks' duration." (Section 10-76d-15(c)) Conditions 2, 3 and 4 can be eliminated immediately. As to the first condition, the letter sent by Dr. Rubin is overly vague and broad (see Finding of Fact No. 15). The PPT could not make a decision based upon such insufficient information. Also, there was no suggested date on which T. could return to school, nor was there any reason to believe his absence would last at least three weeks. Most telling is Dr. Rubin's second communication which suggests that the real explanation for the absence was the lack of agreement between the Parents and the PPT. Also worth noting is the fact that no other evaluator, including Dr. Thies, suggested that T. would benefit from homebound instruction. Finally, home bound instruction would not meet the LRE requirements as applied to T.'s individualized needs. While the Board did not overextend itself in its efforts to discuss the situation with Dr. Rubin, neither did the Parents request that Dr. Rubin send a more detailed explanation of the need for homebound instruction.

11. The Parents have alleged several procedural violations on the part of the Board. While the Supreme Court in <u>Rowley</u> recognized the importance of meeting all procedural requirements, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." <u>Roland M. v. Concord Sch. Comm.</u>, 910 F.2d 983, 994 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991).

12. The Parents have argued that the PPT meeting of June 14, 2001 should not have gone forward as they were not yet prepared. They also argued that the IEP was prepared before the meeting and that other forms were filled out after the meeting when they were not present. While Boards must make every effort to ensure parental attendance at PPT meetings, even if a parent objects to the PPT meeting, there is nothing to prevent a Board from going forward with the meeting without the parents in attendance so long as they have made a good faith effort to obtain the parents' attendance. In addition, Board members of a PPT may meet before the meeting to prepare a draft IEP as long as the parents have the opportunity to provide input and recommend and discuss changes. Here, the Parents did attend the meeting, but as was discussed in Finding of Fact No. 13, the meeting was characterized by dissension and culminated in the Parents' presentation of a letter revoking any and all consents and agreements they had ever granted. There was ample opportunity to reconvene the PPT and to rewrite the IEP, but communication between the parties continued to deteriorate during the summer. Therefore, a procedural violation can not be found with relation to this PPT/IEP.

13. The Parents have also argued that procedural violations exist with relation to the provision of evaluations. During the summer, the Parents requested that the Board pay for Dr. Thies' evaluation and demanded an almost immediate answer (see Finding of Fact No. 14). An immediate answer is not a reasonable expectation; the Parents did receive their answer at the August 23, 2001 PPT, after which the Board appropriately requested this hearing. The situation is somewhat different with Dr. Mary White-Roath. As described in Finding of Fact No. 23, the issue of the reading evaluation languished for almost a year due to the disagreement between the parties. Even after the Board finally agreed to Dr. White-Roath, the actual payment decision was delayed for another month. At that point, however, the Parents were holding T. out of school so the Parents cannot claim that this delay contributed to a deprivation of educational benefit.

14. The parties have clearly reached a point where trust is lacking and communication has broken down. However, it is essential that T. be immediately returned to school before he loses any more academic ground or his social skills experience any further deterioration. Therefore, a third party must be brought in to help the parties plan for T.'s educational future. This consultant will assist the PPT in planning an IEP that places T. in the sixth grade at the middle school and balances T.'s time in the mainstream with the need to remediate his reading and writing skills. In addition, the team will insure that appropriate supplementary aids and services are in place to help T. succeed in the mainstream and that the entire IEP is appropriately implemented.

If the local or regional board of education or the unified school district responsible for providing special education for the student requiring special education does not take action on the findings or prescription of the hearing officer, within fifteen days after receipt thereof, the State Board of Education shall take appropriate action to enforce the findings or prescription of the hearing officer.

Appeals from the hearing decision of the hearing officer may be made to state or federal court by either party in accordance with the provisions of Section 4-183, Connecticut General Statutes, and Section 20, United States Code 1415(i)(2)(A).


_____
Hearing Officer Signature


_____
Hearing Officer        Name in Print


signpage.doc (ho disk)
11/96

The independent consultant will help the PPT review all evaluations done to date and determine if any other evaluations are required. To prevent any unnecessary evaluations, the Parents will submit to the PPT the psychiatric evaluation they are currently obtaining. The consultant will assist the PPT in determining if this psychiatric evaluation is sufficient for educational planning. If not, another psychiatric evaluation will be obtained by the PPT. The consultant will also facilitate the completion of a functional behavior assessment and the creation of a behavior support plan by an individual trained in this area. The consultant will facilitate all communications with other professionals as necessary. Finally, in the event of any disagreement between the parties or within the PPT, the decision of the consultant shall be final.

## FINAL DECISION AND ORDER:

1.  Dr. Martinez' evaluation was not appropriate. The Board will reimburse the Parents for the evaluation performed by Dr. Thies.

2.  A psychiatric evaluation is necessary and appropriate. A psychiatric evaluation will be obtained by the Board as detailed in Conclusion of Law No. 14.

3.  The Board did not commit any procedural violations.

4.  The program offered by the Board in the June 14, 2001 PPT for the 2001-2002 school year was not appropriate. The PPT will convene within one week of receipt of this decision to select an independent consultant who is to be paid by the Board and is agreeable to both the Parents and the Board. If the parties are unable to agree on a consultant, then each party will select a consultant; together, the two consultants will select the independent educational consultant. It is expected that this process will be completed before the end of the calendar year. It is also expected that T. will be returned to school as soon as possible. Until this occurs, the Board will provide homebound instruction.

5.  The independent consultant will assist the PPT in planning an appropriate IEP that will allow for T.'s transition back to school. The various details of this task are detailed in Conclusion of Law No. 14; the consultant will make certain that the PPT addresses each of these components. The consultant's hours shall be determined by the agreement of the Board and the Parents. The educational consultant shall remain in place until both the Board and Parents agree that his or her services are no longer needed by the PPT, but at least through the 2001-2002 school year.

# EXHIBIT "J"



RECEIVED
AUG ?? ????
OFFICE FOR STUDENT AFFAIRS

A. HERBERT SCHWARTZ, M.D.
P.O. Box .801
Woodbridge, Ct 06525·
TELEPHC .I (3l6:3 8 7-7751

Fax 203-389-0135
E-Mail psymd@aol.com

JeanAnn Paddyfote, Ph.D                                    8-22-02
Assistant Superintendent, New Milford Public Schools
50 East Street
New Milford, CT 06776

Re; Your letter of May 30, 2002              Ph-860-354-2654   Fax 860-210-2682 A,J

Re: Travis Myslow , DOB: 7-17-00

In order to respond to your request of May 30, 2002, the following information is provided.
On June 9, the entire school record was briefly reviewed inpreparation for the initial evaluation
sessions with both Travis and his parents. Travis was seen for five sessions often for an hour and
one half. He easily separated from his parents and appeared his stated age in appropriate
clothing was polite, respectful and well oriented to time, place,person and understood he was
being evaluated in order to help him, his parents and the school. He readily told me his date of
birth,his address, phone number, age, grade, and readily gave accurate factual information
regarding his family. When asked what his difficulty was, he said he had "Trouble reading
..........his whole life........ and writing too.". He was both left handed and appeared to be left eyed.
He was interested in the puzzles on the table but readily gave up when he encountered the
slightest difficulty stating it was not possible. My response was "everything is possible" and asked
if he wanted help and how he wanted the help--i.e. a start,hints, show him or?. A simple back and
forth question and answer approach seemed to often engender his continued participation. He
learned quickly.

        At any time in the ensuing four sessions if he were asked to read or write or if one said he
was obviously reading he would often just stop what he was doing and change activity or topic.
With much encouragement he wrote his name in cursive[ "Thats all I can write"]. He worked at the
puzzles in the room with interest but often giving up when it was clear he could with a little hint do
the task. He enjoyed the Living Book on the computer[ Jack Prelutskis Poems ]with an ability to
read the words but again if said he was reading would be disinterested. The same with Nintendo
on screen instructions. He enjoyed the Simple Text writing and the computer reading back to us in
his choice of a variety of voices. During these sessions he described frequently being
"embarrassed" , at not being able to read, at being in the "stupid class", at being in the
kindergarden hallway with an x kindergarden teacher trying to help him read [?], at being seen as a
"retard, at being in "aisle c", and said he could do more "if you don't make me feel like an idiot".
He is "sick of seeing people" which I understood that he was tired of evaluations which addressed
his difficulties.

        At various times during the course of these sessions the school record, various reports,
phone calls re information or confirmation of information were made.

        Travis is a 12 year old boy who is allegedly going into 7th grade who reads far below grade
level and writes almost illegibly who has been in the New Milford schools since second grade with
apparently little change in his ability in these areas who is now easily frustrated, oppositional,

INFORMATION IN THIS REPORT I S CONFIDENTIAL UNDER CHAPTER 899
                    CONNECTICUT GENERAL STATUTE

angered, and anxious when attention is given to his inabilities. To date the programs applied seem to have done little to alleviate his marked inabilities. Although he seems bright and is maturing in other ways these inabilities and the lack of progress and in both the nature and setting may have added to his anxiety and have created a Situational Anxiety Disorder akin to be an Adjustment Reaction with both emotional and conduct components [ICD-9-(309.4)]

In response to your specific questions:

1. +2. The primary psychiatric diagnoses is as stated above is Situational Anxiety Disorder secondary to inability to read and write with repeated stressful experiences in the educational setting. The primary focus should be enlisting both his and his families enthusiasm for an educational program which not only would give promise with appropriate frequent monitoring of his progress with his educational inabilities as well as not provide further trauma. Psychotherapy with a skilled child psychiatrist might provide an additional source of reducing anxiety, conflict and lack of participation. Medication is currently not indicated.

3. Travis as described above can become so anxious he may exhibit what might appear to be inappropriate in behaviour and attitudes.

4.+ 5.It is not clear to me what "pushed" means. If his "avoidance/oppositional pattern" is seen it may well be related to his anxiety and lack of self esteem in the school setting particularly when a reading or writing ability is needed. The "triggers within his learning environment" Travis seemed to comment on when he said "if you don't make me feel like an idiot".

6. The functional behaviour plan does not adequately address his primary difficulties. At points with the use of plastic letter blocks as well as the suggestions for student strategies i.e. Travis will do in-seat relaxation/positive self-talk, etc ------------------probably will add to his difficulties.

7. The answers to these questions seem self evident from the above. Travis 's self esteem seems to be built on his identification with his father, his mother's support, his cognitive ability in other than a school setting, and his motor ability. The past school settings seemed to often provide him with a high level of anxiety from which he could not escape nor cope with without a loss of self esteem. Unless the regimen suggested in answers to question one is instituted, I suspect that "being held responsible" and "traditional consequences" will do nothing to alleviate his difficulties.

A. HERBERT SCHWARTZ M.D.
LFAPA-LFAACAP
ASSOC. CLIN. PROFESSOR
YALE UNIVERSITY

*LFAPA-Life fellow of the American Psychiatric Association
*LFAACAP-Life Fellow of the American Academy of Child and Adolescent Psychiatric Association
*Certified by the American Board of Psychiatry and Neurology in Psychiatry and Child Psychiatry

THE INFORMATION IN THIS REPORT I S CONFIDENTIAL UNDER CHAPTER 899
CONNECTICUT GENERAL STATUTE

CURRENT BILL ENCLOSED

# EXHIBIT "K"

# Armin Paul Thies, Ph.D.
### ABPP/ABCN Board Certified Clinical Neuropsychologist
### Associate Clinical Professor - Yale Medical School

## Neuropsychological Report

Name:  Travis Myslow
Age:  11 years 0 months
DOB:  7/17/1990
Education: completed 5th grade
Dates of Examination: 7/23, 7/26/2001
Date of Report:  August 10, 2001
Date of Feedback: 8/13/2001

## Assessment Procedures

Beery-Buktenica Test of Visual Motor Integration (VMI)
Behavior Assessment System for Children (BASC)
        Parent Rating Scale
        Self Report Rating Scale
Comprehensive Assessment of Spoken Language (CASL)
        Antonyms                    Grammatical Judgment
        Synonyms                    Nonliteral Language
        Sentence Completion      Inference
        Syntax Construction
Connor's Continuous Performance Test (CPT)
NEPSY
Rey-Osterreith Complex Figure
Symptom Checklist
Warshak Inventory for Child and Adolescent Assessment - Second Edition

## Background

Travis was referred for a neuropsychological examination as a second opinion to a neuropsychological examination performed earlier this year and to supplement those previous findings. In addition, there have been several, recent evaluations performed at school. The findings from those previous examinations will be discussed in the report of findings from the present examination in the report to follow. His parents do not want Travis to be promoted to the

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

P.O. Box 906, Orange, Connecticut 06477-0906  -  Phone: (203) 891-8762 - Fax: (203) 891-8794
Stamford Phone: (203) 968-8241

sixth grade, because he does not appear to be functioning at that level.

At the time of this examination, Mr. and Ms. Myslow reported the following presenting problems:

1. A history of writing mirror reversals of number and letters, which is now controlled by tracing his work;
2. High anxiety related to school work;
3. Low self esteem related to school work;
4. "Shuts down" when confronted with challenging material;
5. Poor penmanship;
6. Is not functioning at the fifth grade level in any academic area;
7. Presently reads at approximately the 2.1 grade level.

Travis is reportedly good in math, however, word problems are difficult for him. He was not in the regular classroom for both social studies and science this past year. Rather, he remained in one classroom with three other students for instruction. Phonetic instruction in reading has been provided for four to five years now, with limited effect.

Travis has received 15 mg/day of Ritalin for three years to treat hyperactivity. He has also been medicated with Adderal, 5 mg. per day, however, he became pale, grey, and lethargic on that medication. However, with medication, he was able to focus on projects and complete his homework.

Prenatal and perinatal history is unremarkable. Both motor and language developmental milestones were attained at normal times. At approximately two or three years of age, Travis fell and required three stitches on the back of his head. There were no post concussion symptoms evidenced subsequent to the accident. Academic problems began in kindergarten. Restless behavior and inattention were problems during the third grade. Travis has been in special education since the first grade.

This examination was complicated by the recent history of extensive testing. Not only had most of the principal measures of mental abilities already been administered, but Travis was not eager to engage in yet more testing. Therefore, it was necessary to supplement the previous examinations in order not to elicit practice effects or undue frustration. Despite the history of difficulty in previous examinations, Travis was remarkably cooperative during this examination and seemed to enjoy tasks and challenges that where not similar to school work. Only towards the end of the last testing session did he begin to refuse tests.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

## Assessment Findings

Above average to superior cognitive potential was evidenced in the following measures of mental abilities:

1. Similarities subtest score of the WISC-III;
2. Verbal Immediate and Verbal Delayed Memory Indices of the CMS;
3. Tests of sentence recall in the W/J-R and NEPSY;
4. The Picture Vocabulary subtest of the W/J-R, a test of naming vocabulary;
5. Tests of synonyms and antonyms from the W/J-R and CASL.

Therefore, selecting the appropriate baseline against which to compare performance in specific, cognitive domains becomes important. Even so, his achievement in reading, as measured by the W/J-R Written Language subtests is significantly below even measured intelligence even when corrected for regression towards the mean.

The general pattern of findings indicates some weakness in basic linguistic processes to reading, i.e., phonological processing and speeded naming, even when compared to his average peers. However, the impairment to functional reading and especially writing is greater than the deficiencies evidenced in the assessments of the individual skills required for those activities. Language deficits are circumscribed in that verbal memory and syntactic and pragmatic aspects of language are quite strong. Writing is also largely impeded by severely deficient penmanship. Again, individual motor skills are poor compared to even measured intelligence, but the functional expression using fine motor skills in writing is even more impaired.

Regarding the findings of the previous neuropsychological examination, I concur with Dr. Martinez the following of her findings:

1. Slow rate of work;
2. Poor fine motor coordination (but primarily while writing);
3. Deficient learning across multiple learning trials;
4. Functionally impaired reading and writing.

However, poor facial recognition during the previous examination was not replicated during this examination, therefore, it is not clear whether nonverbal/visual memory is deficient. Poor performance during the Dot Location subtest of the CMS may be the result of poor visual spatial processing, however, the findings are not completely consistent in that regard. In addition, the fact that delayed memory was significantly stronger than immediate memory indicates that the visual Immediate Memory Index was spuriously depressed. There is some evidence of consistently weaker nonverbal processing compared to verbal processing, however, the degree of

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

Page 4

this discrepancy is within normal limits.

Regarding the question of an attention disorder. There is not much supporting evidence, either observational or psychometric, during this examination for ADD or ADHD. It is more probable that inattention occurs primarily in the form of difficulty sustaining vigilance. However, it is more likely that inattention is a manifestation of his emotional condition, particularly in reaction to academic tasks.

Delineating Travis' cognitive processing deficits is made more difficult by the variability of his performance across measures of similar mental abilities and across examinations. It is likely that his emotional condition exacerbates the variability of his performance, depending upon the immediate conditions under which the task is being performed. His presentation during this examination was not as troubled as described during the previous neuropsychological assessment. However, during this examination, an effort was made to avoid academic tasks, such as reading and writing, because they had already, recently, been extensively assessed. Even so, there were tasks during this examination that were refused, after hours of testing.

In light of the above discussion, the following are recommended, many of which are elaborations or modifications of the recommendations by Dr. Martinez:

1.  Management of impeding emotions and behaviors must be part of the educational plan, including:
    a.   Instructing Travis in ways to manage frustration;
    b.   Intervening when symptoms of frustration and failure avoidance first appear;
    c.   Provide opportunities to display competencies;
    d.   Provide encouragement and expressions of confidence in his abilities;
    e.   Chart progress and otherwise make progress salient to him;
    f.   Institute behavior management plans to reward desired behaviors which are mutually exclusive of undesired behaviors, with criteria for success that insures that he will receive at least a moderate number of reinforcements.
2.  Travis needs to be taught mnemonic strategies and to actively employ them when learning information. However, the fact that his delayed recall is so much better than immediate recall suggests that consolidation is delayed and that during the task of acquiring knowledge, immediate recall is impeded. Spaced practice rather than massed practices, e.g., "cramming," is particularly necessary. It also seems evident that he remembers better during tasks that involve auditory-visual or verbal-graphic associations.
3.  I concur with Dr. Martinez that the focus of medication trials should be on reducing anxiety rather than reducing inattention.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

4.   An alternative form of written expression should be found to avoid the need for writing by hand, given his poor fine motor control during this activity. Dictation should be permitted, and voice recognition programs with word processing may be helpful, if Travis is unable to demonstrate sufficient motor coordination to employ a keyboard efficiently. If he can learn to type, then he should be permitted to use word processing for all written assignments.

5.   Vocabulary development is superior. Given the limited success after years of instruction in phonological decoding, it may be beneficial to focus on building sight recognition vocabulary. Whether his visual discrimination for letters and words is poor still remains a question. He performed poorly during the Visual Matching subtest of the W/J-R, however, slow performance may have depressed his score. Nevertheless, training in sight recognition may require visual discrimination training as well. For example, a pair of words such as *was* and *war* can be presented on flash cards with the final letters in red or with some other distinguishing feature. Then, as the discrimination is mastered, the discriminating feature is gradually "faded" until he can rapidly discriminate the words in normal print.

6.   Ultimately, once adequate word recognition is attained, reading for comprehension rather than accuracy may have to be emphasized.

7.   The functional activities of reading and writing must be closely monitored during any attempts to remedy his difficulties in these activities. For that reason 1:1 or small group treatment is indicated. Treatment interventions will likely have to be tailored to the problems as they present themselves. Therefore, published curriculum will probably have to be modified in order to assist Travis to integrate his basic skills into the functional activities. In addition, he should be trained by a skilled and experienced reading specialist.

8.   For the present, requirements for reading in content classes will have to be supplemented by graphic illustrations, books on tape, and other means to compensate for limited reading ability.

9.   Travis shows avid interest in the construction trade and feels competent in his ability to operate heavy machinery. These interests can be incorporated into classroom activities to increase motivation.

10.  In addition, it appears that he can learn even nonverbal, manipulative tasks rather easily, suggesting that experiential learning is the preferred mode of instruction whenever possible.

11.  Given his age, the desire to improve his functional reading and writing have to be balanced against the participation in learning academic subjects which is the normal expectation for his age. In content courses, curriculum and instructional modification will have to be made in order not to depend upon or to require reading and writing. In other words, Travis will have to be considered to be a dyslexic and

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*