Neuropsychological Report - Travis Myslow

dysgraphic student.

12.   In content courses, he will require additional, tutorial support to the extent that grade appropriate curriculum depends upon mastery of material taught in previous grades.

Additional recommendations to address specific problems can be provided in dialogue with parents or teachers, if requested.

Armin Paul Thies, Ph.D., ABPP
Board Certified Clinical Neuropsychologist

The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes

Neuropsychological Report - Travis Myslow

## Appendix - Test Findings and Observations

# Intelligence and Conceptual Reasoning

There are three baselines against which performance can be compared. The first baseline is the average for the normal population of the same age or other demographic variable. The second baseline is the average level of performance for the individual child, and the third baseline is the estimated potential capabilities of the child. The first baseline is reflected in standard scores and percentile scores. The second baseline is determined by the administration of an individual test of intelligence, and the third baseline is estimated from the highest levels of performance on specific measures of mental abilities. Unless otherwise indicated, scores reported here are determined according to age norms. Grade norms are not used, because, in many cases, grade placement is determined by factors other than normal development.

The Wechsler Intelligence Scale for Children - Third Edition (WISC-III) was previously administered by Dr. Martinez, earlier this year. Scores for the WISC-III subtests are reported as scaled scores which have an average of 10 and a standard deviation of 3. The subtest scaled scores from the present administration of the WISC-III are presented in the bar graph below.



Previous WISC-III Subtest Scores

| Key for Subtest Abbreviations | | | |
|---|---|---|---|
| INF | = | Information | |
| SIM | = | Similarities | PC = Picture Completion |
| ARI | = | Arithmetic | COD = Coding |
| VOC | = | Vocabulary | PA = Picture Arrangement |
| COM | = | Comprehension | BD = Block Design |
| DS | = | Digit Span | OA = Object Assembly |
| | | | SS = Symbol Search |

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

The IQ scores are standard scores with an average of 100 and a standard deviation of 15. Scores from 90 to 110 are within the average range. The IQ scores from the previous administration of the WISC-III are compared in the table below.

| Previous WISC-III IQ Index | Standard Score | Percentile Score | 90% Confidence Interval |
|---|---|---|---|
| Verbal | 102 | 55 | 97 - 107 |
| Performance | 81 | 10 | 76 - 89 |
| Full Scale | 92 | 30 | 88 - 97 |

The 90 % confidence interval is the range within which one can be 90 % certain the true ability is contained.

Because the Performance IQ score was depressed by his significantly poorer performance during the Coding subtest, a comparison of the supplementary indices of the WISC-III gives a more accurate comparison of verbal versus nonverbal processing. Those indices are compared in the table below.

| WISC-III Index | Standard Score | Percentile Score | 90% Confidence Interval |
|---|---|---|---|
| Verbal Comprehension | 106 | 66 | 100 - 111 |
| Perceptual Organization | 91 | 27 | 85 - 99 |

The difference between these two indices is significant at the 0.05 level of probability. In other words, a difference of this magnitude or greater would occur by chance in less than 5 out of 100 random samples. Although the difference is probably not the result of chance or error, a difference of this magnitude or greater occurred in 26 % of the normal sample. Therefore, the difference rather commonly occurs amongst normals.

His ability to solve discrete problems requiring either analytical-sequential reasoning or gestalt perception of conceptual relationships was below average to low average. Accuracy of performance during the Analysis-Synthesis subtest of the W/J-R, administered in January of this year, was equal to a standard score of only 81, at the 10th %tile. Notable better, performance during the Concept Formation subtest was equal to a standard score of 99, at the 46th %tile. These two subtests comprise the Fluid Reasoning Factor of the W/J-R, which was equal to a standard

The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes

Neuropsychological Report - Travis Myslow

Page 9

score of 89, at the 23rd %tile.

## Executive Functions and Attention

Attention and executive processing was assessed by means of the subtests of the Attention/Executive Domain of the NEPSY. The subtest scores are presented in the graph below.



| Key to Subtest Abbreviations | | |
|---|---|---|
| Tower | = | Tower Test |
| Aud Att | = | Auditory Attention and Response Set |
| Vis Att | = | Visual Attention |



These subtests comprise the domain score which was equal to a standard score of 93, at the 30th %tile (90% confidence interval = 85 - 102). The results of previous measures of attention and impulse control are presented below.

### Attention - Sensory Selection

Travis was not distracted by external stimuli during the examination and was able to focus attention adequately to remain on task during this examination. These observations are consistent with previously administered tests that measure attention. The indices derived from those tests are presented in the table below.

| Previously Administered Attention Index | Standard Score | Percentile Score | 90% Confidence Interval |
|---|---|---|---|
| WISC-III  Freedom from Distractibility | 98 | 45 | 91 - 106 |
| CMS Attention/Concentration | 94 | 34 | not reported |
| Previously Administered Attention Index | Standard Score | Percentile Score | Standard Error of Measurement |
| W/J-R Processing Speed | 76 | 6 | 70 - 82 |

A comparison between his performance during the CPT during this examination and the

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow                                    Page 10

his CPT performance during the previous neuropsychological examination could not be made, because the previous scores are not available to me. The present indices from the CPT indicating inattention are presented in the table below.

| CPT Scoring Dimension | T Score | Percentile Score | Description of Performance |
|---|---|---|---|
| # Hits | | 98.50 | Markedly Atypical |
| # Omissions | | 98.50 | Markedly Atypical |
| Attentiveness (d') | 66.38 | 94.91 | Markedly Atypical |

The indices from the CPT indicating the level of impulsive responding are presented in the table below. T scores have an average of 50 and a standard deviation of 10.

| CPT Scoring Dimension | T Score | Percentile Score | Description of Performance |
|---|---|---|---|
| # Commissions | 57.28 | 76.66 | Average |
| Hit Reaction Time | 32.67 | 5.14 | Atypically slow |
| B' (Risk Taking) | 100.00 | 99.00 | Atypically cautious |

CPT performance, in general, indicates slow reactions during tasks that require sustained vigilance. However, the BASC profile from the ratings by Travis' mother indicated normal attention and normal levels of activity at home.

## Memory and Learning

In order to assess memory, the Children's Memory Scale (CMS) was administered during the previous neuropsychological examination. The subtest scores are reported as scaled scores which have the same psychometric properties as the WISC-III subtest scores, i.e., an average of 10 and a standard deviation of 3. The subtest scores for the CMS that were reported in the previous neuropsychological report are compared in the bar graph on the following page.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow



### Key for Subtest Abbreviations

| DOT | = Dot Location | STO | = Stories |
|-----|----------------|-----|-----------|
| FAC | = Faces | PA | = Paired Associates. |
| FP | = Family Pictures | | |

The memory indices are standard scores which are comparable to IQ scores. The memory indices from the CMS are presented in the table below.

| Previous CMS Memory Index | Standard Score | Percentile Score |
|---|---|---|
| Verbal Immediate | 106 | 66 |
| Visual Immediate | 85 | 16 |
| Verbal Delayed | 115 | 84 |
| Visual Delayed | 115 | 84 |
| General Memory (all of above) | 109 | 73 |
| Learning | 66 | 1 |
| Delayed Recognition Recall | 88 | 21 |

An analysis of the statistical significance of differences among memory indices could not be performed, because the raw data was not available. However, the discrepancy between verbal and nonverbal memory indices parallels the IQ differences previously obtained. The fact that the Delayed Recognition Recall Index is significantly lower than the Verbal Delayed (recall) Index is

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

Page 12

anomalous and suggests that recognition recall was depressed by factors other than memory.

In addition, various memory measures from the Woodcock-Johnson Psychoeducational Battery - Revised (W/J-R) were administered at school in the beginning of this year. Those findings are presented in the table below.

| 3/2001 W/J-R Subtest/Cluster | Standard Score | Percentile Score | Standard Error of Measurement |
|---|---|---|---|
| Memory for Names | 101 | 54 | 97 - 105 |
| Visual-Auditory Learning | 98 | 45 | 93 - 103 |
| Long Term Retrieval Cluster | 100 | 50 | 96 - 104 |
| Memory for Sentences | 128 | 97 | 122 - 134 |
| Memory for Words | 96 | 41 | 89 - 103 |
| Short Term Memory Cluster | 111 | 78 | 106 - 116 |
| Picture Recognition | 104 | 61 | 97 - 111 |

During this examination, various subtests of memory and learning from the NEPSY were administered. The scaled scores from those subtests are presented in the bar graph below.



Subtest Abbreviations

Faces        ⇒ Memory for Faces
Names        ⇒ Memory for Names
Narrative    ⇒ Narrative Memory
Sentences    ⇒ Memory for Sentences
List         ⇒ List Learning



NEPSY Memory Subtests

These scores are generally consistent with those previously obtained from the W/J-R. Sentence repetition is consistent with the W/J-R Memory for Sentences. In a similar manner, his list learning during the NEPSY showed the same failure to benefit from repeated learning trials, as evidenced in the deficient learning index from the CMS. In addition, his narrative recall during the NEPSY is consistent with the Verbal Memory Index from the CMS. However, face recognition during the NEPSY was high average in contrast to impaired recognition during the

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

CMS.  Therefore, the latter is not a reliable finding.  The Memory Domain score for the NEPSY was equal to a standard score of 88, at the 21st %tile.

## Language

Rapid scanning and visual matching of numbers was equal to a standard score of only 74, at the 4th %tile, as measured by the W/J-R subtest administered earlier this year.  These scores may merely result from slow performance.  Auditory perception of incomplete phonemic strings and subsequent word recognition were equal to a standard score of 117, at the 88th %tile. Consistent with this finding, blending of phonemic strings and subsequent word identification were equal to a standard score of 91, at the 27th %tile.  These two subtests of the W/J-R comprise the Auditory Processing Factor which was equal to a standard score of 100, at the 50th %tile.

Phonological processing, as measured by the NEPSY subtest was low average (scaled score = 8).  This finding was consistent with his verbal fluency during the Speeded Naming subtest (scaled score = 8).  Phonological decoding was previously administered by means of the Word Attack subtest of the W/J-R, which was equal to a standard score of only 82, at the 11th %tile. However, Travis' parents report that he has still not mastered letter combinations for phonetic decoding.

The achievement scores previously obtained for the subtests of the Wechsler Individual Achievement Test (WIAT) are presented in the table below.

| Previous WIAT Subtest/Composite | Standard Score | Percentile Score |
|---|---|---|
| Reading Decoding | 74 | 4 |
| Reading Comprehension | 86 | 18 |
| Reading Composite | 74 | 4 |
| Spelling | 70 | 2 |
| Numerical Operations | 80 | 9 |

These achievement scores are lower than his measured intelligence.

Achievement subtests of the W/J-R were also administered earlier this year.  Those findings are presented in the table on the following page.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow                                        Page 14

| Previous W/J-R Subtest/Cluster | Standard Score | Percentile Score | Standard Error of Measurement |
|---|---|---|---|
| Letter-Word Identification | 75 | 5 | 71 - 79 |
| Passage Comprehension | 84 | 14 | 79 - 89 |
| Broad Reading Cluster | 77 | 6 | 74 - 80 |
| Dictation | 78 | 7 | 73 - 83 |
| Writing Samples | 48 | 0.1 | 43 - 53 |
| Broad Written Language Cluster | 58 | 0.3 | 54 - 62 |
| Calculation | 78 | 7 | 74 - 82 |
| Applied Problems | 108 | 69 | 103 - 113 |
| Broad Math Cluster | 92 | 29 | 88 - 96 |

Subtests from the WIAT and W/J-R which are most similar have yielded similar findings. Writing ability is clearly significantly poorer than expected from his measured intelligence, even when corrected for regression towards the mean.

Earlier this year, fluent oral reading was assessed by a reading specialist, using the Gray Oral Reading Test - Third Edition (GORT-3). Rate , accuracy, and comprehension were markedly deficient (scaled scores of 2, 3, and 3, respectively). The Oral Reading Quotient was previously incorrectly calculated. Erroneously adding the scaled scores for Rate, Accuracy, Passage Score, and Comprehension results in a grossly inflated reading quotient. Only the Passage Score and Comprehension scores are supposed to be added to derive the Oral Reading Quotient. The correct quotient is equal to a standard score of 70, at the 2nd %tile. Thus, fluent reading is consistent with measures of word recognition.

Receptive comprehension of speech was grossly adequate in terms of following test instructions and responding in a relevant manner to test items. Accuracy during the Comprehension of Instructions subtest of the NEPSY was high average (scaled score = 11).

Articulation was grossly normal with fluent speech. The nonverbal attributes of communication were also grossly normal, e.g., intonation, prosody, volume, and the expression of affect in tone of voice. No literal paraphasic errors (mispronunciations) or verbal paraphasic errors (word substitutions) were heard during fluent speech. No significant word finding difficulties or symptoms of dysnomia were heard either during fluent speech or during a test of confrontation naming. Earlier this year, naming vocabulary was equal to a standard score of 110, at the 74th %tile. In contrast, verbal fluency in terms of generating antonyms and synonyms was

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

Page 15

equal to a standard score of 135, the 99th %tile. These two subtests comprise the Comprehension-Knowledge Factor of the W/J-R, which was equal to a standard score of 124, at the 94th %tile.

During this examination, linguistic processing, as revealed in speech, was assessed at three level: (1) the lexical/semantic; (2) the syntactic; and (3) the pragmatic, by means of the CASL. The findings from the CASL are presented in the table below.

| CASL subtest/index | Standard Score | Percentile Score | 90 % Confidence Interval |
|---|---|---|---|
| Anonyms | 119 | 90 | 111 - 127 |
| Synonyms | 116 | 86 | 106 - 126 |
| Sentence Completion | 123 | 94 | 113 - 133 |
| Lexical/Semantic Index | 121 | 92 | 114 - 128 |
| Syntax Construction | 104 | 61 | 95 - 113 |
| Grammatical Judgment | 111 | 77 | 104 - 118 |
| Nonliteral Language | 106 | 66 | 99 - 113 |
| Inferences | 111 | 77 | 102 - 120 |
| Supralinguistic Index | 109 | 73 | 103 - 115 |

Consistent with previous measures of vocabulary and the semantic matrix of his vocabulary, performance during subtests of the Lexical/Semantic Index were above average. Measures of syntactic and pragmatic processes were consistently, although not significantly, lower, in the average range.

As reported above, his writing ability is significantly compromised. In addition, penmanship is extremely poor. A sample of his writing is presented below.
The small printing at the top is partial translation. The sentence reads: *"I got a note." said Ted.*



*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

## Perceptual and Motor Functions

Visual perception, as measured by a combination of items requiring visual closure, object constancy, and figure-ground discrimination, was equal to a standard score of 107, at the 68th %tile, during the previously administered Visual Closure subtest of the W/J-R. His accuracy of spatial directionality during the Arrows subtest of the NEPSY was low average (scaled score = 8). This finding is consistent with his performance during the Developmental Test of Visual-Perception, administered earlier this year. His performance during that test was equal to a standard score of 105, at the 63rd %tile.

Duplication of designs using anagram blocks, during the previously administered Block Design subtest of the WISC-III, was borderline deficient (scaled score = 7). In contrast, his ability to assemble puzzles was average (scaled score = 10). In general, the Perceptual Organization Factor of the WISC-III, which contains this subtest, was equal to a standard score of 91, at the 27th %tile, as previously reported. During this examination, visual construction during the Design Copy subtest of the NEPSY was deficient (scaled score = 4). As a result, the Visuospatial Domain score from the NEPSY was equal to a standard score of only 76, at the 4th %tile. An attempt was made to administer the Rey-Osterreith Complex Figure, however, Travis quickly refused to draw the design after making an adequate, though brief, initial attempt. However, earlier this year, his accuracy during the Developmental Test f Visual-Motor Integration was equal to a standard score of 100, at the 50th %tile for his age.

The graph below depicts the levels of performance during the various subtests of the NEPSY that comprise the Sensorimotor Domain.



The Sensorimotor Domain score was equal to a standard score of 82, at the 12th %tile for his age. Travis is left hand dominant, however, there is a familial history of left hand dominance.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

Neuropsychological Report - Travis Myslow

## Social/Emotional Behavior

The BASC profile of Travis' behavior at home, as reported by his parents, was totally within normal limits, except for borderline significant depression and anxiety, indicating psychological distress. Travis' self report resulted in a BASC profile was within normal limits for the scales reflecting psychological adjustment and adaptive skills but was significantly elevated for scales reflecting maladjustment in school. Conflicts with teachers were particularly an area of difficulty reported. Otherwise, his parents report adequate peer relations and that Travis is well behaved.

Travis' parents reported by means of the WICAA that the following adjustment problems are of moderate severity:

1.  Often loses temper;
2.  Often argues with adults;
3.  Often deliberately annoys people;
4.  Often touchy, cranky, or easily annoyed by others;
5.  Very stubborn;
6.  Handles frustration poorly;
7.  Often tries to avoid responsibility;
8.  Has few, if any, real friends;
9.  Plays alone too much; does not seek friendships;
10. Is teased or bullied by other children;
11. Often feels cheated, gypped, or persecuted
12. Shy or withdrawn; easily embarrassed at school;
13. Gets along poorly with brothers and sisters.

In general, these problems are not prominent at home.

*The Information in This Report is Confidential Under Chapter 899, Connecticut General Statutes*

# Armin Paul Thies, Ph.D.
### ABPP/ABCN Board Certified Clinical Neuropsychologist
### Associate Clinical Professor - Yale Medical School

Comments regarding draft Behavior Plan for Travis Myslow - September 12, 2002

Plan does not incorporate the following elements from my recommendations:

1.    Management of impeding emotions and behaviors must be part of the educational plan, including:

     1.   Instructing Travis in ways to manage frustration;
     2.   Intervening when symptoms of frustration and failure avoidance that appear;
     3.   Provide opportunities to display competencies;
     4.   Chart progress and otherwise make progress salient to him;
     5.   Institute behavior management plans to reward desired behaviors which are mutually exclusive of undesired behaviors, with criteria for success that insures that he will receive at least a moderate number of reinforcements.

The second point above was not clearly stated. The interventions are to prevent an increase in anxiety and to precempt behaviors that interfere with achievement, not to move towards the completion of the assigned task. In this regard, the plan places too much emphasis on avoiding unintentional reinforcement of avoidance behaviors by permitting him to escape from the task demands. The "desired behaviors" in item 5 above include:

     1.   use of verbal report in the service of self advocacy, e.g., reporting difficulty and requesting help;
     2.   Perseverance for a time longer in the task, starting with short durations and increasing the duration as frustration tolerance increases;
     3.   Attempting alternative to task avoidance, e.g., problem solving.

Furthermore, it is essential that task demands not create a high probability of failure or anxiety, e.g., asking him to write with a production demand that exceeds his abilities.

I take issue with the following statement: "the Functional Behavior Assessment suggests that behaviors of concern.....are maintained by negative reinforcement. Travis might engage in these behaviors in order to distance himself from potentially aversive consequences..." Negative reinforcement is the withdrawal of a negative stimulus which results in an increase in the frequency and intensity of the behavior. This is a classic avoidance paradigm. Certain task characteristics in the classroom, e.g., writing, induce anxiety, which is relieved by avoidance behavior. The appropriate intervention is to increase the perceived probability of success, by developing in him

P.O. Box 906, Orange, Connecticut 06477-0906 • Phone: (203) 968-8241 (Automatic Fax Detection)
E-mail: apthies@icom.net

Comments regarding the draft I.E.P. for Travis Myslow - September 12, 2002                    Page 2

The following recommendations from my report do not seem to be addressed by the I.E.P.

1.  Travis needs to be taught mnemonic strategies and to actively employ them when learning information. However, the fact that his delayed recall is so much better than immediate recall suggests that consolidation is delayed and that during the task of acquiring knowledge, immediate recall is impeded. Spaced practice rather than massed practices, e.g., "cramming," is particularly necessary. It also seems evident that he remembers better during tasks that involve auditory-visual or verbal-graphic associations.

2.  An alternative form of written expression should be found to avoid the need for writing by hand, given his poor fine motor control during this activity. Dictation should be permitted, and voice recognition programs with word processing may be helpful, if Travis is unable to demonstrate sufficient motor coordination to employ a keyboard efficiently. If he can learn to type, then he should be permitted to use word processing for all written assignments.

3.  Vocabulary development is superior. Given the limited success after years of instruction in phonological decoding, it may be beneficial to focus on building sight recognition vocabulary. Whether his visual discrimination for letters and words is poor still remains a question. He performed poorly during the Visual Matching subtest of the W/J-R, however, slow performance may have depressed his score. Nevertheless, training in sight recognition may require visual discrimination training as well. For example, a pair of words such as *was* and *war* can be presented on flash cards with the final letters in red or with some other distinguishing feature. Then, as the discrimination is mastered, the discriminating feature is gradually "faded" until he can rapidly discriminate the words in normal print.

4.  The functional activities of reading and writing must be closely monitored during any attempts to remedy his difficulties in these activities. For that reason 1:1 or small group treatment is indicated. Treatment interventions will likely have to be tailored to the problems as they present themselves. Therefore, published curriculum will probably have to be modified in order to assist Travis to integrate his basic skills into the functional activities. In addition, he should be trained by a skilled and experienced reading specialist.

5.  For the present, requirements for reading in content classes will have to be supplemented by graphic illustrations, books on tape, and other means to compensate for limited reading ability.

6.  Travis shows avid interest in the construction trade and feels competent in his ability to operate heavy machinery. These interests can be incorporated into classroom activities to increase motivation.

7.  In addition, it appears that he can learn even nonverbal, manipulative tasks rather easily, suggesting that experiential learning is the preferred mode of instruction whenever possible.

8.  Given his age, the desire to improve his functional reading and writing have to be balanced against the participation in learning academic subjects, which is the normal

Comments regarding the draft I.E.P. for Travis Myslow – September 12, 2002          Page 3

expectation for his age. In content courses, curriculum and instructional modification will have to be made in order not to depend upon or to require reading and writing. In other words, Travis will have to be considered to be a dyslexic and dysgraphic student.

9.   In content courses, he will require additional, tutorial support to the extent that grade appropriate curriculum depends upon mastery of material taught in previous grades.

The I.E.P., with the revisions suggested on page one of this document would he adequate as an interim program until a final placement that appropriately meets his educational need has determined.

Armin Paul Thies, Ph.D., ABPP
Board Certified Clinical Neuropsychologist
Board Certified Clinical Psychologist

Armin Paul Thies, Ph.D.
ABPP/ABCN Board Certified Clinical Neuropsychologist
Associate Clinical Professor - Yale Medical School

**Comments regarding the draft I.E.P. for Travis Myslow - September 12, 2002**

**Goal 1: need objectives to work on content, i.e., expression**

**Objective 1: (suggested revision) Travis will independently dictate an eight to ten word sentence which will then be edited for correct grammar, punctuation, and spelling.**

**Objective 2: phonological skills are poor; what is the objective?**

**Objective 3: Prognosis for improving penmanship is likely to be poor, at this late date. Goals and objectives for keyboard skills are probably more relevant. What does "improve" mean?**

**Goal 2:**

**Objective 1: ...a structured approach to problem solving...??**

**Objective 2: What does "appropriately" mean?**

**Objective 3: How is this going to be taught?**

**Objective 4: How is "...appropriate for time, place and activity..." to be judged?**

**Goal 3: "improve" --how much?**

**Goal 5: If the objectives are met with less than perfect performance, the goal should not also have a partial success criteria of "3 of 4."**

**Goal 6: [illegible]**

**Objective 1: This kind of verbal insight is not normally expected at his age.**

**Objective [illegible] (suggested rewording) Travis will learn alternatives for dealing with anxiety and will [illegible] solutions.**

**Objective A: How [illegible] week for keyboard instructions?**

**Objective C: What [illegible] "increase" mean?**

P.O. Box 906, Orange, Connecticut 06477-0906 • Phone: (203) 968-8241 (Automatic Fax Detection)
E-mail: apthies@iconn.net

# EXHIBIT "L"

# SCHAGHTICOKE MIDDLE SCHOOL

23 Hipp Road, New Milford, Connecticut
Telephone (860) 354-2204 ♦ Fax (860) 210-2216

Jean E. Malcolm, Principal
Barbara A. Ajello, Assistant Principal

September 19, 2002

Mr. and Mrs. Matt Myslow
3 Hallets Road
New Milford, CT 06776

Dear Mr. and Mrs. Myslow:

This letter constitutes my written response to the Section 504 complaint that you filed on or about September 5, 2002 pursuant to New Milford Board of Education Policy 5145.4 Grievance Procedure for Complaints of Discrimination. Specifically, you made thirty-three separate allegations that the following staff, by and through their actions or inactions since second grade, have discriminated against you and your son, Travis: Jean Ann Paddyfote, Thomas Mulvihill, Adele Johnson, Josephine Rositano, Jennifer Okoski, Raymond Avery, Denis Dolan, and Paula Kelleher. For the following reasons, it is my opinion that there has been no discriminatory action taken against you or your son.

Board of Education policy recommends that any issues involving discrimination by a member of the school community be reported within 40 calendar days of the alleged discriminatory action. You have alleged numerous incidents of discrimination stemming back to Travis' second grade year. Although it is my opinion that such allegations are beyond the scope of the relevant Board policy, I have interviewed staff concerning every allegation in order to thoroughly investigate and understand the nature of your complaint. In this regard, it was necessary to extend the timeline for responding to your complaint beyond the five business day timeline to ten business days – September 19, 2002. This extension of time was discussed with you on September 10, 2002.

Furthermore, you raise numerous issues concerning Travis' identification for special education services pursuant to the IDEA, 20 U.S.C. §1400, *et seq.*, and Conn. Gen. Stat. §10-76, *et seq.* In particular, you allege that discrimination has occurred because staff has failed to provide an appropriate public education for Travis by, among other reasons, failing to appropriately identify his disability and by failing to provide specific levels of accommodation and modifications to Travis in the public school setting and by failing to place him in an out-of-district placement. See allegation numbers 3, 7-10, 12-24, 30-31, and 33. It is my opinion that such issues should be addressed by a State Department of Education Due Process Hearing Officer pursuant to Conn. Gen. Stat. §10-76h since the allegations concern the specific nature of educational services that were provided to Travis. Such issues are outside the scope of this grievance process because Travis is identified for special education services pursuant to IDEA and C.G.S. §10-76, and not provided services solely based on Section 504. You have received the procedural safeguards at every planning and placement team meeting regarding the planning

and placement team process and such hearing procedures. Furthermore, this complaint was filed on your behalf by your attorney, Deborah Stevenson. Therefore, this office forwarded your complaint to the State Department of Education on September 6, 2002 to commence the hearing grievance; however, per a conversation that I had with Thomas Badway of the State Department of Education Due Process Unit on September 10, 2002, I learned that your attorney expressly stated that you did not wish to pursue this complaint in a due process hearing at this time. Accordingly, this response only addresses these allegations to the extent that there was any discriminatory motive in not providing such educational services. See allegation numbers 3, 7-10, 12, 14-24, 30-31, and 33.

As part of this investigation, I reviewed the educational records of Travis and interviewed the following individuals:

1) Cindy and Matt Myslow, the parents;
2) Travis Myslow, the student;
3) Barbara Ajello, Assistant Principal, Schaghticoke Middle School
4) Adele Johnson, Speech and Language Pathologist
5) Jennifer Okoski, teacher
6) Susan Pullen, teacher
7) JeanAnn Paddyfote, Interim Superintendent of Schools
8) Thomas Mulvihill, Assistant Superintendent of Schools
9) Denis Dolan, Principal, John Pettibone School
10) Josephine Rositano, School Psychologist
11) Paula Kelleher, Principal
12) Lynn Holmes, School Nurse
13) Dr. Terry Neu, Independent Educational Consultant
14) Thomas Badway, Department of Education Consultant

My conclusions correspond with the numbered paragraphs contained in your complaint as follows:

1) The incident on August 30, 2002 involving Travis and another student was promptly addressed by Assistant Principal Ajello. The complaint was that both boys were allegedly involved in name-calling and that the male student who pushed Travis into a locker received a disciplinary consequence. There was no discrimination by school staff.

2) The incident on August 29, 2002 involved a concern by Mrs. Okoski that Travis' anxiety in relationship to his reading and writing should be monitored. According to Travis' IEP, staff is to "…limit the amount of writing, provide access to a computer, and to adjust class activities to alleviate anxiety due to reading and writing." No staff member told Travis that his writing was "sloppy." The staff were following the IEP and there was no discrimination.

3) Travis has been identified as learning disabled in the area of reading. There is no special education identification label for dyslexia. No discrimination has occurred.

4) The evaluation recommended by the planning and placement team (PPT) was required because staff were concerned about Travis' behaviors in the school setting. According to state and federal law, the PPT requested an evaluation, as they are required to do, to learn more about Travis in preparation for educational programming. There seems to be an inference by this allegation that staff somehow diagnosed Travis with ADHD. This diagnosis came from a licensed medical doctor – Dr. Alshansky – who also prescribed medication for Travis. NO discrimination occurred.

5) It is my understanding that Travis has not been on medication (e.g. Ritalin) for many years. During the time that Travis was on medication it was brought to the school by Travis and/or his parents to be administered by the school nurse. I find no discrimination.

6) Although the school nurse may have attended PPT meetings to update her information concerning Travis' medication regime in the school setting, no staff has called you to insist that Travis remain on certain medication. No discrimination.

7) Over the years Travis has been evaluated in a variety of areas for his learning disability. I find no discrimination.

8) You mentioned that you would fax to me further information regarding this allegation. No such information was provided. The staff has no recollection regarding any statements made by you that were ignored. I find no discrimination.

9) The educational record reflects that Travis received grades according to school district policy and based on his IEP. No further information regarding the specifics of this allegation was provided by you, as mentioned during our interview. I find no discrimination.

10) Exemption from Connecticut Mastery Tests is a PPT decision. In grade 6, during CMT testing, Travis was not attending school.

11) The teachers who have worked with Travis are trained and certified to teach students with learning disabilities. According to my interviews, the staff has individually worked with Travis on his reading and writing skills. Travis does not appreciate this specialized instruction and the one-on-one attention by staff makes him feel "stupid" because other special education students in his class do not have such accommodation or modifications. Moreover, compared to regular education students, Travis' IEP provides for less time in the mainstream setting. Staff deliver Travis' IEP in accordance with the PPT recommendations. Such recommendations are made based on the evaluative information and input from a variety of sources. Travis also has a counseling goal to assist him with his self-esteem and anxiety in the school setting. Accordingly, I find no discrimination.

12) – 24) There was no discriminatory motive involved in the PPT discussions concerning the issues raised in these allegations. The PPT based their decisions on evaluative

information in Travis' file and/or that was needed to make educational programming recommendations.

25) The teachers working with Travis have assigned Travis work in accordance with the goals and objectives of his IEP.

26) Procedural safeguards, provided by the State Department of Education, are provided to you at every PPT meetings. Informal complaints by parents, like yourselves, are treated similarly and if complaints involve accommodation or modification to the IEP, such concerns are required by law to be addressed at PPT meetings. Accordingly, I find no discrimination regarding the concerns addressed by you. Furthermore, Dr. Avery and Dr. Paddyfote have written to you about the school's policies and the state/federal laws regarding your concerns with Travis' educational program.

27) When questioned about this allegation, the benefits you seem to complain about involve benefits as comparable to other special education children who were in Travis' classes. Travis' program was based on his specialized needs as seen by the PPT. There was no discriminatory motive behind such decisions.

28) You claimed that this incident occurred two years ago in grade 5 at John Pettibone School. Such decisions involving gym class were made by a gym teacher not named in this complaint. Upon investigation, the decision was based on classroom policy for all students in the class, not only Travis. Since grade 5, Travis has a behavioral plan that addressed completion of work that is discussed at PPT meetings. There was no discrimination.

29) This allegation concerns the mainstream time recommended by the PPT. I find that Travis' schedule was discussed at numerous PPT meetings and there was no discriminatory motive behind his class schedule.

30) Travis' paraeducator time never lapsed. There was a switch in assignment from the specific individual working with Travis. No discrimination.

31) Travis' classroom in 5th grade was not in the kindergarten hallway. It was at the end of the wing near the kindergarteners. Other 5th grade classrooms were also near the kindergarten hallway, and in this regard, other 5th grade students were also placed in these classrooms. Accordingly, I find no discrimination as Travis was not singled out.

32) As discussed in paragraphs 1-32, there was no discriminatory motive behind the decisions made by staff in programming for Travis.

33) It is my understanding that this allegation is more akin to a remedy. Since it is my conclusion that no discrimination has occurred, I find no reason for a remedy to be awarded. Travis is entitled to receive, and has received the same benefits as other

children enrolled in the New Milford Public Schools. To the extent that he has not been assigned to more mainstream classroom time, this decision was the result of a PPT meeting based on the IEP. Notwithstanding, it is my understanding that based on a recent PPT meeting on 09/13/02, there was a recommendation to place Travis in an out-of-district placement and to pay for individualized counseling with Dr. Schwartz, a doctor chosen and agreed to by you. In this regard, most of your requests have otherwise been addressed through the PPT process.

Since there has been no finding of discrimination, this grievance is dismissed.

I hope that this response addresses your concerns. Should you wish to appeal this decision, please consult board policy 5145.4 for the procedures and timeline. If you need a copy of this policy, please contact my office immediately.

Very truly yours,

Jean Malcolm

## CERTIFICATE OF SERVICE

I, Derek T. Braslow Esquire, hereby certify that a true and correct copy of the within

Second Amended Complaint- Civil Action was served on the following via US First Class Mail:

Thomas R. Gerarde, Esquire
**Howd & Ludorf**
65 Wethersfield Avenue
Hartford, CT  06114-1190
Attorney for Defendants:
**New Milford School District, New Milford
Board of Education, Raymond Avery,
JeanAnn Paddyfote, Thomas Mulvihill,
Paula Kelleher, Denis Dolan, Josephine
Rositano, Jean Malcolm, Adele Johnson,
Deborah Shelley, Robyn Vikland.**

Katherine C. Callahan, Esquire
**Updike Kelly & Spellacy, P.C.**
One State Street
P.O. Box 231277
Hartford, CT  06123-1277
Attorney for Defendant:
**Robert Rubin, M.D.**

Jeffrey A. Blueweiss
**Bai, Pollock, Blueweiss & Mulcahey**
10 Middle Street
Bridgeport, CT  06604
Telephone:  (203) 366-7991
Attorney for Defendant:
**Terry Neu, Ph.D.**

Richard A. O'Connor, Esquire
Christine Robinson, Esquire
**Sachner & O'Connor**
The Crossroads West
765 Straits Turnpike
Building 2 - Suite1001
Middlebury, CT  06762-1323
Telephone:  (203) 598-7585
Attorney for Defendants:
**Anna Alshansky, M.D.
Martin Kreminitzer, M.D.**

Royce L. Vehslage, Esquire
**Genovese Vehslage & Chapman**
500 Enterprise Drive
Rocky Hill, CT  06067
Telephone:  (860) 513-3760
Attorney for Defendant:
**Diana Badillo-Martinez, PhD.**

Date:  December 18, 2003

_____
**Derek T. Braslow, Esquire**