1

1   UNITED STATES DISTRICT COURT

2   DISTRICT OF CONNECTICUT

3   - - - - - - - - - - - - - - - - - - - -

4   MATTHEW AND CINDY MYSLOW, ET AL,

5                         Plaintiffs,

6       -against-

7   NEW MILFORD SCHOOL DISTRICT, ET AL,

8                         Defendants.

9   - - - - - - - - - - - - - - - - - - - -

10      A Video Conference Deposition held at 326 Garden

11   Avenue, Cornell University, Ithaca, New York, on the

12   30th day of November, 2004, commencing at 10:40 AM.

13

14          BEFORE:   CZERENDA COURT REPORTING, INC.

15                    71 State Street

16                    Binghamton, New York 13901-3318

17                    KEVIN CALLAHAN

18                    Shorthand Reporter

19                    Notary Public

20                    Binghamton - (607) 723-5820

21                              (800) 633-9149

22

23

24   WITNESS:   PETER R. BREGGIN, M.D.

Peter Breggin by Ms. Powell

1       Q.    Have you written any peer-reviewed
2   articles on educational methodology?
3       A.    No.
4       Q.    Have you ever worked in a public school?
5       A.    No.
6       Q.    Have you ever worked as a school
7   counselor?
8       A.    No.
9       Q.    Have you ever worked as a director of
10  pupil personnel services?
11      A.    No.
12      Q.    Have you published any peer-reviewed
13  articles on learning disabilities?
14      A.    I'm trying to think if I cover that
15  subject in any of my peer-reviewed articles.  I have
16  to think about it a minute.  No.  It would be in my
17  books, though.
18      Q.    It isn't peer reviewed?  Those are not
19  peer reviewed, isn't that right?
20      A.    Actually, books are peer reviewed in the
21  sense that the publishers show them to other
22  professionals, but they're not what people usually
23  refer to as peer reviewed.
24            Another book that I wrote -- article

52

Peter Breggin by Ms. Powell

1   are on multiple medications, and very often what I'm

2   doing is helping people cut back or withdraw.  So, I

3   may see children on four and five medications, and

4   even here in Ithaca within the past couple of years

5   I've been doing that.

6            What I do is I work with the school and

7   the family and anybody else who is interested in the

8   child in order to reduce the medication while

9   providing whatever support the child needs for that.

10           Q.    Have you prescribed medicine?

11           A.    Sure.  During that process usually most

12   often I'm prescribing during the process of helping

13   people who are overmedicated.  I'm rarely starting

14   the medicine.

15           Q.    All right.  Do you remember my

16   introduction, I named many defendants that I

17   represent.  In your report I believe you only

18   mentioned two of them, so I am going to be asking you

19   if you have any opinions regarding my other clients.

20           Do you have any opinions regarding Raymond

21   Avery?

22           A.    No.

23           Q.    Do you have any opinions regarding Thomas

24   Mulvihill?

53

Peter Breggin by Ms. Powell

1       A.    No.

2       Q.    Do you have any opinions regarding Paula

3   Kelleher?

4       A.    No.

5       Q.    Do you have any opinions regarding Denis

6   Dolan?

7       A.    No.

8       Q.    Do you have any opinions regarding Jean

9   Malcolm?

10      A.    No.

11      Q.    Do you have any opinions regarding Adele

12  Johnson?

13      A.    No.

14      Q.    Do you have any opinions regarding Deborah

15  Shelley?

16      A.    No.

17      Q.    Do you have any opinions regarding Robin

18  Kikland?

19      A.    No.

20      Q.    Thank you.

21      A.    That was clear.

22      Q.    Yes.   Quick.   One of your books entitled,

23  RECLAIMING OUR CHILDREN --

24      A.    Yes.

62

Peter Breggin by Ms. Powell

1   emphasis was on the school district much as the

2   emphasis in the State of Connecticut's Department of

3   Education hearing, Mangs.

4        Q.   So, you are planning on testifying as to

5   the negligence of the school district?

6        A.   Yeah, the school itself, the school itself

7   and its treatment of the boy.  But the school's

8   constantly referred to as the school district in the

9   legal docs, but I'm going to refer to what was done

10  to him in school that was inappropriate by the

11  members of the teams and the teachers and what

12  effects that had on him.  But that is part of the

13  school district, as well, but those are legal issues

14  that I haven't been informed about and that I may not

15  be able to clarify.

16       Q.   All right.

17       A.   Actually, the term is better system, the

18  New Milford School System, rather than district would

19  be, I think, a better legal term.

20       Q.   So, you're planning on testifying as to

21  the negligence of the school system?

22       A.   Yes.

23       Q.   Tell me what standard you're applying to

24  figure out whether the school meets or doesn't meet

72

Peter Breggin by Ms. Powell

1    Q.    Should she have not given him the ADHD

2    screening tests?

3    A.    At this point it's just not an issue to

4    jump ahead to ADHD.  At this point it is not an

5    issue.  The issue is:  I've got a child who clearly

6    hasn't progressed in reading.  Let's figure that

7    out.

8         Plenty of ADHD kids can read.  That's not

9    one of the criteria for ADHD, can't read.  This is a

10   shortcut.  This is getting the problem out of the

11   school and into the pediatrician's office for

12   medication.

13   Q.    All right.  So, Miss Rositano failed to

14   diagnose dyslexia?

15   A.    Well, I didn't say that.  You keep pinning

16   me down to one point that I'm not saying.  I'm saying

17   she failed to address the overall reading problem.

18   Maybe she's incapable of diagnosing.  She's,

19   obviously, incapable of diagnosing ADHD.  Maybe she

20   can't diagnose dyslexia.  I don't know.

21        I do know she didn't even address the

22   fundamental issue, and that's set in motion all of

23   the disasters that follow.  If that was the only

24   thing the school district did, that would have

73

Peter Breggin by Ms. Powell

1    accounted for what follows, but the school district

2    did more than that.

3        Q.   So, if Miss Rositano asked you what she

4    should have done, Miss Rositano should have noticed

5    that there was a reading problem and discussed it

6    with the parents, right?

7        A.   Well, that's one of the many things she

8    should have done, yes.

9        Q.   And then what should she have done besides

10   that?

11       A.   Well, she should have decided whether she

12   was competent to evaluate this problem.  And if not,

13   she should have had somebody else in the school

14   system or paid somebody outside the school system to

15   evaluate why the child can't read.  And the child

16   virtually couldn't read.  The child was down at a low

17   second grade level.

18       Q.   So, who should have performed the

19   evaluation assuming Miss Rositano couldn't?

20       A.   That's up to the school system at that

21   point and the parents.  The parents could have said,

22   we'll do it.  The school system could have said,

23   we'll do it.  The school is supposed to be able to

24   evaluate something like that.  If they can't, that's

Peter Breggin by Ms. Powell

1    okay.   They can outsource it.

2         Q.    To what type of professional?

3         A.    Generally psychologists do this,

4    educational psychologists or psychologists.   There

5    are other kinds of people that can do it.   Depending

6    on their background and training, teachers can

7    contribute to it.

8              It's something that usually you expect

9    just to get a lot of input from the school.   And then

10   using the red flag that he can't read, because he has

11   an average or above average IQ, you would then look

12   for the causes.

13        Q.    All right.   Do you find any other fault

14   with Miss Rositano?

15        A.    Well, let me see if there would be some

16   point to looking further at her report.

17              No.   I think that's my basic criticism.

18        Q.    All right.   Have you ever testified as an

19   expert in Federal Court as to whether a school

20   district has met the standards of IDEA?

21        A.    Not to my memory, not to my recollection.

22        Q.    All right.   What other school personnel do

23   you find fault with?

24        A.    If you look at my Myslow chronology --

Peter Breggin by Ms. Powell

1      Q.    Yep.

2      A.    -- the teacher C. Church is writing notes

3  to the mom.  Although she does not specifically

4  mention medication, she's clearly responding to his

5  having been started on medication a week before, and

6  the parents confirm that.  And she is really pushing

7  for how well he's doing especially in the mornings

8  when he's getting his Ritalin.  She is --

9      Q.    So, you don't think she actually thought

10 Travis was doing better?

11     A.    I think that she's just too eager to show

12 that the medication is the approach.  She's not

13 writing home saying, you know, we've got new reading

14 programs and he needs this new reading program and

15 we're going to teach him to read.  She's writing home

16 that he is, you know, really -- basically, he's an

17 easier kid since he's been started on the Ritalin.

18 And she didn't know what the effects of Ritalin are,

19 but she's, obviously, enthusiastic about it.

20           And then in the fourth grade Miss Coope,

21 she gets even more enthusiastic about it.  And I have

22 a bunch of quotes.  I can read them into the record.

23     Q.    I think we can probably mark the

24 chronology.

Peter Breggin by Ms. Powell

1    A.    I mean, she again --

2    Q.    Have you ever seen Travis when he's been

3 on medication?

4    A.    No.  Let me finish with one part of my

5 answer.

6    Q.    Sure.

7    A.    She even goes ahead and interrogates him

8 about whether or not he's taking his medication.

9 That's how much she's become the director of a mental

10 hospital ward.  She's interrogating him to get him to

11 say that -- finally that he didn't take his

12 medication.  That's on 4.

13    Q.    So, she's not supposed to check with him

14 whether he's taking his prescribed medication?

15    A.    A, it's not her job.  B, if she's

16 concerned about it, she should talk to the mother.

17 C, this is all part of pushing medication.  This

18 isn't about, did you forget your insulin this

19 morning, little Johnny?  This is about, have you had

20 your drugs today?  I don't like your behavior and --

21    Q.    Have you ever spoken to Mrs. Coope?

22    A.    -- and this is pushing the medication.

23         Maybe I should read this stuff into the

24 record.  On November 22, '99, she writes, Cindy,

Peter Breggin by Ms. Powell

1    there is a difference when he takes his med.  He's

2    able to control his behavior and able to complete

3    tasks.  I know it's tough for you to make an

4    evaluation of its effectiveness when you aren't here,

5    but I see a difference.

6                 Now, she doesn't know what that difference

7    is.  She doesn't know what the effect is.

8         Q.    I think she's making an observation of his

9    behavior in the classroom.  And were you there to see

10   something different?

11                    MR. BRASLOW:   I don't know that

12                he was finished.

13                    Can you hear me?  I don't know

14                that you were finished with your answer,

15                Doctor.

16        Q.    We need to --

17        A.    I plan to read this whole thing into the

18   record, but I don't need to.

19        Q.    We have your notes.  We can mark them for

20   the record.

21                 Did you ever observe Travis in the

22   classroom?

23        A.    No.  By the time I got to see him, he was

24   doing well in another school.  There was no point to

78

Peter Breggin by Ms. Powell

1    my -- I didn't need to see him because he was doing

2    better, by accounts, in regard to his school work.

3        Q.    You didn't even know Travis in 1999, is

4    that correct?

5        A.    That's right.  I said by the time I would

6    have gotten to see him, he was already doing well in

7    another school system.

8        Q.    All right.  So, you put down in your

9    chronology where you find fault with Mrs. M. Coope,

10   is that correct --

11       A.    That's correct.

12       Q.    -- on pages 2 and 3?

13       A.    Yes.

14       Q.    And was Miss Coope engaging in the

15   practice of medicine without a license, in your

16   opinion?

17       A.    In my opinion, she was, but it's not my

18   main criticism.  The main criticism is that she's

19   pushing drugs and not doing her job as a teacher.

20   Instead of saying, your son can't read, your son

21   can't read, your son can't read, this is what we need

22   to do, she would have done a lot better if she got on

23   the phone and said, let's push the school board to

24   provide some reading services to your son.  She was

79

Peter Breggin by Ms. Powell

1    getting --

2         Q.   She --

3         A.   She was getting some service, but they

4    weren't working.  Excuse me.

5         Q.   She should have ignored Travis' behavior?

6         A.   No.  She should report the behavior to the

7    mom.

8         Q.   All right.  So, it's okay to report the

9    behavior to the mother?

10        A.   Certainly, it's not okay to push the drug

11   as the solution.  What she doesn't know -- for

12   example, she says, in effect, that she can see the

13   difference when he's on the drug.  Does she know

14   whether he's on withdrawal?  Does she know that the

15   drug is working by, in fact, suppressing the central

16   nervous system so he's a quieter child?  She didn't

17   know, but she is encouraging the medication and,

18   obviously, against the mom's wishes.  She's making

19   that clear.

20        Q.   All right.  Fine.  What other school

21   personnel did you find fault with?

22        A.   Dr. Paddyfote.

23        Q.   What did she do?

24        A.   Well, through various communications she

80

Peter Breggin by Ms. Powell

1    paints a picture of the child which is unrealistic

2    and which is calculated to push a doctor into

3    diagnosing a psychiatric disorder in the child.  For

4    example, to say that the child is unable to sustain

5    attention yesterday for more than two minutes at a

6    time, end quote, was never, never shown anywhere.

7    But it's a -- it's like a condemnation that says, you

8    better diagnosis this child with ADHD and do

9    something about it because the child can't pay

10   attention to anything more than two minutes.  That's

11   just not true.

12            What happened to the child, as was

13   demonstrated clearly when he was actually evaluated

14   by Dr. Neu, is that the child would get frustrated

15   and upset when he couldn't read, write or spell.

16        Q.   And so, did you know how long Travis could

17   sustain his attention in November of 2000?

18        A.   Well, many occasions at home, going to the

19   movies, eating dinner, playing, he had normal

20   attention when we know that in school he had sporadic

21   problems when -- of frustration when he had to

22   confront problems with reading, writing and

23   spelling.  Those were his areas that he had never

24   been taught.

81

Peter Breggin by Ms. Powell

1      Q.   Do you know why Mrs. Paddyfote wrote that

2  letter?

3      A.   Oh, yeah.  She's writing letters to

4  professionals to convince them to diagnose ADHD and

5  medicate.  That's the whole thrust of it.

6      Q.   What's your basis for that conclusion?

7      A.   A, because these listings of exaggerated

8  symptoms are calculated to complete a diagnosis of

9  ADHD.  And, B, she's pressing him in this case to go

10  to a -- in one case to go to a neurological group,

11  which is not necessarily the best group for

12  evaluating a child but certainly one most likely to

13  provide a medication in the case of a diagnosis.

14      Q.   Do you know whether the parents had to

15  consent to that evaluation?

16      A.   Oh, I know that they had to consent and I

17  know they did at the last minute, yes.

18      Q.   So, the parents did consent to getting an

19  evaluation by a neurologist?

20      A.   Yes.

21      Q.   And do you know whether that was a

22  recommendation made by the PTT?

23      A.   Yes.  Yes, it was.

24      Q.   What could the parents have done if they

84

Peter Breggin by Ms. Powell

1    substituting, pushing this child into the medical

2    system by any method possible including diagnosing

3    the child, recommending drugs and sending little

4    notes home to mom about drugs rather than teaching

5    the child to read.  That is the fundamental

6    criticism.  It could be described as practicing

7    medicine without a license.  That's not the specific

8    charge.

9         The specific charges are that they failed

10   to teach this child and instead coercively pushed and

11   encouraged a medical calming down and subduing of the

12   child while still not teaching the child to read.

13        Q.  So, it's in the nature of an educational

14   malpractice type thing?

15        A.  I think it's a combination of both.  It's

16   overstepping the bounds into practicing medicine

17   without a license.  It's an educational negligence

18   and educational failure.  It's a failure under IDEA.

19   It's a failure by their own standards as described in

20   a more limited way by the hearing officer.

21        Q.  Do you think Miss Coope was practicing

22   medicine without a license?

23        A.  Marginally yes, in a way.  But that's,

24   again, that's not how I'm framing the charges here.