UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - -

MATTHEW AND CINDY MYSLOW, ET AL,

                Plaintiffs,

  -against-

NEW MILFORD SCHOOL DISTRICT, ET AL,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -

    A Continued Video Conference Deposition held at 326 Garden Avenue, Cornell University, Ithaca, New York, on the 8th day of April, 2005, commencing at 9:20 AM.

        BEFORE:  CZERENDA COURT REPORTING, INC.

                  71 State Street

                  Binghamton, New York 13901-3318

                  KEVIN CALLAHAN

                  Shorthand Reporter

                  Notary Public

                  Binghamton - (607) 723-5820

                          (800) 633-9149

WITNESS:  PETER R. BREGGIN, M.D.

Page 279

1 time that I was getting a good look at, which was
2 1998 through 2003 and I believe that his activities
3 affected him through that time, but I believe to this
4 very day and forever.
5     Q. In section A under the damages section,
6 you state the opinion, apparently, upon reasonable
7 medical -- with a reasonable degree of medical
8 certainty that Travis' entire educational experience
9 was severely impaired, is that correct?
10     A. Yes.
11     Q. Okay. And, sir, the basis of that opinion
12 is that he was, in your opinion, sir, misdiagnosed
13 with ADHD and placed on medication for that?
14     A. Well, that's the initial nutshell, but
15 I've elaborated considerably more on that. I can go
16 back over that some more, if you want.
17         It's a failure to get him appropriate
18 resources and, in fact, playing the cover-up game,
19 shoving this kid under the school rug. The school
20 says let's gets the dustpan out and dust him over to
21 the pediatrician rather than address his reading
22 problems and his writing problems, which were
23 apparent from the evaluation and the education and
24 the doctor goes along with. That has massive

Page 280

1 implications beyond just diagnosing and giving him
2 the medication. It's the failure to stop that
3 process, redirect the school and the parents to more
4 appropriate approaches. And it's the stigmatization
5 of the child. That's the part that never goes away.
6     Q. You reference in A, loss of schooling.
7 Then B says, humiliation. Do you see that section of
8 your report?
9     A. Yep.
10     Q. And the first sentence there, sir, says,
11 It is thoroughly documented that during this time
12 period Travis felt stupid.
13         Can you tell me, sir, where you found that
14 documentation.
15     A. Well, again, I'd have to go through the
16 records, but it comes up in some of the school and
17 professional reports, and the parents talk about it.
18 But, I mean, that's a matter of going through all the
19 records and seeing what I put in -- what I have in
20 the report itself.
21     Q. But what I want to make sure that I
22 understand, Dr. Breggin, is you're relying both on
23 the parents' verbal reports to you as to what Travis
24 felt, as well as what's contained in the educational

*** Notes ***

Page 281

1 record, is that right?
2     A. Yeah. Educational and medical record,
3 yes.
4     Q. And how is that you were able to determine
5 that Travis felt that the teachers and other students
6 humiliated him?
7     A. I talked to him some about it, the first
8 interview. I talked to the parents about it. That
9 would have been the main sources for that
10 information. That's about the only place you're
11 going to get that. I don't remember whether there
12 was anything in any of the medical records about it.
13 I'd have to go back and look at that, but what I
14 remember is mainly talking to the parents about it.
15     Q. Okay. And do you remember whether they
16 gave you a time frame for those feelings of
17 humiliation?
18     A. Well, I'm sure some of it begins before he
19 ever saw Dr. Rubin and extends throughout that period
20 because during that period he's not learning. He's
21 not growing. He's not doing well and he's also got a
22 label, taking medication from the school.
23     Q. Doctor, in that section B you also state
24 that he felt humiliated because of his inability to

Page 282

1 read and because of some of his associated
2 behaviors. Can you tell me what you're referring to
3 by associated behaviors.
4     A. Well, he'd get real upset in school and
5 he'd act badly. He'd have temper tantrums, refuse to
6 do his work, things like that, refuse to try.
7     Q. Is it your understanding from review of
8 the records that other students humiliated him
9 because of those behaviors?
10     A. I don't think I saw that in the record.
11 That would be from, A, what I know to be the case for
12 all of these children, you know, how they feel about
13 their circumstances of what they're exposed to and
14 also talking to the parents.
15     Q. Okay.
16     A. And the stupid part is also mentioned by
17 other people other than his parents.
18     Q. Okay. That's in the educational record,
19 is that right, sir?
20     A. Yes. Educational and mental health
21 records.
22     Q. And mental health records. I think that
23 we have talked about C, but I want to go back to
24 that, sir. It's your personal and professional

*** Notes ***

**Page 283**

1 opinion that it's stigmatizing to a child to be
2 diagnosed mentally ill and to be medicated, is that
3 correct?
4   A. Yes.
5   Q. Is it your opinion that the diagnosis of
6 ADHD is a diagnosis of mental illness?
7   A. Well, it's in the list of mental disorders
8 of the American Psychiatric Association. It's
9 considered a mental disorder by all people who deal
10 with it.
11       And while mental illness is not a term
12 that is used, for example, in the DSM 4, people
13 associate mental disorder and mental illness as one
14 and the same.
15   Q. And the only way that Travis would know
16 that he had been labeled mentally ill is if someone
17 had told him that, yes?
18   A. God, no. As soon as you take a drug, you
19 know there's something the matter with you and you've
20 got some sort of mental problem, mental illness. I
21 might think in those terms he has to know that he has
22 a mental problem. He's getting a drug for it.
23   Q. And it's your opinion, sir, as I read your
24 report, that Travis starting at age, approximately,

**Page 284**

1 seven and a half was aware that adults in his world
2 view him as having a mental disorder, correct?
3   A. Yes. In fact, the teachers were
4 monitoring his medication, some of them at least.
5   Q. And when the medication was stopped, he no
6 longer was taking medication, sir, did that, Travis'
7 perception of himself in that regard, change, based
8 upon your interviews with him?
9   A. I know that he is glad not to be taking
10 medication, doesn't want to see doctors. He doesn't
11 talk as if he's stupid now. He talks more like he's
12 angry what was done to him, but it's really hard on
13 the phone to get an in-depth conversation with
14 Travis, the subtleties of all that.
15   Q. Is it your opinion, sir, that Travis
16 currently has low self-esteem?
17   A. My sense as I talk to him would be, yes,
18 that he does and -- but, again, I'm not in a position
19 to do an extensive psychiatric evaluation of him on
20 my brief phone calls with him. I'd have to see him
21 myself to do that.
22   Q. So, you have not conducted a full
23 psychiatric evaluation of Travis?
24   A. No. No. No. Didn't even attempt it.

*** Notes ***

**Page 285**

1   Q. Looking at item D, Dr. Breggin, the loss
2 of enjoyment of his childhood section, you basically
3 state stimulants frequently cause social withdraw
4 along with fatigue or sad or depressed feelings and
5 you cite yourself for that statement, correct?
6   A. Well, I'm citing all the literature that's
7 contained in my article.
8   Q. Okay.
9   A. And I didn't do an extensive review of
10 that literature that I presented at the consensus
11 development conference.
12   Q. Understood. You indicated in this section
13 of your report, sir, that during this period Travis
14 lost all his friends. And what period are you
15 referring to, sir?
16   A. While he's on the medication.
17   Q. Well, he was on the medication for a
18 two-year period from second grade through fourth or
19 fifth grade, right?
20   A. No.
21   Q. Well, the medication prescribed by
22 Dr. Rubin started in March of 1998 and ended in May
23 of 2000?
24   A. Yeah. That's not second grade.

**Page 286**

1   Q. I think he was --
2   A. He was in third grade. He was on the
3 medication in third grade.
4   Q. During that two-year period, which we have
5 agreed is when the Ritalin was prescribed with
6 holidays off, during the summer months, is it your
7 understanding, sir, that Travis had no friends?
8   A. My understanding precisely is that he
9 was, his parents reported, I only have this from his
10 parents, would be the only source of that kind of
11 information, was that he stopped playing with his
12 friends during that period of time.
13   Q. Did you ask Travis about that, sir?
14   A. I don't recall if I did or not. It's very
15 hard to get information from Travis.
16   Q. And you indicate in your report, which was
17 prepared last fall, that Travis --
18   A. By the way, maybe I should go back and
19 review my earlier interview with Travis to see, but
20 whatever is in that interview would be all that I
21 remember anyway.
22       Go ahead.
23   Q. And you indicate in the report, sir, that
24 he is only now regaining a social life?

*** Notes ***

### Page 287

1  A. Yes.
2  Q. Again, where did that information come
3  from?
4  A. Parents.
5  Q. And then you also then go on to state he
6  was frequently sad, stressed and anxious. Where did
7  that information come from?
8  A. Parents.
9  Q. And lastly, sir, I want to look at subpart
10 E, the adverse drug effects --
11 A. Yes.
12 Q. -- page 26 of your report. These would be
13 the physical side effects, is that right, Doctor?
14 A. Yes.
15 Q. And you've indicated that, in fact, there
16 is no indication that there have been any permanent
17 physical side effects of the Ritalin, correct?
18 A. Yes. We have no evidence for that. We do
19 have animal studies indicating that animal brains do
20 not recover from this length of exposure to Ritalin,
21 but we have no way of measuring that in human beings.
22     MS. CALLAHAN: Doctor, can we
23 take a break --
24     THE WITNESS: Hopefully.

### Page 288

1     MS. CALLAHAN: -- so Mr. Dube can
2 take a phone call.
3     (Whereupon a short break was
4 taken)
5 BY MS. CALLAHAN:
6  Q. Okay, Doctor. Dr. Breggin?
7  A. Okay.
8  Q. Okay. We are just at that last section of
9 the damages, which is section E, on page 26.
10 A. Yes.
11 Q. And just again more to reorient myself
12 than anything else, Doctor, you have no indication
13 that any of items 1 through 6 under letter E are
14 permanent problems, is that correct?
15 A. Right. We have no evidence for it, but we
16 can assume that it wasn't good for his body from what
17 we know, you know, in what happens to animals, but we
18 have no physical evidence of anything continuing from
19 those effects in terms of physical adverse effects or
20 his social withdrawal.
21 Q. And, Doctor, did you find evidence in the
22 records that, in fact, Travis had suppressed and
23 delayed growth during the two years that the Ritalin
24 was prescribed?

*** Notes ***

### Page 289

1  A. I could not find enough readings to
2 determine from the records whether he did. The
3 parents report that he lost his appetite and he
4 wasn't growing as fast as he did as when he was taken
5 off the medication. That's typical. So, what's
6 typical fits with their report, but I couldn't
7 document it from the medical records.
8  Q. And you didn't have any access to any
9 prior medical records, is that correct?
10 A. You know, I don't recall. Not that I
11 remember other than Dr. Rubin's.
12 Q. You don't have any information, do you,
13 Dr. Breggin, about what type of growth curve was
14 typical for this kid?
15 A. No. We have a little bit of a growth
16 curve in the doctor's records. You know, we see that
17 he's basically here, you know, on those measures on
18 this curve that on weight he's, approximately, in the
19 same level as he was, a tiny bit lower.
20 Q. Right.
21 A. It's not significant. That's between age
22 seven and a half and nine.
23 Q. And you don't have any growth charts from
24 any prior pediatrician, correct?

### Page 290

1  A. I don't, no.
2  Q. Nor any from any subsequent pediatrician?
3  A. No, I don't.
4  Q. So, you have no evidence to support an
5 allegation that there was suppressed or delayed
6 growth in this child?
7  A. Other than the observations of the
8 parents.
9  Q. And did the parents indicate that they
10 were routinely taking height and weight measurements?
11 A. Nope.
12 Q. Do you know if they were?
13 A. Oh, I assume they would have told me if
14 they were. Not that I'm aware of.
15 Q. So other than their subjective assessment
16 of how Travis grew after the medication was stopped,
17 you have no basis for indicating that there was
18 suppressed or delayed growth due to the Ritalin?
19 A. You always use the word "subjective." You
20 observe. You use the word "subjective" to describe
21 the parents' observations. I would not call them
22 subjective. I would say they were observations.
23 Q. They're certainly their personal
24 observations. They're the parents. I would suggest

*** Notes ***

Page 291

1  to you, sir, and you can correct me if I'm wrong,
2  that parents are not objective when it comes to their
3  children, but I'll withdraw the question.
4      Other than the information relayed to you
5  by the parents about Travis' growth before and after
6  the medication, you have no basis for offering an
7  opinion that the medication suppressed and/or delayed
8  growth in Travis, correct?
9      A. That's correct. That's one of the reasons
10 I'm not emphasizing that kind of thing.
11     Q. Okay. And the loss of appetite, that is
12 information relayed to you by the parents, as well,
13 correct?
14     A. Yes.
15     Q. And did you determine, sir, when the loss
16 of appetite occurred? Was it immediately when the
17 medication was started?
18     A. I don't think I went into that detail on
19 that kind of a question.
20     Q. Okay. Did you make any determination,
21 sir, during the summer months, for example, when
22 Ritalin was not being taken by Travis that his
23 appetite returned?
24     A. Don't recall.

Page 292

1      Q. Number 2, increased nervousness, anxiety,
2  agitation and irritability?
3      A. Excuse me. Basically, what I got from the
4  parents, when he was taking the drug, it reduced his
5  appetite. I didn't go into any great detail about
6  how did it start or stop in the summer. I would
7  assume it got better in the summer.
8      Q. Did they indicate to you there was any
9  weight loss during the time that Travis took the
10 drug?
11     A. No. Just that they didn't think that he
12 was growing as fast as he could and that he grew
13 faster when the drug was stopped.
14     Q. Number 2, the nervousness, anxiety,
15 agitation and irritability that you document, in your
16 opinion, sir, those are all side effects of the
17 medication, correct?
18     A. Yes, potentially. You never can know with
19 certainty.
20     Q. Potential side effects?
21     A. Most probably.
22     Q. In Travis' case was it reported to you by
23 his parents that he had all of those things?
24     A. They reported that -- there's a mention in

*** Notes ***

Page 293

1  the medical record of Dr. Rubin's record about its
2  having an effect on him like that at the end. And
3  that's the one thing that Travis kind of remembered
4  in my conversations with him with the first
5  interview, as I recall. He remembered that kind of a
6  change in himself but not much of anything else.
7  Again, he's not very communicative on the phone.
8      Q. And just so I'm clear, Doctor, because
9  your voice trailed away, that Travis conveyed in your
10 first conversation with him that he remembered
11 becoming anxious or irritable?
12     A. Something along those lines and that it
13 was less so now, that that wasn't the problem
14 anymore. That was the only one of the emotional
15 things that he could identify.
16     Q. Number 3, impaired sleep. Again, that's a
17 potential side effect of the medication, correct?
18     A. Right.
19     Q. And did Travis or his parents relay to you
20 that his sleep patterns or sleep was impaired while
21 he was taking the medication?
22     A. His parents did.
23     Q. Okay. And that is not a problem now --
24     A. No.

Page 294

1      Q. -- as far as you know, correct?
2      A. No, it's not a problem now.
3      Q. And similarly, the social withdrawal and
4  depression, we talked about those as potential side
5  effects of the drug, correct?
6      A. Yes, right.
7      Q. And that information that Travis was both
8  socially withdrawn and depressed came to you from his
9  parents, correct?
10     A. Yes.
11     Q. And that was only while he was on the
12 medication, is that correct?
13     A. Yeah. They saw an improvement when he
14 came off the medication, yes.
15     Q. And it's not a problem today, as far as
16 you know?
17     A. That's correct. It's not a problem today,
18 neither he or his parents. I asked him about that.
19 And he said, I have friends.
20     Q. And the gastrointestinal problems, again,
21 that's a possible side effect of the medication,
22 correct?
23     A. Yes.
24     Q. That can be caused by any number of

*** Notes ***

Page 367

1  not testify to that matter if I were in court.
2     Q. You have never testified to that in
3  court? Is that your testimony?
4     A. I don't think so. If I did, I must have
5  been relaxed. That's the kind of remark I would have
6  made if I was very relaxed. In fact, it's much more
7  complicated than that, of course.
8     Q. Okay. Doctor, you've never written a
9  protocol for a clinical trial --
10    A. No.
11    Q. -- true? Never been a principal
12 investigator in a clinical trial?
13    A. No.
14    Q. Never served on an institutional review
15 board?
16    A. No.
17    Q. Never had to bring clinical trials or
18 projects before an institutional review board for
19 approval?
20    A. No.
21    Q. Never worked for the FDA?
22    A. Nope.
23    Q. Never served as a consultant for the FDA?
24    A. Nope. I have for the Federal Aviation

Page 368

1  Agency but not the FDA.
2     Q. Never served as a member of the FDA
3  Administrative Advisory Committee?
4     A. No.
5     Q. Doctor, would you agree that your theories
6  about Ritalin and similar family of drugs are
7  principally anecdotal and not subject to peer review?
8     A. No. The reverse of that. My views have
9  been subject to peer review on a number of occasions,
10 and I have published many peer-reviewed articles on
11 the subject and was invited by the National
12 Institutes of Health to be the expert on the adverse
13 effects on adults and children at the 1998 consensus
14 conference.
15       MS. ROBINSON: I have nothing
16   further. Thank you, Doctor.
17      - - - - -

*** Notes ***

Page 369

1  EXAMINATION BY
2  MS. POWELL:
3     Q. Doctor, Melinda Powell for the school.
4  I'll be pretty quick.
5       You reviewed the Ben Bronz records, is
6  that right?
7     A. Yes. Those which were given to me, mm-mm.
8     Q. And can you tell me how the educational
9  program at Ben Bronz differs from the educational
10 program at New Milford?
11    A. Well, it's very hard to get that out of
12 records other than they were very highly focused on
13 teaching him to read and that was a major goal and
14 aim and they went about that systematically.
15      Other than that, I'd have to sort of go
16 through the records and have to answer the question
17 in more detail, but they were very --
18    Q. So, you don't know exactly what
19 methodology was used for the reading program?
20    A. No, that's correct, I don't know that. I
21 know that they were specialized in it, they focused
22 on it and that he responded.
23    Q. It's your belief that Travis' program at
24 New Milford did not have a focus on reading?

Page 370

1     A. That's correct. And still does not.
2     Q. Okay. That's based upon a review of the
3  PPT minutes?
4     A. Well, my current view is based on talking
5  to Travis and his parents, that he's getting no
6  individual educational approach for his reading.
7     Q. It's your belief that Travis does not have
8  a current IEP? Is that what you're telling me?
9     A. No, I didn't say that.
10    Q. All right. But your information --
11    A. By the way, if this is going to go on for
12 a while, I want a lunch break.
13    Q. No. We're going to finish up right now.
14      Your information coming from the parents
15 is not necessarily a review of the current IEP, is
16 that correct?
17    A. I do not have the current IEP. I have
18 exactly what I've sent to you, about 20 pages that
19 the parents faxed me.
20    Q. All right. Is it your opinion that the
21 New Milford School District has never regarded Travis
22 as being learning disabled?
23    A. I didn't even ask myself that question. I
24 do believe they never taught him properly in the area

*** Notes ***

Page 303

1  be a narrow area.
2      Q. And you haven't done any specific
3  postgraduate training in pediatric neurology, is that
4  true?
5      A. That's correct. Other than my residency,
6  you know, where I had a stint in neurology.
7      Q. And, Doctor, your overall practice, what
8  percentage of it would you divide or assign, rather,
9  to adults versus children?
10     A. I think we went over this quite
11 extensively in the first depo, I believe. Over the
12 years we have divided my practice in two.
13     Q. I understand we went over the past rather
14 in depth in day one. I wasn't clear about today how
15 would you describe your practice?
16     A. Today is about half involving children and
17 their families. More than it used to be.
18     Q. Have had you any specific training in the
19 field of pediatric neurology?
20     A. No, I would not say so. I don't think so.
21     Q. All right. And do you know what the
22 standard of care is for a pediatric neurologist in a
23 community-based practice?
24     A. I would have a good idea about what the

Page 304

1  standard of care was in regard to certain areas such
2  as prescription of medication, yes --
3      Q. Of all medications?
4      A. -- but not in some other areas, not in the
5  broader practice of neurologist. When it came to
6  diagnosing psychiatric disorders and prescribing
7  medication, there's a huge overlap between psychiatry
8  and neurology. The standard would be virtually the
9  same.
10     Q. Do you believe that you have a knowledge
11 of the standard of care that would apply to pediatric
12 neurologists in the diagnosis of a medication or just
13 particular medication?
14     A. It would be mostly limited to psychoactive
15 agents of one kind or another and most -- I would
16 know them most in the area of psychiatric
17 medications, but I've also studied and been involved
18 with consultations involving other medicines, you
19 know, in -- that are used by neurologists.
20     Q. What is the basis of your belief that
21 you're aware of what the standard of care is for
22 pediatric neurologists in a community-based practice
23 with respect to the prescription of medicines?
24     A. Well, in particular, psychoactive

*** Notes ***

Page 305

1  medications. Well, first of all, I've been in
2  practice for more years than I care to remember from
3  1968 on. During that period of time I've attended
4  multiple conferences where neurologist have been
5  present. I've lectured to neurologists. I've been
6  lectured to by neurologists.
7           I have read enormously in the neurological
8  literature. I have a fairly large neurological
9  library. I've written about neurological disorders
10 quite extensively in my books and my articles. I've
11 heard -- at the ADHD conference we had neurologists
12 speaking then about, you know, what neurologists
13 should know in the area of ADHD and medications.
14 It's -- so, I have the general knowledge that any
15 physician who has been at work as long as I have
16 would have in the highly specialized area. I've just
17 looked so much at medication and their effects.
18     Q. Doctor, going back for a second to your
19 qualifications, you don't have a doctorate or PhD in
20 pharmacology, do you?
21     A. No.
22     Q. Or any degree at all in pharmacology, is
23 that correct?
24     A. No. That's right. I don't have a degree

Page 306

1  in pharmacology. Pharmacology is a very good part of
2  medical and psychiatric training, however, very good,
3  big part. And we get a lot of courses and lectures
4  in that. Mainly, I've been studying the field for
5  decades.
6      Q. Doctor, what is the standard of care for
7  pediatric neurologists as it relates to the care and
8  treatment rendered in this case by Drs. Alshansky and
9  Kreminitzer to Travis Myslow?
10     A. I don't understand your question. Do you
11 mean abstractly to do what a prudent pediatric
12 neurologist would do?
13     Q. Well, you've just told me that you're
14 aware of what the standard of care is for pediatric
15 neurologists and that, I believe, you're limiting
16 just to the dispensing or the prescription of
17 medication, is that correct?
18     A. No, that's not correct.
19     Q. So, you're saying that you're aware of the
20 standard of care in a more general sense for
21 pediatric neurologists to include the care and
22 treatment they render to their patients?
23     A. No, that's not correct. I already said --
24 I made very clear what my expertise was, which I told

*** Notes ***

Page 371

of reading, and that was the central issue at the time.

Q. Do you agree that Travis --

A. I don't recall whether they used the words "learning disability" to describe him.

Q. Do you agree that Travis has been identified as learning disability in order to receive special education service?

A. Yes, very likely. That's how you get that.

Q. So, you agree that he has been classified as learning disabled?

A. He very well may have been classified as learning disabled in order to get his school status, but that's not what this is about. To me, it's not about whether they happen to put him down in a -- code him as learning disabled. It's more a matter of whether they addressed his learning disability.

Q. And do you know when he was identified as being learning disabled?

A. No, I don't recall.

Q. All right. And you're not an expert in how to teach someone with learning disabilities, is that right?

Page 372

A. That's correct, I'm not an expert in teaching.

MS. POWELL: I have no further questions.

MS. CALLAHAN: We are all set, Doctor.

MR. DUBE: All right. Doctor, this is Mike Dube. I think we are done. You have a good afternoon.

MS. ROBINSON: Christine Robinson again. Would you do me a favor. Would you make sure when you send your bill for this round of the deposition that you also send to Attorney Dube copies of the checks that you received so that we can ferret out between us who owes what.

THE WITNESS: Definitely.

MS. ROBINSON: Thank you.

MR. DUBE: Thank you.

MS. CALLAHAN: Thank you, Doctor.

THE WITNESS: Thank you.

- - - - -

*** Notes ***

Page 373

STATE OF_____
COUNTY OF_____

I have read the foregoing record of testimony taken at the time and place indicated in the heading thereof, and I do hereby acknowledge it to be a true and correct transcript thereof.

_____
PETER R. BREGGIN, MD

Subscribed and sworn to
before me this ____ day
of _____, 20__.

_____
NOTARY PUBLIC

Page 374

STATE OF NEW YORK    :
COUNTY OF BROOME     :

I, KEVIN P. CALLAHAN, Shorthand Reporter, do certify that the foregoing is a true and accurate transcript of the proceedings in the matter of Matthew and Cindy Myslow, et al, v New Milford School District, et al, held in Ithaca, New York, on April 8, 2005.

_Kul_
KEVIN CALLAHAN
Shorthand Reporter
Notary Public
CZERENDA COURT REPORTING, INC
71 State Street
Binghamton, New York 13901-3318

*** Notes ***