# Peter R. Breggin, M.D.
101 East State Street, No. 112
Ithaca, New York 14850

Phone: 607 272 5328                                   Fax: 607 272 5329

September 29, 2004

## Report in the Case of Travis Myslow

## TABLE OF CONTENTS

**I. Purpose**

**II. Background of the Expert**

    A. Background Concerning Psychiatric Treatment and Medication

    B. Background Concerning Educational Approaches

**III. Materials Reviewed**

**IV. Clinical Summary**

    A. Treatment by Dr. Rubin

    B. Treatment by Dr. Alshansky and Dr. Kremenitzer

**V. Pediatric and General Medical Standards for the Diagnosis and Treatment of ADHD**

**VI. Relevant Psychiatric Standards for the Treatment of ADHD**

**VII. The Drug Enforcement Administration (DEA)**

**VIII. Negligence of the Doctors and the School District**

**IX. Damages Caused by the Doctors and the School District**

**X. Summary**

**Bibliography**

**Appendices**

# REPORT

## I. Purpose

I was asked to evaluate the case of Travis Myslow (born 7.17.90), including his educational relationship with the New Milford Public Schools (the school district) and his treatment by pediatrician L. Robert Rubin, M.D., and neurologists, Anna Alshansky, M.D. and Martin Kremenitzer, M.D (the doctors). Specifically, I was asked if these entities or individuals were negligent in their treatment of Travis and, if so, what damages were incurred by Travis.

## II. Background of the Expert

### A. Background Concerning Psychiatric Treatment and Medication

Please see my appended Summary Resume and publications in the bibliography.
I have been in the private practice of psychiatry since 1968 working with adults and with children and their families. I am frequently consulted concerning the diagnosis and treatment of children, and have a subspecialty in clinical psychopharmacology, especially adverse drug effects. I have written many books that deal with children and with medication effects in children, including:

> *Psychiatric Drugs: Hazards to the Brain, 1983*
> *Brain-Disabling Treatments in Psychiatry, 1997*
> *The War Against Children of Color, 1994, revised 1998*
> *Reclaiming Our Children, 1998*
> *Talking Back to Ritalin 1998, revised 2001*
> *The Ritalin Fact Book 2002*

I have written many peer-reviewed articles about the diagnosis and treatment of children, including:

> Psychostimulants in the treatment of children diagnosed with ADHD: Risks and Mechanism of Action. *International Journal and Safety in Medicine, 12*, 3-35, 1999.

> "The hazards of treating 'attention-deficit/hyperactivity disorder' with methylphenidate (Ritalin)" (with G. Breggin) *Journal of College Student Psychotherapy* 10:55-72, 1996.

"Fluvoxamine as a cause of stimulation, mania, and aggression with a critical analysis of the FDA-approved label." *International Journal of Risk and Safety in Medicine, 14*: 71-86, 2002.

"What psychologists and psychotherapists need to know about ADHD and stimulants." *Changes: An International Journal of Psychology and Psychotherapy 18*:13-23, Spring 2000

My research, publications, and forensic work have influenced the FDA-approved labeling of drugs, including aspects concerning children. In 2004 I presented at two FDA public hearings concerning antidepressants as a cause of suicide in children. The conclusions of the FDA closely paralleled observations I have been making in my publications for ten years (see www.Breggin.com).

I have given hundred of presentations to medical and scientific organizations on the topic of the diagnosis and treatment of children, including the following:

American Psychological Association
American Counseling Association
National Institute of Mental Health (NIMH)
American Association for the Advance of Science
American Autism Society
Harvard School of Education

I have been invited to present concerning children to organizations of attorneys, professionals, and government agencies, including:

1. One-day workshop for teachers and mental health professionals sponsored by Common Pleas Court of Clarion County, Pennsylvania, sponsored by Judge Charles Alexander (on mediating children, including ADHD and stimulant drugs). Circa 1995.

2. Scientific present at the NIH Consensus Development Conference on the <u>Diagnosis and Treatment of Attention Deficit Hyperactivity Disorder,</u>" a three day conference on the latest concepts concerning ADHD and its treatment. I was asked by NIH to present on adverse drug effects in children. November 16-18, 1998.

3. Presentation at Hearing on "Behavioral Drugs in Schools: Questions and Concerns" of the Subcommittee on Oversight and Investigations and the Subcommittee on Early Childhood, Youth, and Families of the U.S. House or Representatives Committee on Education and the Workforce. September 29, 2000.

4. Presentation at the Maryland State Task Force to Study the Uses of Methylphenidate and Other Drugs on School Children. Circa 2000. Also to several state legislative committees around the country.

5. Presentation at "Ritalin Litigation," described as "The medical and legal roadmap to trying or defending your Ritalin suit successfully," including presentations on stimulant drug treatment, ADHD, and the role of the FDA and DEA in monitoring industry activities. I presented on "The science behind the lawsuits." The American Conference Institute, New York City, March 29, 2001.

6. Presentation at "Emerging Drug Litigation Conference" conference on "The Science and Medicine of Ritalin." Sponsored by Mealey's (Lexis/Nexis). New Orleans, May 17, 2001.

**B. Background Concerning Educational Approaches**

I have a long-standing interest and expertise in education, especially as it relates to mental health issues. In 1967-1968 I was a fulltime consultant to the National Institute of Mental Health (NIMH) in the Center for Mental Health and Education. In that role I developed, evaluated, and monitored research projects in mental health and education in schools throughout the country. After leaving NIMH, I acted as a consultant in education for several years. During that time I taught at the Antioch-Putney School of Education (graduate students in education), at the Washington School of Psychiatry (supervising pupil personnel services in the D.C. school system), and as an adjunct professor in the Department of Counseling in the School of Education of the University of Maryland. In more recent years (1996-1999), I was a faculty associate in the Counseling Department of the School of Education of Johns Hopkins University where many of my students were preparing to become school counselors.

I have been invited to speak on educational concerns on numerous occasions, including to the Harvard School of Education. I have also been invited to testify on matters relating to education before state legislatures and the U.S. Congress, including the U.S. House of Representatives Committee on Education (2000). I have given a number of invited workshops at the American Counseling Association local and national conferences, often involving mental health specialists in the field of education.

I have also written extensively on issues that involve educational standards, particularly in regard to elementary and high school, for example, in my books Reclaiming Our Children and Talking Back to Ritalin.

In my capacity as a clinician, I have often consulted with schools and teachers concerning my individual patients, and sometimes concerning more school-wide issues.

**III. Materials Reviewed**

It was difficult to categorize all the materials reviewed. The following includes some of the salient documentation:

### A. Interviews:

Interviews by telephone with Travis Myslow and his mother and father, Cindy and Matthew Myslow, on September 28, 2004.

### B. CVS pharmacy records

### C. Medical records

> Neurology Associates (Drs. Alshansky and Kreminitzer)
> Anna Alshansky, M.D., neurologist, evaluation of 10.27.00
> Martin Kreminitzer, M.D., neurologist, evaluation of 4.24.01
> Robert Rubin, M.D., pediatrician
> New Milford Hospital ER, 12.23.99

### D. Medical and Psychological Reports

> A. Herbert Schwartz, M.D., psychiatrist, letter to JeanAnn Paddyfote, Ph.D., 8.22.02
> Armin Paul Thies, Ph.D., neuropsychologist, 8.13.01
> Pamela Samaha, LCSW, evaluation, 12.1
> Simon Sobo, M.D., Letter to Whom It May Concern, 9.27.01, and Prescription that drugs are not needed, 7.17.0
> Richard Carter-Toress, M.D., Psychiatric Evaluation, 10.30.01 (concurs with Theis and Samaha)
> D. A. Begelman, Ph.D., clinical psychologist and psychotherapist, letter To Whom It May Concern, 11.1.01.
> Fred Baughman, M.D., neurologist, abstract of records of the case.
> Mary Ann Block, D.O., evaluation of the case.

### E. Multiple New Milford Public School District Records

> Josephine Rositano, school psychologist, Learning Assessment based on February 1998 evaluations; Psychological Evaluation, March 5[3/5], 1998.
> Mary White-Roath, Ed.D., Psycho-Educational Evaluation, 9.8.01, 9.15.01, and 10.17.0 and other communications
> Antoinette Montague, MA, Speech and Language Pathologist evaluation, 2.20.03
> Dianne Badillo Martinez, Ph.D., neuropsychologist, resume and report March 29, 2001
>
> Letters from JeanAnn C. Paddyfote, Ph.D., Director of Pupil Personnel and Special Services to Martinez (12.19.00), Dr. Alshansky (11.1.00), and Dr. A. Herbert Schwartz (5.30.02)

  PPT Recommendation making "neurological evaluation" "to rule in or rule out ADHD and to determine appropriate treatment." 10.26.00
  Anna Alshansky, M.D., neurologist. To Whom It May Concern Letter, about Travis, 10.27.00
  Behavior Intervention Plan, 8.30.03
  Occupational Therapy Screening, Jeffrey Schaghticoke Middle School, 6.19.02
  State of Connecticut, Department of Education, Final Decision and Order (14 pages), 10.20.01

### F. Legal documents

  Plaintiffs' Answers to Interrogatories of Defendants Anna Alshansky and Martin Kreminitzer, and response to document request
  Defendants Alshansky and Kreminitzer Objections to First Set of Interrogatories
  Defendants Alshansky and Kreminitzer Objection to Request for Production
  Defendants Alshansky and Kreminitzer Answers to Plaintiff's First Set of Interrogatories to all Defendants
  Defendants Alshansky and Kreminitzer Answers to First of Requests for Production Addressed to All Defendants
  Defendant Robert Rubin Response to Plaintiffs' First Set of Interrogatories Addressed to All Defendants
  Defendant Robert Rubin Objections to First Set of Interrogatories
  Answers to Plaintiffs' First Set of Interrogatories Addressed to All Defendants
  Second Amended Complaint
  Plaintiff Myslow's Responses to Defendants First Set of Interrogatories
  Plaintiffs' Answers to Interrogatories of Defendants Alshansky and Kreminitzer

## IV. Clinical Summary

### A. Treatment by Dr. Rubin

  Travis had difficulty learning to write and especially to read. This caused increasing frustration and humiliation at school. According to the parents, Travis' teachers and school officials individually and during PPT's pressured the family to obtain an evaluation for Attention Deficit Hyperactivity Disorder with the aim of a medication intervention. The record confirms this based on the school psychology report of 3.5.98 by Josephine Rositano. In her summary evaluation, she wrote that Travis was overall "functioning in the Average to High Average range of general intelligence," but failed to mention his failure to keep up with his grade level in writing and in math. The combination of those two observations, an average IQ, and poor performance in reading, should have been a red flag for dyslexia and/or inadequate teaching. Instead, she wrote, "The results also indicate a child with characteristics of an Attention Deficit/Hyperactivity Disorder (Combined Type) and comorbid Oppositional Defiant and Dysthymic Disorders."

At the urging of the school and Ms. Rositano, the parents went to their pediatrician, L. Robert Rubin, 3.27.98. They brought the Rositano report with them and showed it to the doctor who spent only a few minutes with them and with Travis.

Dr. Rubin's note reads: "See recent school evaluations. Will use 2 week trial of Ritalin 10 mg daily. Rubin."

On this basis alone, Dr. Rubin began a regimen of Ritalin that would last for three school years. He took no history, performed no physical examination, made no observations on the child, developed no overall treatment plan, made no specification of the behaviors to be treated or the desired endpoints, and did not provide for periodic re-evaluations.

In his Answers, Dr. Rubin acknowledges that his record contains no school records. There is no indication that he communicated further with the school or that he requested or obtained any further evaluations of the child. He would not even see the child again until 10.1.99—eighteen months later.

According to the parents and the record, Dr. Rubin did not physically examine the child, take his vital signs, or order any laboratory studies.

According to the parents, Dr. Rubin said in effect, "We'll try Ritalin." He gave them no indication that the diagnosis of ADHD and treatment with Ritalin were the subject of heated public and professional controversy. He did not tell them that Ritalin was a Schedule II drug, indicating a high potential for addiction and abuse, as well as related problems with rebound and withdrawal. He provided no warnings about any adverse effects, such as growth suppression; headache; stomachache; insomnia; social withdrawal, depression, fatigue, and mood instability; social withdrawal; obsessive-compulsive symptoms; increased nervousness, anxiety and agitation; tics; blood pressure and cardiovascular problems; or skin rashes (See Breggin, 1998a&b, 1999a-c, for summary of adverse reactions to Ritalin).

The parents report that Dr. Rubin asked them if Travis was having any problems at home and that they replied that he was not. The only home conflicts were related to Travis' frustration over schoolwork. In particular, he showed no signs of hyperactivity and inattention at home. He ate dinner quietly without getting up or fidgeting. He took rides in the car, watched TV, and played video games without displaying inattention or hyperactivity. The parents were not told that ADHD could not be limited to one setting, such as the school. Much later, they learned this from Dr. Thies who also explained that ADHD-like behaviors could be generated by anxiety and frustration surrounded schoolwork in a child who was dyslexic and/or poorly taught.

There are numerous notes in Dr. Rubin's medical record concerning the renewal of Ritalin prescriptions. Most seem the result of telephone calls with non-medical personnel. The pharmacy records confirm the renewal of prescriptions for Ritalin by Dr. Rubin. His final prescription was on 3.24.00 for 90 tablets of methylphenidate 5 mg. There are no prescriptions during the summer months.

Toward the end of the 2000 school year, Travis and his parents grew increasingly unwilling to continue the Ritalin. Travis was not improving in school and he often felt sick. He had insomnia, headaches, stomachaches, chronic constipation, some depression or sadness, increased irritability and a feeling of being "hyper," and considerable social withdrawal. He often felt stupid and dumb, and unable to learn. He remained thin and at times sickly looking. The parents began to withhold his morning dose of Ritalin and for

a few weeks or less Travis began to spit out the dose given to him at school. The Myslow family was obviously intimidated by the school and fearful of telling them that Travis was reducing and stopping his medication. During the last two-three months of the school year, they explained to me, they received reports that Travis was doing better, although the school did not know he was no longer taking the medication.

A 5.9.00 note by Dr. Rubin states, "Child says Ritalin makes him 'hyper'. Not taking it in AM for 1 week plus. School doesn't know and patient having no school difficulties. Parents and child want to stop 5 mg noon dose. I will agree with use of placebo a month before telling school."

On 1.19.01, Dr. Rubin wrote a letter confirming the lack of an overall evaluation and the role of the school in his prescription of the Ritalin to Travis:

> The above named patient has been on Ritalin (methylphenidate) for the past three years. He originally started this medication at the suggestion of his school because of observed and perceived difficulties.
>
> His parents feel there has been no real improvement since inception of the treatment.
>
> Sincerely, L. Robert Rubin, M.D.

### B. Treatment by Dr. Alshansky and Dr. Kremenitzer

At the start of the school year in September 2000, Travis continued to be unable to read and to have difficulties writing, and his emotional distress resumed. On 9.27.00 Dr. Rubin wrote, "On no meds but having school difficulties again this year. Plan: Try Concerta 18 mg daily for 2 weeks. If it makes him 'hyper' – will then try Adderall. Rubin." A margin note says "Tel. Call." It appears that Dr. Rubin was conferring with someone but it's unclear who it might be. He did not begin Travis on Concerta, a long-acting form of methylphenidate (Ritalin).

The school continued pressuring the parents to resume Travis on medication. On 10.26.01, an "Out-of-District Provider Letter Form" indicates that a PPT meeting was held "to recommend a neurological evaluation for Travis Myslow" with the stated purpose "to rule in or rule out ADHD and to determine appropriate treatment." The note is heavily skewed toward motivating the neurologist to diagnose ADHD and to start medication. It asks, "Why does Travis demonstrate a high activity level and is unable to sustain his attention to task for more than two minutes." This is more an exaggerated attack than an analysis. Travis was obviously able to pay attention to many different activities. His problems centered on specific school activities where he became frustrated. Another issue was, "Are there neurological factors affecting his extreme difficulty in learning to read." This is an extreme attempt to find the fault in the child's brain rather than in his schooling. A New Milford School parental consent form dated 10.26.00 confirms that the impetus behind the neurological consultation came from the school.

The following day, 10.27.00, neurologist Anna Alshansky, M.D saw Travis for the first and only time. She described behavior problems in school. In her records, she

possessed the skewed 3.5.98 school psychology report by Josephine Rositano that refers to "characteristics of an Attention Deficit/Hyperactivity Disorder." Again linking the motivation for medication to the school, the doctor remarks, "As per Mrs. Myslow reports, the teachers felt that the medication did provide improvement in Travis' behavior." Dr. Alshansky does not describe any behavioral problems observed in her office or at the child's home related to ADHD or any other psychiatric diagnosis.

Dr. Alshansky on that day wrote a "To Whom It May Concern" letter that was obviously intended for the school system in which she diagnosed ADHD. In a letter to Dr. Rubin on the same day, she diagnosed ADHD and wrote, "I recommend a trial of Adderall since Travis had unpleasant side effects on the Ritalin." She also recommended a variety of other special services. After three years without benefit on Ritalin and after serious adverse effects from the Ritalin, there was little hope that Adderall (a mixture of amphetamine) would be any more effective or safer.

A remarkable telephone call note in Dr. Rubin's medical record on 11.9.00 documents the pressure to keep Travis on medication: "Phone call: Ritalin made hyper. Mom stopped. Adderall caused school to think he 'looks out of it.' Adderall decreased appetite. Dr. Alshansky has seen him. Plan: Call Dr. Alshansky to determine what drug to use next." At this point, Dr. Rubin continues to cooperate in the effort to keep Travis medicated.

When the Adderall made Travis ill, Dr. Alshansky changed to Dexedrine. She did not tell the parents that there is not essential difference between the two drugs (both are forms of amphetamine and have the same effects). Travis reacted badly to the new drug. He looked so ill and apathetic that the school called Mrs. Myslow. When Mrs. Myslow was unable to get a telephone response from Dr. Alshansky, she wanted to give up seeing the doctor and to stop medicating her son.

According to Mrs. Myslow, the school again intervened and arranged an appointment on 4.24.01 with Dr. Kremenitzer in the same neurology group (see ahead). In the meanwhile, the school had continued to exert pressure to get Travis evaluated medically and medicated. On 11.1.00, JeanAnn Paddyfote, Ph.D., Director of Pupil Personnel and Special Services, wrote a letter to neurologist Alshansky requesting an evaluation of Travis. It's a more detailed but similar statement to the one that emanated from the PPT meeting on 10.26.00. The letter is heavily skewed toward motivating the neurologist to diagnose ADHD and to start medication. In a list of 12 issues to be addressed, the first one again states: "Why does Travis demonstrate a high activity level and is unable to sustain his attention to task for more than two minutes?" The final "issue" is "Why is Travis so impulsive?" These "issues" would be bound to pressure the neurologist to diagnose the child ADHD and to medicate him. Dr. Paddyfote stated that the school district would pay for the evaluation. Dr. Paddyfote wrote a similar letter to neuropsychologist Diana Badillo Martinez, Ph.D., again agreeing to pay for the consultation.

In her 3.29.01 report, Dr. Martinez documents how unhappy Travis feels but attributes the problem to an undefined neurological problem rather than to his circumstances at school. She acknowledges, "However, Travis did not do well on medication for Attention Deficit." Instead, she suggests, "He may benefit from a trial of anti-anxiety medication to assist him during the process in which his behaviors are being addressed" (p. 9, also p. 12). Her diagnoses are Cognitive Disorder, Generalized Anxiety

Disorder, Oppositional Defiant Disorder and Monitor to R/O Attention Deficit Disorder. Thus, after three years of Ritalin treatment for ADHD by Dr. Rubin, and further amphetamine treatment by Dr. Alshansky, the neuropsychologist was unable to establish a diagnosis of ADHD. However, she encouraged yet another medication regimen.

Fortified with Dr. Martinez's report, neurologist Kremenitzer cast further doubt on the diagnosis of ADHD when he saw Travis for the first and only time. He diagnosed the child has having "Learning disability in the area of dyslexia." He also diagnosed "Generalized Anxiety Disorder." He listed "Possible ADD." The doctor wrote, "It appears as if both Adderall and Dexedrine, as well as Regular Ritalin [sic], seem to make him hyperactive." However, he then prescribed Concerta 18 mg in the morning. Given he did not diagnose ADHD, the medication is not indicated. He wrote letters to both the school and Dr. Rubin concerning his prescription of Concerta. The parents told me that Dr. Kremenitzer did not explain to them that Concerta contained exactly the same chemical as Ritalin (methylphenidate), but in a longer-acting preparation. As before, Travis behaved normally in the doctor's office and there is no description of any abnormal behavior at home. Again, Travis responded badly to the medication and the parents stopped it. They never again allowed anyone to medicate their son.

The Myslow family eventually sought help from independent professionals and received confirmation that their son did not suffer from ADHD or any other primary psychiatric diagnosis, and did not need medication. Instead, he was found to be suffering from anxiety and stress secondary to his failure to read and inadequate educational interventions at New Milford. These professionals include the following individuals (the dates indicate specific reports): A. Herbert Schwartz, M.D., psychiatrist, 8.22.02; Armin Paul Thies, Ph.D., neuropsychologist, 8.13.01; Pamela Samaha, LCSW, 12.1; Simon Sobo, M.D., psychiatrist, 7.17.0, 9.27.01; Richard Carter-Toress, M.D., psychiatrist, 10.30.01; D. A. Begelman, Ph.D., clinical psychologist and psychotherapist 11.1.01.

When transferred to a private school, the Benz Bronz Academy, that helped him to overcome his reading problem, Travis began to prosper. He has done well without any psychiatric treatment or medications.

## V. Pediatric and General Medical Standards for the Diagnosis and Treatment of ADHD

### A. The *Physicians' Desk Reference*, 1998

The Physicians' Desk Reference (PDR) is sent free each year to every physician in the United States. It contains the official FDA-approved labels for prescription medications. It is a commonly used reference by physicians. The complete 1998 label for Ritalin as found in the PDR is contained in **Appendix A**.

The official Ritalin FDA-approved label for Ritalin is relatively brief (slightly more than one page long in the PDR). Therefore, the written comments that I will quote are unusually easy to locate and to read in the PDR. The 1998 label is found in the corresponding annual editions of the PDR. Earlier versions are essentially the same, so that a physician would have obtained basically the same information if referring to any Ritalin label in the 1990s.

Under the section on **INDICATIONS**, the Ritalin label states the following:

> <u>Ritalin is indicated as an integral part of a total treatment program which typically includes other remedial measures (psychological, educational, social)</u> for a stabilizing effect in children with a behavioral syndrome characterized by the following group of developmentally inappropriate symptoms: Moderate-to-severe distractibility, short attention span, hyperactivity, emotional lability, and impulsivity. (p.1897, underlining added)

Notice the use of the word "typically" in describing the inclusion of psychological, educational and social "remedial measures" in the treatment of the child diagnosed with ADHD. **Dr. Rubin's** treatment was atypical in this regard in that it did not include this more comprehensive program.

Consistent with the above themes, the official Ritalin label states:

> Adequate diagnosis requires the use not only of medical but of special psychological, educational, and social resources. ... The diagnosis must be based upon a complete history and evaluation of the child and not solely on the presence of one more of these characteristics. (p. 1897)

**Dr. Rubin's** medical record and the report of both parents who were present at the time confirm that **Dr. Rubin** did not take a complete history or evaluation, but based his diagnosis on second-hand information from a non-physician who described the presence of one or more of these characteristics.

The Ritalin label also contains this admonition:

> The diagnosis of this syndrome should not be made with finality when these symptoms are only of comparatively recent origin. (p. 848).

**Dr. Rubin** recorded no history and reportedly took no history of the origin of these symptoms that were in fact of comparatively recent origin in the classroom.

In regard to environmental problems (such as peer conflict), Ritalin is not indicated. According to the official Ritalin label:

> Drug treatment is not indicated for all children with this syndrome. Stimulants are not intended for use in the child who exhibits symptoms secondary to environmental factors and/or primary psychiatric disorders, including psychosis. Appropriate educational placement is essential and psychosocial intervention is generally necessary. When remedial measures alone are insufficient, the decision to prescribe stimulant medication will depend upon the physician's assessment of the chronicity and severity of the child's symptoms. (p. 1897).

**Dr. Rubin** paid no heed to these admonitions. He did not investigate the origin or secondary environmental factors or other psychological and psychiatric causes of the boy's problem. He did not first make sure that appropriate educational placement and

psychosocial interventions had been tried. He made the mistake of assuming the existence of the ADHD syndrome and then medicating the child with no further inquiry.

These themes are repeated in the **PRECAUTIONS** section of the Ritalin label:

> Drug treatment is not indicated in all cases of this behavioral syndrome and should be considered only in light of the complete history and evaluation of the child. The decision to prescribe Ritalin should depend on the physician's assessment of the chronicity and severity of the child's symptoms and their appropriateness for his/her age. Prescriptions should not depend solely on the presence of one or more of the behavioral characteristics. (p. 1897).

Note the repetition of the theme that the medication should not be prescribed solely on the basis of the presence of the behavioral characteristics or symptoms.

There is also a specific warning under **CONTRAINDICATIONS** that Ritalin should not be given in cases of "Marked anxiety, tension, and agitation" because it may "aggravate these symptoms." A contraindication is an absolute prohibition. The theme is repeated in the **PRECAUTIONS** section that states, "Patients with an element of agitation may reaction adversely; discontinue therapy if necessary." Similarly, the **PRECAUTIONS** section also warns, "When these symptoms are associated with acute stress reactions, treatment with Ritalin is usually not indicated."

A **CONTRAINDICATION** is the highest level of warning in the FDA hierarchy of warnings. It comes even ahead of a **WARNING**. A **CONTRAINDICATION**, unlike a **WARNING** or a **PRECAUTION**, indicates that the drug should never be used under these circumstances. Nonetheless, **Dr. Rubin** prescribed Ritalin to a child who was suffering from "marked anxiety, tension, and agitation" in school, risking that he would "aggravate these symptoms."

The Ritalin label is quite specific that medication is not appropriate for every child and that it should not be used as the sole response to these behaviors. Psychological, social and educational evaluations are always required and drugs should not be resorted to until appropriate "remedial measures" have proven insufficient. The label is also clear that medication is not indicated when the problem is environmental, caused by stress, or associated with agitation, anxiety and tension.

No drug can help a child deal with peer conflict, peer abuse as victims or perpetrators, or aggression and fighting. In this case, Travis was subjected to peer abuse for seeming to be "stupid."

The label is relatively weak and outdated in regard to listing potential adverse effects. Nonetheless, it does mention "suppression of growth (ie, weight gain, and/or height)" with long-term use, seizures, blood pressure and cardiac problems, nervousness and insomnia, skin rashes, joint pain, headache, movement abnormalities, abdominal pain, headache, and worsening of nervousness, anxiety and agitation. It also warns about Drug Dependence in a special box. The family states that **Dr. Rubin** never warned them about any undesirable or dangerous effects. The doctor's records provide no evidence that he did.

The label confirms that Ritalin has not been shown to have long-term safety and efficacy.

The themes found in the official FDA-approved Ritalin label are found in numerous sources of information for professionals.

## B. *Drug Facts and Comparisons*, 1998

Drug Facts and Comparisons (1998) is an annual compendium that has some similarities to the Physicians' Desk Reference. The section on Ritalin is reproduced in **Appendix B**. It is published annually. It draws heavily on the FDA-approved label and it is commonly used as a primary source of medication information. If **Dr. Rubin** had turned to this document he would have found all of the warnings and caveats present in the official label as contained in the Physicians' Desk Reference, sometimes with slightly different emphasis or language. It reminds the doctor not to base medication treatment solely on the existence of the syndrome and not to treat environment problems with stimulants. It states that methylphenidate (Ritalin) is contraindicated in children with anxiety, tension and agitation because it may aggravate their condition, and twice warns about this problem. It repeats that long-term safety and efficacy have not been established.

Drug Facts and Comparisons states, "Carefully monitor patients on long-term treatment" (p. 1743), some **Dr. Rubin** failed to do. It stresses the importance of a complete history and evaluation before prescribing. It states, "Prescription should not depend solely on the presence of one or more of the behavioral characteristics" (p. 1744). It notes, "When symptoms are associated with acute stress reactions, treatment with methylphenidate is not usually indicated" p. 1744).

The book lists many potential adverse effects, including weight loss, abdominal pain, headache, skin rash, cardiovascular abnormalities, insomnia, motor control problems, worsening of anxiety, tension, and agitation, and psychosis. It also mentions tolerance and drug abuse. As noted, **Dr. Rubin** did not warn the family about these potential problems.

## C. *Nelson Textbook of Pediatrics*, 1987, 1992, and 1996

The Nelson Textbook of Pediatrics is probably the most highly regarded textbook in the field and the most widely used. It continues to go through frequent revisions and was my primary textbook of pediatrics in medical school (1958-1962) when I took a special rotation on pediatrics. It describes standard treatment approaches and provides guidelines.

### (1) 1987 Edition of *Nelson Textbook of Pediatrics*

In order to show the consistency of recommendations spanning a decade, my analysis begins with observations and quotes from the Thirteen Edition of the textbook (Behrman and Vaughn, 1987).

The textbook's section on the treatment of ADHD begins as follows:

> **Treatment**: Treatment of children with attention deficit disorders is directed at the social environment of the home and classroom and at the

> child's personal academic and psychosocial needs, with judicious use of
> medication. A clear explanation of the child's condition must be given
> both to the parents and to the child. (p. 65)

The textbook emphasizes informed consent in regard to medication:

> The benefits and disadvantages of medication must be weighed carefully
> by the physician, with full disclosure to parents, and to the child as well,
> within the limits of his or her understanding. Informed consent is a
> necessary condition for effective treatment, since adequate management of
> the hyperactivity child with the attention deficit syndrome requires parents
> and child to sustain a regiment that may last for many years. (p. 67)

The pediatric text puts special emphasis on educational evaluation and treatment:

> **School.** The child with attention deficit syndrome with hyperactivity
> often has a learning disability, and may need any of the special
> educational approaches prescribed for learning disabilities. (p. 67)

In regard to learning disabilities and other educational problems, the textbook goes on to mention behavior modification, special classes and tutoring as potential sources of help. Unfortunately, the **New Milford School District** became focused on diagnosing Travis with ADHD rather than providing the appropriate "special educational approaches prescribed for learning disabilities."

It would turn out that Travis indeed suffered from a learning disability, dyslexia. More accurately, he had not been taught to read. **Dr. Rubin** failed in his duty to make certain that the child was adequately evaluated in this regard.

Nelson's textbook makes clear that the doctor must stay in close touch with the school:

> It is essential that physician and school personnel maintain close
> communication about the child's progress. Decisions about medication or
> about referral to a mental health facility may well depend foremost upon
> the information obtained from a cooperative and perceptive teacher. (p.
> 67).

While prescribing Ritalin for three years, at no time **Dr. Rubin** maintain any communication with the school about his progress, let alone "maintain close communication."

The textbook similarly states, "Probably the most important tools in evaluation are the developmental history and the teacher's reports of academic problems and behavior in the classroom" (p. 64). **Dr. Rubin** had no such reports at the initiation of medication treatment or during medication treatment.

When children have problems with aggression, the pediatric textbook asserts the following:

> In fact, behavioral therapy can be <u>more efficacious than medication</u> for treating certain problems, especially aggression. (p. 67) (underline added)

While not physically aggressive, Travis was "oppositional" in school—that is, he expressed frustration over his inability to cope with school as a non-reader.

When a child is experiencing negative emotional reactions, referral to a mental health specialist becomes more important.

> There is no conclusive evidence that psychotherapy is primarily beneficial in the attention deficit syndrome, but individual and family therapy is indicated when ADD is complicated by depression, social withdrawal or negativism, eroded self-esteem, or chronic family conflict. (p. 67)

Due to adverse drug effects from **Dr. Rubin's** treatment and improper **New Milford School** interventions, Travis' problems became increasingly complicated by depression, social withdrawal, negativism and eroded esteem. Undoubtedly some conflict was also generated within the family. **Dr. Rubin**, despite the standard of care, did not refer the Travis or his family for mental health care.

The textbook carefully separates problems with aggression from ADHD, and devotes a section to "Aggressive Behavior and Aggressive Disorders." It points out that many ADHD children may seem aggressive because of their unintentional clumsiness, and that this must be distinguished from intentional aggression. It emphasizes the important of evaluating the sources and nature of the child's aggression. It states, "The more refractory cases require psychiatric intervention to reveal and modify the underlying psychodynamics" (p. 68).

A section specifically devoted to psychopharmacology beings with the following observation:

> Using drugs to modify children's behavior is controversial. (p. 76)

There were many other sources to indicate that medication was "controversial" in 1998 as it remains today. Indeed, later that year the National Institutes of Health would hold its Consensus Development Conference on the Diagnosis and Treatment of ADHD and conclude that the diagnosis and the treatment remained controversial (NIH, 1998). **Dr. Rubin** never informed the family that there was any controversy surrounding the diagnosis and treatment of ADHD.

### (2) 1992 Edition of *Nelson Textbook of Pediatrics*

In 1992, the 14th Edition of <u>Nelson Textbook of Pediatrics</u> was published (Behrman and Vaughn, 1992). Although the format is somewhat changed, the substance remains largely the same. A section entitled <u>Diagnosis and Differential Diagnoses</u> emphasizes the importance of testing and ruling out other disorders, such as learning disabilities, epilepsy, and sensory impairments.

Under a section entitled <u>Clinical Manifestations</u> of ADHD there is a description of the kind of information that should be elicited and put into the medical chart:

> **Clinical Manifestations**. A description of the problem behaviors in specific situations and environments is elicited. A *history* of aggression and fears, poor relationships with peers, academic difficulty, behavioral problems at school, and reaction to authority define the breadth of the problem and provide useful information about the concurrent presence conduct disorder, anxiety disorders, and learning disabilities. (p. 67, bold and italics in original)

The section elaborates on other vital facts required for a complete history.

The next section discusses a variety of examinations that should be included to determine the diagnosis and the treatment, including tests of "language skills" and evaluations for "learning disabilities."

The section on **TREATMENT** begins with a very strong statement:

> Stimulant medications should be used only as a part of an ongoing plan of behavioral and psychosocial therapy involving the child, parents, and school. This approach is the most likely to be efficacious. (p. 68).

In the section on TREATMENT, close cooperation with the school is again emphasized:

> Close communication between the physician and school personnel is essential. .... Behavior therapy is a more efficacious treatment than pharmacotherapy for aggression and physical acting out in children with ADHD. Decisions about medication should be made in consultation with school personnel as well as with parents. (p. 68)

Unfortunately in this case, the interactions between the **New Milford School District** and the doctors resulted in more harm than good, due to the biased view of the school district.

The dramatic statement about "Using drugs to modify children's behavior is controversial" is also found in the 14th edition (p. 73) at the start of the section on PSYCHOPHARMACOLOGY.

Under <u>Stimulant Medications</u>, the pediatric textbook states, "These stimulants should be used concurrently with individual, family, and community therapy, but often this is not done" (p. 74).

Also of importance for this case, the 1992 edition of <u>Nelson Textbook of Pediatrics</u> reminds the reader that the presence of aggression in childhood is not used to define this syndrome (p. 69). Any oppositional behavior on Travis' part was a separate problem from any possible ADHD syndrome. Furthermore, in discussing "Disruptive Behavioral Disorders," including aggression and fighting, the textbook states, "Pharmacotherapy is, by and large, not indicated for this problem" (p. 67).

### (3) 1996 Edition of *Nelson Textbook of Pediatrics*

In 1996, two years before **Dr. Rubin** treated Travis, the 15th edition of the Nelson Textbook of Pediatrics was published (Behrman et al., 1996). This was the most recent edition at the time Dr. Rubin began prescribing Ritalin to Travis. There are no substantial changes from the earlier editions and the essential points continued to be made. In fact, the 1996 edition is almost identical to the 1992 edition in regard to ADHD and its treatment. <u>All of the quotes that I have selected from the 1992 edition can be found in the 1996 edition.</u>

For example, the section on treatment begins with exactly the same strong emphasis as the 1992 edition. It is worth repeating:

> **TREATMENT**: Stimulant medication should be used only as a part of an ongoing treatment plan of behavioral and psychosocial therapy involving the child, parents, and school. This approach is most likely to be efficacious. (p. 91, bold and caps in original)

Other relevant points are repeated from the earlier edition, including the use of individual and family therapy "when hyperactivity is complicated by depression, social withdrawal, conduct disorder, eroded self-esteem, or family conflict" (p. 92).

In regard to peer problems and delinquency, the 15th edition adds that there is "little evidence that stimulants improve ... control of anger" (p. 92). Furthermore, the 15th edition states:

> Peer interaction is not favorably altered with long-term drug treatment. The increased likelihood of developing delinquency later is also unaffected by stimulant medication usage. The long-term benefits of these medicines have not yet been established. (p. 92)

Note that the textbook repeats the well-established fact that long-term benefits for the treatment had not been established. Despite this warning, **Dr. Rubin** continued to treat Travis for three years without demonstrable good effect. Furthermore, **Dr. Alshansky** and **Dr. Kremenitzer** continued this mistaken practice.

### D. *Pediatric Clinics of North America*, 1992

In 1992 the prestigious Pediatric Clinics of North America published a review of current practices (standards) in the profession (Kelly and Aylward, 1992). The description of contemporary standards is basically the same as that summarized by the Nelson Textbook of Pediatrics, except greater detail is provided. It affirms that ADHD is a complex and difficult diagnosis that requires multiple approaches to evaluate and to treat. In regard to the pediatrician's relationship with the school, it states, "teacher report measures are a necessary component in the evaluation of attention deficit disorders" (p. 497). It further observes, "The pediatrician can play an important role in education of school personnel by means of reports, contacts with the child's classroom teachers, and attendance at school conferences" (p. 501). Overall, the analysis makes clear that diagnosing ADHD is not the kind of one-stop office procedure that took place in **Dr. Rubin's** treatment of Travis.

The continued emphasis on the need for cooperation between doctors and the school emphasizes the damaging effect of **New Milford's** harmful interventions.

### E. American Academy of Pediatrics, 1995

The American Academy of Pediatrics is the premier organization of pediatricians. In 1995 it published The Classification of Child and Adolescent Mental Diagnoses in Primary Care (Wolraich, 1995). The book emphasizes the importance of examining psychosocial and educational factors in the diagnosis and treatment of childhood disorders. It divides the diagnostic process into two main sections. The first is "Situations Section" that deals with "Children's Responses to Environmental Situations and Potentially Stressful Events." The second section is entitled "Child Manifestations Section" and it specifically addresses the ADHD diagnosis. In regard to ADHD, it states that, "Specific environmental situations and stressors often make a significant contribution to the severity of these behaviors, though they are seldom entirely responsible for a disorder-level diagnosis of these behaviors." Among the "situations and stressors" are "Physical abuse/sexual abuse" and marital stresses. It also notes that "Difficulties with cognitive/adaptive skills, academic skills, and speech and language skills often lead to frustration and low self-esteem that contribute to the severity of these behaviors. These conditions may also co-exist with ADHD and therefore should be systematically assessed" (p. 97, underlined added).

The above observations again emphasize the importance of **New Milford's** failure to properly address Travis' language skills and the resultant "frustration and low self-esteem."

The classification book does not deal with specific treatments. However, it provides two case examples of how to use the model. One is a child with hyperactive and impulsive behavior. The evaluation examines the child's psychosocial situation and the "intervention" involves "counseling the parents on effective parenting techniques" and other psychosocial approaches (pp. 19-20) with no mention of medication. Overall, the book emphasizes the psychosocial and educational complexity of diagnosing ADHD as well as other disorders involving aggression.

### F. American Medical Association Council Report, 1998

The AMA Council Report on ADHD and stimulant treatment was published in the AMA's official journal (Goldman et al., April 1998). Published in 1998, the year that **Dr. Rubin** began treating Travis, the report was based on literature that spanned 1975 through March 1997. Its conclusion confirms the problems in this case: "It is clear from the discussion of the diagnostic assessment that ADHD simply cannot be diagnosed in a typical 15-minute primary care office visit." The AMA report goes on to say that the diagnostic assessment "will require several visits and may require a multidisciplinary team approach, specialty consultation or both in some cases" (p. 1105). **Dr. Rubin** utterly failed to meet these standards.

The AMA report cites an earlier 1994 report by Waldrop as one basis for its conclusions. Waldrop (1994), writing in Clinical Pediatrics, reaffirmed that the "successful treatment of ADHD requires a multidisciplinary approach" (p. 86) and that

cases involving problems such as learning disabilities, conduct disorders, or depression "should be referred for further psychiatric, educational, or neurologic management" (p. 87).

### G. The 1998 NIH Consensus Development Conference on the Diagnosis and Treatment of ADHD

This author (Breggin, 1998b) was the scientific expert on adverse drug effects and made two presentations at this highly publicized conference sponsored by the National Institutes of Health (NIH, 1998) and the National Institute of Mental Health. Of special importance to **Dr. Rubin's** treatment, the consensus conclusions emphasized the continuing controversy surrounding both the diagnosis and treatment with stimulants.

The NIH Consensus Statement (1998, p. 3) declares, "the disorder has remained **controversial**." The consensus statement elaborates:

> The diverse and conflicting opinions about ADHD have resulted in confusion for families, care providers, educators, and policymakers. The **controversy** raises questions concerning the literal existence of the disorder, whether it can be reliably diagnosed, and, if treated, what interventions are most effective.
>
> One of the major controversies regarding ADHD concerns the use of psychostimulants to treat the conditions. [emphases added]

The NIH Consensus Statement hammered home the theme of controversy surrounding the diagnosis and treatment. Its conclusions repeated its earlier assertion that despite progress in the field, "this disorder and its treatment have remained **controversial** in many public and private sectors" (p. 20) (emphasis added).

Furthermore, the NIH Consensus Statement made clear that ADHD was not an established brain disorder: "Although research has suggested a central nervous system basis for ADHD, further research is necessary to firmly establish ADHD as a brain disorder" (p. 7). Furthermore, "our knowledge about the cause or causes of ADHD remains speculative" (p. 21).

Professionals without a vested interest who came from various fields in science and medicine wrote the consensus conference statement.

At the conference, I documented the known adverse effects of Ritalin (Breggin, 1998b) and later published them in two peer-reviewed journals (Breggin, 1999a-c). As noted, **Dr. Rubin** failed to warn the parents about the controversial nature of the diagnosis and the treatment, and the many adverse effects caused by Ritalin. **Drs. Alshansky** and **Kremenitzer** also failed in this regard.

### VI. Relevant Psychiatric Standards for the Treatment of ADHD

ADHD is a psychiatric diagnosis. Especially in regard to medication treatment, psychiatrists and psychiatric documents tend to set the standards. Beyond that, several psychiatric publications are routinely used in the training of medical students and then