pediatricians and other medical professionals during their training in the psychiatric area of their specialty. However, since I have already cited so much literature that is directly related to the pediatric community, I will be brief in discussing primarily psychiatric sources.

### A. The *American Psychiatric Press Textbook of Psychiatry*, 1994

One of the most commonly used general sources is the American Psychiatric Press Textbook of Psychiatry (Hales, et al., 1994). The chapter by Dulcan (1994) makes clear that a thorough evaluation is required before administering stimulant medication and that medication alone is rarely if ever the sole treatment.

> Psychiatric treatment should be preceded by a comprehensive clinical evaluation. (p. 1209)
>
> Information from the school is always useful and is essential when there is concern about learning or behavior in school, or peer functioning. With parental consent, the clinician talks with the teacher; obtains records of testing, grades, and attendance; and requests completion of a standardized checklist, such as the Teacher Report Form of the Child Behavior Check List. (p. 1210)
>
> Important general principles include ... virtually never using medication as the only treatment. (p. 1211, underline added)

In the section specifically addressing stimulant medication, Dulcan makes the following observations:

> It is clear that medication alone is rarely sufficient treatment. Even children who respond positively continue to show deficits in some areas. Specific learning disabilities and gaps in knowledge and skills due to inattention require educational remediation. Social skill deficits and family pathology may need specific treatment. Parent education and training in techniques of behavior management are virtually always indicated. (p. 1214, underline added)

### B. American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders, IV*, 1994

The American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) (1994) is the primary source of the ADHD diagnosis. Researchers, insurance companies and the FDA base their work on this manual. All textbooks tend to cite its ADHD criteria as the official criteria. The 1994 edition was the most recent available prior to **Dr. Rubin** prior to his treatment of Travis. This manual represents an attempt to research a scientific consensus in the community and to establish standards for diagnosis. In its introduction, the book states, "It must be

noted that DSM-IV reflects a consensus about the classification and diagnosis of mental disorders derived at the time of its initial publication" (p. xxiii). It is specifically intended for forensic as well as clinical use: "DSM-IV may facilitate the legal decision makers' understand of the relevant characteristics of mental disorders" (p. xxiv).

The manual makes clear, "Attention-Deficit/Hyperactivity Disorder is not diagnosed if the symptoms are better accounted for by **another mental disorder**..." (p. 83, bold in original). Thus, when a child has another psychiatric condition, such as an Acute Stress Reaction, Post Traumatic Stress Disorder, Oppositional Defiant Disorder or an Adjustment Disorder, it is inappropriate to diagnose him with ADHD and to medicate him with Ritalin. Similarly, if learning disorders generate his school problems, it is not appropriate to diagnose him with ADHD and to medicate him.

The manual makes clear that the ADHD diagnosis cannot be made on the basis of abnormal behaviors that are present in school and nowhere else. It states, "Some impairment from symptoms is present in two or more settings (e.g., at school [or work] and at home)" (p. 84). The parents reported to me that they told **Dr. Rubin** that there were no problems at home. Dr. Rubin's record indicates that the problem is located in the school. **Dr. Alshansky** was also remiss in diagnosing ADHD when the school was the only setting in which the behaviors were documented. Similarly, the **Milford School** evaluators were in error in pushing for an ADHD diagnosis when the problems centered on school and especially on problems relating to reading.

## VII. The Drug Enforcement Administration (DEA)

For many years the DEA has shown grave concern about the addiction and abuse potential of Ritalin, as well as its numerous serious adverse effects. The DEA has warned about its over-prescription in the United States (Drug Enforcement Administration, 1995, 1996; Feussner, 1998; Sannerud & Feussner, 2000).

At the conclusion of its conference on ADHD and Ritalin in December 1996, the Drug Enforcement Administration (DEA) declared:

> [T]he use of stimulants for the short-term improvement of behavior and underachievement may be thwarting efforts to address the children's real issues, both on an individual and societal level. The lack of long-term positive results with the use of stimulants and the specter of previous and potential stimulant abuse epidemics, give cause to worry about the future. The dramatic increase in the use of methylphenidate in the 1990s should be viewed as a marker or warning to society about the problems children are having and how we view and address them.

**Dr. Rubin's** negligence in the treatment of Travis Myslow is an unfortunate confirmation of the DEA's concerns.

## VIII. Negligence of the Doctors and the School District

All of the opinions in this section are rendered with a reasonable degree of medical certainty. The basis for this summary and additional aspects of negligence will be found in the text of this report.

### A. Negligence of Dr. Rubin

Dr. Rubin failed in his treatment by almost every standard imaginable in regard to the diagnosis and treatment of ADHD.

1. Based on a mistaken approach to diagnosing, Dr. Rubin made a wrong and unjustified diagnosis. The child did not have ADHD. The mere existence of some ADHD-like behaviors in one setting, the school, is insufficient to make the diagnosis. The absence of these behaviors at home especially suggests that problems at school are causative. There were other obvious causes for the child's distress, in particular his inability to read. That inability was based largely on inadequate teaching.

2. Dr. Rubin allowed the parents and himself to be pressured by the school into prescribing medication.

3. He did not do a take a history, perform a physical examination, complete an evaluation of the child, make a treatment plan, identify specific behaviors to be addressed, and discuss the probable endpoints of treatment.

4. He prescribed a Schedule II substance without seeing the child for periods as long as eighteen months. Overall, he did not adequately monitor the child.

5. He did not respond to the obvious failure of the treatment to help the child.

6. He did not respond to the child's accumulating adverse drug effects, including a dramatic worsening of his social relationships and an increase in anxiety and agitation, common side effects of stimulant medication.

7. He did not inform the parents about the public and professional controversy surrounding the diagnosis and treatment of ADHD.

8. He did not obtain informed consent from the parents concerning the adverse effects of Ritalin.

9. He did not educate the parents concerning adverse effects to look for so that the parents could identify these effects when they occurred.

10. He did not inform the parents that the long-term safety and efficacy of Ritalin had not been established.

11. He did not communicate to Dr. Alshansky the futility and risks of continuing to medicate the child with stimulant medication.

12. He failed to inform the parents of alternative approaches to treating the behaviors displayed by Travis.

### B. Negligence of Dr. Alshansky

Dr. Alshansky saw the patient only once later in the child's history of medication treatment and therefore played a much lesser role than Dr. Rubin and the New Milford School District in the harm that befell the child. However, Dr. Alshansky failed the patient in the following important ways:

1. Based on a mistaken approach to diagnosing, Dr. Alshansky made a wrong and unjustified diagnosis. The child did not have ADHD. The mere existence of some ADHD-like behaviors in one setting, the school, is insufficient to make the diagnosis. The absence of these behaviors at home especially suggests that problems at school are causative. There were other obvious causes for the child's distress, in particular his inability to read. That inability was based largely on inadequate teaching.

2. Dr. Alshansky continued the failed and dangerous regimen of stimulant medication, causing the child considerable distress and adding to the overall toxic effects on his brain and body.

3. Dr. Alshansky failed to obtain informed consent from the parents concerning the nature of Adderall and Dexedrine, and their close relationship to each other and to Ritalin.

4. Dr. Alshansky allowed herself to be paid by the school district and to become involved with the district in a manner that produced a conflict interest. It was clear that the school was pressuring the parents to medicate their child and it was clear that the parents felt in conflict with the school. Under these circumstances, the doctor should not have accepted payment from the school. Having accepted payment from the school, the doctor should have explained the conflict of interest to the parents and offered to find another neurologist.

### C. Negligence of Dr. Kremenitzer

Dr. Kremenitzer, like Dr. Alshansky, saw the patient only once later in his history of medication treatment and therefore played a much lesser role than Dr. Rubin and the school district in the harm that befell the child. However, Dr. Kremenitzer failed the patient in the following ways:

1. Despite casting appropriate doubt on the ADHD diagnosis, Dr. Kremenitzer continued the failed and harmful regimen of stimulant medication, causing the child considerable distress and adding to the overall toxic effects on his brain and body. In particular, despite acknowledging that stimulants, including Ritalin, had failed and

caused adverse effects in the past, he started the child on Concerta, a drug that contains a long-acting form of methylphenidate or Ritalin.

    2. Dr. Kremenitzer failed to obtain informed consent from the parents concerning the fact that Concerta contains the same chemical as Ritalin.

    3. Dr. Kremenitzer allowed himself to be paid by the school district and to become involved with the district in a manner that produced a conflict interest. It was clear that the school was pressuring the parents to medicate their child and it was clear that the parents felt in conflict with the school. Under these circumstances, the doctor should not have accepted payment from the school. Having accepted payment from the school, the doctor should have explained the conflict of interest to the parents and offered to find another neurologist.

## D. Negligence of the New Milford School District

    1. The school district (including the PPT team, Josephine Rositano, and JeanAnn Paddyfote, Ph.D.) in effect practiced medicine without a license when it promoted the ADHD diagnosis and the use of medication to the parents and attempted to pressure them into having their child medically evaluated for medication. This was done by verbal communications from individual professionals, by school meetings, and through written documents. The 3.5.98 school psychology report by Josephine Rositano refers to "characteristics of an Attention Deficit/Hyperactivity Disorder," confirming that the school had crossed the line into practicing medicine in a coercive manner. This report was given to Mrs. Myslow to carry to Dr. Rubin. This event is the most critical in the unfolding mistreatment of Travis Myslow. Had the school not acted in this manner, Travis would not have been exposed to years of stimulant medication during which time his basic educational needs remained unmet and his psychological and physical condition deteriorated.

    2. The school district wrote reports that allied supposedly independent professionals with the school district in its conflict with the parents of the child. Letters from JeanAnn C. Paddyfote, Ph.D., Director of Pupil Personnel and Special Services to Dr. Martinez (neuropsychologist) (12.19.00) and Dr. Alshansky (neurologist) (11.1.00), as well as to Dr. Kremenitzer who practiced in the same group as Dr. Alshansky, were highly prejudicial against the child and calculated to focus attention on a presumed disorder in the child rather than the failings of school in regard to instructing him.

    3. The school established paid relationships with supposedly independent professionals such as Drs. Martinez, Alshansky and Kremenitzer and plied them prejudicial reports in order to focus attention on a presumed disorder in the child rather than the failure of school in regard to instructing him. Especially in light of the conflict existing between the school and the Myslow family, this was highly unethical.

4. The school pressured the Myslows to seek evaluations from professionals with whom the school had established unethical relationships, including Drs. Martinez, Alshansky and Kremenitzer.

5. The school systematically failed to meet Travis' educational needs while it tried to focus attention on his presumed psychiatric disorders.

6. Overall, the school used medical diagnosis and treatment, and the threat of medical diagnosis and treatment, as a coercive method to control and suppress Travis and his parents while failing to meet the child's educational needs.

## IX. Damages Caused by the Doctors and the School District

The opinions in this section are rendered within a reasonable degree of medical certainty. All four of the defendants: Drs. Rubin, Alshansky and Kremenitzer, and the New Milford School District share in each of these damages. However, the great majority of the damages resulted from the acts of Dr. Rubin and the New Milford School District. Ultimately, the school district involved itself with all of the doctors and all of the damages these doctors inflicted on Travis Myslow.

For all of the damages, the main period of time spanned 1998-2001, but the effects continue to linger. Obviously, Drs. Alshansky and Kremenitzer play a relatively small role in a more limited time period.

The damages include the following:

### A. Loss of Schooling and Appropriate Educational Interventions Over More Than a Four Year Span, 1998-present

Because his poor reading was never properly and fully addressed, his entire educational experience was severely impaired. His emotions and behaviors that interfered with his schooling can be attributed entirely to the school's inadequate teaching. By improperly diagnosing and medicating Travis, each of the physicians contributed to this educational catastrophe for which the school was primarily responsible.

### B. Humiliation Over More Than a Four Year Span, 1998-present

It is thoroughly documented that during this time period Travis felt stupid. He felt that the teachers and the other students humiliated him because of his inability to read and because of some of his associated behaviors. This had a very negative effect on his well-being and self-esteem. The three doctors and the school shared in causing these damages.

### C. Stigmatization Over More Than a Four Year Span, 1998-present

It is extremely stigmatizing as a child to be labeled mentally ill and to be medicated. Because he knew he was frequently discussed among the teachers and

because he at times was given medication at school, Travis negotiated his way in a world in which the adults at school viewed him as having a mental disorder requiring medication. This also had a very negative effect on his well-being and self-esteem. In my clinical experience, this kind of childhood stigmatization and humiliation has lasting effecting into adulthood. The three doctors and the school shared in causing these damages.

### D. Loss of Enjoyment of His Childhood and General Psychosocial Impairments Over More Than a Four Year Span, 1998-present

Stimulants frequently cause social withdrawal, along with fatigue and sad or depressed feelings (Breggin, 1998a&b; 1999a-c). During this period, Travis lost all his friends and is only now regaining a social life. During this time he was frequently sad, stressed and anxious (see E, below). Dr. Rubin bears primary responsibility for these damages to which Drs. Alshansky and Kremenitzer also contributed. As in all of the damages, the school also played an important role.

### E. Adverse Drug Effects Caused by Stimulants Over a Four Year Period, April 1998-May 2001.

Dr. Rubin has the primary responsibility for causing the following adverse reactions:
1. Suppressed and delayed growth, and loss of appetite.
2. Increased nervous, anxiety, agitation, and irritability.
3. Impaired sleep.
4. Social withdrawal and depression.
5. Gastrointestinal problems, including occasional stomachaches and chronic constipation.
6. Headaches.

In addition, Drs. Alshansky and Kremenitzer caused him more acute adverse drug reactions in which he became ill, robotic, and unable to function. The school also played an important role by encouraging the diagnosis and medicating of Travis.

### X. Summary

The New Milford School District played a primary causative role throughout the period of medical malpractice in this case during the period 1998-2001. The school pressured the parents and the doctors to have Travis medically diagnosed and treated with psychiatric drugs. The school created unethical, biased relationships with Travis' treating physicians. The school district's actions toward Travis and his parents were grossly negligent and coercive.

Among the physicians, Dr. Rubin was the primary source of medical negligence for initially going along with the school and for inappropriately diagnosing Travis with ADHD and treating him with Ritalin for three years. Dr. Rubin was grossly negligent.

Drs. Alshansky and Kremenitzer were also negligent but were involved for a much briefer period of time.

_[signature: Peter R. Breggin MD]_

Peter R. Breggin, M.D.

**Bibliography**

American Academy of Pediatrics. (2002). Clinical Practice Guideline: Diagnosis and evaluation of the child with Attention-Deficit/Hyperactivity Disorder. Pediatrics, 105, 1158-1170.

Behrman, R. and Vaughn, V. (Eds.) (1987). Nelson Textbook of Pediatrics, Thirteen Edition. Philadelphia: W.B. Saunders Company.

Behrman, R. and Vaughn, V. (Eds.) (1992). Nelson Textbook of Pediatrics. Philadelphia: W.B. Saunders Company.

Behrman, R., Kliegman, R., and Arvin, A. (Eds.) (1996). Nelson Textbook of Pediatrics, Fifteenth Edition. Philadelphia: W.B. Saunders Company.

Breggin, P. (1996). The Hazards of Treating 'Attention-Deficit/Hyperactivity Disorder' with Methylphenidate (Ritalin)" (coauthored by Ginger Breggin). Journal of College Student Psychotherapy 10:55-72.

Breggin, P. (1997). Brain-Disabling Treatments in Psychiatry. New York: Springer Publishing Company.

Breggin, P. (1998a). Talking Back to Ritalin. Monroe, Maine: Common Courage Press.

Breggin, P. (1998b). Risks and mechanism of action of stimulants. NIH Consensus Development Conference on Diagnosis and Treatment of Attention Deficit Hyperactivity Disorder, November 16-18, 1998, Program and Abstracts, pp. 105-120. National Institutes of Health, Bethesda, Maryland.

Breggin, P. (1999a). Psychostimulants in the treatment of children diagnosed with ADHD: Part I—Acute risks and psychological effects. Ethical Human Sciences and Services 1:13-33.

Breggin, P. (1999b). Psychostimulants in the treatment of children diagnosed with ADHD: Part II—Adverse effects on brain and behavior. Ethical Human Sciences and Services 1:213-241.

Breggin, P. (1999c). Psychostimulants in the treatment of children diagnosed with ADHD: Risks and mechanism of action." International Journal of Risk and Safety in Medicine, 12 (1), 3-35. (Simultaneously published version of two other 1999 articles)

Breggin, P. (2000a). Reclaiming our children: A healing solution for a nation in crisis. Cambridge, Massachusetts: Perseus Books.

Breggin, P. (2000b). What psychologists and psychotherapists need to know about ADHD and stimulants." Changes: An International Journal of Psychology and Psychotherapy 18:13-23.

Breggin, P. (2000c). The NIMH multimodal study of treatment for attention-deficit/hyperactivity disorder: A critical analysis. International Journal of Risk and Safety in Medicine 13:15-22.

Breggin, P. (2001a). Talking Back to Ritalin, Revised Edition. Cambridge, MA: Perseus Books.

Breggin, P. (2001b). MTA study has flaws. (letter) (2001) Archives of General Psychiatry, 58, 1184.

Breggin, P. (2002). The Ritalin Fact Book. Cambridge, MA: Perseus Books.

Drug Enforcement Administration (DEA). (1995, October). Methylphenidate (background paper). Washington, DC: Drug and Chemical Evaluation Section, Office of Diversion Control, DEA, U.S. Department of Justice.

Drug Enforcement Administration (DEA). (1996, December 10-12)). Conference report: Stimulant use in the treatment of ADHD. Washington, DC: DEA, U. S. Department of Justice

Drug Facts and Comparisons, 1998 Edition. Methylphenidate, pp. 1743-1745. St. Louis: Facts and Comparisons.

Dulcan, M. (1994). Treatment of children and adolescents. In Hales, R., Yudofsky, S., and Talbott, J. (Eds.). (1994). The American Psychiatric Textbook of Psychiatry, Second Edition, pp. 1209-1250. Washington, DC: American Psychiatric Press.

Feussner, G. (1998). Diversion, trafficking, and abuse of methylphenidate. NIH Consensus Development Conference on Diagnosis and Treatment of Attention Deficit Hyperactivity Disorder, November 16-18, 1998, Program and Abstracts, pp. 201-204. National Institutes of Health, Bethesda, Maryland.

Hales, R., Yudofsky, S., and Talbott, J. (Eds.). (1994). The American Psychiatric Textbook of Psychiatry, Second Edition. Washington, DC: American Psychiatric Press.

Kelly, D. and Aylward, G. (1992, June). Attention deficits in school-aged children and adolescents: Current issues and practice. Pediatric Clinics of North America, 39, 487-512.

NIH Consensus Development Conference on Diagnosis and Treatment of Attention Deficit Hyperactivity Disorder. (1998, November 16-18). Consensus Statement. National Institutes of Health, Bethesda, Maryland.

Physicians' Desk Reference, 1998 Edition. Ritalin, pp. 1896-1898. Montvale, New Jersey: Medical Economics.

Sannerud, C. & Feussner, G. (2000). Is Ritalin an abused drug? Does it meet the criteria for a Schedule II substance? In Greenhill, L. & Osman, B. (Eds.). Ritalin theory and practice, pp. 27-42. New York: Mary Ann Liebert Publishers.

Waldrop, RD. (1994). Selection of patients for management of attention disorder-hyperactivity disorder in a private practice setting. Clinical Pediatrics, 33, 83-87.

Wolraich, M. (Ed.) (1995). The Classification of Child and Adolescent Mental Diagnoses in Primary Care. Elk Grove Village, Illinois: American Academy of Pediatrics.

**Appendices**

A. 1998 FDA-Approved Ritalin Label from the *PDR*

B. 1998 Methylphenidate (Ritalin) section from *Drug Facts and Comparisons*

C. 1998 Breggin Peer-Reviewed Article on Stimulant Adverse Effects

D. Breggin Resume Summary