UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MATHEW AND CINDY MYSLOW, ET AL | : | NO.:  3:03CV00496 (MRK) |
| | : | |
| v. | : | |
| | : | |
| NEW MILFORD SCHOOL DISTRICT, | : | |
| ET AL | : | AUGUST 15, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF
## SCHOOL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I.    THE PARTIES**

The plaintiffs, Mathew and Cindy Myslow, commenced this civil rights action by way of complaint dated March 14, 2003 against the New Milford School District, the New Milford Board of Education, and ten individual employees of the New Milford school system (collectively referred to as the "School Defendants").  The individual School Defendants are: (1) Raymond Avery, the former Superintendent of Schools; (2) JeanAnn Paddyfote, the current Superintendent and former Director of Pupil Personnel and Assistant Superintendent; (3) Thomas Mulvihill, Assistant Superintendent; (4) Paula Kelleher, Principal of Pettibone Elementary School; (5) Denis Dolan, Assistant Principal of Pettibone Elementary School; (6) Jean Malcolm, former Principal of Schaghticoke Middle School; (7) Josephine Rositano, School Psychologist at Pettibone Elementary School; (8) Adele Johnson, current Supervisor of Special Education and former Speech Language Pathologist; (9) Deborah Shelley, Travis' special education teacher at Pettibone Elementary School from March-June 2001; and (10) Robyn Viklund, former School Nurse at Pettibone Elementary School.

## II.    FACTUAL BACKGROUND

Travis Myslow entered the New Milford School District ("District") as a second grader in the fall of 1997.  See Second Amended Complaint, ¶29; Plaintiff's Interrogatory Responses, No. 2, attached as **Exhibit A**; and Cindy Myslow's deposition transcript, p. 6, attached as **Exhibit B**.  Travis attended Pettibone Elementary School from 2nd to 5th grade (1997-98, 1998-99, 1999-2000, 2000-01).  See **Exhibit A**, No. 2. The Myslows home-schooled Travis for the beginning of 6th grade, and Travis completed his 6th grade year at Schaghticoke Middle School (2001-02).  See **Exhibit A**, No. 2.  Travis attended Ben Bronz Academy, at the New Milford School District's expense, for 7th and 8th grades (2002-03, 2003-04).  See **Exhibit A**, No. 2; and **Exhibit B**, p. 215.

Prior to the start of Travis' 2nd grade year in New Milford, the Myslows advised the District that Travis had difficulty reading.  See **Exhibit B**, pp. 23-24.  In January 1998, Travis' 2nd grade teacher, Chris Church, referred Travis for consideration of eligibility of special education services.  See Second Amended Complaint, ¶32; JeanAnn Paddyfote Affidavit, ¶5, attached as **Exhibit C**; and Parent Notice of PPT and Parent Notice of Referral to Special Education, attached as **Exhibit D**.  Travis' parents were provided notice of the referral, as well as notice of the scheduled PPT to determine Travis' eligibility for special education services.  See **Exhibit C**, ¶6; and **Exhibit D**.  A Planning and Placement Team (PPT) meeting was held on January 20, 1998, at which time, the PPT recommended psychoeducational and speech/language evaluations.  See **Exhibit C**, ¶7; and 1/20/98 PPT Meeting Summary, attached as

**Exhibit E**.

On March 3 and 5, 1998, Josephine Rositano, the School Psychologist, conducted the psychological evaluation of Travis. <u>See</u> Second Amended Complaint, ¶40; and 3/98 Psychological Evaluation, attached as **Exhibit F**. She administered a number of tests including the Wechsler Intelligence Scale for Children, the Bender Visual-Motor Gestalt Test, Child Symptom Inventories, and Sentence Completion Drawing. <u>See</u> **Exhibit F**. Ms. Rositano determined that: Travis was functioning in the Average to High Average range of general intelligence; he showed better development in verbal skills than perceptual motor skills; he showed poor problem solving skills; he approached situations in a rigid, concrete manner; his strengths were in verbal abstract reasoning skills and timed paper and pencil tasks; his weaknesses were in visual alertness to his environment and visual motor integration skills. <u>See</u> **Exhibit F**, p. 5. Ms. Rositano also explained that the test results showed that Travis exhibited characteristics associated with Attention Deficit/Hyperactivity Disorder (ADHD). <u>See</u> **Exhibit F**, p. 5; Josephine Rositano's Interrogatory Responses, No. 22, attached as **Exhibit G**; and Mathew Myslow's deposition transcript, pp. 25-27, attached as **Exhibit H**. Ms. Rositano encouraged the Myslows to share the results of her evaluation with Travis' pediatrician. <u>See</u> **Exhibit F**, p. 5. The plaintiffs allege that Ms. Rositano also indicated that she thought medication would help Travis. <u>See</u> **Exhibit H**, pp. 26-29.

On March 18, 1998, another PPT was held to determine Travis' eligibility for special education services. <u>See</u> **Exhibit C**, ¶8; and 3/18/98 PPT Meeting Summary, attached as **Exhibit I**. Both the District and the parents felt services were warranted.

3

<u>See</u> **Exhibit C**, ¶8; and **Exhibit I**.  The PPT identified Travis as learning disabled and

recommended placement in the special education program.  <u>See</u> **Exhibit C**, ¶8; and

**Exhibit I**.

On March 27, 1998, the Myslows spoke with Travis' pediatrician, Dr. L. Robert

Rubin, and provided him Josephine Rositano's evaluation.  <u>See</u> **Exhibit H**, pp. 86-87;

and Dr. Rubin's deposition transcript, pp. 52-53, attached as **Exhibit J**.  Dr. Rubin

diagnosed Travis as having ADHD, a species of ADD, and prescribed a two-week daily

trial of Ritalin.  <u>See</u> Second Amended Complaint, ¶41; and **Exhibit J**, pp. 50, 96.  The

School Defendants did not ask Dr. Rubin to prescribe Travis medication; indeed Dr.

Rubin has never spoken with anyone from the New Milford school system regarding

Travis.  <u>See</u> **Exhibit C**, ¶10; and **Exhibit J**, p. 108.

Travis began taking Ritalin in the spring of 1998 and continued taking the

medication, on school days only, until the spring of 2000.  <u>See</u> **Exhibit B**, pp. 163-67;

and **Exhibit H**, pp. 92-93, 97.  During school hours, the medication was administered by

the defendant school nurse, Robyn Viklund.  The Myslows filled the last Ritalin

prescription on March 24, 2000.  <u>See</u> CVS Pharmacy records, attached as **Exhibit K**.

As of October 5, 2000, Travis continued to remain off of any medication.  <u>See</u> 10/5/00

PPT Meeting Summary, attached as **Exhibit L**.

As a result of being identified as having a learning disability, Travis received

special education services.  Federal law requires that boards of education implement

individualized education plans for such students.  <u>See</u> Individuals with Disabilities

Education Act (IDEA), 20 U.S.C. §1414.  Students covered under the Act are entitled to

a free appropriate public education (FAPE).  The specific manner or approach used to provide the FAPE is left to the discretion and judgment of the student's PPT.  <u>See</u> **Exhibit C**, ¶9.

At a PPT convened on October 26, 2000, the Myslows requested a neurological evaluation with Dr. Anna Alshansky.  <u>See</u> **Exhibit C**, ¶11; 10/26/00 PPT Revised Meeting Summary, attached as **Exhibit M**; and Drs. Alshansky and Kreminitzer's Interrogatory Responses, No. 11, attached as **Exhibit N**.  The District agreed to the evaluation with Dr. Alshansky.  <u>See</u> **Exhibit M**.  Dr. Alshansky had been referred to the Myslows by Dr. Rubin.  <u>See</u> Second Amended Complaint, ¶52; **Exhibit J**, p. 86; and Dr. Alshansky's 10/27/00 report, attached as **Exhibit O**.

Dr. Alshansky concurred with Dr. Rubin's diagnosis of ADHD and confirmed that Travis had a learning disability.  <u>See</u> Second Amended Complaint, ¶54; **Exhibit N**, No. 7;and **Exhibit O**.  Dr. Alshanksy prescribed Adderall and/or Dexedrine.  <u>See</u> Second Amended Complaint, ¶¶55-56; and **Exhibit O**.  Dr. Martin Kreminitzer, a partner in Dr. Alshansky's office, subsequently prescribed a trial of Concerta.  <u>See</u> **Exhibit N**, Nos. 7, 23. Travis did not take any medication for ADD or ADHD after 5th grade.  <u>See</u> **Exhibit L**.

In March 2001, Travis underwent a psychological evaluation with Dr. Diana Badillo-Martinez.  <u>See</u> Second Amended Complaint, ¶59; and Dr. Badillo-Martinez's 3/29/01 report, attached as **Exhibit P**.  Dr. Badillo-Martinez concluded that Travis exhibited behaviors that "are common in people who are in situations they are having difficulty coping with, who have Attention Deficits…," and recommended, among other things, that Travis be re-evaluated within a year to "further elucidate the presence of a

true Attention Deficit Disorder." <u>See</u> **Exhibit P**, p. 9.

Dr. Armin Thies performed another neurological evaluation on July 23 and 26, 2001. <u>See</u> Dr. Thies' 8/10/01 report, attached as **Exhibit Q**, p. 4. Dr. Thies concluded that "[t]here is not much supporting evidence, either observational or psychometric, during this examination for ADD or ADHD." <u>See</u> **Exhibit Q**, p. 4. Dr. Thies further noted that "it is more likely that inattention is a manifestation of [Travis'] emotional condition, particularly in reaction to academic tasks." <u>See</u> **Exhibit Q**, p. 4.

In September 2001, both the Board of Education and the Myslows requested a due process hearing under the IDEA to determine the adequacy of the special education program designed for Travis Myslow. <u>See</u> **Exhibit C**, ¶13; Plaintiffs' Request for Due Process Hearing, attached as **Exhibit R**; and Order Granting Motion to Consolidate, attached as **Exhibit S**. The plaintiffs' request for due process was limited to issues and events surrounding the PPTs on June 14, 2001 and August 23, 2001. <u>See</u> **Exhibit R**; and **Exhibit S**. The due process hearing addressed the following four issues:

"1.    Board's refusal to consent to an independent reading evaluation.

2.    Board's refusal to reimburse the parents for an independent neuropsychological evaluation by Dr. Thies.

3.    PPT's refusal to provide homebound placement for the 2001-2002 academic year.

4.    The Board recommended a psychiatric evaluation and Parents are refusing. Board is requesting a hearing officer to order that the psychiatric evaluation go forward."

<u>See</u> **Exhibit S**. The hearing officer also considered whether the Board offered a free

and appropriate public education to Travis in the June 14, 2001 IEP and whether the Board committed any procedural violations. See Final Decision and Order, attached as **Exhibit T**. The hearing officer determined that: (1) the Board would reimburse the Parents for Dr. Thies' evaluation; (2) a psychiatric evaluation was necessary and appropriate; (3) the Board did not commit any procedural violations; and (4) the IEP offered in the June 14, 2001 PPT was not appropriate. An independent consultant was to be retained to assist in the planning of Travis' IEP. See **Exhibit T**. The plaintiffs did not appeal the due process hearing officer's decision and order. See **Exhibit A**, No. 9; and **Exhibit H**, p. 64.

After the due process hearing, the Board and the plaintiffs each selected a consultant, and those two consultants selected Terry Neu, Ph.D., as the independent educational consultant responsible for making any final decisions regarding Travis' program. See Second Amended Complaint, ¶71; **Exhibit C**, ¶14; and **Exhibit H**, p. 59. Pursuant to the due process order, "[I]n the event of any disagreement between the parties or within the PPT, the decision of the consultant shall be final." See **Exhibit T**. There is no evidence that the School Defendants failed to follow any of Dr. Neu's recommendations, or that they somehow coerced Dr. Neu. See **Exhibit C**, ¶15; and **Exhibit H**, pp. 59-60, 64-68.

In August 2002, the Myslows filed a grievance under the Rehabilitation Act claiming, *inter alia*, that staff misdiagnosed Travis' learning disability; insisted that Travis remain on Ritalin; failed to provide Travis with an appropriate education; continued to

deny Travis benefits given to other children; refused to test for dyslexia; and failed to take any action against another student who grabbed Travis by the throat and slammed him into a locker calling him "an idiot."  See Second Amended Complaint, ¶124.  The grievance was denied.  See Second Amended Complaint, ¶¶126, 128.

## III.    PLAINTIFFS' CLAIMS

The plaintiffs allege, *inter alia*, that the School Defendants violated their son's rights by: (i) misdiagnosing Travis with ADHD and suggesting medication; and (ii) failing to educate Travis based upon his learning disabilities and/or provide him with a free appropriate public education.  See Second Amended Complaint, ¶¶24, 26; and Notice of the Intention to Commence Suit, attached as **Exhibit U**.  The plaintiffs submitted a notice of intention to commence this suit to the School Defendants on January 3, 2003.  See **Exhibit U**.  The plaintiffs' claims are limited to events prior to and through Travis' sixth grade year, which ended in June 2002.  See **Exhibit H**, pp. 63-64.

The plaintiffs' claims against the individual School Defendants stem primarily from their involvement in Travis' PPTs.  The plaintiffs have failed to identify any alleged wrongful conduct by Thomas Mulvihill or Jean Malcolm outside of their participation in the PPTs.  See **Exhibit B**, pp. 79-81, 89-90; and **Exhibit H**, pp. 21, 23-24.

Paula Kelleher is being sued because she was allegedly a "big part" of Travis' PPTs, she encouraged medication, she removed Travis and another student from a classroom and assigned them to a new special education teacher without permission, and she observed Travis in his 5th grade classroom without permission.  See **Exhibit B**, pp. 84-88; and **Exhibit H**, pp.21-23.

Denis Dolan is being sued for his involvement in Travis' PPTs and working with Ms. Kelleher.  See **Exhibit B**, pp. 88-89; and **Exhibit H**, p. 23.

Deborah Shelley is being sued for her involvement in Travis' PPTs, and because she was Travis' fifth grade teacher who worked with him in the hallway where the kindergarten classroom was located.  See **Exhibit B**, p. 101; **Exhibit H**, pp. 41-42.

The plaintiffs have not identified any specific conduct for which they are suing Raymond Avery other than perhaps failing to change Travis' educational program.  See **Exhibit B**, pp. 77-78; and **Exhibit H**, pp. 15-17.

Adele Johnson is being sued for her involvement in Travis' PPTs, for observing Travis without permission, and for failing to implement an appropriate program for Travis in the 6th grade following the due process hearing.  See **Exhibit B**, pp. 97-101; and **Exhibit H**, pp. 35-39.

Robyn Viklund is being sued because she allegedly made recommendations regarding Travis' medication schedule and dosage, and called the Myslows when Travis was running low on medication.  See **Exhibit B**, pp.69, 102; and **Exhibit H**, pp. 42-44. No changes were made without the parents first consulting with Dr. Rubin.  See **Exhibit B**, pp. 67-69; and **Exhibit H**, p. 43.  The parents gave Ms. Viklund permission to give Travis the prescribed medication.  See **Exhibit B**, p. 68.

The plaintiffs testified that they are suing JeanAnn Paddyfote for failing to provide an appropriate education to Travis.  See **Exhibit B**, p. 79; and **Exhibit H**, pp. 19-21.

The plaintiffs are suing Josephine Rositano for conducting the evaluation and recommending that the Myslows share the evaluation with Travis' pediatrician, and for

failing to implement methods to help Travis at PPTs.  <u>See</u> **Exhibit B**, p. 91; and **Exhibit H**, p. 34.

The plaintiffs have disclosed Dr. Peter Breggin as their only "expert witness" against the School Defendants.  Dr. Breggin has no opinions regarding the claimed negligence of Raymond Avery, Thomas Mulvihill, Paula Kelleher, Denis Dolan, Jean Malcolm, Adele Johnson, Deborah Shelley and Robyn Viklund.  <u>See</u> Dr. Breggin's deposition transcript, pp. 52-53, attached as **Exhibit V**.  Dr. Breggin's opinions regarding JeanAnn Paddyfote and Josephine Rositano are subject to a motion to preclude.

The School Defendants hereby move for summary judgment as to the plaintiffs' Second Amended Complaint in its entirety.

## IV.  <u>SUMMARY JUDGMENT STANDARD</u>

The court shall render summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56c; <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 250 (1986).  A factual dispute is "genuine" when the evidence is such that a reasonable jury can return a verdict for the non-moving party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 247-48.  A "material fact" is one whose resolution will effect the ultimate determination of a case.  <u>See</u> <u>id</u>.

In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party.  <u>See</u> <u>Anderson</u>, 477 U.S.

at 255.  However, "[t]he mere existence of a scintilla of evidence in support of the non-

movant's position will be insufficient; there must be evidence on which the jury could

reasonably find for the [non-movant]."  <u>Hayut v. State University of New York</u>, 352 F.3d

733, 743 (2nd Cir. 2003).  "[T]he nonmoving party must come forward with specific facts

showing that there is a <u>genuine</u> <u>issue</u> <u>for</u> <u>trial</u>."  <u>Caldarola v. Calabrese</u>, 298 F.3d 156,

160 (2nd Cir. 2002), *quoting*, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

574, 586-87 (1986) (underline in original).  A non-moving party may not rely on mere

allegations, legal conclusions, unsupported statements, or a denial of the pleadings.

<u>See</u> <u>Celotex Corp. v. Catrett</u> , 477 U.S. 317, 327 (1986).

## V.    **LAW AND ARGUMENT**

### A.    **The Plaintiff's Claims Are, In Part, Barred By The Statute Of Limitations.**

#### 1.    **Two-Year Statute Of Limitations Bars Negligence, Malpractice And Negligent Infliction Of Emotional Distress Claims.**

The plaintiffs' negligence and negligent infliction of emotional distress claims

against the School Defendants, as well as the plaintiffs' malpractice claim against

Josephine Rositano, are barred by the applicable two-year statute of limitations.

Connecticut General Statutes §52-584 provides:

> No action to recover damages for injury to the person, … caused by
> negligence, or by reckless or wanton misconduct, or by malpractice …
> shall be brought but within two years from the date when the injury is first
> sustained or discovered or in the exercise of reasonable care should have
> been discovered, and except that no such action may be brought more
> than three years from the date of the act or omission complained of….

11

The plaintiffs initiated this action on March 19, 2003.  Accordingly, the plaintiffs'

claims, to the extent that they arise from alleged negligence, malpractice or negligent

infliction of emotional distress by the School Defendants prior to March 2001, are time-

barred.  The statute of limitations bars the plaintiffs' claim that Josephine Rositano

and/or the PPT "misdiagnosed" Travis and recommended medication, as such actions

allegedly occurred in 1998, five years before the commencement of suit.

### 2.    Three-Year Statute Of Limitations Bars Remaining Claims.

The plaintiffs' remaining claims against the School Defendants are barred by a

three-year statute of limitations period.

Connecticut General Statutes §52-577 provides that "[n]o action founded upon a

tort shall be brought but within three years from the date of the act or omission

complained of."  This statute applies to the plaintiffs' intentional infliction of emotional

distress as well as to all of their federal claims.  The three-year limitation period set forth

in §52-577 is the operative statute of limitations for tort actions based on §1983 civil

rights claims.  See Wallace v. Town of Stratford Bd. of Educ., 674 F. Supp. 67, 71 (D.

Conn. 1986); see also, Williams v. Walsh, 558 F.2d 667, 673 (2nd Cir. 1977).  It is well-

established that "state law supplies the statute of limitations for claims under §1983."

Connolly v. McCall, 254 F.3d 46, 41 (2nd Cir. 2001), *citing*, Eagleston v. Guido, 41 F.3d

865, 871 (2nd Cir. 1994).

"When conducting an analysis under §52-577, 'the only facts material to the trial

court's decision on a motion for summary judgment are the date of the wrongful conduct

alleged in the complaint and the date the action was filed.'"  Collum v. Chapin, 40 Conn.

App. 449, 451, 671 A.2d 1329 (1996).  As the plaintiffs' commenced this action in March 2003, any claims stemming from conduct occurring prior to March 2000 are time-barred. To the extent the plaintiffs' claims are based on the alleged "misdiagnosis" or recommendation for medication by Josephine Rositano and/or the PPT, these claims are time-barred as the alleged conduct occurred in 1998.

**B.      The Plaintiffs Cannot Maintain An Action Against The Individual School Defendants Pursuant To §504 Of The Rehabilitation Act Of 1973 Or The Americans With Disabilities Act.**

In Counts Four, Five and Nine, the plaintiffs allege that the School Defendants violated §504 of the Rehabilitation Act of 1973 (Counts Four and Nine) and the Americans with Disabilities Act (Count Five).  The individual School Defendants are entitled to summary judgment as a matter of law.

### 1.      Section 504 Does Not Provide For Individual Capacity Suits.

The individual School Defendants are not subject to liability under §504 of the Rehabilitation Act.  The Rehabilitation Act applies only to programs and activities receiving Federal financial assistance.  See 29 U.S.C. §794.  Section 504 of the Rehabilitation Act does not provide for individual capacity suits against government officials.  See Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98, 107 (2nd Cir. 2001).  Therefore, the plaintiffs' §504 claims set forth in Counts Four and Nine must be dismissed as against the individual School Defendants.

### 2.      The ADA Does Not Provide For Individual Capacity Suits.

Similarly, none of the individual School Defendants are subject to liability under the Americans with Disabilities Act because the Act does not provide for suits against

individual state actors.  See Garcia, *supra*, 280 F.3d at 107.  The ADA's prohibition

against discrimination is limited to employers, employment agencies, labor

organizations and joint labor-management committees.  See 42 U.S.C. §12111(2).   An

"employer" is defined under the ADA to mean "a person engaged in an industry

affecting commerce who has 15 or more employees…and any agent of such person…."

42 U.S.C. §12111(5)(A).  This is the same definition of "employer" as used in Title VII

that has been interpreted by the Second Circuit not to impose supervisor liability.  See

Tomka v. Seiler Corp., 66 F.3d 1295, 1313, 1317 (2nd Cir. 1995).

Whereas the ADA does not subject individual employees to potential liability, the

individual School Defendants are entitled to summary judgment as to Count Five.

**C.     The School Defendants Are Entitled To Summary Judgment As To Plaintiffs' Claims Pursuant To §504 Of The Rehabilitation Act Of 1973, The Americans With Disabilities Act And 42 U.S.C. §1983 Because The Plaintiffs Failed To Exhaust Their Administrative Remedies.**

The plaintiff has the burden of establishing the existence of subject matter

jurisdiction by a preponderance of the evidence.  See Makarova v. United States, 201

F.3d 110, 113 (2nd Cir. 2000).  In this case, the School Defendants are entitled to

summary judgment as to Counts Four, Five, Six and Nine because the plaintiffs failed to

exhaust the administrative remedies available to them under the Individuals with

Disabilities Education Act (IDEA), and therefore, the court lacks subject matter

jurisdiction.

The IDEA governs the education of children with disabilities.  Under the IDEA,

educators and parents must jointly develop an individualized education plan (IEP) for

each year of a child's education.  <u>See</u> 20 U.S.C. 1414(d).  The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education…."  20 U.S.C. 1400(d).  In support of that goal, the IDEA requires that states offer extensive procedural safeguards to parents of children covered under the Act, including the right to an impartial due process hearing.  <u>See</u> 20 U.S.C. 1415.  The IDEA also states that:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 (42 U.S.C. §12101 et seq.), title V of the Rehabilitation Act of 1973 (29 U.S.C. §790 et seq.), or other Federal laws protecting children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) <u>and</u> (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. §1415(l) (underline added).  Subsection (f) provides for the impartial due process hearing.  Subsection (g) provides that "any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency."  A plaintiff's failure to exhaust the administrative remedies available under the IDEA deprives a court of subject matter jurisdiction.  <u>See</u> <u>Polera v. Bd. of Educ. Of Newburgh</u>, 288 F.3d 478, 483 (2nd Cir. 2002); <u>Hope v. Cortines</u>, 69 F.3d 687, 688 (2nd Cir. 1995); <u>Garro v. State of Conn.</u> 23 F.3d 734 (2nd Cir. 1994).  "Where, as here, a full remedy is available at the time of injury, a disabled student [or his parents] claiming deficiencies in his or her education may not ignore the administrative process, then later sue for damages."  <u>Polera</u>, 288 F.3d at 488.

In this case, the plaintiffs requested a due process hearing in September 2001

only with respect to the June 14, 2001 and August 23, 2001 PPTs.  To the extent the

plaintiffs' claims stem from events prior to, or subsequent to, those PPTs, the School

Defendants are entitled to summary judgment.  This Court lacks subject matter

jurisdiction to hear any federal claims arising from Travis' 2nd-5th grade years, or from

the School Defendants' conduct following the due process hearing and the introduction

of Dr. Neu as an educational consultant.  In other words, any claims stemming from the

provision of special education services to Travis outside of the first four months of the

6th grade school year are subject to dismissal.  The Court also lacks subject matter

jurisdiction to consider any claims arising during the subject time period, but which were

not raised at due process.

      In addition, the School Defendants are entitled to summary judgment as to any

claims of procedural violations.  The impartial hearing officer rendered a final decision

and order on November 20, 2001, finding that the Board did not commit any procedural

violations.  The plaintiffs did not appeal said decision.  As such, the plaintiffs failed to

exhaust their administrative remedies pursuant to 20 U.S.C. §1415(l), which requires

that a plaintiff pursue a due process hearing <u>and</u> an appeal of any adverse decision

before bringing a claim under §504, the ADA or §1983.

      **D.**    <u>**The Plaintiffs Have Failed To State A Claim Under §504 Of The Rehabilitation Act Of 1973 Or The Americans With Disabilities Act Because There Is No Evidence Of Bad Faith Or Gross Misjudgment.**</u>

      The IDEA affords parents of a child covered under the Act an avenue for relief if

their child is denied a free appropriate public education (FAPE), even in the absence of

discrimination.  Conversely, §504 of the Rehabilitation Act and the ADA allow for relief

only where there is discrimination against the child.  Section 504 provides that:

> No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance….

29 U.S.C. §794(a).  The ADA provides that:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. §12132.  In this case, the plaintiffs proceed only under §504 and the ADA, as

opposed to the IDEA.  As such, evidence of discrimination is essential.

In order to set forth a *prima facie* case of discrimination under §504 or the ADA,

the plaintiff must show that the defendant acted in bad faith or exercised gross

misjudgment.  See Thompson v. Bd. of the Sp. Sch. Dist. No. 1, 144 F.3d 574, 580 (8th

Cir. 1998); Sellers v. Sch. Bd., 141 F.3d 524, 529 (4th Cir. 1998), *cert. denied*, 525 U.S.

871 (1998) (holding that §504 claim was properly dismissed where complaint alleged

failure to timely assess and diagnose a student's disability); A.W. v. Marlborough Co.,

25 F. Supp.2d 27, 31 (D. Conn. 1998) (granting summary judgment for defendants

where plaintiffs alleged that child was denied a FAPE); Fetto v. Sergi, 181 F. Supp.2d

53, 75-76 (D. Conn. 2001); Zahran v. New York Dept. of Educ., 306 F. Supp.2d 204,

213-14 (N.D.N.Y. 2004).  "To prove discrimination in the education context, 'something

more than a mere failure to provide the 'free appropriate education' required by [IDEA]

must be shown.'' Sellers, 141 F.3d at 529, *quoting*, Monahan v. Nebraska, 687 F.2d 1164, 1170 (8th Cir. 1982).

> The reference in the Rehabilitation Act to "discrimination" must require, we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation had been made, and that a different placement must be required under [IDEA], is not necessarily the same thing as a holding that a handicapped child has been discriminated against solely by reason of his or her disability. Therefore, something more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities, i.e., a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment.

Monahan, 687 F.2d at 1170.

In this case, there are no allegations, let alone evidence, of bad faith or gross misjudgment by the School Defendants. The plaintiffs' allege, *inter alia*, that the School Defendants were negligent in their duty to provide a free appropriate public education and that they failed to properly diagnose Travis' condition. See Second Amended Complaint, ¶¶24, 26. A professional disagreement over Travis' diagnosis, however, does not rise to the level of bad faith or gross misjudgment. See Thompson, *supra*, 144 F.3d at 580; Sellers, *supra*, 141 F.3d at 529. Similarly, the mere failure to provide a FAPE does not rise to the level of bad faith or gross misjudgment. See Thompson, *supra*, 144 F.3d at 580; Sellers, *supra*, 141 F.3d at 529; A.W., *supra*, 25 F. Supp.2d at 31; Zahran, *supra*, 306 F. Supp.2d at 213-14; Monahan, *supra*, 687 F.2d at 1170.

In this case, after performing extensive testing, Josephine Rositano determined that Travis exhibited characteristics commonly associated with ADHD.  Subsequently, Dr. Rubin, Travis' pediatrician, diagnosed Travis with ADHD, a species of ADD, and prescribed a trial of Ritalin.  Two years later, Dr. Alshansky, a neuropsychologist, confirmed the diagnosis of ADHD.  And then, after performing her own psychological evaluation, Dr. Badillo-Martinez likewise found that Travis exhibited behaviors characteristic of individuals who have Attention Deficit.  Assuming *arguendo* that Travis does not have ADHD, these opinions illustrate that this case involves at most a professional disagreement over Travis' condition.  There is simply no evidence of bad faith or gross misjudgment with respect to Travis' "diagnosis."

Similarly, there is no evidence of bad faith or gross misjudgment with respect to Travis' IEP or overall education.  In fact, the evidence points to the opposite conclusion.  The School District was actually the party responsible for initialing seeking due process.  There is no evidence that the School Defendants were insincere in their efforts to provide Travis a FAPE, and as set forth above, a substantively faulty IEP is insufficient to incur liability.  As such, the plaintiffs' claims under §504 (Counts Four and Nine) and the ADA (Count Five) fail as a matter of law.

**E.    The Plaintiffs Cannot Maintain An Action Under §504 Of The Rehabilitation Act Of 1973 Or The Federal Regulations For Procedural Violations.**

The plaintiffs premise their §504 claim, in part, on alleged procedural violations.  The plaintiffs allege, *inter alia*, that the School Defendants failed to establish adequate procedural safeguards in violation of §504 (Counts Four and Nine) and related federal

regulations (Count Nine).  These claims fail as a matter of law because §504 of the

Rehabilitation Act and the federal regulations do not provide for a private cause of

action to redress an alleged failure to establish procedural safeguards and/or an alleged

failure to enforce regulatory due process requirements.  See A.W. v. Marlborough Co.,

25 F. Supp.2d 27 (D. Conn. 1998) (34 C.F.R. §104.7 does not give rise to private cause

of action); Power v. Sch. Bd. of the City of Virginia Beach, 276 F. Supp.2d 515 (E.D.Va.

2003) (no cause of action to enforce a regulatory right to due process under 34 C.F.R.

§104.36).

> Section 504 was intended to remedy disability discrimination, and
> consequently a plaintiff must demonstrate such discrimination to establish
> a claim under this statute.  A procedural error, by itself, is insufficient to
> warrant the protections of the Rehabilitation Act.

A.W., *supra*, 25 F. Supp.2d at 31 (citations omitted).  "Section 504 itself contains no

procedural rights, nor guarantees them."  Power, *supra*, 276 F. Supp.2d at 519.  "While

Section 504 clearly provides for a private cause of action to enforce a claim of

*discrimination*, it does not provide for a cause of action to assert a claim of procedural

inadequacy, separate and apart from discrimination."  Id. at 519-20 (internal citation

omitted).

### F.    The Plaintiffs Have Failed To State A §1983 Claim Under The Fourteenth Amendment.

In Count Six, the plaintiffs allege that the School Defendants deprived Travis of

his rights to equal protection, and substantive and procedural due process under the

14th Amendment to the United States Constitution.  See Second Amended Complaint,

¶160.   The claim is brought pursuant to the procedural vehicle set forth in 42 U.S.C.

§1983.

Section 1983 provides a right of action against any person who, acting under

color of law, deprives another of a right, privilege, or immunity secured by the

Constitution or federal laws.  See 42 U.S.C. §1983; Rendell-Baker v. Kohn, 457 U.S.

830, 835 (1982).  Section 1983 does not create any substantive rights, but rather

provides a procedure to redress the deprivation of federal rights that are guaranteed

elsewhere.  See Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985).

The Fourteenth Amendment states, in pertinent part, that:

No State shall make or enforce any law which shall abridge the privileges
or immunities of citizens of the United States; nor shall any State deprive
any person of life, liberty or property, without due process of law; nor deny
to any person within its jurisdiction the equal protection of the laws.

The plaintiffs' claims that Travis was deprived of his rights under the Fourteenth

Amendment fail for the reasons set forth below.

## 1.    Equal Protection

The plaintiffs allege that the defendants discriminated against Travis in violation

of his Fourteenth Amendment right to equal protection.  The Equal Protection Clause of

the Fourteenth Amendment is "essentially a direction that all persons similarly situated

be treated alike."  City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439,

105 S. Ct. 3249 (1985).  In order to establish a violation of equal protection, the plaintiffs

must show that: (1) Travis, as compared with others similarly situated, was selectively

treated; and (2) "such treatment was based on impermissible consideration such as

race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." LeClair v. Saunders, 627 F.2d 606, 609-10 (2nd Cir. 1980), *cert. denied*, 450 U.S. 959, 101 S. Ct. 1418; Giordano v. City of New York, 274 F.3d 740, 750-51 (2nd Cir. 2001); Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2nd Cir. 2001); Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2nd Cir. 2000); Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 15-17 (2nd Cir. 1999). "Proof of … discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Silver v. City University of New York, 947 F.2d 1021, 1022 (2nd Cir. 1991), *quoting*, Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977).

The plaintiffs' claim in this case is not based on Travis' membership in a suspect class. Individuals with disabilities are not yet classified as a suspect class. See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 445-46 (1985). As such, in order to prevail on their equal protection claim, the plaintiffs must establish a malicious or bad faith intent to injure by the School Defendants. See Giordano, *supra*, 274 F.3d at 750-51; Harlen, *supra*, 273 F.3d at 499; Lisa's Party City, *supra*, 185 F.3d at 16; LeClair, *supra*, 627 F.2d at 609-10. There is no such evidence, or even an allegation, against any of the School Defendants. See §D above. In fact, the School District sough due process on its own in an effort to ensure that Travis was receiving a proper education. Where there is no evidence of an "intent to disadvantage all members of a class that includes plaintiff," there can be no liability. See Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 151 (2nd Cir. 2002).

### 2.    Procedural Due Process

The plaintiffs also allege a deprivation of procedural due process.  Due process requires that a person deprived of a constitutionally protected liberty or property right be given an opportunity to be heard at a meaningful time and in a meaningful manner.  See Mathews v. Eldridge, 424 U.S. 319, 333 (1976).  Determining whether an individual has been denied due process requires a two-part inquiry.  First, did the plaintiff have a property or liberty interest protected by the Constitution?  See Narumanchi v. Board of Trustees of Conn. St. Univ., 850 F.2d 70 (2nd Cir. 1988), citing, Board of Regents v. Roth, 408 U.S. 564 (1972).   Second, if so, what process was due, and did the government deny the plaintiff the identified interest without providing that constitutional minimum?  See Narumanchi, 850 F.2d at 72.

The School Defendants did not deprive Travis Myslow of a liberty interest protected under the Fourteenth Amendment.  Indeed, the plaintiffs have not even identified a liberty interest that Travis was allegedly denied.

The term "liberty," as guaranteed by the Fourteenth Amendment, denotes freedom from bodily restraint, as well as "the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized … as essential to the orderly pursuit of happiness by free men."  Board of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701 (1972), quoting, Meyer v. Nebraska, 262 U.S. 390, 399.  There is no such liberty interest at issue in this case.

The School Defendants assume for purposes of this motion that Travis had a property interest in a special education. The defendants deny, however, that Travis was denied a free appropriate public education. Nonetheless, the plaintiffs' claim fails because Travis and his parents were afforded all the process that was due.

Due process requires that a person deprived of a constitutionally protected liberty or property right be given an opportunity to be heard at a meaningful time and in a meaningful manner. See Mathews v. Eldridge, 424 U.S. 319, 333 (1976). Generally, that process includes a notice of the proposed action and an opportunity to be heard. See id. at 335; Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). In this case, the plaintiffs received both. The Myslows were provided notice that Travis was being referred for consideration of special education services; they were provided notice of each PPT meeting; they were provided an opportunity to participate in developing Travis' IEP; and they were provided extensive procedural safeguards via the IDEA. A due process hearing was held in 2001 at which time the parties had a full opportunity to present arguments and evidence regarding both the special education services that had been provided to Travis, as well as those services that should be provided to him in the future.

Moreover, where the allegation is that the defendants failed to provide a free appropriate public education, as is the case here, "the Due Process Clause of the Fourteenth Amendment is not violated ... so long as the State provides a meaningful postdeprivation remedy." Hellenic Amer. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 880 (2nd Cir.1996). The administrative procedures set forth in the

IDEA provides parents a post-deprivation remedy, and as such, afforded the plaintiffs all the process that was due.  See M.H. v. Bristol Bd. of Educ., 169 F. Supp.2d 21, 33 (D. Conn. 2001); Wenger v. Canastota Cent. Sch. Dist., 979 F. Supp. 147, 153 (N.D.N.Y. 1997); B.D. v. DeBuono, 130 F. Supp.2d 401, 435 (S.D.N.Y. 2000).  As such, any procedural due process claim fails as a matter of law.

### 3.     Substantive Due Process

The plaintiffs' claim that the School Defendants have denied Travis substantive due process also fails as a matter of law.

The United States Supreme Court has described the Due Process Clause as a "constitutional guarantee of respect for those personal immunities which … are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or are 'implicit in the concept of ordered liberty.'"  Rochin v. California, 342 U.S. 165, 72 S.Ct. 205 (1952) (internal citations omitted), citing, Palko v. Connecticut, 302 U.S. 319, 325 (1937).  Protection has generally been afforded only "to matters relating to marriage, family, procreation, and the right to bodily integrity."  Albright v. Oliver, 510 U.S. 266, 272, 114 S.Ct. 807 (1994).

Furthermore, governmental acts that violate substantive due process protections ordinarily must "shock the conscience" of the court.  See e.g., Rochin v. State of California, 342 U.S. 165, 72 S.Ct. 205 (1952).  In a due process challenge to abusive conduct by a state actor, the court must determine "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  County of Sacramento v. Lewis, 523 U.S. 833, 848, 118