STATE OF CONNECTICUT
DEPARTMENT OF EDUCATION

CASE # 01-294   (Consolidated with Case No. 01-305)

New Milford Board of Education v. T. (Student)

T. (Student) v. New Milford Board of Education

Appearing on behalf of the Parents:   Attorney Deborah G. Stevenson
                                       226 East Flag Swamp Road
                                       Southbury, CT 06488

Appearing on behalf of the Board of Education:   Attorney Nicole A. Bernabo
                                                  Sullivan, Schoen, Campane &
                                                              Connon, LLC
                                                  646 Prospect Avenue
                                                  Hartford, CT 06105

Appearing before:                      Attorney Gail K. Mangs,
                                       Hearing Officer

## FINAL DECISION AND ORDER

### ISSUES:

**Board issues:**
1. Was the neuropsychological evaluation performed by Dr. Diana Badillo-Martinez appropriate? If not, should the Board reimburse the parents for the evaluation performed by Dr. Armin Thies?
2. Did the Board offer an appropriate program for the 2001-2002 school year?
3. Is a psychiatric evaluation necessary and appropriate?

**Parent issues:**
1. Did the Board offer a free and appropriate public education to T. in the June 14, 2001 IEP? If not, is homebound instruction appropriate?
2. Should the Parents be reimbursed for Dr. Thies' evaluation?
3. Were procedural violations committed by the Board?

### PROCEDURAL HISTORY:

This hearing was requested by the Board on September 4, 2001 and assigned Case No. 01-294. The prehearing conference was convened on September 12, 2001. On September 8, 2001, the Parents filed for due process; this case was assigned to a different

APR. 30. 2003 10:51AM    SULLIVAN SCHOEN CAMPANE CONNON        NO. 439    P. 3/24
Case 3:03-cv-00496-MRK    Document 131-26    Filed 08/15/2005    Page 2 of 7

November 20, 2001                     -2-                     Final Decision and Order 01-294

hearing officer under Case No. 01-305. A prehearing conference was held in Case No. 01-305 during which that hearing officer directed the parties to file motions to consolidate the two cases. Both parties filed motions and on September 26, 2001, the hearing officer in Case No. 01-305 issued an order granting the motion to consolidate the two cases. Also on September 26, 2001, the current hearing officer agreed to the consolidation of the two matters under Case No. 01-294. This case was convened on October 18, October 25, October 30, November 1, November 2, and November 7, 2001. The matter was also set down for October 17, 2001, but due to a misunderstanding, all parties did not appear. Final arguments were made and the hearing closed on November 7, 2001.

## SUMMARY:

T., who is now eleven years old, entered the Board's school district early in second grade. His teacher quickly observed that T. was working below grade level, had a poor attention span, frustrated easily, and became obstinate when confronted with work he felt unable to do. After evaluations were performed, T. was identified as learning disabled and began receiving special education services. From second grade through the end of fifth grade, T.'s academic difficulties persisted, especially in the areas of reading and writing. Always somewhat oppositional and easily frustrated, T.'s behavior markedly declined during the fourth and fifth grades. He resisted academic tasks and often refused to comply with directions or complete assigned work. T.'s behavior did not improve with the use of behavior plans or contracts. In addition, T.'s reading skills never advanced much beyond an early second grade level. The PPT responded by increasing T.'s special education hours until he was receiving virtually all of his academic instruction in a self-contained special education classroom. The PPT also recommended that T. receive a psychiatric evaluation. T.'s parents refused to consent to a psychiatric evaluation. They also disagreed with the PPT recommendation to promote T. to the sixth grade in the Board's middle school for the 2001-2002 school year and requested homebound instruction and independent reading and neuropsychological evaluations. During the summer of 2001, counsel for the parties attempted to resolve the dispute but were unable to reach any resolution, although the Board eventually agreed to fund an independent reading evaluation about the time this hearing convened. The parents have kept T. at home since the school year opened and have provided two hours of tutoring per week during this time. In addition, they provided some evidence that T. has been receiving counseling and is now undergoing a psychiatric evaluation.

## FINDINGS OF FACT:

1. The student began attending Board schools during the fall of second grade (the 1997-1998 school year). In January, 1998, his teacher referred him for testing due to his inability to do grade level work, difficulty focusing, frustration, and obstinate behavior. (Exhibit P-3)

2. Psychoeducational testing performed during February and March of 1998 revealed that T. was reading and writing at a 1.4 grade level equivalent. In addition, on the WISC-III, he received a verbal score of 115, performance score of 86, and a full scale

APR-03-03 10:31AM Case 3:03-cv-00496-MRK SULLIVAN SCHOEN Document 131-26 CAMPANE CONNON Filed 08/15/2005 NO. 439 Page 3 of 7 P. 4/24

November 20, 2001                 -3-                Final Decision and Order 01-294

score of 108. The PPT identified T. as learning disabled and recommended that he receive twelve hours per week of special education services. During second grade, T. also began taking Ritalin to treat his attentional difficulties. This program was continued for T.'s third grade year (the 1998-1999 school year). The PPT recommended 6 hours of special education services for fourth grade (the 1999-2000 school year) noting T.'s "high frustration" during writing. (Exhibits P-5, P-6, P-7, Testimony of Mother)

3. While T. had previously displayed periods of frustration and obstinate behavior, his behavior became a major issue during fourth grade. At PPTs convened in September, 1999, the student's regular education teacher described T. as exhibiting frustration and low self confidence. The school psychologist suggested that T.'s oppositional behavior was a reflection of his frustration. The PPT increased T.'s special education hours to 7.5 and exempted T. from standardized testing in reading and writing. During the fall of 1999, T. also began receiving reading instruction with the "Let's Read" program, a structured multisensory, language based, sequential reading program. (Exhibits P-8, P-9, Testimony of School Psychologist and Middle School Special Education Chair)

4. Teachers continued to report a deterioration in T.'s behavior and work completion during the 1999-2000 school year. His behavior plan was rewritten to describe appropriate and inappropriate behaviors and their consequences. Due to continuing concerns about T.'s oppositional behavior, low frustration tolerance and lack of self esteem, the PPT recommended a psychiatric evaluation at a PPT convened on March 21, 2000. The PPT reiterated their request for a psychiatric evaluation at most of the ensuing PPT meetings. The Board believes that only a psychiatrist can comprehensively evaluate and make recommendations regarding both the psychological and medical issues that may be causing T.'s frustration, anxiety, oppositional behavior, and possible depression. The Parents have never agreed to an independent psychiatric evaluation. (Exhibit B-2, Testimony of School Psychologist, Assistant Superintendent, Mother)

5. On May 8, 2000, the annual PPT was convened. The team discussed T.'s continuing impulsive and oppositional behavior and also noted that he displayed periods of anger and feelings of adequacy. The team recommended that T. receive 7.5 hours of special education services during the 2000-2001 school year (fifth grade) and that the triennial evaluation be administered prior to March, 2001. The parents refused the psychiatric evaluation that had been recommended at the March, 2000 PPT. (Exhibit B-4)

6. In September, 2000, the student's parents brought him to the Sylvan Learning Center for additional reading and writing assistance. The Sylvan Learning Center assessed T.'s reading ability as falling at the 1.8 grade equivalent level. (Exhibit P-11)

7. The PPT met on October 5, 2000 to discuss T.'s lack of progress in reading and writing and his ongoing sense of discouragement. T.'s parents questioned why the PPT had continued to promote T. from grade to grade, but they rejected counseling

believing that it would be useless if T. did not also make progress in reading. His parents also reported that medication for T.'s attentional difficulties had been discontinued as they felt it had not provided any benefit. The IEP was revised to increase T.'s special education services to 12.5 hours per week and to include special education instruction in math and one on one reading instruction (with the "Let's Read" program). The reading program was provided by a certified paraprofessional under the special education teacher's supervision; the teacher had received several days of instruction on presenting the "Let's Read" program. (Exhibits B-13, P-19, Testimony of School Psychologist and Kathleen Taylor, Fifth Grade Special Education Teacher)

8. Concerns about T.'s lack of progress and increasing behavioral issues continued. T. persisted in oppositional behavior, inattention, and work refusals. He also had difficulty completing assigned tasks and following directions. At a PPT convened on October 26, 2000, the PPT increased T.'s special education services to 17.5 hours per week although goals and objectives remained the same. In addition, the parents requested and the PPT agreed to provide a neurological evaluation. Questions were prepared for Dr. Anna Alshansky who evaluated T. and provided a report dated October 27, 2000. Dr. Alshansky concluded that T. satisfied the criteria for attention deficit hyperactivity disorder and was learning disabled; in addition, she determined that T. had fine motor function delays and poor self-esteem and anxiety possibly due to his under-achievement. She recommended full psychoeducational and language evaluations, intensive educational supports, psychological counseling, and a trial of Adderall. This report was discussed at a PPT convened on December 12, 2000, at which time the PPT recommended neuropsychological, achievement, cognition, and occupational therapy evaluations. Members of the PPT also questioned whether Dr. Alshansky's report had satisfactorily answered their questions. (Exhibits B-15, B-16, B-19, B-24, Testimony of Kathleen Taylor)

9. T. received most of his educational program during fifth grade in a small classroom at the end of the fifth grade hall; the adjoining group of classrooms housed the kindergartens. T. apparently felt that the classroom's location meant he had been relegated to the kindergarten wing. He received some mainstream instruction in science and social studies when hands-on projects, which T. enjoyed, were presented, and also had recess, lunch, and specials with regular education students. Due to the increasing class size, the Board hired another special education teacher in March, 2001; T. was placed with the new teacher. Both special education teachers testified that T.'s behavior was completely inconsistent and never really improved despite their use of behavior plans and behavior contracts. They were unable to link his behavior to any particular activity or subject. (Testimony of Mother, Kathleen Taylor and Deborah Shelley, Fifth Grade Special Education Teacher from March - June, 2001)

10. Occupational therapy, auditory, reading, cognitive and achievement tests were performed by Board personnel during the winter of 2001. The examiner who performed the learning assessment reported that T. often exhibited oppositional and uncooperative behavior during the testing. It was concluded that T. did not have a deficiency in the auditory perception and conceptualization of speech sounds. While

T.'s overall cognitive ability fell within the average range, his broad reading scores were equivalent to a student of 7 years, 10 months; his basic reading skills score fell at a level equivalent to a student of 7 years, 9 months (T. was 10 years, 6 months at the time of this testing). His broad written language score was equivalent to a student of 7 years, 2 months. His math and broad knowledge scores fell within the average range. T.'s processing speed was within the low range. On the Gray Oral Reading Test, T. scored at a 1.9 grade equivalent level. His comprehension score fell at a grade equivalent level of 3.5 (based on a subtest where the examiner reads the passage and questions aloud to the student). The occupational therapy evaluator found that T. was generally within the average range and did not require services. (Exhibits B-30, B-33, B-34, B-39A)

11. The PPT submitted questions to Dr. Diana Badillo-Martinez in preparation for the neuropsychological evaluation she administered to T. in March, 2001. Dr. Martinez testified that T. was resistant to the testing and easily frustrated; his attitude made testing somewhat difficult and therefore she was not able to answer all the questions that were posed. She concluded that T.'s intellectual abilities fell with the average range but that he learned new material slowly, worked very slowly, and had marked reading decoding and comprehension deficits. She also stated that T. becomes oppositional when he feels inadequate or thinks he might feel inadequate due to the demands that may be placed upon him. Dr. Martinez concluded that these oppositional behaviors interfere with his ability to learn and must be dealt with if he is to progress in school. She was not able to determine why T. reads so poorly. She diagnosed T. as having a Cognitive Disorder NOS, Generalized Anxiety Disorder (for which she recommended medication), Oppositional Defiant Disorder, and a Reading Disorder; she did not believe that T. had ADD but recommended that T. be monitored in order to rule out ADD. During testimony, Dr. Martinez suggested that T. needs a specific, clear behavior program that will help him learn to control his behavior and deal with his frustration. Homebound instruction will only delay his social growth and reinforce his oppositionality. (Exhibits B-29, B-37, Testimony of Dr. Martinez)

12. Dr. Martinez' report was discussed by the PPT on April 5, 2001. The PPT determined that T. continued to qualify for special education services as a learning disabled student and recommended that the IEP be continued without change for the remainder of the school year. In addition, T.'s behavior plan, as revised in March, 2001, was incorporated into the IEP. The plan called for three warnings and a time-out when T. refused to follow directions. (Exhibits B-38, B-39, Testimony of Assistant Superintendent)

13. On June 14, 2001, the PPT convened to plan for the 2001-2002 school. This meeting was quite long and characterized by many disagreements between the Board, the parents, and their respective counsel. The Board members of the PPT proposed an IEP that would promote T. to the sixth grade in the Board's middle school where he would receive 22.5 hours of special education services per week: T. would receive English, reading and math instruction in the resource room, and science and social studies instruction in collaborative mainstream classrooms. T.'s reading instruction would be provided by the Wilson program, a reading program similar to "Let's Read"

but with a more mature presentation; reading instruction would be in a group of 5 or 6 students. T.'s parents rejected the promotion to sixth grade on the basis of T.'s inability to read at grade level. They also objected to the PPT being convened on June 14 as they did not feel there was sufficient information to plan an IEP; they believed that further independent evaluations were necessary in order to appropriately program for T., although they did not seem certain as to which evaluations were needed. The Board proposed a reading evaluation and reiterated their past request for a psychiatric evaluation. Towards the end of this extended meeting, the parents' attorney presented the Board members of the PPT with a letter that essentially revoked consent or agreement with any evaluations, diagnoses, behavior plans, or materials and methods of instruction heretofore proposed or supported by the Board including the IEP of April 5, 2001. There is some disagreement as to whether the parents requested any specific evaluations at this meeting, but in any case, there was great discord and the PPT ended with an agreement that the attorneys for the Board and the parents would discuss the issue of independent evaluations outside the PPT and attempt to reconcile their opposing views. (Exhibit B-50, Testimony of Middle School Special Education Chair, Kathleen Taylor, and T.'s Mother)

14. On July 9, 2001, the student's parents, through their attorney, requested a neuropsychological evaluation by Dr. Armin Thies, and a reading evaluation by Dr. Mary White-Roath. They again rejected a psychiatric evaluation. The Board refused the neuropsychological evaluation based upon the evaluation completed by Dr. Martinez, but requested further information about Dr. White-Roath. The parents responded that Dr. Thies would perform only tests that were not duplicative of those administered by Dr. Martinez; they requested an immediate response as T. was scheduled to see Dr. Thies. The parents also stated that they would allow the Board to speak with Dr. White-Roath prior to the evaluation, but only if the parents participated in the conversation. (Exhibits B-57 through B-70)

15. Despite extensive correspondence between counsel for the Board and parents during the summer of 2001, decisions were not made regarding evaluations until a PPT convened on August 23, 2001. During this PPT meeting, the Board agreed to pay for a reading evaluation by Dr. Mary White-Roath (although only if the parents allowed them to speak to her first without the parents or their attorney present). To minimize conflict and possibly avoid due process, the Board also offered to pay half the cost of Dr. Thies' evaluation. The parents rejected this offer of partial payment. Toward the end of the meeting, the parents also requested homebound instruction for T. They offered a letter dated August 22, 2001 from T.'s pediatrician, Dr. Robert Rubin, which stated "I recommend a trial of homebound instruction for T. due to his current emotional condition affecting his mental welfare. Follow-up would be very important in determining when he can return to the traditional classroom setting." In a form received on August 31, 2001, Dr. Rubin further stated the duration of homebound instruction to be "until satisfactory resolution between school, parents and physician." The Board members of the PPT rejected the request for homebound instruction based upon insufficient information. Although a date and time were arranged for the Assistant Superintendent to speak with Dr. Rubin, she was not available at that time; the Assistant Superintendent did not contact the parents to schedule another date and

time for a conversation with Dr. Rubin. (Exhibits B-77, B-78, B-79, B-89, Testimony of Assistant Superintendent)

16. Dr. Armin Thies, a clinical neuropsychologist, performed a neuropsychological evaluation in July, 2001. He reported that T. became resistive toward the end of his testing. Dr. Thies reviewed T.'s previous evaluations and found that T. works very slowly but has average to superior cognitive ability. His reading and writing fall significantly below his measured intelligence. Dr. Thies concurred with Dr. Martinez that there was little evidence of ADD but that T.'s inattention was a likely result of his emotional condition when confronted with academic tasks. Dr. Thies recommended (stating that many of the recommendations were elaborations or modifications of Dr. Martinez' recommendations) that the management of T.'s behaviors be included in his educational plan; T. must learn to manage his frustration. He also recommended a medication trial to reduce T.'s anxiety, the use of a computer for word processing, building a sight recognition vocabulary (since T. had not been successful with phonological instruction), one on one or small group reading and writing instruction, and modifications that would enable T. to participate in the regular curriculum. (Exhibit B-75)

17. On September 4, 2001, the Board requested Due Process. (Exhibits B-91, H.O.-1)

18. On September 4, 2001, the parents agreed to let the Assistant Superintendent speak to Dr. White-Roath without the participation of the parents or their attorney. (Exhibit B-92)

19. Also on September 4, 2001, T. began receiving regularly scheduled therapy from Dr. D.A. Begelman, a clinical psychologist. T. has also seen Dr. Simon B. Sobo, a psychiatrist. In addition, T.'s parents have brought him to the Center for Attention and Related Disorders for a psychiatric evaluation and psycho-social assessment. (Exhibits P-55, P-57, P-67)

20. Dr. John G. Gelinas, a child, adolescent and adult psychiatrist, was asked by the Board to review T.'s records. In a letter dated October 26, 2001, he stated that a psychiatric evaluation was warranted due to T.'s history of learning disabilities and behavioral difficulties at school. Dr. Gelinas testified that only a psychiatric evaluation can assess medical and psychiatric issues. He also testified that Dr. Martinez' evaluation not only raised more questions than it answered, but that her diagnosis of "Cognitive Disorder NOS" was meaningless and therefore useless for educational planning purposes. (Exhibit B-111, Testimony of Dr. Gelinas)

21. T.'s reading level has shown little progress since he has been a student in the Board's school. In grade 2, his reading comprehension reached the 1.4 grade equivalent level. In third grade, he reached the 2.5 grade equivalent level. In grade 4, his reading comprehension was at a 4.2 grade level, although this was based upon an administration of the Gray Oral Reading Test where the examiner reads the material and questions to the child; T.'s own reading accuracy fell at the 2.3 grade level equivalent. Finally, in fifth grade, T.'s broad reading on the Woodcock-Johnson-