revised test fell at the 2.2 grade level, his basic reading at the 2.1 grade level, and his accuracy at less than the 1.9 grade level. T.'s written expression tested at the 1.8 grade level when he was in the fifth grade. This was after T. had been individually instructed for almost two years with the "Let's Read" program and had moved from book 4 to book 5 in the program (although Board personnel testified that the "Let's read" program sets forth reading instruction in such a way that reading growth may not be seen on standardized tests until the entire program is completed). T.'s Mother testified that T.'s current home tutor tested T. and found him to be reading at a grade equivalent level of 2.3. Therefore, in four years, T. has made less than one year's reading progress. (Exhibit B-115, Testimony of Middle School's Special Education Chair, Kathleen Taylor, and Mother)

22. The student has not attended school since the end of the 2000-2001 school year. His parents have arranged for T. to receive tutoring for 2 hours per week and to volunteer at a local nursing home. T.'s father testified that they did not want T. in school until a program they deemed appropriate was in place. (Testimony of Mother and Father)

23. Dr. White-Roath completed her evaluation after almost a year of Parent/Board disagreement over who should administer the independent reading evaluation to T. In the late fall of 2000, the Board and parents agreed that the evaluation would be completed by Elaine Cheeseman. However, as Elaine Cheeseman had trained the teachers who implemented the "Let's Read" program, she no longer performed student evaluations. The parents proposed Susan Wiggins, but the Board would not agree to hiring her. The Board proposed Miriam Cherkes-Julkowski, Risa Davidson, and David Zena, but the parents were unwilling to travel outside the immediate area due to their work commitments. The parents later recommended Dr. Pogge of Katonah, New York but it is unclear whether they sent his resume to the Board. As described above, the Board eventually contracted with Dr. Mary White-Roath although even after agreement had been reached and the parents allowed the Board to contact Dr. White-Roath on September 4, 2001, the Board did not officially agree to fund the evaluation until October, 2001. (Exhibits B-47, B-92, Testimony of Mother and Assistant Superintendent)

24. Dr. White-Roath tested T. during September and October, 2001. She found that T. processes very slowly, but is of average cognitive ability. Many of his reading skills tested significantly below average and his writing sample could not be scored. Dr. White-Roath's report states that T. requires a structured, intensive, comprehensive and systematic reading/spelling program which should be presented in a one to one or small group setting. Direct instruction by a trained teacher is essential. Dr. White-Roath also recommended intensive remedial instruction in reading comprehension and writing. (Exhibit B-116)

## CONCLUSIONS OF LAW:

1. The parties do not dispute that T. is a learning disabled student entitled to a free and appropriate public education ("FAPE") with special education and related services as provided for under the provisions of Connecticut General Statutes 10-76 et seq., and

APR-20-2003 03:30PM LIV School Camp-27 CONN 08/15/2005 Page 2 of 7 P. 10/24
Case 3:03-cv-00496-MRK   Document 34-27   Filed 08/15/2005   Page 2 of 7

November 20, 2001                            -9-                      Final Decision and Order 01-294

the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. 1401 et seq. T.'s learning disability lies in the areas of written language and reading, including encoding, decoding and comprehension.

2. The standard for determining whether FAPE has been provided begins with the test established by Supreme Court in Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176 (1982). First, the procedural requirements of the IDEA must have been met by the school district. Second, the individualized program must be reasonably calculated to enable the child to receive educational benefit. This test has been subsequently clarified to hold that FAPE requires that the individualized educational program offered to a child must provide a more than trivial educational benefit. (See Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3rd Cir. 1988), cert denied, 488 U.S. 1030 (1989)).

3. T. is an extremely complex student who has presented great challenges to the Board. Why does this child, who has at least average cognitive ability, have such difficulty with reading and writing? And why has his oppositional behavior become worse over time? This hearing transpired because with all the evaluations to which T. has been subjected, there is no concrete answer to these questions. The Board has concluded that if T.'s behavior is controlled, he will learn to read. T.'s Parents believe that if T. learns to read, his difficult behaviors will disappear. Both views are overly simplistic. It is uncertain which came first, the academic difficulties or the problem behaviors, but it is clear that they are intertwined and must both be dealt with.

4. Under 34 C.F.R. Section 300.502(b)(2), if a parent requests an independent educational evaluation, the public agency must, without unnecessary delay, either initiate a hearing to show that its evaluation is appropriate, or ensure that the independent evaluation is provided at public expense. Here, the Board has not met their burden of proof. The neuropsychological evaluation performed by Dr. Martinez gave some insight into T. but was insufficient to support any real educational planning. She could not answer all the questions posed to her and was unable to determine why T. could not read. Dr. Gelinas testified that at least part of her diagnosis was meaningless. Her evaluation provided so few answers that in response to the report, the PPT did not make any changes to T.'s IEP (an IEP that was not working). Finally, the fact that the Board still felt the need for further evaluations even after Dr. Martinez completed her report is a further indication that Dr. Martinez' evaluation, standing alone, was not sufficient or appropriate. With Dr. Martinez' evaluation providing so little assistance to the PPT, it was natural that the parents would request what they felt would be a more comprehensive neuropsychological evaluation. Dr. Thies' evaluation relied heavily on Dr. Martinez' evaluation; he did, however, supplement her testing and recommendations and made suggestions that were more specific and useful in an educational setting. Therefore, the Board must reimburse the Parents for the Thies evaluation.

5. T.'s oppositional behavior is getting in the way of his educational progress. Almost every teacher and evaluator who worked with T. reported some difficulty with T.'s behavior. As T.'s behavior and academic performance deteriorated, the Board sought

a psychiatric evaluation. Both Dr. Martinez and Dr. Thies indicated that T.'s behavior was interfering with his educational progress and both recommended a trial of medication for anxiety. The possibility that anxiety plays a role in the behaviors that are interfering with T.'s educational progress must be investigated. Under C.F.R. 300.532(g), each Public Agency must ensure that children are assessed in all areas related to the suspected disability. In addition, one of the related services available to children who have been identified under the special education statutes is medical; under 34 C.F.R. Section 300.24(b)(4) medical services are defined as "...services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services." Therefore, the Board's request for a psychiatric evaluation was reasonable and necessary. However, as it now appears that T.'s parents are in the process of obtaining a psychiatric evaluation, further evaluation *may* be unnecessary as discussed in the final order.

6. The Board did not, however, do enough to modify T.'s behavior. Practical strategies for working with T. were never developed. As T.'s oppositional behaviors continued to escalate, PPTs were convened; but for the most part, no specific usable behavior interventions emerged from these meetings. Behavior plans were written (see Finding of Fact No. 12) and behavior contracts were employed (Finding of Fact No. 9), but to no avail. T.'s teachers were unable to link instances of his resistant behavior to any particular activity or subject. They suggested that T.'s problem behaviors just appeared from nowhere; this seems somewhat unlikely. The PPT should have obtained a functional behavior assessment; when completed by a qualified individual, such assessments often yield information that can be translated into useful, successful behavior plans. A functional behavior assessment is still in order.

7. Throughout the 2000-2001 school year, the Board's response to T.'s negligible academic progress and escalating behavior difficulties was to increase his time in the self contained special education classroom. Even though the increased hours did not seem to ease the situation, they continued to decrease the amount of time T. spent in the regular education classroom (see Findings of Fact Nos. 7 and 8). It is not clear that T. ever had an integrated, comprehensive educational program that exposed him in any meaningful way to the grade level content he was cognitively capable of handling. The IDEA requires that children with disabilities are educated in the least restrictive environment ("LRE"); that is, with children who are not disabled, and, that children with disabilities are to be removed from the regular education environment "...only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." (20 U.S.C. Section 1412 (a)(5)). 34 C.F.R. Section 300.552(e) also requires school districts to ensure that "A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modification in the general curriculum." It is clear that T.'s instruction was provided in an increasingly restrictive environment that did not meet his needs and provided negligible educational benefit.

8. The Parents have argued that the PPT's decision to promote T. each year was not appropriate. Although T. does not work at grade level and has never made the expected progress each year, the issue is not the grade to which T. is assigned; it is whether his educational program was appropriate.

9. The program offered by the Board for the fall of 2001 as contained in the IEP dated June 14, 2001 is really more of what T. received during the 2000-2001 school year. Although little reading progress could be demonstrated by T. after two years with "Let's Read" (see Finding of Fact No. 21), the Board proposed that he receive educational instruction with the Wilson program, which, as described by Board witnesses, is quite similar. The IEP contains no new behavior initiatives and, as in the previous year, most of T.'s academic instruction would take place in the resource room. Placement in collaborative classrooms for social studies and science was a positive change, but without viable behavioral or reading programs in place, it is unlikely that T. would have experienced much success in those classes. While this IEP looks good on paper, it does not meet T.'s individual needs and therefore is not calculated to provide educational benefit as required by Rowley.

10. The Parents' response to this IEP, however, can not be supported. Homebound instruction is described in the Regulations of Connecticut State Agencies Section 10-76d-15, which states that such instruction shall be provided only when the PPT finds that at least one of the following conditions applies: "(1) A physician has certified in writing that the child is unable to attend school for medical reasons and has stated the expected date the child will be able to return to the school. (2) The child has a handicap so severe that it prevents the child from learning in a school setting, or the child's presence in school endangers the health, safety or welfare of the child or others. (3) A special education program recommendation is pending and the child was at home at the time of referral. (4) The child is pregnant or has given birth and a physician has certified that home bound or hospitalized instruction is in the child's best interest and should continue for a specified period of time." (Section 10-76d-15(b) In addition, the regulation states that homebound instruction "...shall be provided when a child's condition will cause an absence of at least three weeks' duration." (Section 10-76d-15(c)) Conditions 2, 3 and 4 can be eliminated immediately. As to the first condition, the letter sent by Dr. Rubin is overly vague and broad (see Finding of Fact No. 15). The PPT could not make a decision based upon such insufficient information. Also, there was no suggested date on which T. could return to school, nor was there any reason to believe his absence would last at least three weeks. Most telling is Dr. Rubin's second communication which suggests that the real explanation for the absence was the lack of agreement between the Parents and the PPT. Also worth noting is the fact that no other evaluator, including Dr. Thies, suggested that T. would benefit from homebound instruction. Finally, home bound instruction would not meet the LRE requirements as applied to T.'s individualized needs. While the Board did not overextend itself in its efforts to discuss the situation with Dr. Rubin, neither did the Parents request that Dr. Rubin send a more detailed explanation of the need for homebound instruction.

11. The Parents have alleged several procedural violations on the part of the Board. While the Supreme Court in Rowley recognized the importance of meeting all procedural requirements, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991).

12. The Parents have argued that the PPT meeting of June 14, 2001 should not have gone forward as they were not yet prepared. They also argued that the IEP was prepared before the meeting and that other forms were filled out after the meeting when they were not present. While Boards must make every effort to ensure parental attendance at PPT meetings, even if a parent objects to the PPT meeting, there is nothing to prevent a Board from going forward with the meeting without the parents in attendance so long as they have made a good faith effort to obtain the parents' attendance. In addition, Board members of a PPT may meet before the meeting to prepare a draft IEP as long as the parents have the opportunity to provide input and recommend and discuss changes. Here, the Parents did attend the meeting, but as was discussed in Finding of Fact No. 13, the meeting was characterized by dissension and culminated in the Parents' presentation of a letter revoking any and all consents and agreements they had ever granted. There was ample opportunity to reconvene the PPT and to rewrite the IEP, but communication between the parties continued to deteriorate during the summer. Therefore, a procedural violation can not be found with relation to this PPT/IEP.

13. The Parents have also argued that procedural violations exist with relation to the provision of evaluations. During the summer, the Parents requested that the Board pay for Dr. Thies' evaluation and demanded an almost immediate answer (see Finding of Fact No. 14). An immediate answer is not a reasonable expectation; the Parents did receive their answer at the August 23, 2001 PPT, after which the Board appropriately requested this hearing. The situation is somewhat different with Dr. Mary White-Roath. As described in Finding of Fact No. 23, the issue of the reading evaluation languished for almost a year due to the disagreement between the parties. Even after the Board finally agreed to Dr. White-Roath, the actual payment decision was delayed for another month. At that point, however, the Parents were holding T. out of school so the Parents cannot claim that this delay contributed to a deprivation of educational benefit.

14. The parties have clearly reached a point where trust is lacking and communication has broken down. However, it is essential that T. be immediately returned to school before he loses any more academic ground or his social skills experience any further deterioration. Therefore, a third party must be brought in to help the parties plan for T.'s educational future. This consultant will assist the PPT in planning an IEP that places T. in the sixth grade at the middle school and balances T.'s time in the mainstream with the need to remediate his reading and writing skills. In addition, the team will insure that appropriate supplementary aids and services are in place to help T. succeed in the mainstream and that the entire IEP is appropriately implemented.

The independent consultant will help the PPT review all evaluations done to date and determine if any other evaluations are required. To prevent any unnecessary evaluations, the Parents will submit to the PPT the psychiatric evaluation they are currently obtaining. The consultant will assist the PPT in determining if this psychiatric evaluation is sufficient for educational planning. If not, another psychiatric evaluation will be obtained by the PPT. The consultant will also facilitate the completion of a functional behavior assessment and the creation of a behavior support plan by an individual trained in this area. The consultant will facilitate all communications with other professionals as necessary. Finally, in the event of any disagreement between the parties or within the PPT, the decision of the consultant shall be final.

### FINAL DECISION AND ORDER:

1. Dr. Martinez' evaluation was not appropriate. The Board will reimburse the Parents for the evaluation performed by Dr. Thies.

2. A psychiatric evaluation is necessary and appropriate. A psychiatric evaluation will be obtained by the Board as detailed in Conclusion of Law No. 14.

3. The Board did not commit any procedural violations.

4. The program offered by the Board in the June 14, 2001 PPT for the 2001-2002 school year was not appropriate. The PPT will convene within one week of receipt of this decision to select an independent consultant who is to be paid by the Board and is agreeable to both the Parents and the Board. If the parties are unable to agree on a consultant, then each party will select a consultant; together, the two consultants will select the independent educational consultant. It is expected that this process will be completed before the end of the calendar year. It is also expected that T. will be returned to school as soon as possible. Until this occurs, the Board will provide homebound instruction.

5. The independent consultant will assist the PPT in planning an appropriate IEP that will allow for T.'s transition back to school. The various details of this task are detailed in Conclusion of Law No. 14; the consultant will make certain that the PPT addresses each of these components. The consultant's hours shall be determined by the agreement of the Board and the Parents. The educational consultant shall remain in place until both the Board and Parents agree that his or her services are no longer needed by the PPT, but at least through the 2001-2002 school year.

If the local or regional board of education or the unified school district responsible for providing special education for the student requiring special education does not take action on the findings or prescription of the hearing officer within fifteen days after receipt thereof, the State Board of Education shall take appropriate action to enforce the findings or prescription of the hearing officer.

Appeals from the hearing decision of the hearing officer may be made to state or federal court by either party in accordance with the provisions of Section 4-183, Connecticut General Statutes, and Section 20, United States Code 1415(i)(2)(A).

_____
Hearing Officer Signature

_____
Hearing Officer    Name in Print

Gail K. Mangs

signpage.doc (ho disk)
11/96