## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT (NEW HAVEN)

|  |  |  |
|---|---|---|
| MATHEW AND CINDY MYSLOW, as Parents and Natural Guardians of Minor Plaintiff TRAVIS MYSLOW, | : : : : | Case No.: 3:03-cv-496-MRK |
| Plaintiffs, | : : | |
| v. | : : | |
| NEW MILFORD SCHOOL DISTRICT, *et al.*, | : : : | |
| Defendants. | : : : | |

## PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO THE FIVE MOTIONS THAT ARE PENDING IN THIS MATTER

### INTRODUCTION

Matthew and Cindy Myslow ("Mrs. Myslow"), the plaintiffs in this matter (collectively, "plaintiffs"), by and through their counsel, Alan C. Milstein and Michael Dube of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. and Deborah G. Stevenson, respectfully submit this omnibus brief in opposition to the five motions that are pending in this matter.

The first three motions, which relate to the plaintiffs' expert Peter Breggin, M.D. ("Dr. Breggin"), are as follows:

> 1.    The motion by codefendants New Milford School District ("District"), New Milford Board of Education ("Board"), Raymond Avery, Jeanann Paddyfote ("Dr. Paddyfote"), Thomas Mulvihill, Paula Kelleher ("Ms. Kelleher"), Denis Dolan ("Mr. Dolan"), Jean Malcom ("Ms. Malcom"), Josephine Rositano ("Ms. Rositano"), Adele Johnson, Deborah Shelley ("Ms. Shelley"), and Robyn Vikland ("Ms. Vikland") (collectively, "School District defendants" or "District," as context dictates) to preclude Dr. Breggin from testifying as to whether the School District defendants violated the applicable standard of care;

2.     The motion by codefendant L. Robert Rubin, M.D. ("Dr. Rubin") to preclude Dr. Breggin from testifying as to whether Dr. Rubin violated the applicable standard of care; and

3.     The motion by codefendants Anna Alshansky, M.D. ("Dr. Alshansky") and Martin Kreminitzer, M.D. ("Dr. Kreminitzer") (cumulatively, "doctor defendants") to preclude Dr. Breggin from testifying as to whether Drs. Alshansky and Kreminitzer violated the applicable standard of care.

The fourth and fifth motions, which relate to the substance of the plaintiffs' case, are as follows:

4.     The motion by the School District Defendants for summary judgment; and

5.     The motion by Drs. Alshansky and Kreminitzer for summary judgment.

For the reasons that follow, all five motions must be denied.

## COUNTER-STATEMENT OF FACTS

### I.

This case is yet another example of the "aggressive promotion of Ritalin and other stimulant drugs by educational institutions" and the concomitant "misdiagnosis of ADHD and excessive dispensation of stimulant drugs to children."[1]  As was recently pointed out by one commentator,

> [s]chool officials increasingly pressure parents to give ... children stimulant drugs such as Ritalin, Concerta, Metadate, Dexedrine and Adderall.  Parents who resist treating their children with Ritalin have faced the expulsion of their children from school ... . Forcing children to take medication such as Ritalin for the sole purpose of controlling disruptive behavior in school violates their constitutionally protected liberty interest in privacy and bodily

---

[1] See Amy L. Komoroski, Note, Stimulant Drug Therapy for Hyperactive Children: Adjudicating Disputes Between Parents and Educators, 11 B.U. Pub. Int. L.J. 97-99 (Fall 2001).

integrity, as well as their right to an education pursuant to federal law.[2]

In 2003, the Connecticut legislature, recognizing this, enacted a statute "prohibiting the recommendation of psychotropic drugs by school personnel."[3]  It provided as follows:

> Each local and regional board of education shall adopt and
> implement policies prohibiting any school personnel from
> recommending the use of psychotropic drugs for any child.  Such
> policies shall set forth procedures (1) for communication between
> school health or mental health personnel and other school
> personnel about a child who may require a recommendation for a
> medical evaluation, (2) establishing the method in which school
> health or mental health personnel communicate a recommendation
> to a parent or guardian that such child be evaluated by an
> appropriate medical practitioner, and (3) for obtaining proper
> consent from a parent or guardian of a child for the school health
> or mental health personnel to communicate about such child with a
> medical practitioner outside the school who is not a school
> employee.[4]

## II.

In this case, the School District defendants failed to identify the dyslexia of the plaintiffs' son Travis Myslow ("Travis") and to accommodate this disability.  Instead of doing so, they mistook the manifestations of his frustration with his disability for signs of attention deficit disorder ("ADD") and attention deficit/hyperactivity disorder ("ADHD") and required that he be medicated with methylphenidate hydrochloride ("Ritalin")[5] and similar drugs.  Drs. Rubin, Alshansky, and Kreminitzer, the gatekeepers to those drugs, utterly failed in that role, allowing

---

[2] See id. at 100.

[3] See generally C.G.S.A. § 10-212b.

[4] See id.

[5] As Ms. Komorski points out in her Note, "[t]he Drug Enforcement Agency considers Ritalin a class II drug, in the same class as cocaine, methamphetamine, and methadone.  It is not uncommon, however, to find 25% or more of the children on Ritalin in American classrooms." See id. at 99 n.5.

them to be dispensed to Travis willy-nilly.  As a result of the defendants' conduct, Travis has been stigmatized, has suffered physical harm, was deprived of a normal childhood, and was denied the reasonable accommodations and free and appropriate public education due and owing him under the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. ("Section 504"), the Individuals With Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA"), and other federal and state laws, among other things.

The standard governing summary judgment in the federal courts is set forth in Fed. R. Civ. Pro. 56 as follows: summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[6]   The facts of this matter follow.[7]

III.

Travis was born on July 17, 1990.[8]  In the Fall of 1997, Travis enrolled in one of the District's schools, the John Pettibone School ("Pettibone"), as a second grader.[9]  It was apparent

---

[6] See Fed. R. Civ. Pro. 56.

[7] The plaintiffs' exhibits are as follows: (1) "Second Amended Complaint," attached as Exhibit "A"; (2) excerpts from the deposition of Mrs. Myslow, attached as Exhibit "B"; (3) "Plaintiff Travis Myslow's Responses to Defendants' First Set of Interrogatories," attached as Exhibit "C"; (4) "Plaintiffs' Answers to Interrogatories of Defendants Anna Alshansky, M.D. and Martin Kreminitzer, M.D.," attached as Exhibit "D"; (5) sample documents generated by Travis' schoolteachers, attached as Exhibit "E"; (6) sample tests taken by Travis, attached as Exhibit "F"; (7) "Out-Of-District Provider Letter Form," attached as Exhibit "G"; (8) "Summary of Travis Myslow's Level of Performance 1998-2001," attached as Exhibit "H"; (9) "Section 504 Discrimination Grievance Form" dated September 5, 2002, attached as Exhibit "I"; and (10) "Report in the Case of Travis Myslow" by Dr. Breggin, attached as Exhibit "J."

[8] See Exhibit A, ¶ 28; see also Exhibit A, Exhibit A thereto, page 1.

to the plaintiffs from Travis's earliest days at Pettibone that he wrote numbers and letters backwards and, at a minimum, needed to be tested for dyslexia.[10]   In the absence of this diagnosis, he understandably became frustrated with school.[11]   By the District's concession, as of that date Travis was "functioning approximately two years below grade level in all academic areas."[12]

Representatives of the District advised that "[t]hey could help him and fix" his reading problems.[13]   A Planning and Placement Team assembled by the District ("PPT") directed Ms. Rositano, a School Psychologist employed by the District, to perform a psychological evaluation of Travis.[14]   On March 3 and 5, 1998 she did so.[15]   Notwithstanding the plaintiffs' well-placed "concern[] about him not reading and writing backwards," Ms. Rositano concluded as follows:

> Travis is a 7 year, 7 month old second grade student who was referred for an evaluation by the [PPT].   The results of this evaluation find Travis to be functioning in the Average to High Average range of general intelligence.   His overall verbal skills are better [developed than] his perpetual-motor skills.   Travis shows poor problem solving skills and approaches situations in a rigid, concrete manner.   His strengths are in his verbal abstract reasoning skills and timed paper and pencil tasks.   His weaknesses are in his visual [alertness] to his environment and visual-motor integration skills.

---

[9]   See Exhibit A, ¶ 30; see also Exhibit E, page 1 (demonstrating Travis' writing of backwards sevens on an early mathematics test).

[10]   See Exhibit A, ¶ 29.

[11]   See Exhibit A, ¶ 30.

[12]   See Exhibit A, Exhibit A thereto, page 1.

[13]   See Exhibit B, page 25.

[14]   See Exhibit A, Exhibit A thereto.

[15]   See Exhibit A, Exhibit A thereto.

> The results also indicate a child with characteristics of an Attention Deficit/Hyperactivity Disorder (Combined Type) and comorbid Oppositional Defiant and Dysthmic Disorders.
>
> The parents are encouraged to share the results of ... this evaluation with Travis' pediatrician.[16]

At that point, representatives of the District, including Ms. Keller, Mr. Dolan, Ms. Rositano, Ms. Shelley, and Ms. Vikland, completed checklists and had the plaintiffs complete checklists speaking to the issue of whether Travis had ADD or ADHD.[17]   The plaintiffs were subsequently directed to take both Ms. Rositano's report and the checklists to Travis' physician at the time, Dr. Rubin, a board-certified physician.[18]   On March 27, 1998, they did so.[19]   At that time, without performing any examination whatsoever of Travis, Dr. Rubin prescribed Ritalin for Travis, noting as follows in his chart: "See recent school evaluations.   Will use 2 wk trial of ritalin 10 mg. daily.   Rubin[.]"[20]   In Dr. Rubin's own words, Travis "started this medication at the suggestion of his school because of observed and perceived difficulties."[21]

In any event, shortly after his visit to Dr. Rubin, Ms. Rositano "called and wanted to know how [Travis] made out at the pediatrician."[22]   At a follow-up PPT meeting, "[t]he school

---

[16] See Exhibit A, Exhibit A thereto, page 5 (emphasis added); see also Exhibit B, page 31.

[17] See Exhibit A, ¶¶ 37-39.

[18] See Exhibit A, ¶¶ 37-40.

[19] See Exhibit A, Exhibit B thereto, page 1.

[20] See Exhibit A, ¶ 43; see also Exhibit A, Exhibit D thereto; Exhibit B, pages 128-29.

[21] See Exhibit A, Exhibit D thereto (emphasis added).

[22] See Exhibit B, page 52.

asked" Mrs. Myslow "if Travis was taking Ritalin."[23]  Ms. Vikland began administering Ritalin to Travis at school.[24]  Shortly thereafter, on April 3, 1998, Travis's teacher wrote to the plaintiffs to advise them as follows: "I wanted to let you know that Travis has had a very good week.  He is much less impulsive and able to concentrate better.  The afternoon he seems to 'dissolve,' but mornings [after he has taken his Ritalin] have been noticeably better."[25]  The next week's note pointed out "a definite improvement in ... attention and focus."[26]  The next month, a note advised that he "is more focused and therefore able to complete his morning work without a problem."[27]  These notes continued to be written and sent home.[28]  At proximate points in time, numerous other educators at the school advised the plaintiffs as to their thoughts on how to maximize the perceived effectiveness of Ritalin.[29]

Immediately after Travis entered the third grade in the Fall of 1998, the plaintiffs asked the District if it would test Travis for dyslexia.[30]  It refused, with Mr. Dolan "stating that there is no test for dyslexia."[31]  Ironically, at a proximate point in time, his teacher advised that "he

---

[23] See Exhibit B, page 51.

[24] See Exhibit B, page 53.

[25] See Exhibit E, page 1.

[26] See Exhibit E, page 2.

[27] See Exhibit E, page 3.

[28] See generally Exhibit E, page 3.

[29] See generally Exhibit B, page 54.

[30] See Exhibit C, pages 2-3.

[31] See Exhibit C, page 3; see also Exhibit C, page 4.

frequently writes letters backwards" and "often becomes very frustrated when the work doesn't come easily to him."[32]

Though "there were mornings that Travis begged [Mrs. Myslow] not to give him the medication," the District continued to enthuse about Ritalin.[33]  On November 22, 1999, when Travis was in fourth grade, his new teacher advised that "[t]here is a difference when he takes his [medication].  He is able to control his behavior and more able to complete tasks."[34]  On December 8, she noted that Travis had experienced a "[v]ery difficult afternoon" because the "dose of medication had been reduced by half that morning" at the plaintiffs' behest.[35]  On April 14, she noted that he was "rather argumentative [and] difficult" because he did not take his Ritalin.[36]  Under this pressure, Mrs. Myslow "would call Doctor Rubin and he would mail [her] the prescriptions."[37]

As demonstrated by the following colloquy during Mrs. Myslow's deposition, the Ritalin was in fact unnecessary:

> [MRS. MYSLOW]: Doctor Rubin, … one time he said I could send Travis [to school without medication] without telling the school … .
>
> [QUESTION]: Okay.  And did that happen, Mrs. Myslow?  Did you send Travis to school without giving him his medication in the morning and not tell the school that the medication had not been given?

---

[32] See Exhibit E, page 10.

[33] See Exhibit B, page 72.

[34] See Exhibit E, page 5.

[35] See Exhibit E, page 6.

[36] See Exhibit E, page 9.

[37] See Exhibit B, page 69.

[MRS. MYSLOW]: Yes.

[QUESTION]: Okay.   And what feedback did you get from the school?

[MRS. MYSLOW]: He was excellent.

[QUESTION]: And what did you conclude as a result of that?

[MRS. MYSLOW]: He didn't need Ritalin.[38]

According to the plaintiffs, besides suffering the loss of his dignity as a result of his being on Ritalin, he was suffering from severe anxiety, constipation, low self-esteem, poor fine motor coordination, physical illnesses, lethargy, anxiousness, loss of appetite, feelings of withdrawal and isolation and embarrassment, among many other things.[39]

Travis entered fifth grade still reading at a first-grade level.[40]  The plaintiffs, frustrated, and having seen Travis achieve absolutely no benefit from Ritalin, decided that they would not allow him to continue on the medication.[41]  The District, however, was not willing to abide by the plaintiffs' sound decision.[42]  Its representatives directed the plaintiffs to have Travis evaluated by Drs. Alshansky and Kreminitzer, two individuals the District repeatedly used for this purpose, so that Travis could be put on new medication, advising that they would pay those doctors for their services.[43]

---

[38] See Exhibit B, pages 161-62.

[39] See Exhibit D, page 1.

[40] See Exhibit A, Exhibit E thereto, page 3; see also Exhibit H.

[41] See Exhibit A, ¶ 45; see also Exhibit A, Exhibit D thereto.

[42] See Exhibit A, ¶ 46.

[43] See Exhibit A, ¶¶ 46-49.

On October 27, 2000, Dr. Alshansky wrote to Dr. Rubin to advise him that "[g]iven all the information provided to me, I agree with the diagnosis of attention deficit hyperactivity disorder."[44]  Of course, the District, rather than Dr. Rubin, had initially made that diagnosis.  She prescribed Adderall and Dexedrine, which are drugs similar to Ritalin, which were administered to Travis in December 2000, with Travis' treatment with Dr. Alshansky ceasing that month.[45]  Travis was even more physically ill on Adderall and Dexedrine than he was on Ritalin.[46]  On April 24, 2001, Dr. Kreminitzer saw Travis, diagnosed him with "[p]ossible ADD," prescribed Concerta, and advised that he was considering prescribing "a medication such as Clonidine."[47]

Besides the fact that Travis was being medicated for an illness that he did not have, the plaintiffs' answers to interrogatories reveal that the District was violating federal and state law as follows:

> Since Travis was in Third grade, the school denied Travis a Dyslexia Test, stating that there is no test for dyslexia.  When Travis was in Fifth grade, the school also denied him one on one reading and occupational therapy.  Rositano denied Travis proper diagnosis of his learning disability in 1998 and by the PPT team members (School District, Board of Education agents, Dolan, Rositano, Kelleher, and all those listed in PPT documents) at each PPT meeting subsequent to initial diagnosis until Dr. Schwartz made the correct diagnosis.  Travis was denied appropriate education as other children by PPT members; Travis was denied participation in classes in school as other children by PPT members (same as above including Shelley and Neu) from initial diagnosis until placement at Ben Bronz [Academy for middle school]; PPT members compelled Travis to undergo behavioral modifications as a result of the inappropriate diagnosis; Travis was subjected to having his teachers (Shelley, Kelleher and other PPT

---

[44] See Exhibit A, Exhibit E thereto, page 3.

[45] See Exhibit A, Exhibit E thereto, page 3.

[46] See Exhibit A, ¶ 98.

[47] See Exhibit A, Exhibit H thereto.

members) read and write for him; Travis was given false and misleading "passing" grades unlike other children; Travis was denied the ability to participate in classroom work as other children as a direct result of the inappropriate diagnosis; PPT members denied Travis the ability to participate in gym class as other children as a direct result of the inappropriate diagnosis; PPT members caused Travis to "feel stupid" and be humiliated as a direct result of, including but not limited to, the inappropriate diagnosis, placement decisions, observations, evaluations, and behavior modifications; PPT members caused Travis to endure lengthy periods of travel to a private school necessary for Travis to compensate for the inappropriate education provided by the district and causing him to miss extracurricular activities with his peers; PPT members caused Travis to take medication unlike other children due to the inappropriate diagnosis; the PPT members caused Travis to suffer side effects and illness from the medication further exacerbating his ability to participate in academics and extracurricular activities with his peers; the PPT members caused unnecessary delay in that Travis endured an additional nine or ten months of receipt of inappropriate education, evaluation, and placement after the due process hearing officer decision prior to his placement at Ben Bronz.[48]

The District's failings are readily apparent from the documentary evidence in the record.

While Travis was in fifth grade, he was given a score of 104 out of 100 on the following test:

If you were James, how would you deal with your loneliness?

*Run away*

What would you do if you were James and your aunts threatened you?

*Lock my ants in thar rooms*

List ways that being with the creatures were different from living with James' aunts.

*Nise*

Tell what you think would have happened to the creatures on the peach if James had not been there to introduce him.

---

[48] See Exhibit D, pages 3-4.

*Ded*[49]

The plaintiffs, represented by one of the undersigned attorneys, Attorney Stevenson, were constrained to request a due process hearing with the Connecticut Department of Education.[50]  In November 2001, the Due Process Officer ruling on the case concluded, among other things, that the plaintiffs were "prevailing parties," that the District, the Board, and their agents failed to provide Travis with "an integrated, comprehensive educational program that exposed him in any meaningful way to the grade level content he was cognitively capable of handling," that they erroneously provided Travis with instruction "in an increasingly restrictive environment that did not meet his needs and provided negligible educational benefit," and that they implemented an IEP that did "not meet [Travis's] individual needs and therefore is not calculated to provide educational benefit as required by <u>Rowley</u>."[51]  These defendants' behavior did not improve after the hearing; in February 2002, they refused to even investigate the possibility of an out-of-district placement for Travis, instead requiring him to attend Schaghticoke Middle School for an eight week "diagnostic placement" over the plaintiffs' objection.[52]

In August 2002, A. Herbert Schwartz, M.D. ("Dr. Schwartz") performed an *independent* evaluation of Travis.[53]  He concluded that Travis was in actuality suffering from "Situational Anxiety Disorder, secondary to inability to read and write with repeated stressful experiences in

---

[49] <u>See</u> Exhibit F, page 3.

[50] <u>See generally</u> Exhibit A, Exhibit I thereto.

[51] <u>See</u> Exhibit A, ¶ 108; <u>see also</u> Exhibit A, Exhibit I thereto.  Of course, the reference is to <u>Board of Education of the Hendrick Hudson Central School District v. Rowley</u>, 458 U.S. 176 (1982).

[52] <u>See</u> Exhibit A, ¶ 111.

[53] <u>See</u> Exhibit A, ¶ 115; <u>see also</u> Exhibit A, Exhibit J thereto.

the educational setting" as a result of the previous misdiagnosis.[54]  He noted that "[m]edication is currently not indicated."[55]  Another *independent* doctor, Armin Paul Thies, Ph.D. ("Dr. Thies"), opined similarly, stating that anxiety-related medication was contraindicated.[56]  In his opinion, Travis did not have, and never had, ADD or ADHD; he had dyslexia and dysgraphia and related situational anxiety.[57]

In the wake of these opinions, in September 2002, the plaintiffs filed a Section 504 Discrimination Grievance Form with Ms. Malcom.[58]  Among their nearly thirty complaints was that "Mrs. Rositano insisted Travis suffered from ADHD" and that school staff "insisted that Travis remain on Ritalin or similar drugs for three years when he did not have ADHD."[59]  After Ms. Malcom denied their complaint, they appealed her decision to Ms. Paddyfote.[60]  Thereafter, the Board met "in an attempt to resolve the grievance," "determined that it could not" do so, and therefore "denied the grievance."[61]  Shortly thereafter, the plaintiffs asked for information as to the proper procedures to appeal the Board's denial of the grievance.[62]

Having received no word, the plaintiffs filed suit on behalf of Travis in this Court on March 19, 2003.

---

[54] See Exhibit A, ¶ 115; see also Exhibit A, Exhibit J thereto.

[55] See Exhibit A, Exhibit J thereto, page 2.

[56] See Exhibit A, Exhibit K thereto.

[57] See Exhibit A, ¶¶ 99-106.

[58] See Exhibit A, ¶¶ 111-127; see also Exhibit I.

[59] See Exhibit A, ¶¶ 111-127; see also Exhibit I, page 2.

[60] See Exhibit A, ¶ 127; see also Exhibit A, Exhibit L thereto..

[61] See Exhibit A, ¶ 128.

[62] See Exhibit A, ¶ 129.

IV.

Currently, the following Counts exist against the following defendants:

| Count | Defendant |
|---|---|
| Count One, for negligence in demanding that Travis go on Ritalin, and for failure to provide Travis with a free and appropriate public education when they knew or should have known that Travis had dyslexia and dysgraphia. | School District defendants |
| Count Two, for medical malpractice | Doctor defendants |
| Count Three, for lack of informed consent | Doctor defendants |
| Count Four, for violations of Section 504 | School District defendants and Drs. Alshansky and Kreminitzer |
| Count Five, for violations of the ADA | School District defendants |
| Count Six, for violations of 42 U.S.C. § 1983 | School District defendants and Drs. Alshansky and Kreminitzer |
| Count Seven, for intentional infliction of emotional distress | School District defendants |
| Count Eight, for negligent infliction of emotional distress | School District defendants |
| Count Nine, for violations of Section 504, the ADA, the IDEA, and certain provisions of the Connecticut General Statutes | School District defendants |

V.

Subsequent to the institution of their suit, the plaintiffs retained Dr. Breggin, who holds

an M.D., as an expert. Dr. Breggin has practiced psychiatry privately since 1968, specializing in

the treatment of children and their families and sub-specializing in clinical

psychopharmacology.[63] He has authored a great number of peer-reviewed articles about the

diagnosis and treatment of children, including a 1998 article on the adverse effects of stimulants,

and written a number of well-known books in the areas of his specialty, including The Ritalin

Fact Book.[64] He is frequently consulted in this area.[65] Indeed, entities as diverse as the federal

---

[63] See Exhibit J, page 2.

[64] See Exhibit J, pages 2, 29.

14

Food and Drug Administration ("FDA"), the American Psychological Association, and the Harvard School of Education have sought his counsel.[66]

Dr. Breggin is also expert in educational approaches.[67]  He has developed, evaluated, and monitored research projects in mental health and education for a number of years, taught graduate courses on education, and testified on educational issues before the United States House of Representatives Committee on Education and the legislatures of various states.[68]

Prior to preparing his twenty-nine page report, he interviewed the plaintiffs and Travis, reviewed numerous pharmacy, medical, and school records, assayed medical and psychological reports, and looked over the documents generated since the commencement of suit.[69]  Having done so, he rendered a number of opinions.  Though it is impossible to properly represent the breadth and scope of his opinions here, distilled to their essence, they are as follows:

[A.    Negligence of Dr. Rubin]

The Physicians' Desk Reference (PDR) is sent free each year to every physician in the United States.  It contains the official FDA-approved labels for prescription medications. …

Under the section on INDICATIONS, the Ritalin label states the following:

Ritalin is indicated as an integral part of a total treatment program which typically includes other remedial measures (psychological, educational, social) for a stabilizing effect in

---

[65] See Exhibit J, page 2.

[66] See Exhibit J, page 3.

[67] See Exhibit J, page 4.

[68] See Exhibit J, page 4.

[69] See Exhibit J, pages 3-5.

children with behavioral syndrome characterized by the following group of developmentally inappropriate symptoms: Moderate-to-severe disability, short attention span, hyperactivity, emotional liability, and impulsivity. …

Notice the use of the word "typically" in describing the inclusion of psychological, educational and social "remedial measures" in the treatment of the child diagnosed with ADHD. Dr. Rubin's treatment was atypical in this regard in that it did not include this more comprehensive program.

Consistent with the above themes, the official Ritalin label states:

Adequate diagnosis requires the use not only of medical but of special psychological, educational, and social resources. … The diagnosis must be based upon a complete history and evaluation of the child and not solely on the presence of one or more of these characteristics. …

Dr. Rubin's medical record and the report of both parents who were present at the time confirm that Dr. Rubin did not take a complete history or evaluation, but based his diagnosis on second-hand information from a non-physician who described the presence of one or more of these characteristics. …

* * * *

In regard to environmental problems (such as peer conflict), Ritalin is not indicated [according to its label]. … Dr. Rubin paid no heed to these admonitions. He did not investigate the origin or secondary environmental problems or other psychological and psychiatric causes of the boy's problem. He did not first make sure that appropriate educational placement and psychosocial interventions had been tried. He made the mistake of assuming the existence of the ADHD syndrome and then medicating the child with no further inquiry.

* * * *

[At this point, Dr. Breggin recites the numerous standards set forth in peer-reviewed articles that are published and distributed to doctors throughout the country.]

Dr. Rubin failed in his treatment by almost every standard imaginable in regard to the diagnosis and treatment of ADHD.

1. Based on a mistaken approach to diagnosing, Dr. Rubin made a wrong and unjustified diagnosis. The child did not have ADHD.

2. Dr. Rubin allowed the parents and himself to be pressured by the school into prescribing medication.

3. He did not take a history, perform a physical examination, make a treatment plan, identify specific behaviors to be addressed, and discuss the probable endpoints of treatment.

* * * *

**B.     Negligence of Dr. Alshansky**

Dr. Alshansky saw the patient only once later in the child's history of medication treatment and therefore played a much lesser role than Dr. Rubin and the New Milford School District in the harm that befell the child. However, Dr. Alshansky failed the patient in the following important ways:

1. Based on a mistaken approach to diagnosing, Dr. Alshansky made a wrong and unjustified diagnosis. The child did not have ADHD. The mere existence of some ADHD-like behaviors in one setting, the school, is insufficient to make the diagnosis.

2. Dr. Alshansky continued the failed and dangerous regimen of stimulant medication, causing the child considerable distress and adding to the overall toxic effects on his brain and body.

* * * *

**C.     Negligence of Dr. Kreminitzer**

* * * *

1. Despite casting appropriate doubt on the ADHD diagnosis, Dr. Kreminitzer continued the failed and harmful regimen of stimulant medication, causing the child considerable distress and adding to the overall toxic effects on his brain and body. …

2.    Dr. Kreminitzer failed to obtain informed consent from the parents concerning the fact that Concerta contains the same chemical as Ritalin.  …

* * * *

**D.    Negligence of the New Milford School District**

1.    The school district (including the PPT team, Josephine Rositano, and JeanAnn Paddyfote, Ph.D.) in effect practiced medicine without a license when it promoted the ADHD diagnosis and the use of medication to the parents and attempted to pressure them into having their child medically evaluated for medication.  This was done by verbal communications from individual professionals, by school meetings, and through written documents.  The 3.5.98 school psychology report by Josephine Rositano refers to "characteristics of an Attention Deficit/Hyperactivity Disorder," confirming that the school had crossed the line into practicing medicine in a coercive manner. This report was given to Mrs. Myslow to carry to Dr. Rubin.  This event is the most critical in the unfolding mistreatment of Travis Myslow.  Had the school not acted in this matter, Travis would not have been exposed to years of stimulant medication during which time his basic educational needs remained unmet and his psychological and physical condition deteriorated.

* * * *

4.    The school pressured the Myslows to seek evaluations from professionals with whom the school had established unethical relationships, including Drs. Martinez, Alshansky and Kreminitzer.

5.    The school systematically failed to meet Travis's educational needs while it tried to focus attention on his presumed psychiatric disorders.

6.    Overall, the school used medical diagnosis and treatment, and the threat of medical diagnosis and treatment, as a coercive method to control and suppress Travis and his parents while failing to meet the child's educational needs.[70]

---

[70] See Exhibit J, pages 10-27 (some emphasis deleted).

Dr. Breggin went on to opine on causation and damages, including Travis's "loss of schooling and appropriate educational interventions over more than a four year span, 1998-present," "humiliation over more than a four year span, 1998-present," "stigmatization over more than a four year span, 1998-present," and "adverse drug effects caused by stimulants ... ."[71]

## **LEGAL ARGUMENT**

### I.    **THE MOTIONS TO PRECLUDE DR. BREGGIN FROM TESTIFYING MUST BE DENIED**

1.    Applicable Legal Principles

Fed. R. Evid. 702, which governs expert testimony in federal courts, provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[72]

Notwithstanding the fact that "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence,"[73] Rule 702 "embodies a liberal standard of admissibility for expert opinions"[74] and affords a district judge "broad discretion to a district court to admit expert testimony."[75]

---

[71] See Exhibit J, pages 25-27.

[72] See Fed. R. Evid. 702.

[73] See Bourjaily v. United States, 483 U.S. 171 (1987).

[74] See, e.g., Nimely v. City of New York, 414 F.3d 381, 395-96 (2d Cir. 2005).

[75] See, e.g., United States v. Feliciano, 223 F.3d 102, 120 (2d Cir. 2000).

Numerous questions surrounding the application of this Rule were resolved by the 1993 United States Supreme Court case of <u>Daubert v. Merrell Dow Pharmaceuticals</u>.[76] As explained by the Supreme Court, whatever the area of expertise of an expert, Rule 702 requires the district court to fulfill the "gatekeeping" function of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[77]

To this end,

> <u>Daubert</u> enumerated a list of factors that, while not constituting a "definitive checklist or test," a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation.  See <u>Daubert</u>, 509 U.S. at 593-94 ... .  In addition to setting forth these criteria for testing an expert's methodology, the Supreme Court has also stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions. "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the <u>ipse dixit</u> of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146 ... (1997).  Thus, we have previously stated that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, <u>Daubert</u> and Rule 702 mandate the exclusion of that unreliable opinion testimony." ...[78]

---

[76] <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993).

[77] <u>See</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999) (citing <u>Daubert</u>, 709 U.S. at 579).

[78] <u>See</u> <u>Nimely</u>, 414 F.3d at 396-97; <u>cf.</u> <u>Tyus v. Urban Search Management</u>, 102 F.3d 256 (7th Cir. 1996) (observing that the <u>Daubert</u> factors do not "neatly" apply to a sociologist's proposed expert testimony).

Not surprisingly, "[a] review of the caselaw after <u>Daubert</u> shows that the rejection of expert testimony is the exception rather than the rule."[79]

Additionally, two provisions of substantive Connecticut law are relevant to the inquiry here. First, Connecticut case law dictates that in a professional negligence case in which the facts present issues that are beyond the ken of the average layperson, "a plaintiff must establish through expert testimony: (1) the applicable standard of care, (2) the defendant's breach of that standard, and (3) that the breach proximately caused the injury."[80] Second, Connecticut General Statutes § 52-184c sets forth detailed requirements for proposed experts in professional negligence cases, providing as follows:

> (a) In any civil action to recover damages resulting from personal injury or wrongful death ... in which it is alleged that such injury or death resulted from the negligence of a health care provider ... the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.
>
> (b) If the defendant health care provider is not certified by the appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself out as a specialist, a "similar health care provider" is one who: (1) Is licensed by the appropriate regulatory agency of this state or another state requiring the same or greater qualifications; and (2) is trained and experienced in the same discipline or school of practice and such training and experience shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim.

---

[79] <u>See</u> Charles Alan Wright, 29 <u>Fed. Prac. & Proc.</u> Evid. R. 702 (2005 Supp.).

[80] <u>See, e.g.</u>, <u>Law v. Camp</u>, 116 F. Supp. 2d 295 (D. Conn. 2000) (citing <u>Pisel v. Stamford Hosp.</u>, 180 Conn. 314, 334-42, 430 A.2d 1 (1980)).

(c) If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a "similar health care provider" is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a "similar health care provider."

(d) Any health care provider may testify as an expert in any action if he: (1) Is a "similar health care provider" pursuant to subsection (b) or (c) of this section; or (2) is not a similar health care provider pursuant to subsection (b) or (c) of this section but, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim.[81]

2.     The School District Defendants' Motion Must Be Denied

The School District defendants, citing Glaser v. Pullman and Comley, L.L.C., a 2005 Connecticut decision,[82] argue that Dr. Breggin "is not a qualified educational expert" because Dr.

Breggin is a medical doctor, not an educator. He has never been employed by a school district. ... He has never been employed as a school psychologist. ... He performed none of his own testing and has never even met Travis. ... He is not an expert in education. ... He knows nothing about educational methodology or ... the teaching methods used to teach children. He has never worked in a public school, nor has he been employed as a school counselor [or] director of pupil personnel services (special education) and has not written any peer reviewed articles on learning disabilities, dysgraphia or dyslexia (the conditions plaintiff claims he suffers from). ... He has never testified on the standard of care of a school psychologist or director of pupil

---

[81] See C.G.S.A. § 52-184c.

[82] See Glaser v. Pullman and Comley, L.L.C., 88 Con. App. 615, 623-624 (2005).

> personnel. ...  He does not even know what methods were used to teach Travis; he has never observed him in the classroom nor has he been to the school.  ...  He has never testified as to whether a school district met the standards of the IDEA.  ...  He did not even attempt a psychiatric evaluation of Travis which arguably may have been within the realm of [his] expertise.[83]

Self-evidently, Daubert, rather than Glaser, applies to the question of whether Dr. Breggin is generally qualified as an expert vis-à-vis the District.[84]  Thus, the question actually before this Court is whether Dr. Breggin has the "knowledge, skill, experience, training, or education" to serve as an expert witness against the School District defendants.[85]

It is plain that Dr. Breggin does.  Although he is indeed "a medical doctor, not an educator," as the School District defendants allege, he has developed, evaluated, and monitored research projects in mental health and education for a number of years, taught graduate courses on education, and testified on educational issues before a number of federal and state legislative bodies, including the United States Congress.  Thus, the District's contention that "[h]e knows nothing about educational methodology or ... the teaching methods used to teach children" is simply untrue.  Moreover, contrary to the District's allegation, Dr. Breggin has interacted with Travis, having spoken to him on the telephone.  Additionally, the District's argument that Dr. Breggin is unqualified to serve as the plaintiffs' expert because he has never been employed as a school counselor or as a director of pupil personnel services is a non-starter; the District's own school psychologist, Ms. Rositano, whose March 1998 report the School District defendants

---

[83] See "Motion to Preclude Expert Testimony of Peter Breggin," pages 5-6.

[84] See Nimely, 414 F.3d at 396-97 (pointing out that Daubert applies in this instance); cf. Law, 116 F. Supp. 2d at 295 (making clear that C.G.S. § 52-184c supplements Daubert when an expert alleges that professional negligence has occurred because there is no conflict between federal law and Connecticut law on the issue).

[85] See Fed. R. Evid. 702.

attach to their motion, does not have the M.D. that Dr. Breggin has.  Moreover, although Dr. Breggin has not written any peer-reviewed articles on dysgraphia or dyslexia, he is not being called on to opine as to whether or not Travis suffers from those conditions: Drs. Schwartz and Thies, who the plaintiffs will call as fact witnesses at the trial of this matter, have opined that Travis suffers from those conditions, and their opinions in this regard are not contradicted in the record.  Finally, Dr. Breggin's lack of prior testimony in this particular area does not mean that he is unqualified to testify in this area in this case.

At a bare minimum, he is qualified to testify as to the standard of care in diagnosing ADD and ADHD, testify as to whether Ms. Rositano was qualified to make the initial "diagnosis," testify as to whether Dr. Rubin acted in reliance upon the District's initial "diagnosis" in prescribing the medication, and testify that Dr. Rubin's prescription of medication was inextricably related to Ms. Rositano's initial "diagnosis."

Thus, for the foregoing reasons, the School District defendants' motion must be denied.

3.    Dr. Rubin's Motion Must Be Denied

Dr. Rubin begins his argument by citing C.G.S. § 52-184c and contending that Dr. Breggin is unqualified to testify because he is not a "similar health care provider."[86]

Under that statute, Dr. Breggin must testify as to the prevailing professional standard, which is "that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers."[87]  Because Dr. Breggin is not board-certified in pediatrics, the plaintiffs must

_____

[86]    See "Defendant L. Robert Rubin, M.D.'s Memorandum of Law in Support of His Motion to Preclude Plaintiffs' Expert, Peter Breggin, M.D." ("Dr. Rubin's Expert Motion"), page 4.

[87]    See C.G.S. § 52-184c(d).

demonstrate to this Court that he "possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide expert testimony as to the prevailing professional standard of care [exhibited by providers similar to Dr. Rubin]" in order to qualify Dr. Breggin to testify against the doctor defendants in this case.[88]

Dr. Breggin clearly possesses great expertise in child psychiatry and child psychopharmacology, two fields of medicine that are intimately related to the aspect of pediatrics that involves the prescribing of stimulant drugs. There is no dispute that, in specializing in the treatment of children and their families and sub-specializing in clinical psychopharmacology, he has acquired specialized knowledge in the area of the prescription of stimulants to children.[89] Moreover, he has possessed this expertise for nearly forty years. Furthermore, he has authored a great number of peer-reviewed articles about the diagnosis and treatment of children and written a number of well-known books in the areas of his specialty, including The Ritalin Fact Book. Dr. Breggin is frequently consulted in his areas of expertise, with entities as diverse as the FDA, the American Psychological Association, and the Harvard School of Education having sought his counsel. If anything, Dr. Breggin has more expertise regarding the prescription of Ritalin than Dr. Rubin does. He is clearly qualified to testify against Dr. Rubin.

Thus, Dr. Rubin's argument in this regard fails.

Dr. Rubin concludes his argument by contending that Dr. Breggin's opinions regarding the nature and extent of Travis's injuries are scientifically unsound because they are based

---

[88] See C.G.S. § 52-184c(a).

[89] Interestingly, Dr. Breggin worked with Benjamin Spock, M.D. at the beginning of his career. See Excerpts from the deposition of Dr. Breggin, attached to Dr. Rubin's Expert Motion as Exhibit A, pages 92-93.

entirely on "subjective assessments, speculation and conjecture."[90]  There is no merit to this contention.  Dr. Breggin's opinions are patently "based upon sufficient facts or data,"[91] namely the facts and data contained in the numerous pharmacy, medical, and school records, the medical and psychological reports, and the documents generated since the commencement of suit, which provide an ample basis for his conclusions regarding causation.  Although his opinions regarding causation are his own, this is perfectly allowable.   In coming up with them, he has reviewed sufficient facts or data, namely the above mentioned documents, he has employed reliable principles and methods, carefully applying the principles that are set forth in his peer-reviewed article on the side effects of stimulants such as Ritalin, and he has applied those principles and methods to the facts of this case in a reliable manner, concluding, by comparing the side effects that befell Travis to the side effects that normally befall individuals who are put on stimulants, that the stimulants that the doctor defendants prescribed caused Travis to experience the side effects in question.  As such, his opinion on causation passes muster under Rule 702 and Daubert.[92]

Thus, Dr. Rubin's argument in this regard fails as well, and his motion must be denied.

4.    The Motion Brought by Drs. Alshansky and Kreminitzer Must Be Denied

Like Dr. Rubin, Drs. Alshansky and Kreminitzer begin their argument by citing C.G.S. § 52-184c and contending that Dr. Breggin is unqualified to testify because he is not a "similar health care provider."[93]  For the reasons stated above, this argument fails.

---

[90] See Dr. Rubin's Expert Motion, pages 7-9.

[91] See Fed. R. Evid. 702.

[92] See generally Fed. R. Evid. 701-703.

[93] See "Defendants' Alshansky's and Kreminitzer's Motion to Disqualify Plaintiff's Expert, Dr. Peter Breggin" ("Other Doctors' Expert Motion"), pages 4-6.

Those doctors then contend that "Dr. Breggin's theory of causation related to permanent harm is based entirely on speculation" and is therefore inadmissible under <u>Daubert</u>.[94]  According to them, "[t]here is no evidence to support Dr. Breggin's opinion that [their] limited participation of two visits ... and the limited amount of trial medication actually ingested at the tail end of his treatment had any [e]ffect whatsoever on his educational course" and "Dr. Breggin is not qualified to offer the opinion that any diagnosis or alleged misdiagnosis resulted in any change of [Travis's] educational course."[95]

In so arguing, Drs. Alshansky and Kreminitzer are implicitly contending that Dr. Breggin's testimony is infirm because he cannot completely separate the harm caused by Dr. Rubin and Drs. Alshansky and Kreminitzer.  This argument fails because it is not Dr. Breggin's burden, and not the plaintiffs' burden for that matter, to apportion the harm caused by Dr. Rubin, on the one hand, and Drs. Alshansky and Kreminitzer, on the other hand.  That burden must be borne by the doctor defendants.[96]  This being so, if Dr. Breggin's testimony regarding causation and damages is sound as to Dr. Rubin, and it is, then it follows that it is sound as to Drs. Alshansky and Kreminitzer.

Thus, the motion brought by Drs. Alshansky and Kreminitzer must be denied.

## II.    THE SCHOOL DISTRICT DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT MUST BE DENIED

In their motion for summary judgment, the School District defendants advance a hodgepodge of arguments going to the merits of the plaintiffs' claims.  Whereas a few of the

---

[94] <u>See</u> Other Doctors' Expert Motion, pages 6-8.

[95] <u>See</u> Other Doctors' Expert Motion, page 6.

[96] <u>Cf.</u> <u>Reilly v. DiBianco</u>, 6 Conn. App. 556, 507 A.2d 106 (1986) (analogous case observing that "the burden of proof as to ... apportionment is upon [an] actor").

District's minor objections to the plaintiffs' Complaint are well-placed, all of their major contentions fail, and the motion must therefore be denied in substantial part.

    1.    <u>The Statute of Limitations Does Not Bar The Plaintiffs' Claims</u>

The District first argues that "[t]he plaintiffs' negligence and negligent infliction of emotional distress claims against the [District], as well as the plaintiffs' malpractice claim against [Ms.] Rositano, are barred by the applicable two-year statute of limitations" and that "[t]he plaintiffs' remaining claims against the [District] are barred by a three-year statute of limitations period."[97]

This argument fails.  Negligence and malpractice claims are governed by C.G.S. § 52-584, which provides that "[n]o action to recover damages for injury to the person ... caused by negligence ... or ... malpractice ... shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years of the act or omission complained of ... ."[98]  C.G.S. § 52-577 provides for a three-year statute of limitations for most other claims.[99]

The continuing course of conduct doctrine, however, tolls the running of the statute of limitations contained in §§ 52-584 and 52-577 in a number of instances.[100]  This doctrine was recently summarized by the Appellate Court of Connecticut as follows:

---

[97] <u>See</u> "Memorandum of Law in Support of School Defendants' Motion for Summary Judgment" ("District's Summary Judgment Brief"), pages 11-12.

[98] <u>See</u> C.G.S. § 52-584.

[99] <u>See</u> C.G.S. § 52-577.

[100] <u>See, e.g.</u>, <u>Sanborn v. Greenwald</u>, 39 Conn. App. 289, 295-96, 664 A.2d 803 (1995).

> When the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed.  ...  [I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong.  ...  Where [our Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. ...
>
> "The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied.  ... For example, the doctrine is generally applicable under circumstances where [i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury or where the negligence consists of a series of acts or omissions and it is appropriate to allow the course of [action] to terminate before allowing the repose section of the statute of limitations to run[.]"[101]

In this case, the plaintiffs are suing the District as the result of a course of conduct that began around March of 1998 when Ms. Rositano rendered her report and ended, at the very earliest, in April 2001 when Travis saw Dr. Kreminitzer for more medication at the District's behest.  The plaintiffs commenced suit in March 2003, less than two years after that event.  As such, applying the continuing course of conduct doctrine, the plaintiffs' case was timely filed.

2.    The Plaintiffs Concede That There Is No Individual Liability Under Section 504 and the ADA

The District next alleges that the plaintiffs' claims against the individuals who allegedly violated Section 504 and ADA must be dismissed because neither of those statutes provide for

---

[101] See, e.g., Navin v. Essex Sav. Bank, 82 Conn. App. 255, 260-61, 843 A.2d 679, 683-84 (2004).

"individual capacity suits."[102]  The District is correct in this limited regard.[103]  The plaintiffs filed

suit against these individuals because a school district only acts through its agents, and those

agents were therefore named in the Complaint.[104]

>    3.     The District's Argument That The Plaintiffs Failed To Exhaust Their
>           Administrative Remedies Fails

This Court need not labor long on the District's argument that the plaintiffs failed to

exhaust their administrative remedies prior to filing this suit.[105]

As the Second Circuit recently made clear in Polera v. Board of Educ. of Newburgh

Enlarged City School District,

>    [a]lthough the IDEA provides for a federal cause of action
>    to enforce such rights, it imposes a broadly applicable requirement
>    that plaintiffs first exhaust administrative remedies:
>
>    Nothing in this chapter shall be construed to restrict or limit
>    the rights, procedures, and remedies available under the
>    Constitution, the Americans with Disabilities Act of 1990 [42
>    U.S.C. § 12101 et seq.], title V of the Rehabilitation Act of 1973
>    [29 U.S.C. § 791 et seq.], or other Federal laws protecting the
>    rights of children with disabilities, except that before the filing of a
>    civil action under such laws seeking relief that is also available
>    under this subchapter, the procedures under subsections (f) and (g)

---

[102] See District's Summary Judgment Brief, pages 13-14.

[103] See, e.g., Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98, 107 (2d Cir. 2001)
(providing); see also Tomka v. Seiler Corp., 66 F.3d 1295, 1313, 1317 (2d Cir. 1995).

[104] Similarly, the plaintiffs cannot quibble with the District's argument that "Section 504
itself contains no procedural rights, nor guarantees them."  See District's Summary Judgment
Brief, pages 19-20; see also Americans With Disab. Pract. & Compliance Manual §§ 1:208
(2005).  Finally, the plaintiffs take no issue with the District's argument that "Connecticut
General Statutes § 10-76b-4 does not provide for a private cause of action."  See District's
Summary Judgment Brief, page 52.

[105] Indeed, if the District truly believed that the plaintiffs had failed to exhaust their
administrative remedies, they would have filed a motion to dismiss under Fed. R. Civ. Pro.
12(b)(1) at the outset of this case.

of this section shall be exhausted to the same extent as would be
required had the action been brought under this subchapter.[106]

Here, the plaintiffs are essentially suing the District because it required him to be
medicated in violation of the ADA and Section 504, not because it failed to come up with an
appropriate IEP in contravention of the IDEA, which was dealt with separately before the
Connecticut Department of Education.

In any event, the plaintiffs did exhaust their administrative remedies as regards the claims
in question.  As was made clear above, the only administrative remedies available to the
plaintiffs were those adopted by the District pursuant to Section 504.  When the plaintiffs
inquired as to what procedures were in place, they were advised that they must file a "grievance"
with the District.  They did so.  The District then supposedly conducted an investigation and
found that no discrimination was present.  The plaintiffs, utilizing the appellate procedure
adopted by the District, appealed to the Board.  The District refused to hold any due process
hearing pursuant to Section 504, and the plaintiffs were powerless to compel the District to
conduct such a hearing.

Thus, to the extent that they were required to do so, the plaintiffs exhausted all of their
administrative remedies prior to their filing of this lawsuit.

4.     The District's Argument That The Plaintiffs Have Failed To State A Claim Under
       Section 504 or the ADA Fails

The District's next argument is that in order to state a claim for violations of the disability
laws, the plaintiffs must demonstrate bad faith on the part of the District.[107]  To the extent that

---

[106] See, e.g., Polera v. Board of Educ. of Newburgh Enlarged City School Dist., 288 F.3d
478, 483 (2002) (citation omitted) (emphasis added).

[107] See District's Summary Judgment Brief, pages 16-19.

this argument is even timely,[108] it fails.  Section 504 is designed to eliminate discrimination on the basis of disability.[109]  The regulations implementing it provide that "[n]o qualified handicapped person shall, on the basis of handicap, ... be subjected to discrimination."[110]  A "handicapped person" is defined as, among other things, a person suffering from a "mental impairment which substantially limits one or more major life activities," and "mental impairment" including "learning disabilities" and "major life activities" including learning.[111]  In some Circuits *other* than the Second Circuit, "a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment."[112]

The record in this case is replete with facts upon which a jury could conclude that the District and its agents acted with bad faith or gross misjudgment.  Indeed, if they credit the plaintiffs' testimony that the District lazily required them to put Travis on stimulants in order to attend school there, rather than take any meaningful steps to deal with Travis's real difficulties, a jury could come to no other conclusion.  Thus, the District's argument fails.

5.    The District's Argument That The Plaintiffs' 42 U.S.C. § 1983 Claim Is Not Legally Sound Fails

The District spends nearly ten pages discussing the Fourteenth Amendment and why, in its view, the plaintiffs' claims under the Fourteenth Amendment and the disability laws, as

---

[108] See Fed. R. Civ. Pro. 12(b) (providing that "[a] motion making any of these defenses shall be made before pleading if a further pleading is permitted").

[109] See 34 C.F.R. §§ 104.1, 104.3(k)(2)(i).

[110] See id. § 104.4(a).

[111] See id. §§ 104.3(j)(1); 104.3(j)(2).

[112] See, e.g., Monahan v. Nebraska, 686 F.2d 1164, 1170 (8th Cir. 1982) (cited by the District).  The plaintiffs' research reveals that the Second Circuit has not ruled on the issue.

incorporated by 42 U.S.C. § 1983, fail.[113]  To the extent that this argument is timely,[114] it fails, as the plaintiffs have clearly stated claims under 42 U.S.C. § 1983.

It is well-established that "[f]orcing children to take medication such as Ritalin for the sole purpose of controlling disruptive behavior in school violates their constitutionally protected liberty interest in privacy and bodily integrity, as well as their right to an education pursuant to federal law."[115]  Indeed, "[i]n the absence of a compelling state interest, an individual has the right to be free from the administration of unwanted psychotropic medication ... pursuant to the rights of privacy and bodily integrity."[116]  One court has gone as far as expressly holding that a child's "right to a free appropriate public education [cannot] be premised on the condition that he be medicated without his parents' consent."[117]  Thus, the District's protestations notwithstanding, the plaintiffs have stated claims under 42 U.S.C. § 1983.

6.    The District's Argument That The Plaintiffs' Connecticut State Constitution Claim Is Not Legally Sound Fails

The District then devotes its attention to its argument that the plaintiffs have failed to state a claim under the Connecticut State Constitution.[118]  To the extent that this argument is

---

[113] See District's Summary Judgment Brief, pages 20-28.

[114] See Fed. R. Civ. Pro. 12(b).  Furthermore, because the District is making the argument that the plaintiffs have failed to state a claim, it must be inferred that the School District defendants' actions were not objectively reasonable.

[115] See Komoroski, 11 B.U. Pub. Int. L.J. at 100 (citations omitted); see also James C. O'Leary, Note, An Analysis of the Legal Issues Surrounding Forced Use of Ritalin: Protecting a Child's Right to "Just Say No," 27 New Eng. L. Rev. 1173 (1993) (citations omitted).

[116] See id. at 106 (citations omitted).

[117] See id. at 101-02 (citing Valerie J. v. Derry Coop. Sch. Dist., 771 F. Supp. 483 (D.N.H. 1991)).

[118] See District's Summary Judgment Brief, pages 29-31.

timely,[119] it fails.  Nearly ten years ago, the Connecticut Supreme Court determined that the Connecticut Constitution provides private individuals with a claim for violations of their right to a free and appropriate public education without discrimination.[120]

>    7.    The District's Arguments Regarding Immunities Fail

The District proceeds to advance over ten pages worth of argument with regard to various immunities that various defendants allegedly enjoy.[121]  Its arguments fail.

The District first argues that the School District defendants enjoy sovereign immunity vis-à-vis Count One, for negligence, Count Two, for malpractice, Count Seven, for intentional infliction of emotional distress, and Count Eight, for negligent infliction of emotional distress. In so arguing, it only cites case law tending to show that the *Board*, rather than *all of the School District defendants*, are entitled to immunity from the claims that are set forth in Counts One, Two, Seven, and Eight.  Thus, whereas the Board may be entitled to sovereign immunity with regard to those counts, the remaining School District defendants are not.

The District then argues that the School District defendants enjoy governmental immunity from those Counts because their actions were discretionary, and discretionary actions cannot give rise to liability on its part.  The District's argument fails, however, as the "exception

---

[119] See Fed. R. Civ. Pro. 12(b).  Furthermore, because the District is making the argument that the plaintiffs have failed to state a claim, it must be inferred that the School District defendants' actions were not objectively reasonable.

[120] See Sheff v. O'Neill, 238 Conn. 1, 678 A.2d 1267 (1996).  In Sheff, the Court considered the issue of whether the non-moving party had "stated a case for relief under our state constitution, which was amended in 1965 to provide both a right to a free public elementary and secondary education; Conn. Const., art. VIII, § 1; and a right to protection from segregation. Conn. Const., art. I, § 20."  See id. at 24, 678 A.2d at 1281.  The Court was "persuaded that a fair reading of the text and the history of these amendments demonstrates a deep and abiding constitutional commitment to a public school system that, in fact and in law, provides Connecticut schoolchildren with a substantially equal educational opportunity."  See id.

[121] See District's Summary Judgment Brief, pages 32-43.

to liability ... carved out for discretionary acts [only applies] as long as they were not performed maliciously, wantonly or in an abuse of discretion."[122]  It is a jury's function, rather than this Court's function, to determine whether or not the District's actions were performed "maliciously, wantonly or in an abuse of discretion" so as to defeat the District's right to governmental immunity, and therefore those issues are not ripe for disposition.

This being so, the District's argument in this regard fails.

8.      The District's Arguments Regarding The Plaintiffs' Negligence and Malpractice Claims Against The School District Defendants Fail

The School District defendants proceed to rehash their argument regarding Dr. Breggin in the guise of the argument that "the plaintiffs cannot establish negligence or malpractice against [them] absent expert testimony."[123]  As the plaintiffs have presented expert testimony as to the negligence and malpractice of the School District defendants, this Court need not resolve whether or not this is a correct statement of the law.

9.      The Plaintiffs Have Clearly Stated a Claim for Intentional Infliction of Emotional Distress

The District's final argument of substance is that the plaintiffs have failed to state a claim for intentional infliction of emotional distress ("IIED").  As correctly stated by the District, a plaintiff alleging IIED must prove four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of

---

[122] See Gordon v. Bridgeport Housing Auth., 208 Conn. 161, 166 544 A.2d 1185, 1189 (1988).

[123] See District's Summary Judgment Brief, pages 43-46.  Although the School District defendants also argue that the plaintiffs do not state a claim for "educational malpractice," they are not attempting to; rather, their claim in this regard is for statutory violations and that failure to provide a free and appropriate public education effectively discriminated against Travis because he was thereby unable to benefit from his education in the manner that non-disabled children would have been able to.

his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."[124]  Here, the jury could easily find that the District knew or should have known that forcing Travis to take stimulant medications would cause him the emotional distress that he alleges he suffered.  Moreover, the District's conduct was extreme and outrageous.  As was recently pointed out,

> [f]rom the beginning of time, little boys have been impulsive, hyperactive, and distractible.  Until recently, these behaviors have not been perceived by educators as constituting a "behavioral disorder" warranting such extreme action as compulsory medication.  The modern trend to medicate children for administrative convenience in schools is alarming.  An exorbitant amount of children in the United States have been diagnosed with ADD and ADHD, often from checklists provided to teachers by the school district, with little or no contact with the medical personnel who prescribe drugs to treat this behavioral problem.  ...[125]

Furthermore, the facts of this matter clearly support a jury finding regarding causation and severity.

This being so, the District's motion in this regard must be denied.

10.    Conclusion

For the foregoing reasons, except as noted, the District's motion must be denied.

## II.    DR. ALSHANSKY AND KREMINITZER'S MOTION FOR SUMMARY JUDGMENT MUST ALSO BE DENIED

In their motion for summary judgment, Drs. Alshansky and Kreminitzer advance two main arguments going to the merits of the plaintiffs' claims against them: (1) their claims against

---

[124] See, e.g., Petyan v. Ellis, 2000 Conn. 243, 253, 510 A.2d 1337 (1986).

[125] See Komoroski, 11 B.U. Pub. Int. L.J. at 120.

Dr. Alshansky are barred by the statute of limitations; and (2) the plaintiffs' claims are not properly cognizable against them in federal court.[126]   Because neither of these arguments succeed, the motion must be denied.

    1.    The Statute Of Limitations Does Not Bar The Plaintiffs' Claims Against Dr. Alshansky

According to Dr. Alshansky,

> [b]ased on the undisputed facts in this case, and the law in Connecticut, there is no issue of material fact regarding the time bar of the Statute of Limitations.  This is a medical malpractice action.  The alleged wrongful conduct occurred in 2000 when Dr. Alshansky evaluated and recommended medication for the minor plaintiff.  The family made a decision to discontinue treatment with Dr. Alshansky on December 4, 2000.  ...  Allegedly actionable harm was present immediately after ingesting the medication documented clearly by deposition testimony of Travis' parents and in the medical records.  The Complaint was filed on March 19, 2003, far more than two years after the alleged injury occurred, and well over two years after "actionable harm" was or should have been discovered.  This is several months beyond the two-year limitation period provided for medical malpractice actions in C.G.S. § 52-584.[127]

As previously stated, however, C.G.S. § 52-584 provides that "[n]o action to recover damages for injury to the person ... caused by ... malpractice ... shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years of the act or omission complained of ... ."[128]   In other words, suit on an

---

[126] See generally "Memorandum Of Law In Support Of Motion For Summary Judgments As To Defendants Anna Alshansky, M.D. & Martin Kreminitzer, M.D." ("Doctors' Summary Judgment Motion").

[127] See Doctors' Summary Judgment Motion, pages 9-10.

[128] See C.G.S. § 52-584.

injury that was occasioned by malpractice must be brought within two years of the malpractice unless the fact that there was wrongdoing was not discovered at the time and should not have been discovered at the time of the malpractice, in which case suit can be brought within three years of the malpractice.

In this case, the plaintiffs were not aware of the fact that Travis did not have ADHD, and therefore should not have been given Adderall and Dexedrine by Dr. Alshansky, until Drs. Thies and Schwartz rendered their reports in 2002. Thus, the Complaint, which was filed within three years of December 2000, was timely.

    2.    The Argument That "Neither Of These Defendants Should Be Sued In Federal Court" Fails

Drs. Alshansky and Kreminitzer then argue that this Court should not exercise supplemental jurisdiction over the plaintiffs' claims against them.[129]

This Court has previously considered, and rejected, the argument that there is no subject matter jurisdiction over the plaintiffs' claims against Travis's doctors. Specifically, on or around June 26, 2003 and August 8, 2003, the doctor defendants filed motions to dismiss the Complaint for lack of subject matter jurisdiction, advancing the same arguments advanced now. The Court held oral argument on the motions or around October 21, 2003. On January 30, 2004, the Court entered an Order denying the motions. This Order constitutes the law of this case, and Drs. Alshansky and Kreminitzer are precluded from re-litigating the issues that were resolved thereby.[130]

---

[129] See Doctors' Summary Judgment Motion, pages 11-17.

[130] See, e.g., Waterbury Equity Hotel, LLC v. City of Waterbury, 85 Conn. App. 480, 85 A.2d 269, 265 (2004) (observing that in endorsing the application of the law of the case doctrine in the Connecticut courts, "our Supreme Court has recognized that [a] judge should hesitate to

## <u>CONCLUSION</u>

The defendants' desire to deprive the plaintiffs of their day in court notwithstanding, their

motions must be denied.  Their conduct was, indeed, alarming.

Dated: <u>Wednesday, October 19, 2005</u>

s/Alan C. Milstein
Alan C. Milstein, CT03703
Michael Dube, PHV0216
Sherman, Silverstein, Kohl,
Rose & Podolsky, P.A.
Fairway Corporate Center
4300 Haddonfield Road, Suite 311
Pennsauken, NJ 08109
Telephone: 856-662-0700
Facsimile: 856-488-4744
EMail: AMilstein@sskrplaw.com and
MDube@sskrplaw.com

Deborah G. Stevenson, Esquire
226 Flag Swamp Road
Southbury, CT 06488
Telephone: 860-354-3590
EMail: Dgs31@yahoo.com

*Attorneys for the Plaintiffs*

---

change his own rulings in a case and should be even more reluctant to overrule those of another
judge").