COPY

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3    - - - - - - - - - - - - - - - - - - - - - -

4    MATTHEW AND CINDY MYSLOW, ET AL,

5                          Plaintiffs,

6        -against-

7    NEW MILFORD SCHOOL DISTRICT, ET AL,

8                          Defendants.

9    - - - - - - - - - - - - - - - - - - - - - -

10        A Video Conference Deposition held at 326 Garden

11    Avenue, Cornell University, Ithaca, New York, on the

12    30th day of November, 2004, commencing at 10:40 AM.

13

14            BEFORE:   CZERENDA COURT REPORTING, INC.

15                      71 State Street

16                      Binghamton, New York 13901-3318

17                      KEVIN CALLAHAN

18                      Shorthand Reporter

19                      Notary Public

20                      Binghamton - (607) 723-5820

21                                (800) 633-9149

22

23

24    WITNESS:   PETER R. BREGGIN, M.D.

61

Peter Breggin by Ms. Powell

1    matter of your testimony?

2        A.    Yes.

3        Q.    Are you attempting to testify as to the

4    negligence of school personnel in this case?

5        A.    Well, I've been really asked to testify

6    concerning the New Milford public schools and their

7    general approach to the child.

8            I was not -- there wasn't a lot of

9    emphasis put on my attempting to evaluate the

10   behavior of any one individual, though in a few cases

11   where individual behavior stood out as being

12   particularly egregious I noted it and remarked on it,

13   but the general impression I had was that I was to

14   speak most specifically about the school district

15   itself.

16           Along the way, I noted the behavior of a

17   couple of the teachers and in my followup report.

18   And in the original report I particularly talked

19   about the behavior of the individual who wrote the

20   original report that went to the doctor, Josephine

21   Rositano.  And later on I commented in particular on

22   the behavior of Jeanann Paddyfote and I commented on

23   the letter of someone who the father identified as a

24   parateacher, assistant teacher, Bonnie, but my

62

Peter Breggin by Ms. Powell

1    emphasis was on the school district much as the

2    emphasis in the State of Connecticut's Department of

3    Education hearing, Mangs.

4        Q.    So, you are planning on testifying as to

5    the negligence of the school district?

6        A.    Yeah, the school itself, the school itself

7    and its treatment of the boy.  But the school's

8    constantly referred to as the school district in the

9    legal docs, but I'm going to refer to what was done

10   to him in school that was inappropriate by the

11   members of the teams and the teachers and what

12   effects that had on him.  But that is part of the

13   school district, as well, but those are legal issues

14   that I haven't been informed about and that I may not

15   be able to clarify.

16       Q.    All right.

17       A.    Actually, the term is better system, the

18   New Milford School System, rather than district would

19   be, I think, a better legal term.

20       Q.    So, you're planning on testifying as to

21   the negligence of the school system?

22       A.    Yes.

23       Q.    Tell me what standard you're applying to

24   figure out whether the school meets or doesn't meet

63

Peter Breggin by Ms. Powell

1  that standard.

2      A.   Well, one of the most basic standards is

3  whether or not they're practicing medicine without a

4  license.  I'm familiar with what medicine is and what

5  education is.  I know that later on the Connecticut

6  Legislature, I think it's after this, perhaps in part

7  in response to some of my own work, made it clear

8  that teachers aren't supposed to be talking about

9  medication with parents and encouraging it.  I mean,

10 that's a part of it.

11         A part of this standard is that -- the

12 standards of the IDEA and, you know, concerning the

13 fact that you're supposed to provide a child with an

14 education and not cover up that failure by medicating

15 the child and that you're supposed to -- one of the

16 standards is you're supposed to do a complete

17 evaluation of the learning disorders that a child has

18 and addresses those learning disorders.

19         These standards are common to all school

20 districts.  And they begin with the federal

21 government and Department of Education; but they

22 usually, and in this case from what I can understand,

23 are reinforced by the laws of the state.

24         And in many ways some of what I'm basing

Peter Breggin by Ms. Powell

64

1   this on is simply the same conclusions that Mangs

2   came to only I'm adding to it the practicing medicine

3   throughout the school system without a license and

4   pressuring the parents to do things they didn't want

5   to do, coercion.

6       Q.   So, relying on the hearing officer's

7   decision as to whether the school met the

8   requirements of the IDEA?

9       A.   No.  Not particularly, no.  I'm saying

10  that many of the conclusions I come to are similar.

11      Q.   All right.  What standards are you using

12  to figure out whether the school district complied

13  with the IDEA?

14      A.   Well, the standards of the IDEA say that

15  you have to provide an adequate education to a child

16  and in that process you have to completely evaluate

17  the child in terms of the child's learning

18  disabilities or have the child evaluated in some way

19  privately if you're not going to do it and that you

20  have to meet that child's needs as a part of

21  providing education that's required of the child,

22  that's needed by the child.

23      Q.   What definition of practicing medicine are

24  you using?

Peter Breggin by Ms. Powell

1          A.    A diagnosing and medication -- diagnosing

2    mental disorders and suggesting treatments.

3          Q.    Suggesting treatment?

4          A.    Yes, treatments, specific treatments.    In

5    this case medication and doing it in an environment

6    that's coercive.    It's inherently coercive because

7    the parents, of course, are going to be intimidated.

8          Q.    All right.    Did you determine whether any

9    of the school defendants or any of the school

10   personnel were practicing medicine without a license?

11         A.    Yep.

12         Q.    Who?

13         A.    Rositano.

14         Q.    All right.    And how did she do that?

15         A.    Well, I'll get into some detail, then.    Do

16   you want me to start doing that?

17         Q.    Yeah.    I need to know what evidence you're

18   relying on to testify that Miss Rositano was

19   practicing medicine without a license.

20         A.    Well, I need to refer to -- in my report.

21   Do you want me to elaborate?    I'll have to take a

22   minute and pull out her report that was taken to

23   Dr. Rubin.    Let me see what's in my report for you.

24               In the report I point out that, first of

Peter Breggin by Ms. Powell

1    all, one of her mistakes that she had was to

2    completely miss the red flag for dyslexia and/or

3    inadequate teaching because the child met the

4    criteria for a dyslexia in regard to having an

5    average or above average IQ and poor performance in

6    the specific area of reading that fell below that

7    expectation and below grade level.

8                    MS. CALLAHAN:    Are you referring

9            to a specific page in your report,

10           Doctor?

11                   THE WITNESS:    Yes.  I'm looking

12           at page 6 just to remind myself.

13       Q.    And so, Miss Rositano missing a diagnosis

14   of dyslexia means she's practicing medicine without a

15   license?

16       A.    No.  I'm starting from the beginning and

17   looking at what she did that was negligent as a

18   school psychologist evaluating the patient, and I do

19   know something about school psychologists as a member

20   of the American Psychological Association.  She is

21   missing the diagnosis, presumptive diagnosis, of

22   dyslexia and saying instead, quote, The result also

23   includes a child with characteristics of an attention

24   deficit disorder combined type and comorbid

Peter Breggin by Ms. Powell

1    oppositional disorder.  That's a school psychologist

2    making a psychiatric diagnosis.

3         Q.   So, she would be qualified to diagnose

4    dyslexia but not qualified to diagnosis ADHD?

5         A.   Well, she shouldn't be doing it in this

6    manner.  She's not qualified necessarily to diagnose

7    ADHD and shouldn't be doing it -- it's a diagnosis

8    where she's encouraging the use of medication because

9    she knows this is likely to lead to medication and

10   gives a referral specifically advising for this thing

11   to be taken to Dr. Rubin and she's basically acting

12   as a pressure conduit here.  She's acting as a

13   coercive force to get the child into the medical

14   system for medication.

15        Q.   And you know that just because she made

16   the referral?

17        A.   Well, from the nature of the write-up

18   where she is not emphasizing what the school needs to

19   do, which is look at the dyslexia that is -- or

20   inadequate teaching, that the reading issue -- I

21   mean, even if you have a poor reader, you have a

22   child who is not going to do well in school, going to

23   be trouble in school, anxious in school.  That's your

24   fundamental issue with this child and going to be the

68

Peter Breggin by Ms. Powell

1  fundamental issue with anybody who is being promoted

2  without being taught to read.

3          And she misses this or doesn't want to

4  address it because it requires work on the part of

5  the school and instead she gives a psychiatric

6  diagnosis.  She's a school psychologist, should be

7  focusing on the school issues, and sends the child

8  basically for medication to the pedestrian and tells

9  the mother and puts in the report, take this thing to

10  the doctor.

11          Q.   All right.  In your opinion, is Miss

12  Rositano qualified to diagnose dyslexia?

13          A.   She's certainly qualified enough to say,

14  this could be dyslexia and what we should focus on.

15  Maybe she's not qualified to do that, either.  She

16  doesn't act like she is, but she should be.  It's a

17  requirement for her to be able to say, we need to

18  look at the issue of his reading and his dyslexia.

19  I'm a school psychologist.  I know that when a child

20  can't read and especially when the child has an IQ

21  that's capable of reading that we have either what is

22  called dyslexia or more likely nobody ever taught the

23  child to read.  And that's the fundamental thing she

24  could determine.

69

Peter Breggin by Ms. Powell

1              Whether she has the skill, she looks to me

2    like -- I don't know whether she has the skill or

3    not.  She certainly doesn't display the skill to

4    diagnosis dyslexia.  That should be her job.  Either

5    diagnose it or say, this is what we need to do.  We

6    need to evaluate.  Under IDEA we have to provide that

7    child an adequate --

8              In this case we don't know if it's a

9    learning disability.  We know the child is not

10   reading and not reading badly, stagnant.

11        Q.   Your opinion is that Miss Rositano should

12   have suggested dyslexia as a possible problem?

13        A.   That she should, yes, she should have

14   had -- she should have raised the whole issue of this

15   child can't read.  We have to evaluate this.  If I'm

16   incapable of it, then we'll get somebody else in to

17   evaluate.

18              This child is not reading.  Of course, the

19   child is going to have all kinds of behavioral

20   issues.  You don't diagnose ADHD when there's

21   something else going on like the inability to read.

22   By diagnosis ADHD is a diagnosis of exclusion.  So,

23   if she feels competent to diagnosis ADHD, she's

24   missing the point.

Peter Breggin by Ms. Powell

1        Q.    What's your authority that the diagnosis

2    of ADHD is a diagnosis of exclusion?

3        A.    DSM 4.

4        Q.    So, it's your opinion that Miss Rositano

5    should have suggested that Travis be evaluated by his

6    pediatrician?

7        A.    She definitely should not at this point

8    have suggested a diagnosis of ADHD requiring the

9    intervention of a pediatrician, no.  She should have

10   looked at the child and said, mom, school, we have a

11   child who can't read.  Let's figure this out.

12       Q.    And what should she have done after that?

13       A.    Well, what eventually happened with the

14   parents, you know, going into severe conflict with

15   the school system is that they went to a school that

16   could teach the child to read, apparently.

17       Q.    She should have recommended that they go

18   to a different school?

19       A.    We don't know at that point.  What she

20   needs to do at that point is say, the child can't

21   read.  Everything stops.  What is a school supposed

22   to do?  It is supposed to first and foremost teach

23   the child to read.  That it's.  That's the most basic

24   important skill that you can get for life out of

71

Peter Breggin by Ms. Powell

1    school.  If you can't read, you can't do most things

2    in this world.

3            To have a child who can't read, to pass

4    that child along without stopping and saying, our

5    first and primary problem is to understand why this

6    child isn't reading and to teach the child to read,

7    that's it.

8            To send the child off and concoct the

9    diagnosis of ADHD to a pediatrician is tantamount to

10   saying, parents, medicate the child, and tantamount

11   to telling the pediatrician, the school system wants

12   you to medicate the child.

13       Q.   That's not what she said?

14       A.   Well, she came very close.  She said, it's

15   ADHD.  We all know that almost all of those children

16   are going to get medicated if that's the diagnosis

17   and send them to the pediatrician.

18           She completely overlooked her primary

19   responsibility by the standards of common sense,

20   education, the purpose of schools, IDEA.  She

21   completely overlooked the most fundamental thing she

22   could do which is make sure that child's reading

23   problem is addressed and three years later gets

24   addressed.

72

Peter Breggin by Ms. Powell

1      Q.    Should she have not given him the ADHD

2    screening tests?

3      A.    At this point it's just not an issue to

4    jump ahead to ADHD.  At this point it is not an

5    issue.  The issue is:  I've got a child who clearly

6    hasn't progressed in reading.  Let's figure that

7    out.

8          Plenty of ADHD kids can read.  That's not

9    one of the criteria for ADHD, can't read.  This is a

10    shortcut.  This is getting the problem out of the

11    school and into the pediatrician's office for

12    medication.

13      Q.    All right.  So, Miss Rositano failed to

14    diagnose dyslexia?

15      A.    Well, I didn't say that.  You keep pinning

16    me down to one point that I'm not saying.  I'm saying

17    she failed to address the overall reading problem.

18    Maybe she's incapable of diagnosing.  She's,

19    obviously, incapable of diagnosing ADHD.  Maybe she

20    can't diagnose dyslexia.  I don't know.

21          I do know she didn't even address the

22    fundamental issue, and that's set in motion all of

23    the disasters that follow.  If that was the only

24    thing the school district did, that would have

75

Peter Breggin by Ms. Powell

1        Q.    Yep.

2        A.    -- the teacher C. Church is writing notes

3    to the mom.  Although she does not specifically

4    mention medication, she's clearly responding to his

5    having been started on medication a week before, and

6    the parents confirm that.  And she is really pushing

7    for how well he's doing especially in the mornings

8    when he's getting his Ritalin.  She is --

9        Q.    So, you don't think she actually thought

10   Travis was doing better?

11       A.    I think that she's just too eager to show

12   that the medication is the approach.  She's not

13   writing home saying, you know, we've got new reading

14   programs and he needs this new reading program and

15   we're going to teach him to read.  She's writing home

16   that he is, you know, really -- basically, he's an

17   easier kid since he's been started on the Ritalin.

18   And she didn't know what the effects of Ritalin are,

19   but she's, obviously, enthusiastic about it.

20            And then in the fourth grade Miss Coope,

21   she gets even more enthusiastic about it.  And I have

22   a bunch of quotes.  I can read them into the record.

23       Q.    I think we can probably mark the

24   chronology.

Peter Breggin by Ms. Powell

1        A.    I mean, she again --

2        Q.    Have you ever seen Travis when he's been

3    on medication?

4        A.    No.  Let me finish with one part of my

5    answer.

6        Q.    Sure.

7        A.    She even goes ahead and interrogates him

8    about whether or not he's taking his medication.

9    That's how much she's become the director of a mental

10   hospital ward.  She's interrogating him to get him to

11   say that -- finally that he didn't take his

12   medication.  That's on 4.

13       Q.    So, she's not supposed to check with him

14   whether he's taking his prescribed medication?

15       A.    A, it's not her job.  B, if she's

16   concerned about it, she should talk to the mother.

17   C, this is all part of pushing medication.  This

18   isn't about, did you forget your insulin this

19   morning, little Johnny?  This is about, have you had

20   your drugs today?  I don't like your behavior and --

21       Q.    Have you ever spoken to Mrs. Coope?

22       A.    -- and this is pushing the medication.

23             Maybe I should read this stuff into the

24   record.  On November 22, '99, she writes, Cindy,

77

Peter Breggin by Ms. Powell

1   there is a difference when he takes his med.  He's

2   able to control his behavior and able to complete

3   tasks.  I know it's tough for you to make an

4   evaluation of its effectiveness when you aren't here,

5   but I see a difference.

6           Now, she doesn't know what that difference

7   is.  She doesn't know what the effect is.

8       Q.   I think she's making an observation of his

9   behavior in the classroom.  And were you there to see

10  something different?

11              MR. BRASLOW:   I don't know that

12          he was finished.

13              Can you hear me?  I don't know

14          that you were finished with your answer,

15          Doctor.

16      Q.   We need to --

17      A.   I plan to read this whole thing into the

18  record, but I don't need to.

19      Q.   We have your notes.  We can mark them for

20  the record.

21          Did you ever observe Travis in the

22  classroom?

23      A.   No.  By the time I got to see him, he was

24  doing well in another school.  There was no point to

78

Peter Breggin by Ms. Powell

1  my -- I didn't need to see him because he was doing

2  better, by accounts, in regard to his school work.

3       Q.   You didn't even know Travis in 1999, is

4  that correct?

5       A.   That's right.  I said by the time I would

6  have gotten to see him, he was already doing well in

7  another school system.

8       Q.   All right.  So, you put down in your

9  chronology where you find fault with Mrs. M. Coope,

10  is that correct --

11       A.   That's correct.

12       Q.   -- on pages 2 and 3?

13       A.   Yes.

14       Q.   And was Miss Coope engaging in the

15  practice of medicine without a license, in your

16  opinion?

17       A.   In my opinion, she was, but it's not my

18  main criticism.  The main criticism is that she's

19  pushing drugs and not doing her job as a teacher.

20  Instead of saying, your son can't read, your son

21  can't read, your son can't read, this is what we need

22  to do, she would have done a lot better if she got on

23  the phone and said, let's push the school board to

24  provide some reading services to your son.  She was

79

Peter Breggin by Ms. Powell

1    getting --

2         Q.   She --

3         A.   She was getting some service, but they

4    weren't working.   Excuse me.

5         Q.   She should have ignored Travis' behavior?

6         A.   No.   She should report the behavior to the

7    mom.

8         Q.   All right.   So, it's okay to report the

9    behavior to the mother?

10        A.   Certainly, it's not okay to push the drug

11   as the solution.   What she doesn't know -- for

12   example, she says, in effect, that she can see the

13   difference when he's on the drug.   Does she know

14   whether he's on withdrawal?   Does she know that the

15   drug is working by, in fact, suppressing the central

16   nervous system so he's a quieter child?   She didn't

17   know, but she is encouraging the medication and,

18   obviously, against the mom's wishes.   She's making

19   that clear.

20        Q.   All right.   Fine.   What other school

21   personnel did you find fault with?

22        A.   Dr. Paddyfote.

23        Q.   What did she do?

24        A.   Well, through various communications she

Peter Breggin by Ms. Powell

1    paints a picture of the child which is unrealistic

2    and which is calculated to push a doctor into

3    diagnosing a psychiatric disorder in the child.  For

4    example, to say that the child is unable to sustain

5    attention yesterday for more than two minutes at a

6    time, end quote, was never, never shown anywhere.

7    But it's a -- it's like a condemnation that says, you

8    better diagnosis this child with ADHD and do

9    something about it because the child can't pay

10   attention to anything more than two minutes.  That's

11   just not true.

12          What happened to the child, as was

13   demonstrated clearly when he was actually evaluated

14   by Dr. Neu, is that the child would get frustrated

15   and upset when he couldn't read, write or spell.

16        Q.   And so, did you know how long Travis could

17   sustain his attention in November of 2000?

18        A.   Well, many occasions at home, going to the

19   movies, eating dinner, playing, he had normal

20   attention when we know that in school he had sporadic

21   problems when -- of frustration when he had to

22   confront problems with reading, writing and

23   spelling.  Those were his areas that he had never

24   been taught.

81

Peter Breggin by Ms. Powell

1      Q.    Do you know why Mrs. Paddyfote wrote that
2  letter?
3      A.    Oh, yeah.  She's writing letters to
4  professionals to convince them to diagnose ADHD and
5  medicate.  That's the whole thrust of it.
6      Q.    What's your basis for that conclusion?
7      A.    A, because these listings of exaggerated
8  symptoms are calculated to complete a diagnosis of
9  ADHD.  And, B, she's pressing him in this case to go
10  to a -- in one case to go to a neurological group,
11  which is not necessarily the best group for
12  evaluating a child but certainly one most likely to
13  provide a medication in the case of a diagnosis.
14      Q.    Do you know whether the parents had to
15  consent to that evaluation?
16      A.    Oh, I know that they had to consent and I
17  know they did at the last minute, yes.
18      Q.    So, the parents did consent to getting an
19  evaluation by a neurologist?
20      A.    Yes.
21      Q.    And do you know whether that was a
22  recommendation made by the PTT?
23      A.    Yes.  Yes, it was.
24      Q.    What could the parents have done if they

Peter Breggin by Ms. Powell

1   and no information from the school about how it's

2   their obligation to teach this little boy to read,

3   and they have to stop the machine totally and get to

4   work on teaching the child to read.

5           So, the parents may go along with this and

6   they may go along with that until finally they

7   realize that the medications is making their child

8   worse and he's not learning to read.  There is no

9   evidence whatsoever that these drugs help a child

10  learn to read.

11          Q.   Doctor, you told me that you're going to

12  testify in this case as to the negligence of the

13  school district?

14          A.   Yes.

15          Q.   So --

16          A.   School system, I guess, is a better term.

17          Q.   Well, the school system can't act alone.

18  It needs to act through individuals.  So, I want to

19  focus on why you think specific individuals were

20  negligent, and one thing you told me was that you

21  thought they were practicing medicine without a

22  license?

23          A.   Well, it's not my fundamental criticism.

24  My fundamental criticism is that they are

Peter Breggin by Ms. Powell

1    substituting, pushing this child into the medical

2    system by any method possible including diagnosing

3    the child, recommending drugs and sending little

4    notes home to mom about drugs rather than teaching

5    the child to read.  That is the fundamental

6    criticism.  It could be described as practicing

7    medicine without a license.  That's not the specific

8    charge.

9              The specific charges are that they failed

10   to teach this child and instead coercively pushed and

11   encouraged a medical calming down and subduing of the

12   child while still not teaching the child to read.

13        Q.   So, it's in the nature of an educational

14   malpractice type thing?

15        A.   I think it's a combination of both.  It's

16   overstepping the bounds into practicing medicine

17   without a license.  It's an educational negligence

18   and educational failure.  It's a failure under IDEA.

19   It's a failure by their own standards as described in

20   a more limited way by the hearing officer.

21        Q.   Do you think Miss Coope was practicing

22   medicine without a license?

23        A.   Marginally yes, in a way.  But that's,

24   again, that's not how I'm framing the charges here.

Peter Breggin by Ms. Powell

1    I'm going along with -- pretty much how these things

2    are framed is that the school has been negligent in

3    meeting its obligations to the child and instead in a

4    manner that is now probably illegal in Connecticut

5    pushed medications.

6         Q.    All right.  I'm trying to figure out why

7    we need your testimony to do that.

8         A.    That's --

9         Q.    You're an expert in psychiatry --

10                   MS. POWELL:   We're going to go

11              off the record for a second.

12                   (Whereupon a discussion was held

13              off the record)

14                   (Whereupon a luncheon break was

15              taken)

16                   MS. POWELL:   Back on the record.

17   BY MS. POWELL:

18        Q.    When we broke, we were talking about

19   Ms. Paddyfote, the director of pupil personnel, and

20   of her referral for a neurological exam.

21              Do you recall that?

22        A.    Yes.

23        Q.    And you explained why you thought that the

24   way she worded her letter was inappropriate.

Peter Breggin by Ms. Powell

1          Is there any other action by Ms. Paddyfote

2     that you think was inappropriate?

3          A.    Well, there's the two letters and then

4     there's a summary that she did at one point from the

5     meeting itself, from the team meeting, and that's

6     basically the same as the letter.  So, it's sounds

7     like -- looks like she was writing on behalf of

8     herself and the team, and that whole thing is just a

9     setup to get the child diagnosed and medicated by a

10    neurologist.  The way it's worded in such extreme

11    language and the question it -- requests it asks

12    leads to conclusions.  And that letter was sent to

13    the neurological group.

14          It was also sent to the psychologist

15    Martinez and something similar, I believe, was sent

16    to Schwartz later on.  So, I mean, it's really quite

17    a consistent pattern.

18          Q.    So, you thought the way Ms. Paddyfote

19    requested the evaluations was inappropriate?

20          A.    Yes.  It was extremely biased towards the

21    child.  It was really saying, why is this child so

22    brain damaged?  Why does this child have so much

23    ADHD?  Why is this child like a typical but really

24    bad case of ADHD?  It never said, we didn't teach

Page 367

not testify to that matter if I were in court.
Q. You have never testified to that in court? Is that your testimony?
A. I don't think so. If I did, I must have been relaxed. That's the kind of remark I would have made if I was very relaxed. In fact, it's much more complicated than that, of course.
Q. Okay. Doctor, you've never written a protocol for a clinical trial --
A. No.
Q. -- true? Never been a principal investigator in a clinical trial?
A. No.
Q. Never served on an institutional review board?
A. No.
Q. Never had to bring clinical trials or projects before an institutional review board for approval?
A. No.
Q. Never worked for the FDA?
A. Nope.
Q. Never served as a consultant for the FDA?
A. Nope. I have for the Federal Aviation

Page 368

1 Agency but not the FDA.
2 Q. Never served as a member of the FDA
3 Administrative Advisory Committee?
4 A. No.
5 Q. Doctor, would you agree that your theories
6 about Ritalin and similar family of drugs are
7 principally anecdotal and not subject to peer review?
8 A. No. The reverse of that. My views have
9 been subject to peer review on a number of occasions,
10 and I have published many peer-reviewed articles on
11 the subject and was invited by the National
12 Institutes of Health to be the expert on the adverse
13 effects on adults and children at the 1998 consensus
14 conference.
15     MS. ROBINSON: I have nothing
16 further. Thank you, Doctor.
17     - - - - -

*** Notes ***

Page 369

1 EXAMINATION BY
2 MS. POWELL:
3 Q. Doctor, Melinda Powell for the school.
4 I'll be pretty quick.
5     You reviewed the Ben Bronz records, is
6 that right?
7 A. Yes. Those which were given to me, mm-mm.
8 Q. And can you tell me how the educational
9 program at Ben Bronz differs from the educational
10 program at New Milford?
11 A. Well, it's very hard to get that out of
12 records other than they were very highly focused on
13 teaching him to read and that was a major goal and
14 aim and they went about that systematically.
15     Other than that, I'd have to sort of go
16 through the records and have to answer the question
17 in more detail, but they were very --
18 Q. So, you don't know exactly what
19 methodology was used for the reading program?
20 A. No, that's correct, I don't know that. I
21 know that they were specialized in it, they focused
22 on it and that he responded.
23 Q. It's your belief that Travis' program at
24 New Milford did not have a focus on reading?

Page 370

1 A. That's correct. And still does not.
2 Q. Okay. That's based upon a review of the
3 PPT minutes?
4 A. Well, my current view is based on talking
5 to Travis and his parents, that he's getting no
6 individual educational approach for his reading.
7 Q. It's your belief that Travis does not have
8 a current IEP? Is that what you're telling me?
9 A. No, I didn't say that.
10 Q. All right. But your information --
11 A. By the way, if this is going to go on for
12 a while, I want a lunch break.
13 Q. No. We're going to finish up right now.
14     Your information coming from the parents
15 is not necessarily a review of the current IEP, is
16 that correct?
17 A. I do not have the current IEP. I have
18 exactly what I've sent to you, about 20 pages that
19 the parents faxed me.
20 Q. All right. Is it your opinion that the
21 New Milford School District has never regarded Travis
22 as being learning disabled?
23 A. I didn't even ask myself that question. I
24 do believe they never taught him properly in the area

*** Notes ***

Page 371

of reading, and that was the central issue at the time.

Q. Do you agree that Travis --

A. I don't recall whether they used the words "learning disability" to describe him.

Q. Do you agree that Travis has been identified as learning disability in order to receive special education service?

A. Yes, very likely. That's how you get that.

Q. So, you agree that he has been classified as learning disabled?

A. He very well may have been classified as learning disabled in order to get his school status, but that's not what this is about. To me, it's not about whether they happen to put him down in a -- code him as learning disabled. It's more a matter of whether they addressed his learning disability.

Q. And do you know when he was identified as being learning disabled?

A. No, I don't recall.

Q. All right. And you're not an expert in how to teach someone with learning disabilities, is that right?

Page 372

1    A. That's correct, I'm not an expert in
2  teaching.
3        MS. POWELL:  I have no further
4  questions.
5        MS. CALLAHAN:  We are all set,
6  Doctor.
7        MR. DUBE:  All right.  Doctor,
8  this is Mike Dube.  I think we are done.
9  You have a good afternoon.
10        MS. ROBINSON:  Christine Robinson
11  again.  Would you do me a favor.  Would
12  you make sure when you send your bill for
13  this round of the deposition that you also
14  send to Attorney Dube copies of the checks
15  that you received so that we can ferret
16  out between us who owes what.
17        THE WITNESS:  Definitely.
18        MS. ROBINSON:  Thank you.
19        MR. DUBE:  Thank you.
20        MS. CALLAHAN:  Thank you, Doctor.
21        THE WITNESS:  Thank you.
22        - - - - -
23
24

*** Notes ***

Page 373

1  STATE OF_____
2  COUNTY OF_____
3
4      I have read the foregoing record of testimony
5  taken at the time and place indicated in the heading
6  thereof, and I do hereby acknowledge it to be a true
7  and correct transcript thereof.
8
9
10
11              _____
12              PETER R. BREGGIN, MD
12
13
14  Subscribed and sworn to
15  before me this _____ day
16  of _____, 20___.
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24

Page 374

1  STATE OF NEW YORK    :
2  COUNTY OF BROOME     :
3
4      I, KEVIN P. CALLAHAN, Shorthand
5  Reporter, do certify that the foregoing is a true
6  and accurate transcript of the proceedings in the
7  matter of Matthew and Cindy Myslow, et al, v New
8  Milford School District, et al, held in Ithaca, New
9  York, on April 8, 2005.
10
11
12
13              _____
14              KEVIN CALLAHAN
15              Shorthand Reporter
16              Notary Public
17              CZERENDA COURT REPORTING, INC
18              71 State Street
19              Binghamton, New York 13901-3318
20
21
22
23
24

*** Notes ***