**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT (NEW HAVEN)**

|  |  |  |
|---|---|---|
| MATHEW AND CINDY MYSLOW, as Parents and Natural Guardians of Minor Plaintiff TRAVIS MYSLOW, | : : : : | Case No.: 3:03-cv-496-MRK |
| Plaintiffs, | : : | |
| v. | : : | |
| NEW MILFORD SCHOOL DISTRICT, *et al.*, | : : : | |
| Defendants. | : : : | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING**
**THE SCHOOL DISTRICT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Matthew and Cindy Myslow, the plaintiffs in this matter (collectively, "plaintiffs"), are the parents of Travis Myslow ("Travis"). By and through their counsel, Alan C. Milstein and Michael Dube of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. and Deborah G. Stevenson, they respectfully submit this supplemental brief. This supplemental brief regards the motion for summary judgment ("Motion") that has been filed by codefendants New Milford School District ("District"), New Milford Board of Education, Raymond Avery, Jeanann Paddyfote, Thomas Mulvihill, Paula Kelleher, Denis Dolan, Jean Malcom, Josephine Rositano, Adele Johnson, Deborah Shelley, and Robyn Vikland (collectively, "defendants" or "School district defendants," as context dictates).

As this Court is aware, on January 4, 2006, extensive oral argument on the Motion was held in New Haven before the Honorable Mark R. Kravitz, U.S.D.J. ("Judge Kravitz"). During

the course of said oral argument, and subsequently by Order dated January 6, 2006, Judge

Kravitz asked for supplemental briefing regarding the following four legal and factual issues:

1.    "Precisely what conduct during which years was raised by the Plaintiffs before the

due process hearing officer," with citations to the transcripts of the relevant due process hearing;

2.    Why the defendants' actions constitute a violation of Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. ("Section 504") and the Americans With

Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), which is actionable in money damages, as

opposed to a violation of the Individuals With Disabilities Education Act, 20 U.S.C. § 1400, et

seq. ("IDEA"), which is essentially not actionable in money damages;

3.    Whether or not the plaintiffs have a claim for "procedural violations" of Section

504; and

4.    Whether or not the plaintiffs have a claim against the District under 42 U.S.C. §

1983 in light of the United States Supreme Court's holding in the case of Monell v. New York

City Dept. of Social Services, 436 U.S. 658 (1978), as clarified by cases such as Board of County

Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397 (1997).

Per the Court's directive, we now address the issues raised by it at oral argument, and in

its subsequent Order, seriatim.  As will become clear, the first two issues overlap to some extent.

## II.    WHAT WAS RAISED AT THE DUE PROCESS HEARING?

As the annexed Exhibits demonstrate, the conduct of the District, its agents, and the

parties acting at its direction during the years 1998 through 2001 was raised at the IDEA due

process hearing.  The conduct that was raised included, but was in no way limited to, the

misdiagnosis of Travis, the medication of Travis by codefendant L. Robert Rubin, M.D. ("Dr.

Rubin"), the request of the District to override the plaintiffs' refusal for a psychiatric evaluation

and continued medication of Travis, Travis's inability to read and to write, and Travis's resulting behaviors, social, and emotional needs.

The conduct of the defendants from 1998 through 2001 was discussed in general fashion throughout the due process hearing.  As this Court can see from the attached Exhibits, the conduct raised by the plaintiffs at the hearing was virtually identical to the conduct raised by the Complaint in this Court in large part.  The underlying facts that were relevant to the issues that were before the hearing officer, *i.e.*, the appropriateness of Travis's educational program, are the same underlying facts that are relevant to the issues before this Court, *i.e.*, medical malpractice and lack of informed consent on Dr. Rubin's part and violations of Section 504 and the ADA against the District.  The issues currently before this Court, however, could not have been raised before the IDEA due process hearing officer, and were not raised before her.

**Exhibit A** reveals that on September 4, 2001, the defendants requested a due process hearing for the following reasons:

> (1) At the PPT held on August 23, 2001, the board refused to consent to an independent reading evaluation by Dr. Mary White-Roath because of the specific conditions set by the parent.
>
> (2) At the PPT held on August 23, 2001, the board refused to reimburse the parents for an independent neuropsychological evaluation conducted by Dr. Armin Thies because the board already agreed to and paid  for an independent neuropsychological evaluation that was conducted in the spring 2001;
>
> (3) The PPT refused to agree to the parents' request for a homebound placement based on the information provided to the team at the August 23, 2001 meeting.  Since the commencement of the 2001-2002 school year, the parent has refused to send Travis to Schaghticoke Middle School as provided in the current IEP; and
>
> (4) The board requests that the hearing officer issue an order to override the parents' refusal to consent to a psychiatric evaluation.

On September 8, 2001, the plaintiffs submitted a request for a due process hearing. The plaintiffs described the dispute and gave information regarding Travis's inability to read during four years at the Pettibone School. The plaintiffs also described the defendants' diagnosis of ADHD in 1998 and the subsequent and ensuing medication of the child resulting in illness, depression, and anxiety from 1998 through 2001. The plaintiffs also cited the PPT meetings held in 2001 and the request signed by Dr. Rubin for homebound instruction for the child. The plaintiffs then requested that the hearing officer:

> (1)  Issue an order requiring the District to provide Travis with homebound instruction by a qualified special education reading specialist immediately at a location acceptable to the plaintiffs, with such instruction continuing until such time as the parties can agree upon an appropriate education for Travis.
>
> (2)  Issue an order for the school district to reimburse the plaintiffs for independent evaluations conducted to date.

On September 14, 2001, the plaintiffs amended their request for due process to include consideration of the continued evaluation of the child by Dr. Mary White-Roath, the leave of absence taken by the plaintiffs in order to stay with their child during homebound instruction, and the financial, physical, and emotional impact of the dispute on the Myslow family. The plaintiffs then requested the hearing officer to:

> (1)  Order compensatory education for Travis for time missed due to the school's refusal of homebound instruction;
>
> (2)  Order financial reimbursement to the Myslows for work missed by Cindy Myslow and for the cost of private tutoring for Travis Myslow; and
>
> (3)  Order that the School offer separate written apologies to Travis Myslow and to the Myslow family for the school's intransigence in these matters.

On October 18, 2001, at the beginning of the due process hearing, which was conducted before Attorney Gail Mangs, the defendants withdrew their first issue regarding the independent reading evaluation, while the plaintiffs alleged procedural violations in the delay in the provision of the reading evaluation.  October 18, 2001 Due Process Hearing Transcript, pp. 13-15. The hearing officer "condensed" the plaintiffs' issues before as: (1) the appropriateness of the June 14, 2001 IEP; (2) reimbursement for independent evaluations; and (3) certain procedural violations.  October 18, 2001 Due Process Hearing Transcript, pp. 12-30.[1]

The hearing officer's Final Decision and Order of November 20, 2001 shows that facts relating to PPT meetings held from 1998 through 2001 about the child's educational program, his inability to read, his behavior, his medication, and his social and emotional condition were discussed in the due process hearing.  In addition, evaluations of the child of all kinds from 1998 through 2001 were discussed in the due process hearing.  The hearing officer's order regarding the education of the child extended through 2002 until the time the child was placed into the Ben Bronz Academy sometime in November of 2002.  That's because the hearing officer ordered the

---

[1] Purely by way of background, the plaintiffs were concerned that they would not be allowed to address the appropriateness of the child's educational program in a future due process hearing because of the regulation that required issues to be raised at a PPT meeting prior to going to due process.  Because the plaintiffs were attempting to obtain an accurate reading evaluation of the child in order to request appropriate programming, the plaintiffs were reluctant to raise the specific issue of the appropriateness of the educational program until they could do so with accuracy.  While the report of Dr. Thies was issued on August 13, 2001, and a PPT meeting was held on August 23, 2001, the parents were reluctant to discuss the Thies report without the reading evaluation that, along with and in conjunction with the Thies report, was a crucial part of developing an IEP.  When the defendants sought to discuss the substantive issues raised in the Thies report at the due process hearing, the plaintiffs objected in order to preserve their right to abide by the regulations, raise the appropriateness of the program at a PPT meeting, and then proceed to due process if necessary.  The plaintiffs were genuinely concerned with adhering to statute and regulations requiring them to first exhaust their administrative remedies before seeking due process or court review.  Having preserved their right by objecting, the hearing officer allowed discussion of the Thies report and of the appropriateness of the educational program as an issue before her.

parties to agree upon the hiring of an educational consultant, ultimately Dr. Neu, who was to assist in obtaining an appropriate education for the child until the parties agreed his services were no longer needed, but "at least through the 2001-2002 school year."  Once the child was placed at Ben Bronz, the consultant's services were no longer needed.

Exhibit B reveals that the defendants submitted a list of exhibits to be presented before the due process hearing officer that included, for example, the planning and placement team (PPT) minutes and the individual education program (IEP) for March 21, 2000, April 25, 2000, May 8, 2000, September 19, 2000, September 25, 20000, October 5, 2000, October 26, 2000, May 7, 2001, May 22, 2001, May 29, 2001, June 7, 2001, June 14, 2001, and August 23, 2001. The defendants also submitted as evidence letters from evaluators and evaluation reports including those from Josephine Rositano, Dr. Rubin, Dr. Badillo-Martinez, Dr. Gelinas, Dr. Alshansky, Mary White-Roath, and Dr. Thies dated variously October 27, 2000, November 1, 2000, December 19, 2000, February 22, 2001, March 2, 2001, March 29, 2001, April 5, 2001, July 3, 2001, August 10, 2001, August 30, 2001, and August 31, 2001.

The plaintiffs submitted a list of exhibits and an additional supplemental list of exhibits that included, for example, PPT/IEPs from January 20, 1998, March 18, 1998, June 13, 1998, April 23, 1999, September 23, 1999, September 30,1999, June 14, 2001, and August 23, 2001. The plaintiffs also submitted letters and reports from evaluators including Dr. Rubin, Dr. Badillo-Martinez, Dr. Alshansky, Slyvan Learning Center, Mary White-Roath, and Dr. Thies.

Per this Court's directive, we attach, as Exhibit C, transcribed portions of testimony illustrative of the issues before the hearing officer.  In Mrs. Myslow's testimony, she testified about the PPT's beginning in 1998, the fact that she raised the issue of the child's reading problem repeatedly, the fact that the defendants denied there was a test for dyslexia, the fact that

they provided him false grades and promoted him against the wishes of his parents, the fact that he was placed in the kindergarten hallway, was forced to carry around with him behavioral checklists, and was forced to be medicated.  The hearing officer was not considering the facts in terms of the discriminatory effects on the child, however, or in terms of the negligence or medical malpractice of the doctors involved.  The hearing officer was considering the testimony in terms of the appropriateness of the education of the child, and most important, in terms of the defendants' request for a psychiatric evaluation of the child so that the defendants could continue to medicate the child.

The fact that the defendants were adamant about continuing medication for the child is evident from the witnesses the defendants called and from excerpts of the transcript of their testimony at the due process hearing.  For example,

Psychologist Dr. Diane Badillo-Martinez:

Q Why do you think medication would be helpful?

A  Because his behaviors are significantly out of control and judging from the questions that were ask from, you know, by the school, that seems to be your primary concern that is going to interfere with his ability to learn anything, any tasks.

Q  Can you, as a Neuropsychologist, prescribe medication?

A  No, I can not.

Q  Who prescribes medication for example, anxiety?

A It's generally a psychiatrist, a pediatrician, but generally it would be a psychiatrist….

Q When you are saying that a psychological or psychiatric review would be recommended, not specifically in your report as you indicated but as you're now telling us, is there any particular – does it make any difference what kind of psychologist or psychiatrist would conduct that evaluation?

7

A  Well a psychologist can't do it because they don't prescribe.  So it would have to be a psychiatrist, and I would suggest some – a psychiatrist who specializes in children.

[November 1, 2001 Due Process Hearing Transcript, pp. 84-86, 115, 124.]

Psychiatrist Dr. John Gelinas:

Q  There's been a comment made at this hearing that in order to come up with a comprehensive plan understanding a particular student for educational purposes in terms of development and behaviors, a psychological evaluation would be sufficient.  How do you respond to that type of comment?

A  If it is, that's fine.  I mean if it's sufficient and that it gives people enough information so that they can go forward, I think that's okay.  But, you know,  a lot of people do benefit from the expertise of psychiatrists who are in the unique position, I think, to really integrate the data in a manner that I think is, in my experience, more broad than it would be otherwise.

Q  And how so?

A  Well, you know, psychologists have their tools and we have ours.  So it's a different kind of evaluation.  But I think a child psychiatrist is engaged in appreciating the medical aspects, the family medical and psychiatric history, and can coordinate the psychological testing and the school information in a whole that is practical and pragmatic in a way that sometimes the psychologist can't.

The psychologist really can not access, in my opinion, the medical issues.  They are not medical doctors to the extent that a child psychologist could.  And for many children and teenagers the medical issues and the past psychiatric history needs to really be understood by a psychiatrist whose treating the medical aspects of that illness.

 So many of the students that I see have already been treated by psychiatrists, sometimes in a comprehensive setting, sometimes not.  Medication has often been used in the past, and the people who understand the medications best are the people who prescribe them."

[November 7, 2001 Due Process Hearing Transcript, pp. 17-18.]

School Psychologist Josephine Rositano:

HEARING OFFICER MANGS:   No, I understand, but during fourth grade did you have knowledge that he was on medication?

THE WITNESS:  Yes.  I do have – I did have knowledge.

HEARING OFFICER MANGS:  And did you discuss that with the parents?

THE WITNESS:   We had discussions of medications and behaviors.  Of actually ADHD.  I want to put this in the right context of the whole disorder of ADHD, and it's [sic] impact on the child's life, and family, and functioning.

[November 1, 2001 Due Process Hearing Transcript, pp. 26.]

HEARING OFFICER MANGS:  Did Ritalin appear to be effective while he was on Ritalin?   From what you know?   Your observance?

A  From my observation in the early years, yes.

HEARING OFFICER MANGS:  In the early years it was, and then later years it was not?

THE WITNESS:  no it was not.

Q  Beginning at what grade?

A  Second grade –

Q  That it was not effective?

A  -- either second or third grade when he started.  We did see a marked difference.  And then when he got into fourth grade, there was a problem.

Q  And that would be what year?

A  Of the fourth grade?

HEARING OFFICER MANGS:  '99-2000.

THE WITNESS:  Thank you.  '99-2000.

Q  That's the same year that he began the Let's Read Program.  Is that correct?

A  He began that program in 1999….

Q  Do you recall if his reading level improved while he was on the medication?

A  There was a minimal progress.

[October 18, 2001 Due Process Hearing Transcript, pp. 208-209.]

Assistant Superintendent JeanAnn Paddyfote:

EXAMINATION BY HEARING OFFICER MANGS:

Q  And why, if I could just ask, why a psychiatric and not a psychological?  What extra information would a psychiatric evaluation give?

A  I think there were threads throughout his experience at John Pettibonne (sic) School.  In March of 2001, when the initial request was brought up, he was really at the two-year anniversary of being in Special Education.
  And anxiety – there were issues around his self-esteem and saying, I think there was a comment in the records that said, I wish I – when he was frustrated, I wish I could die. I mean, those are not typical responses that an eight and one half or a nine year old child presents when they get frustrated.
  So, a psychiatric because you need a diagnosis of anxiety or depression.  Something is impacting, I think, when you look at the total picture on his – something is impeding, above and beyond, just the academics.

Q  And a psychologist couldn't make that diagnosis?

A  I'm not sure.  I'm really not sure.  Generally in our system, when we've gone for diagnosis – a diagnosis like that, we look for psychiatric evaluations.

BY MS. BERNABO:

Q  But in terms of what you know about the medication regime, who is more appropriate, in your opinion, a psychiatrist or a psychologist, to deal with the issues?

A  A psychiatrist.

Q  Why?

A  Well, because they prescribe.  And they certainly, are usually, generally speaking, more up to speed with – with medications.

[October 30, 2001 Due Process Hearing Transcript, pp. 208-209.]

Ultimately, the IDEA due process hearing officer took into consideration all of the underlying facts, issued her findings of facts, and concluded most importantly that the defendants failed to provide the child with a free appropriate public education during the time frame that was before her.  She decided nothing regarding any discriminatory effect of the defendants' failure to provide the child with an appropriate education.

## III.    SECTION 504 AND THE ADA

### A.  THE PLAINTIFFS' SECTION 504 AND ADA CLAIMS GENERALLY

The plaintiffs' Complaint sets forth claims under Section 504 and the ADA, and, as it currently stands, does not set forth claims under the IDEA.[2]  The plaintiffs' claims could not have been exhausted administratively under IDEA but were exhausted administratively under Section 504 as required and directed by the defendants.

Of course, as this court considers this aspect of the defendants' summary judgment motion, "all reasonable inferences must be drawn in favor of the nonmoving party," the plaintiffs.  Johnson v. NCB Collection Services, 799 F. Supp. 1298 (D.Conn. 1992); Sharpe v. Conole, 386 F.3d 482, 483-84 (2d Cir. 2004).

Under the IDEA, parents may request review by an impartial hearing officer of complaints relating to the "identification, evaluation, or educational placement of the child, or

---

[2] At oral argument on January 4, the plaintiffs' counsel advised the Court that it would not be pursuing any IDEA claims in this case.

the provision of a free appropriate public education," 20 U.S.C. § 1415(b)(6), and may appeal the hearing officer's decision. 20 U.S.C. § 1415(f) and (g). Parents must also exhaust their administrative remedies before proceeding to court. "Exhaustion of the administrative process allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children." See, e.g., J.D. v. Vermont Dept. of Education, 224 F.3d 60 (2nd Cir. 2000). The exhaustion requirement, of course, also applies where plaintiffs seek relief under other federal statutes when relief is also available under the IDEA. 20 U.S.C. § 1415(l); Hope v. Cortines, 872 F. Supp. 14, 19 (E.D.N.Y.), aff'd, 69 F.3d 687 (2d Cir. 1995). Exhaustion is excused, however, when it would be futile because the administrative procedures do not provide an adequate remedy. See Taylor v. Vermont Dep't of Educ., 313 F.3d 768, 788-91 (2d Cir. 2002). Furthermore, "failure to exhaust administrative remedies does not deprive [the] court of subject matter jurisdiction." See Steele v. Federal Bureau of Prisons, 355 F.3d 1204, 1208-09 (10th Cir. 2003).

To successfully allege exhaustion, a plaintiff must "(1) plead his claims with a 'short and plain statements…showing that [he] is entitled to relief," in compliance with Fed. R. Civ. P. 8(a)(2)"; and (2) "attach a copy of the applicable administrative dispositions to the complaint, or, in the absence of written documentation, describe with specificity the administrative proceeding and its outcome." Knuckles El v. Toombs, 215 F. 3d 640, 642 (6th Cir. 2000).

In this case, the plaintiffs successfully alleged exhaustion by pleading appropriately and describing with specificity the administrative proceeding and its outcome. Quite simply, this is a Section 504/ADA case, not an IDEA case. In addition, any claims that could have been

exhausted under IDEA were exhausted, and any claims that could have been exhausted under Section 504 also were exhausted.[3]  Here is why.

The ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." See also Olmstead v. Dept. of Human Resources, 527 U.S. 581 (1999).  The ADA could not be clearer in its statement that the "remedies, procedures, and rights . . . this subchapter provides" for violations of Sec. 202 are the same as the "remedies, procedures, and rights set forth in" Sec. 505(a)(2) of the Rehabilitation Act, which is Spending Clause legislation.  42 U.S.C. § 12133. Section 505(a)(2), in turn, explains that the "remedies, procedures, and rights set forth in title VI . . . shall be available" for violations of Section 504.  Id.  Whereas the latter authorities require federally funded State and local educational agencies to provide special education and related services to students who meet specified eligibility criteria, Section 504, which provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," prohibits such agencies from discriminating against students with disabilities.  J.D., 224 F.3d at 60.  In Barnes v. Gorman, 536 U.S. 181, the Supreme Court clarified that individuals may sue for damages recipients of federal funds who violate the provisions of the ADA and Section 504 and who thereby discriminate against those individuals.

---

[3] In Morse v. Univ. of Vermont, 973 F.2d 122, 127 (2d Cir. 1992), a panel of the Second Circuit held that all "actions under § 504 of the Rehabilitation Act are governed by the state statute of limitations applicable to personal injury actions."

An "appropriate education" within the meaning of § 504 means: regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b). Under Section 504, "a student may have a viable discrimination claim even if his or her academic performance is satisfactory, provided the student establishes that he or she does not enjoy equal access to the school's programs." Indeed, it is settled in this Circuit that Section 504 implicitly creates a private right of action directly against the recipients of federal funds. Doe v. New York University, 666 F.2d 761, 774 (2d Cir. 1981); Kampmeier v. Nyquist, 553 F.2d 296, 299 (2d Cir. 1977). To establish a prima facie violation of Section 504, a plaintiff must prove: (1) he or she is a "handicapped person" under the Rehabilitation Act; (2) he or she is "otherwise qualified" for the program (3) he or she is excluded from benefits solely because of his handicap; and (4) the program or special service receives federal funding. Joyner by Lowry v. Dumpson, 712 F.2d 770, 774 (2d Cir. 1983)." Mrs. C. v. Wheaton, 916 F. 2d 69 (2d Cir. 1990).

Moreover, the plaintiffs are entitled to proceed in this court in an action for damages against the defendants and to prevail. The United States Supreme Court, in Davis v. Monroe County Sch. Dist., 119 S. Ct 1661 (1999) and Gebser v. Lago Vista Ind. Sch. Dist., 118 S. Ct. 1989 (1998), outline a damages standard that is available to plaintiffs under Section 504 and the ADA that was based on an earlier case, Alexander v. Choate, 469 U.S. 287, 295 (1985), in which the Court noted that discrimination under Section 504 could be actionable if it were the product of "thoughtlessness and indifference." In Davis and Gebser, the Court established that if school personnel are put on notice that discrimination is occurring, that the discrimination is denying a

student access to a free appropriate public education, that the person complained to is high enough in the school system to order an investigation and to remedy any wrong found but fails to act, then the claim can be made that they are engaging in "intentional discrimination" because they were deliberately indifferent or refused to act on their knowledge.  In such a case, the Court held that the school district could be held liable for money damages.  Such is the case before this Court.

Indeed, in this case, the plaintiffs have stated a claim under Section 504 in accordance with the elements articulated by the Second Circuit.  The allegations cited by the plaintiffs in their complaint satisfy the elements necessary to make out a prima facie violation of § 504, most of which are undisputed by the defendants.  There is no dispute that the plaintiff child is a "handicapped person" under the Rehabilitation Act in that his learning disability of dyslexia and dysgraphia and concomitant social and emotional problems are such that the child has a "physical or mental impairment" that "substantially limits" one or more of his "major life activities", including, *inter alia*, his ability to learn and to work.  See generally Complaint. There also is no dispute that the plaintiff child is "otherwise qualified" for a free appropriate public education under Section 504 and that the defendants New Milford School District and Board of Education receives federal funding.  The only element in dispute is whether the plaintiff child was excluded from benefits solely because of his handicap.  The plaintiffs have set forth sufficient allegations and presented sufficient evidence through discovery to state a claim under Section 504. Here, as set forth in the plaintiffs' interrogatory answers, cited in their principal brief, they have stated he was excluded from benefits such as:

     (1) an appropriate evaluation for dyslexia;

     (2) proper diagnosis of his learning disability;

(3) freedom from unnecessary medication

(4) an appropriate public education;

(5) participation in classes as other children;

(6) appropriate remediation;

(7) reading and writing without assistance;

(8) participation in classroom work as others;

(9) participation in recess as others;

(10) participation in gym class as others;

(11) participation in extracurricular activities as others;

(12) receipt of appropriate grades for work performed; and

(13) normal childhood social and emotional interactions as others.

In addition, as a result of the defendants' violation of Section 504, Travis was denied or otherwise suffered, *inter alia,* the following:

(1) correct diagnosis of his disability;

(2) proper remediation for a longer period of time at Ben Bronz;

(3) lengthy travel time to obtain remediation at Ben Bronz causing him to be denied extracurricular activities and social interaction with his peers;

(4) behavioral modifications and punishments, including but not limited to denial of food;

(5) being given false grades;

(6) being falsely promoted;

(7) having teachers read and write for him;

(8) humiliation unlike others (i.e., being placed in kindergarten hallway and having to carry around with him to classes a behavioral checklist notebook);

(9) in class "observations" by principal and others unlike others;

(10) "feeling stupid";

(11) suffering anxiety;

(12) suffering depression;

(13) being ridiculed, stigmatized, teased, and taunted by peers for inability to read and write;

(14) being ridiculed by peers for being compelled to take medication;

(15) suffering side effects and illness from the medication exacerbating his ability to participate in academics and extracurricular activities;

(16) loss of a normal childhood for over four years; and

(17) unnecessary delay of nearly a year in obtaining an appropriate education after the hearing officer's decision.

All of the exclusions, denials, and suffering were due solely to his disability.

Despite the fact that this Circuit holds that the plaintiffs need not show bad faith or gross misjudgment, nonetheless, the plaintiffs alternatively argue that the facts in this case are egregious enough to rise to the level of bad faith and gross misjudgment. It was a gross misjudgment for the defendants to misdiagnose the child and to compel medication of him for a period of four years or more. Similarly, it was bad faith to repeatedly tell the plaintiffs that "there was no test for dyslexia" when an adequate neuropsychological evaluation by Dr. Thies

issued on August 13, 2001 could and did ultimately discover the child's individual educational needs. Once the defendants were put on notice that the child suffered from dyslexia and dysgraphia, it was bad faith and gross misjudgment for the defendants at an August 23, 2001 PPT meeting to disregard the correct diagnosis, to refuse to pay for the evaluation by Dr. Thies, to request to speak to Dr. Rubin concerning the need for continued medication of the child, to refuse to change his educational program other than to add fifteen minutes per week of counseling, and to refuse Dr. Rubin's request to provide homebound instruction to the child until an appropriate program was in place in school.  It was further bad faith and gross misjudgment for the defendants on September 4, 2001, to request a due process hearing, *inter alia*, because "the board requests that the hearing officer issue an order **to override the parents' refusal** to consent to a psychiatric evaluation" when the psychiatric evaluation was requested so that the child could continue to be medicated. There was more than a "professional disagreement", as the defendants suggest, in this case over the diagnosis of this child.  The defendants undertook a campaign of repeated phone calls, verbal in-person prodding, and legal maneuvers in order to have this child remain on medication and to refuse to provide him with appropriate education either in the district or in a private school.  Thus, despite the plaintiffs' reliance on this Circuit's previous decisions, the defendants did act with bad faith and gross misjudgment sufficient to overcome the defendants' claim that the plaintiffs failed to state a claim.  On the contrary, the plaintiffs have alleged more than a sufficient claim upon which relief may be granted, whether or not bad faith and gross misjudgment are taken into consideration, and there are multiple factual issues that remain genuinely in dispute such that motion for summary judgment on this claim should be denied.

Notwithstanding the proper steps taken, the plaintiffs alternatively contend that in this Circuit, the plaintiffs are not required to show bad faith or gross misconduct on the defendant's part in order to properly state a claim for relief. On this issue, the defendants cite no binding precedents for their claim. They cite to only persuasive authority from the 8th Circuit, the 4th Circuit, and certain other district court cases.

On the other hand, the plaintiffs look to this Court and to this Circuit for their authority for their proposition that the plaintiff does not need to establish the defendants intended to discriminate. For example, in <u>Mrs. C. v. Wheaton</u>, 916 F 2d 69 (2d Cir. 1990), the Second Circuit Court of Appeals did not tack on a bad faith requirement to the prima facie elements of a Section 504 claim when a mother challenged the termination of her son's individual education placement under that law. In fact, in <u>Mrs. C.</u>, the Second Circuit stated precisely the elements of a prima facie violation of Section 504.

### CONFUSION ABOUT THE PROVISIONS OF ADA AND SECTION 504

The State Department of Education recognized confusion about the provisions of IDEA and Section 504 when it issued its Series 2000-2001 Circular Letter C-9 from the Commissioner of Education to Superintendents of Schools about Section 504 of the Rehabilitation Act of 1973: Procedural Safeguards. See **<u>Exhibit D</u>**.

It states,

> Over the years, the overlapping requirements of the federal special education law (The Individuals with Disabilities Education Act, IDEA) and Section 504 of the Rehabilitation Act of 1973 have obscured the definitive requirements for procedural safeguards found in each respective law. Specifically, we have found that some districts have confused the Section 504 hearing requirements with IDEA hearing requirements. These systems of due process are unique and independent of each other. The purpose of this letter is to discuss how the procedural safeguards that are required

by Section 504 should be implemented by Connecticut school districts.

The letter goes on to quote 34 C.F.R. §104.36 that

> A recipient that operates a public elementary or secondary education program shall establish and implement, with respect to actions regarding the identification, evaluation, or education placement of persons who, because of handicap, need or are believed to need special instruction or related services, **a system of procedural safeguards** that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, **an impartial hearing** with opportunity for participation by the person's parent or guardian and representation by counsel, **and a review procedure**.  Compliance with the procedural safeguards of section 615 of the Education of the Handicapped act is one means of meeting this requirement.

> [(Emphasis added).]

The letter goes on to state that

> Parents or guardians of students with disabilities under Section 504 have the right to an impartial hearing concerning the identification, evaluation or education placement of a student with a disability. **The Connecticut State Department of Education does not conduct these hearings; these hearings are the responsibility of the local school district** and as such, each district is required to have procedures in place to guarantee a due process hearing before **an impartial hearing officer**.  The impartial hearing requirement found at 34 C.F.R. 104.36 is not the same as the grievance procedure requirement found at 34 C.F.R. 104.7(b).  You must have both procedures in place in your district.

> The **hearing officer may not be**: a person who is an **employee of a public agency which is involved in the education or care of the student**; any person **having a personal or professional interest which would conflict with his or her objectivity** in the impartial due process hearing; an **elected member of a local school board** in which the dispute has arisen; or, a person who participates in the formulation of state policy affecting students with disabilities.

> * * * *

The hearing officer may only review issues related to the identification, evaluation or placement of a child with a disability. A **Section 504 hearing officer does not have jurisdiction to hear claims alleging discrimination, harassment or retaliation unless such a claim is directly related to the failure of the school district to provide the student with a free appropriate public education**.

[(Emphasis added).]

The letter also clarifies the role of IDEA due process hearing officers. In a footnote, it specifies:

The **IDEA hearing officers maintained by the State have very limited Section 504 jurisdiction** defined by the provisions of the Mrs. L[4]. consent decree. The IDEA hearing officers have the authority to hear systemic and procedural claims under both IDEA and Section 504 "provided that a determination of the issues is necessary to ensure that the substantive and procedural rights of the particular child or parent or guardian who initiated due process are being complied with and/or will be complied with in the future and that the other requirements of ripeness and standing are satisfied." **These hearing officers** will not hear what is commonly referred to as "Section 504 only cases", but **will do a review of Section 504 claims if the Mrs. L requirements are met, i.e., that a determination of a Section 504 claim is necessary to the resolution of the issues.**

[(Emphasis added).]

In this case, while the IDEA due process hearing officer under the Mrs. L consent decree, may have had jurisdiction to hear the discrimination issues, it is clear that a determination of the Section 504 claim was not "necessary" to the resolution of the IDEA issues. Hence, the hearing officer's decision determining the educational program for the child was not appropriate. In addition, the hearing officer in this case was very clear about the limited nature of her jurisdiction, stating that, "[a]s a Hearing Officer I have the authority to confirm, modify or reject

---

[4] The circular is referring to Mrs. L. v. Tirozzi, No. H-89-209 (D. Conn. 1991).

the identification, evaluation, or educational placement over the provision of the free appropriate, public education, to the student, and to determine the appropriateness of a unilateral placement or to prescribe alternate Special Education programs for the student." See Exhibit E, October 18, 2001 Due Process Hearing Transcript, p. 3.

The claims that the plaintiffs pleaded before this Court are not claims that are being pursued under IDEA. The claims that were pursued by the plaintiffs under IDEA were pursued at the PPT level within the District and at the due process hearing level at which they prevailed, thus, successfully exhausting their administrative remedies under IDEA. The purpose of the claim before the IDEA due process hearing officer was, in part, to determine the appropriateness of the educational program for the child and to compel the defendants to provide an appropriate educational program for him. The purpose of the claim before the Section 504 due process proceeding was to determine whether the failure of the defendants to provide an appropriate educational program for the child resulted in discrimination against the child such that he was excluded from participation and otherwise denied the benefits of an appropriate education as other children receive. The purpose of the Section 504/ADA claims before this Court is to seek damages from the defendants for that discrimination.

The claims alleged in the plaintiffs' Complaint were appropriately exhausted administratively under the Section 504 procedures the defendants required the plaintiffs to follow and could not be exhausted under IDEA such that the defendants should be precluded from claiming there were other remedies available but not taken. To do so is disingenuous on the part of the defendants and circular in its logic.

Moreover, **Exhibit F** sets forth in great detail the plaintiffs' attempts to resolve their Section 504 claims on the administrative level:

1.      They notified the Superintendent, the Assistant Superintendent, the Principal, and the Board of Education about the problem in writing.

2.      They indicated in their letters, and in the instant complaint, that the defendants were recipients of federal financial assistance.

3.      They showed that the Superintendent, the Assistant Superintendent, the Principal, and the Board of Education had the authority to investigate the complaint and to correct the wrong.

4.      They stated precisely what the discriminatory activity against the child was.

5.      They stated that the defendants exercised control over the sites where the discrimination occurred and over the personnel who committed the discrimination.

6.      They explained that the discrimination was not a single act but that was severe, pervasive, and continuing over a nearly five year period of time.

7.      They showed that the discrimination excluded the child from participation in various academic, social, and extracurricular events and otherwise denied him from the benefits of what other students receive.

8.      They indicated what they wanted the defendants to do to stop the discrimination.

9.      They indicated that the defendants did not have in place the proper grievance procedures to allow for prompt and equitable resolution of the complaint with the result that the discrimination continued to harm the child.

10.     They informed the defendants that if they failed to investigate and halt the discrimination that they could be held to be deliberately indifferent to the discrimination and subject to an action for damages.

In other words, the plaintiffs followed all the steps necessary, including exhausting all administrative remedies, in order to properly hold the defendants liable in damages for violation of Section 504 and the ADA pursuant to controlling case law.  They did all they could to request the defendants to take action, to exhaust their administrative remedies, to comply with existing state and federal law, and to successfully plead a Section 504/ADA complaint pursuant to the standards specified by the U.S. Supreme Court.  The defendants' claim that the plaintiffs failed to state a claim and failed to exhaust their administrative remedies is, thus, utterly without merit.

## IV.     THE PLAINTIFFS' REMAINING CLAIMS

After consultation between Attorneys Dube and Stevenson and the plaintiffs, it has been determined that the plaintiffs will pursue the following claims at trial:

| Count Pled in Complaint | Defendant/s as of January 4, 2006 | Status as of January 10, 2006 |
|---|---|---|
| Count One, for negligence in demanding that Travis go on Ritalin, and for failure to provide Travis with a free and appropriate public education when they knew or should have known that Travis had dyslexia and dysgraphia. | School District defendants | The plaintiffs wish to proceed to trial on this Count in its entirety, as it stands in the Complaint. |
| Count Two, for medical malpractice | Dr. Rubin | The plaintiffs wish to proceed to trial on this Count in its entirety, as it stands in the Complaint. |
| Count Three, for lack of informed consent | Dr. Rubin | The plaintiffs wish to proceed to trial on this Count in its entirety, as it stands in the Complaint. |
| Count Four, for violations of Section 504 | School District defendants | The plaintiffs wish to proceed to trial on this Count in its entirety, as it stands in the Complaint, **except that they will not pursue their claim for purely procedural violations of Section 504** |

| | | **only and they will not pursue any "individual liability claims."** Thus, at trial, the plaintiffs will seek monetary redress for the numerous substantive violations of Section 504 by the District and the Board set forth above. |
|---|---|---|
| Count Five, for violations of the ADA | School District defendants | The plaintiffs wish to proceed to trial on this Count in its entirety, as it stands in the Complaint. |
| Count Six, for violations of 42 U.S.C. § 1983 | School District defendants | The plaintiffs wish to proceed to trial on this Count in its entirety, as it stands in the Complaint, **except that they will not pursue their 1983 claim against the District or the Board; rather, they will pursue their claim against the individual named School District defendants who violated federal law while acting under color of state law, as described in detail in the Complaint.** |
| Count Seven, for intentional infliction of emotional distress | School District defendants | The plaintiffs wish to proceed to trial on this Count in its entirety, as it stands in the Complaint. |
| Count Eight, for negligent infliction of emotional distress | School District defendants | The plaintiffs wish to proceed to trial on this Count in its entirety, as it stands in the Complaint. |
| Count Nine, for violations of Section 504, the ADA, the IDEA, and certain provisions of the Connecticut General Statutes | School District defendants | **Withdrawn, as per statements made at oral argument on January 4, 2006** |

The plaintiffs respectfully believe that this resolves the Court's remaining two inquiries, namely the Court's inquiry regarding Monell and this Court's inquiry regarding whether procedural violations of Section 504 are actionable.

Dated: Tuesday, January 10, 2006

s/Michael Dube
Alan C. Milstein, CT03703
Michael Dube, PHV0216
Sherman, Silverstein, Kohl,
Rose & Podolsky, P.A.
Fairway Corporate Center
4300 Haddonfield Road, Suite 311
Pennsauken, NJ 08109
Telephone: 856-662-0700
Facsimile: 856-488-4744
EMail: AMilstein@sskrplaw.com and
MDube@sskrplaw.com

Deborah G. Stevenson, Esquire
226 Flag Swamp Road
Southbury, CT 06488
Telephone: 860-354-3590
EMail: Dgs31@yahoo.com

*Attorneys for the Plaintiffs*