**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MATHEW AND CINDY MYSLOW, | : | |
| *as parents and natural guardians of* | : | |
| *minor plaintiff Travis Myslow* | : | |
| | : | |
| Plaintiffs, | : | NO.    3:03cv496 (MRK) |
| | : | |
| v. | : | |
| | : | |
| NEW MILFORD SCHOOL DISTRICT, | : | |
| ET AL, | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM OF DECISION**

This case grows out of the extended struggle of Mr. and Mrs. Myslow to obtain assistance for their son Travis' persistent learning difficulties, the allegedly ineffective attempts of Milford educators to help Travis obtain critical learning skills, and the conflicting diagnoses of Travis' problem provided by various members of the medical profession. Although, in yet another unfortunate example of scattershot litigation, the Myslows asserted nine superficially separate counts of statutory and common law violations, the crux of their grievance is that the educators and doctors to whom they turned for assistance hastily and mistakenly diagnosed their son with Attention Deficit and Hyperactivity Disorder (ADHD), placed him on Ritalin and similar drugs, and neglected signs of an underlying dyslexic condition, thereby allegedly thwarting Travis' academic progress, exposing him to various social and psychological harms, and subjecting him to assorted medication-induced ailments.

The large number of Defendants originally named by Plaintiffs separated themselves into five groups of educational and medical entities and professionals: the "School Defendants," namely, the New Milford School District (the "District"), the New Milford Board of Education

(the "Board"), and ten individual teachers, administrators, and other school staff alleged to have been involved in making decisions about Travis' education needs; Travis' pediatrician, Robert Rubin, M.D.; neurologists Anna Alshansky, M.D., and Martin Kremenitzer, M.D.; psychologist Diana Badillo-Martinez, Ph.D.; and independent educational consultant Terry Neu, Ph.D.

Defendants Badillo-Martinez, Neu, Alshansky, and Kremenitzer have been voluntarily dismissed from this case, *see* Orders [docs. ## 116, 118, 147], leaving the School Defendants and Dr. Rubin as the remaining Defendants. The School Defendants filed a Motion for Summary Judgment [doc. # 130], and both the School Defendants and Dr. Rubin filed a Motion to Preclude Expert Testimony [docs. ## 124, 125], seeking to preclude the testimony of Plaintiffs' expert, Dr. Peter Breggin. The Court heard argument on all three motions, after which both Plaintiffs and the School Defendants filed supplemental briefs [docs. ## 152, 153] addressing various issues relating to School Defendants' summary judgment motion.

## I.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must draw all ambiguities and inferences in favor of Plaintiff, *see*

2

*Anderson*, 477 U.S. at 255. Nonetheless, "a plaintiff must provide more than conclusory allegations . . . to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

## II.

The following forms the factual background to the Myslows' claims. As is required on a motion for summary judgment, the Court relates the facts in the light most favorable to the Myslows.

In 1997, Travis Myslow moved to the New Milford School District and enrolled as a second-grader in the John Pettibone School ("Pettibone"). His parents informed the District that Travis had difficulty reading, and in January 1998, his second grade teacher referred him for evaluation of his eligibility for special education services. As required by federal law, Pettibone assembled a Planning and Placement Team ("PPT") and convened a meeting at which parents, school administrators, and special education providers discussed the possibility of providing Travis with special education services, and agreed on the need for psychoeducational and speech/language evaluations. Parents and educators then completed questionnaires relating to the possibility that Travis might have Attention Deficit Disorder or Attention Deficit Hyperactivity Disorder ("ADD/ADHD"), the results of which were provided to, and considered by, the school psychologist, Defendant Josephine Rositano. *See* Psychological Evaluation by Josephine Rositano, Ex. A(A) to Plaintiffs' Second Amended Complaint [doc. #70], at 3.

In early March 1998, Ms. Rositano conducted a psychological evaluation of Travis. She noted that Travis displayed high activity levels and a short attention span, that his teachers reported high levels of inattention, irritability, and impulsiveness, that his mother found him

fidgety and often oppositional, and that Travis himself felt rejected by his peers and constantly "in trouble." *Id.* at 4-5. After conducting various assessments of his learning skills, Ms. Rositano concluded, among other things, that "[t]he results also indicate a child with characteristics of an Attention Deficit / Hyperactivity Disorder (Combined type) and comorbid Oppositional Defiant and Dysthymic Disorders," and she "encouraged" the Mslows "to share the results of the evaluation with Travis' pediatrician." *Id.* at 5.

Based on Ms. Rositano's evaluation, in March 1998 a second PPT meeting agreed that Travis was eligible for special education services, and drew up an Individualized Education Program ("IEP"), as required by the Individuals with Disabilities Education Act, 20 U.S.C. § 1414(d) ("IDEA"). The IEP listed Travis as having a "specific learning disability," March 1998 IEP, School Defendants' Memorandum in Support of Summary Judgment [doc. #131], Ex. I at 5, but the IEP did not name the impairment. The IEP established goals in various areas, including improvement of "overall decoding skills," "overall written expression," and "overall math skills," *id.* at 6-6.2, and specified that Travis would be removed from regular education to special education classes for twelve of his thirty school hours per week, *id.* at 7. Specific techniques for improving his skills were specified as using "[t]ouch math techniques" in special education math classes, and generally "seat[ing] Travis in front, near a helpful peer" and "modify[ing] amount of written work." *Id.* at 9. Although a gap between ability and achievement in the areas of reading and writing was noted, *id.* at 4-11, and improvement goals were set, no mention was made of particular techniques for achieving those goals. Mr. and Mrs. Myslow signed the IEP.

On March 27, 1998, the Myslows met with Travis' pediatrician, Dr. Robert Rubin, and provided him with Ms. Rositano's evaluation and the results of the questionnaires about ADD/ADHD that had been provided to Ms. Rositano. After what Plaintiffs recall was a very

brief office visit, without conducting a thorough history or examination, and relying largely on the Rositano evaluation, Dr. Rubin made a diagnosis of ADHD and suggested a trial of Ritalin.

As the Myslows recall, shortly after their appointment with Dr. Rubin, the school psychologist telephoned them to find out what had happened at the doctor's, and at a follow-up PPT meeting, they were asked whether Travis was taking Ritalin. Travis began taking Ritalin on school days in March 1998, and the Myslows authorized the school nurse to administer the medication. A few weeks later, on April 3, 1998, the Myslows received a note from Travis' teacher telling them that she had noticed improvement in Travis' concentration and self-control in the morning sessions; more feedback along these lines followed on April 7 and May 5. *See* Notes Home, Ex. E to Plaintiffs' Second Amended Complaint [doc. #70]. Travis remained on Ritalin for two years, filling his last prescription on March 24, 2000. During this period, his teachers continued to provide feedback, sending notes home on a number of occasions. *Id.* Mrs. Myslow also recalled that at various times school staff offered opinions on whether Travis was taking enough medication, or taking it at the right time, and that the nurse often called her to discuss medication timing and to implement timing changes.

While Travis remained on Ritalin, the Myslows continued to have concerns about their son's reading and writing, and also became concerned about his physical and psychological health. Mrs. Myslow recalls that while taking Ritalin, Travis lost his appetite, grew constipated, had trouble sleeping, became anxious and withdrawn, and felt stupid for having to take the medication. In response to teacher comments that the Ritalin was not taking effect early enough in the school day, Mrs. Myslow began giving Travis his medication before school, although there were mornings on which he pleaded with her not to make him take the Ritalin.

5

The special education plan that had been formulated for Travis in second grade was continued during the third grade. *See* Final Decision and Order of IDEA Hearing Officer, Exhibit 2 to School Defendants' Memorandum in Support of Summary Judgment [doc.#131] ("IHO Decision") ¶ 2. At the beginning of the third grade (1998-1999), the Myslows repeated their concerns about Travis' reading. They asked the PPT team to arrange a test for dyslexia but recall being told by several members of the PPT team that there was no such test. In the summer of 1999, Travis' summer tutors sent a note home expressing concern that he "frequently writes letters backwards" and asking for permission to "contact his teacher for the upcoming school year in order to make him/her aware of what we have seen." Note dated 7/22/1999, Ex. E to Plaintiffs' Second Amended Complaint [doc. #70].

For Travis' fourth grade (1999-2000), the PPT noted that Travis experienced high frustration in writing. Nevertheless, the PPT initially recommended that Travis receive only six hours of special education rather than the twelve that had been scheduled in the second and third grades. *See* IHO Decision ¶ 2. However, in September 1999, noting Travis' frustration, low self-confidence, and oppositional behavior, the PPT increased his special education hours to 7.5 per week, exempted him from standardized testing in reading and writing, and began Travis on the "Let's Read" program. *Id.* ¶ 3. Travis' frustration and difficult behavior continued, his education plan was rewritten to outline inappropriate behaviors and their consequences, and, on March 21, 2000, the PPT recommended that Travis be evaluated by a psychiatrist. *Id.* ¶ 4. The Myslows rejected the recommendation of psychiatric evaluation. *Id.*

A PPT convened in May 2000 recommended that Travis continue to receive 7.5 hours of special education through the fifth grade (2000-2001), and reiterated the recommendation of a psychiatric evaluation. *Id.* ¶ 5. The Myslows again declined to have Travis psychiatrically

evaluated. Frustrated with the lack of progress on Ritalin and worried about Travis' health, the Myslows stopped giving Travis his medication in May 2000, a decision which they discussed with Dr. Rubin, but did not share with the school until October 2000. The Myslows say that in September 2000, they brought Travis to the Sylvan Learning Center, where his reading level was evaluated at grade 1.8 and he was diagnosed with dyslexia. It is not clear from the record whether the Myslows ever shared that information with the school.

At a PPT meeting held on October 5, 2000, Travis' special education hours were increased to 12.5. Travis' fifth grade special education classes were held in a small classroom that was located at the end of the fifth grade hall, adjacent to a group of classrooms housing the kindergarten, a location that Travis interpreted as a negative judgment on his intelligence. IHO Decision ¶ 9; October 5 IEP, School Defendants' Memorandum in Support of Summary Judgment [doc. #131], Ex. L at 5. The Myslows expressed dissatisfaction with the fact that Travis had been promoted through three successive grades even though he was still reading below second grade level. *See* PPT Meeting Minutes of October 5, 2000, School Defendants' Memorandum in Support of Summary Judgment [doc. #131], Ex. L at 1-A. Travis' continuing oppositional behavior was noted, and the school offered counseling, but the parents rejected the counseling, believing that it would make no difference unless Travis underlying reading difficulties were addressed first. *See* IHO Decision ¶ 7. The Myslows also informed the school that Travis was no longer taking medication for ADD/ADHD. *Id.*

Another PPT meeting was convened on October 26, 2000. At that meeting, the Myslows requested a neurological evaluation, reiterated their concern with dyslexia, and asked that Travis receive one-on-one reading instruction. *See* PPT Meeting Minutes of October 26, 2000, School Defendants' Memorandum in Support of Summary Judgment [doc. #131], Ex. M. The PPT

agreed that the District would bear the expense of the neurological evaluation, *id.*, and prepared questions about Travis' condition for Dr. Anna Alshansky, IHO Decision ¶ 8. In addition, Travis' IEP was dramatically altered to provide that he would take all but 2.75 hours of classes in the special education environment, for a total of 27.25 hours of special education. *See* October 26 IEP, School Defendants' Memorandum in Support of Summary Judgment [doc. #131], Ex. M, at 5. Although the IEP notes that one-on-one reading instruction was already being provided, *id.* at 1-A, Mrs. Myslow recalls that Travis was denied this form of assistance during his fifth grade.

Following the PPT, Travis was referred by his pediatrician, Dr. Rubin, to neurologist Anna Alshansky, for a second opinion as to the diagnosis of ADHD. Dr. Alshansky concurred in the diagnosis of ADHD, but also opined that Travis had a "learning disability affecting his reading and writing skills." Report of Dr. Alshansky dated October 27, 2000, Ex. A(E) to Plaintiffs' Second Amended Complaint [doc. #70] at 3. She prescribed Adderall in place of Ritalin for the ADHD, and recommended "[f]ull pyschoeducational reevaluation as well as language evaluation." *Id.* at 4. Travis had even more serious side-effects on Adderall than he had experienced on Ritalin, and he stopped taking Adderall in December 2000.

Dr. Alshansky's report was discussed at a PPT meeting in December 2000. That PPT recommended that Travis undergo neuropsychological, cognition, and occupational therapy assessments. IHO Decision ¶ 8. Accordingly, the PPT submitted questions about Travis to neuropsychologist Dr. Badillo-Martinez, who evaluated Travis in March 2001. Dr. Badillo-Martinez was unable to determine the cause of Travis' reading difficulties, but felt that he likely did not have ADD, and should be monitored to rule it out. She diagnosed Travis with Generalized Anxiety Disorder and Oppositional Defiant Disorder and suggested that a clear behavior program was needed to help Travis learn. IHO Decision ¶ 11.

8

In April 2001, Travis was examined by a Dr. Kremenitzer, who, in a half-hour meeting, diagnosed Travis as having a "[l]earning disability in the area of dyslexia," "possible ADD," and "[g]eneralized anxiety disorder." Notes of Dr. Kremenitzer, M.D., Ex. A(H) to Plaintiffs' Second Amended Complaint [doc. #70]. Despite having identified ADD as a possibility only, Dr. Kremenitzer prescribed Travis Concerta, an ADD medication, in addition to recommending a psychotherapeutic examination and possible medication for Travis' anxiety. *Id.*

The plan for Travis' 2001-2002 school year was formulated at a PPT meeting in June 2001. The meeting was contentious, with parents and the Board disagreeing over whether Travis should be promoted to the sixth grade, whether further evaluations were necessary before an IEP could be adopted, and whether Travis should be psychiatrically evaluated. In July 2001, continuing to feel that their son's dyslexia was not being appropriately addressed, the Myslows requested an independent neuropsychological evaluation by Dr. Armin Thies, Ph.D, and a reading evaluation by Dr. White-Roath. The parents' requests were addressed at a PPT meeting in August 2001: the Board agreed to pay for an evaluation by Dr. White-Roath, but only if the Board was able to speak with Dr. White-Roath first, without the presence of any family representative. The Board also offered to pay half the cost of an evaluation by Dr. Thies. The Myslows rejected the Board's partial payment offer, and the Board declined the parents' request to allow Travis to be instructed at home.  IHO Decision ¶¶ 13-15.

Having failed to reach agreement with the Board, the Myslows went ahead with an independent evaluation by Dr. Thies. Dr. Thies concluded that "there is not much supporting evidence . . . for ADD or ADHD," and that it "is more likely that [Travis'] inattention is a manifestation of his [anxious] emotional condition," Report of Dr. Thies, School Defendants' Memorandum in Support of Summary Judgment [doc. #131], Ex. Q at 4. He further opined that

"the focus of medication trials should be on reducing anxiety rather than reducing inattention," *id*. at 5, and that Travis should "be considered to be a dyslexic and dysgraphic student," *id.* at 6.

In early September 2001, both the Board and the Myslows requested due process hearings under the IDEA, 20 U.S.C. § 1415(f), and the requests were consolidated for a single due process hearing. According to the IDEA Hearing Officer, the questions to be determined at the consolidated hearing included whether Travis had been provided with a free and appropriate public education in the 2001-2002 school year. IHO Decision at 1. The Myslows did not expressly seek due process with respect to Travis' education prior to the 2001-2002 school year. *See* Myslows' Request for Due Process Hearing, ¶¶ 1-20 and Revised Request for Due Process Hearing ¶¶ 1-4, part of Exhibit A of the Exhibits in Support of Plaintiffs' Supplemental Brief [doc. #153]. However, facts regarding Travis' early education in the District formed part of the record before the Hearing Officer.   The Hearing Officer concluded (among other things) that the Board's response to Travis' lack of academic progress in the 2001-2002 school year was inadequate and that the June 2001 IEP did not meet Travis' needs.

Despite the interposition of an independent consultant, Dr. Neu, relations between the Myslows and the Board did not improve after the IDEA due process hearing. Although the Myslows concede that the Board followed the recommendations of Dr. Neu, Mr. Myslow questioned the consultant's independence, testifying at deposition that Dr. Neu would tell the Myslows one thing on the telephone, but then recommend something completely different at PPT meetings. *See* Deposition of Matthew Myslow at 66-68, attached as Exhibit H to School Defendants' Memorandum in Support of Summary Judgment [doc. #131].

In February 2002, the Myslows requested an out-of-district placement for their son, but instead, the Board had Travis complete an eight-week diagnostic placement at another school

within the District. The Myslows then took Travis for another independent evaluation, this time by Herbert Schwartz, M.D. Dr. Schwartz concluded that Travis' primary psychiatric difficulty was Situational Anxiety Disorder secondary to an inability to read and write, and repeated stressful experiences in an educational setting. He opined that medication was not indicated, and that behavior plans directed at controlling Travis' behavior by holding him accountable would be futile unless the underlying reading and writing disorder was first addressed. Report of Dr. Schwartz, Ex. J to Plaintiffs' Second Amended Complaint [doc. #70] at 2.

The Myslows did not request a further due process hearing to compel the Board to provide out-of-district placement. However, in September 2002, the Myslows filed a grievance alleging discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The Myslows' Section 504 grievance listed thirty-three complaints of allegedly discriminatory behavior by school staff, including misdiagnosis of Travis' learning disability, refusal to test Travis for dyslexia, insistence that Travis take medication that he did not need, refusal to stop making Travis feel stupid, exemption of Travis from standardized tests, inappropriate promotion of Travis to higher grades, and failure to respond to one incident of apparently discriminatory aggression by another child. *See* Grievance Complaint, unlabeled exhibit attached to Exhibits in Support of Plaintiffs' Supplemental Brief [doc. #153]. The Section 504 grievance was investigated by Travis' Principal, Jean Malcolm, who concluded that none of the alleged incidents amounted to discrimination. Letter of Jean Malcolm dated September 19, 2002, Ex. L to Plaintiffs' Second Amended Complaint [doc. #70]. The Myslows appealed Ms. Malcolm's finding of no discrimination to the Board, which also denied the Section 504 grievance. The Myslows did not appeal the Board's denial to the Office for Civil Rights, Department of Education, although counsel for the Myslows was in possession of a document explaining this

step of the grievance procedure. *See* Letter of Attorney Stevenson to Thomas Badway dated November 2002, unlabeled exhibit attached to attached to Exhibits in Support of Plaintiffs' Supplemental Brief [doc. #153], enclosing for Mr. Badway's benefit a copy of the Board's Section 504 Grievance Procedure.   This lawsuit followed.

### III.

At the outset, the Court observes with considerable chagrin that Plaintiffs' scattershot approach to pleading and repeated reformulation of their positions in response to Defendants' arguments have made it difficult to establish the exact contours of their claims.   Because the pleadings and briefs are unclear, the Court is constrained to begin with a summary of its best understanding of which claims remain in the case, and what those claims allege. This understanding is based on the table of remaining claims included in Plaintiffs' Supplemental Brief [doc. #151] at 24-25, and the Court's attempt to unravel the portions of the Second Amended Complaint that Plaintiffs' table incorporates by reference. It appears to the Court that Plaintiffs' remaining claims are as follows:

| | |
|---|---|
| Count I | against School Defendants, for negligence in demanding that Travis take Ritalin and in failing to provide a free appropriate public education; |
| Count II | against Dr. Rubin only,[1] for medical malpractice in misdiagnosing Travis with ADHD; |

[1] The Court notes that Plaintiffs had originally pressed this claim against the school psychologist, Ms. Rositano, as well as Dr. Rubin. However, Plaintiffs' Supplemental Brief clearly states that the claim is now pursued exclusively against Dr. Rubin. *See* Plaintiffs' Supplemental Brief [doc. #151] at 24.

| Count III | against Dr. Rubin only, for lack of informed consent in prescribing Travis Ritalin; |
|---|---|
| Count IV | against School Defendants, for discriminating against Travis on the basis of his learning disabilities in the provision of a free appropriate public education in violation of Section 504 of the Rehabilitation Act ("Section 504"); |
| Count V | against School Defendants, for discriminating against Travis on the basis of his learning disabilities in the provision of a free appropriate public education in violation of the Americans with Disabilities Act ("ADA"); |
| Count VI | against School Defendants under Section 1983, for requiring Travis to be medicated for ADHD in violation of his right to bodily integrity; |
| Count VII | against School Defendants, for intentional infliction of emotional distress; |
| Count VIII | against School Defendants, for negligent infliction of emotional distress. |

Because Dr. Rubin has not moved for summary judgment, Counts II and III are not relevant to the present decision. The Court analyzes each of the other counts, beginning with Plaintiffs' remaining federal claims against School Defendants. As explained below, the Court concludes that certain of Plaintiffs' Section 504/ADA claims survive summary judgment, but that Plaintiffs' claims under Section 1983 do not. The Court then turns to Plaintiffs' various state law claims, and concludes that none of them survives summary judgment.

A.    Counts IV and V – Substantive Violations of Section 504 and the ADA

As observed above, Plaintiffs' kitchen-sink style of pleading has often obscured the thrust of their complaints. With respect to Counts IV and V, for example, Plaintiffs responded to Defendants' argument about exhaustion of administrative remedies (of which more below) in part by asserting that "plaintiffs are essentially suing the District because it required him to be medicated in violation of the ADA and Section 504, not because it failed to come up with an appropriate IEP." Plaintiffs' Omnibus Brief [doc. #136] at 31. However, the Second Amended Complaint makes no mention of forced medication in connection with Plaintiffs' claims under Section 504 and the ADA, and indeed, in their Supplemental Brief [doc. #151] on the topic of their Section 504/ADA claims, Plaintiffs reiterated the importance to their claims of the alleged denials of educational services and discrimination perpetrated by School Defendants. *See* Plaintiffs' Supplemental Brief [doc. #151] at 15 ("[P]laintiffs have set forth sufficient allegations . . . to state a claim under Section 504 . . . [including that] he was excluded from benefits such as: (1) an appropriate evaluation for dyslexia; . . . (4) an appropriate public education; (5) participation in classes as other children; (6) appropriate remediation."); *id.* at 17-18 ("It was bad faith to repeatedly tell the plaintiffs that 'there was no test for dyslexia' . . . to disregard the correct diagnosis, to refuse to pay for the evaluation by Dr. Thies . . . to refuse to change his educational program . . . to refuse Dr. Rubin's request to provide homebound instruction . . . and *to refuse to provide him with appropriate education either in the district or in a private school*.") (emphasis added).

Thus, whereas Plaintiffs made allegations relating to the decision to medicate Travis in Counts I and VI, it is clear that the major thrust of Counts IV and V of the Second Amended Complaint is that Plaintiffs are entitled to damages because the School Defendants discriminated

14

against Travis by depriving him of his right to a free appropriate public education in violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq. See* Second Amended Complaint ¶¶ 147, 148, 151. Because the protections, reach, and requirements of Section 504 of the Rehabilitation Act and Title II of the ADA are virtually identical, *see Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 n.6 (2d Cir. 2002); *Garcia v. S.U.N.Y. Health Sciences Center*, 280 F.3d 98, 113 (2d Cir. 2001), the Court analyzes Plaintiffs' claims under the two statutes together.

To establish a prima facie violation of Seciton 504 or the ADA, the Myslows must show that "(1) [Travis] has a disability for purposes of Section 504/ADA, (2) [he] is otherwise qualified for the benefit that has been denied, and (3) [he] has been denied the benefit by reason of [his] disability." *Weixel*, 287 F.3d at 146-147; *see also Mrs. C. v. Wheaton*, 916 F.2d 69, 74 (2d Cir. 1990) (cited with approval for its discussion of the elements of a prima facie violation of § 504 by *J.D. ex rel. J.D. v. Pawlet School Dist.*, 224 F.3d 60, 70 (2d Cir. 2000)).

In this case, the disputed element is whether Travis was denied educational benefits "*by reason of* his disability." *Weixel*, 287 F.3d at 147 (emphasis added). "In the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will." *Bartlett v. New York State Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998), *vacated on other grounds by New York State Bd. of Law Examiners v. Bartlett*, 527 U.S. 1031 (1998). However, "[s]ince Section 504 relief is conditioned on a showing of discrimination, it requires something more than proof of a mere violation of IDEA – i.e., more than a faulty IEP." *Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Central School Dist.*, 368 F. Supp. 2d 313, 334 (S.D.N.Y. 2005).

The Fourth and Eighth Circuits have described the "something more" than a faulty IEP required to bring claims of discrimination in the provision of special education services under Section 504 or ADA as "bad faith or gross misjudgment." *Sellers v. School Bd. of Mannassas*, 141 F.3d 524, 529 (4th Cir. 1998), *cert. denied* 525 U.S. 871 (1998); *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982). A number of district courts in the Second Circuit have also adopted this formulation. For example in *B.L. v. New Britain Bd. of Educ.*, 394 F. Supp. 2d 522, 540 (D. Conn. 2005), the Connecticut District Court stated: "[C]ourts have found that, in order to establish a section 504 violation, a plaintiff must demonstrate bad faith or gross misjudgment in addition to the denial of a [free appropriate public education]" (internal quotation marks omitted) (second alteration in original). *See also Scruggs v. Meriden Bd. of Educ.*, No. 3:03CV2224, 2005 WL 2072312, at *9 (D. Conn. Aug. 26, 2005) (same); *Zahran v. New York Dept. of Educ.*, 306 F. Supp. 2d 204, 213 (N.D.N.Y. 2004) (same). However, the Second Circuit has never explicitly used the "bad faith or gross misjudgment" formulation, although it has affirmed "for substantially the reasons stated by the District Court" at least one district court opinion employing that phraseology. *See Wenger v. Canastota Central Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997), *aff'd mem.*, 208 F.3d 204 (2d Cir. 2000).

What the Second Circuit *has* said is that money damages against non-state governmental entities for violations of Section 504 or Title II of the ADA may be awarded only upon a showing of "deliberate indifference to the rights secured the disabled by the acts." *Garcia*, 280 F.3d at 115. It is not clear whether *Garcia's* "deliberate indifference" standard is at all different from the "bad faith or gross misjudgment" formulation affirmed in *Wenger*, but the Court need not resolve that issue at this time. For purposes of the present motion for summary judgment, the Court assumes that the standards are identical. Thus, the question for this Court is whether the

16

Myslows have adduced sufficient evidence for a reasonable jury to find that the School Defendants acted with "deliberate indifference" to Travis' right to a free appropriate public education.

### Exhaustion of Administrative Remedies

Before turning to the merits of Plaintiffs' claims, however, the Court must address the School Defendants' contention that the Court lacks subject matter jurisdiction over Plaintiffs' Section 504/ADA damage claims because the Myslows failed to exhaust available administrative remedies under the IDEA.

According to the Second Circuit, "potential plaintiffs with grievances related to the education of disabled children generally must exhaust their administrative remedies before filing suit in federal court, even if their claims are formulated under a statute other than the IDEA (such as the ADA or the Rehabilitation Act)." *Polera v. Bd. of Educ. of Newburgh*, 288 F.3d 478, 481 (2d Cir. 2002). This exhaustion requirement applies whenever a plaintiff "seek[s] relief that is also available under [the IDEA]," 20 U.S.C. § 1415(I). "[R]elief that is also available" has been broadly construed to "mean relief for the events, conditions, or consequences of which the person complains, not necessarily relief of the kind the person prefers.'" *Polera*, 288 F.3d at 488 (quoting *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist.*, 98 F.3d 989, 991-92 (7th Cir. 1996)). In other words, if the IDEA administrative process offers a remedy (even if not preferred) for the ills of which a plaintiff complains, the plaintiff "may not ignore the administrative process, then later sue for damages" under a theory of Section 504 or ADA discrimination. *Id.* Further, in the Second Circuit, "plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction" over a Section 504 or ADA claim. *Polera*, 288 F.3d at 483.

The parties do not dispute that Plaintiffs were obliged to pursue administrative remedies

17

under the IDEA prior to bringing this suit for damages under Section 504 and the ADA. Similarly, no one disputes that the Myslows did in fact participate in an administrative proceeding before an IDEA Hearing Officer before bringing this suit. What the parties disagree about is whether that IDEA hearing was sufficient to satisfy Plaintiffs' exhaustion obligation for all of their Section 504/ADA claims in this litigation.  The School Defendants assert that Plaintiffs have exhausted only their claims with respect to Travis' education in the sixth grade, and that Plaintiffs did not expressly request due process on, and therefore should not now be allowed to seek damages for, alleged discriminatory failures to provide a free appropriate education in grades two through five.

According to the IDEA Hearing Officer, the questions presented to her were as follows: 1. Whether Travis had been provided with a free and appropriate public education in the 2001-2002 school year; 2. Whether the Board should reimburse the parents for Dr. Thies' evaluation; 3. Whether a psychiatric evaluation was necessary and appropriate; 4. Whether homebound instruction was appropriate; and 5. Whether the Board had committed procedural violations in connection with the 2001 IEPs/ PPTs. *See* IHO Decision at 1. Thus, the School Defendants are correct that, although Plaintiffs here seek damages for deficits in Travis' education beginning in 1998, at the IDEA hearing they only requested evaluation of the adequacy of Travis' educational program for the year 2001-2002.  However, Plaintiffs counter that the IDEA hearing nonetheless adequately exhausted their claims with respect to all the years that Travis spent in District schools because, even if not listed as questions presented to the Hearing Officer, facts relating to

18

all those years form part of the record compiled and considered by the Hearing Officer. *See* Plaintiffs' Supplemental Brief [doc. #151] at 3.[2]

The parties did not cite, and the Court has been unable to find, any cases addressing the scope of the IDEA exhaustion requirement and its application to situations such as this one, where a plaintiff alleges a prolonged course of educational failures but did not request due process with respect to all, or even a majority, of the school years in which educational deprivations occurred. Rather, the Court's research efforts located only decisions addressing application of the IDEA exhaustion requirement to Section 504/ADA claims in situations where a plaintiff had made no attempt to pursue IDEA remedies at all. *See, e.g., J.S. v. Attica Central Schools*, 386 F.3d 107, 113 (2d Cir. 2004) (noting that "students asserted that they were excused from exhaustion because of a 'class action exception.'"); *Polera*, 288 F.3d 478, 481 ("[T]he focal point of our inquiry must be Polera's admitted failure to exhaust the administrative remedies available to her."); *Hope v. Cortines*, 872 F. Supp. 14, 17 (E.D.N.Y. 1995), aff'd 69 F.3d 687 (2d Cir. 1995) ("[T]here exists no dispute that plaintiffs have failed to exhaust IDEA's administrative procedures . . . .").

In the absence of any decisions directly on point and in an effort to assess whether Plaintiffs have complied with their exhaustion obligations, the Court has sought guidance from

---

[2] Plaintiffs also submit that they exhausted their claims of discrimination by filing, and appealing the initial disposition of, a Section 504 grievance. The Court need not dwell long on this argument because it is exhaustion of procedures under the IDEA that is a prerequisite for bringing Plaintiffs' claims under Section 504 and the ADA. Plaintiffs raised their exhaustion of the Section 504 grievance procedure in response to School Defendants' assertion that Plaintiffs had failed to present claims of discrimination (as opposed to claims of inadequate educational services) to the IDEA Hearing Officer. But, as the Court explained above, Plaintiffs' Section 504/ADA claims need not, and do not, turn on a showing of intentional discrimination. To the contrary, it is sufficient if Plaintiffs prove a denial of educational services and deliberate indifference by the School Defendants.

the purposes underlying the IDEA exhaustion requirement. The Second Circuit has described the

reasons for exhaustion in this context as follows:

> 'Exhaustion of the administrative process allows for the exercise of
> discretion and educational expertise by state and local agencies, affords full
> exploration of technical educational issues, furthers development of a complete
> factual record, and promotes judicial efficiency by giving these agencies the first
> opportunity to correct shortcomings in their educational programs for disabled
> children.' If the administrative process is not successful at resolving the dispute, it
> will at least have produced a helpful record because administrators versed in the
> relevant issues were able to probe and illuminate those issues for the federal
> court.

*J.S.*, 386 F.3d at 112-113 (quoting *Polera*, 288 F.3d at 487) (internal citation omitted).

Thus, it is clear that one of the central goals of IDEA exhaustion is the compilation of a

thorough administrative record that provides inexpert federal courts with the considered opinion

of educational experts on technical educational issues such as the adequacy of a child's IEP. As

rehearsed above, Plaintiffs' claim for damages under Section 504 and the ADA requires them to

show both that Travis' IEPs were faulty and that School Defendants acted with deliberate

indifference. While the question of deliberate indifference may be suited to consideration by a

jury, the purposes of the exhaustion requirement compel the conclusion that the adequacy *vel*

*non* of Travis' IEPs should not be argued to and decided by a jury, but should be based on

deferential consideration of the findings of the Hearing Officer.  Thus, the Court concludes that

Section 504/ADA exhaustion is satisfied with respect to, and damages may be sought for, only

those school years for which there has been an administrative determination of an inadequate

IEP or other denial of a free appropriate public education.

In the Myslows' case, although the questions presented to the Hearing Officer only

explicitly referred to Travis' sixth grade education plan, the facts before her clearly involved the

substance of earlier IEPs and the Hearing Officer expressly found that the School Defendants did

not provide Travis with a free appropriate public education during *either* the fifth or sixth grades. *See* IHO Decision, Final Decision and Order ¶ 4 ("The program offered by the Board in the June 14, 2001 PPT for the 2001-2002 school year was not appropriate."); IHO Decision, Conclusions of Law ¶ 7 ("Throughout the 2000-2001 school year . . . T.'s instruction was provided in an increasingly restrictive environment that did not meet his needs and provided negligible educational benefit."); *id. ¶ 4* (describing the 2000-2001 IEP as "an IEP that was not working"). Although the Hearing Officer's conclusion regarding the adequacy of Travis' education in the fifth grade might be considered dicta if it were part of a judicial opinion, the expert assessment of facts in evidence that it reflects is surely enough to satisfy the expertise-driven exhaustion requirement.

By contrast, the record contains no such explicit finding from the Hearing Officer regarding Travis' education in earlier years, and the Myslows never challenged the Hearing Officer's findings on appeal as permitted by the IDEA. The Court therefore concludes that Plaintiffs' claims that Travis was not provided with a free appropriate public education in the fifth and sixth grades have been appropriately exhausted, but the claims relating to earlier grades have not. Consequently, the Myslows may seek damages under Section 504/ADA only with respect to alleged discriminatory deficits in Travis' fifth and sixth grade education.

The Court's conclusion in this regard does not mean, however, that Plaintiffs will be prevented from presenting at trial evidence relating to Travis' education in grades two, three, and four. Having persuaded the Hearing Officer that the School Defendants failed to give Travis the services he needed in fifth and sixth grades, Plaintiffs are entitled to prove that this expert-identified failure amounted to deliberate indifference and should be compensated with an award of damages. Evidence as to the School Defendants' handling of Travis' educational difficulties in

earlier grades appears both highly relevant and admissible to provide context for the Myslows' claims for fifth and sixth grades and also to demonstrate a course of conduct by the School Defendants that amounted to deliberate indifference as to Travis' educational needs.

*Discrimination*

Having determined that the Court has subject matter jurisdiction over Plaintiffs' claims that Travis was discriminatorily denied a free appropriate public education in the fifth and sixth grades, the Court now turns to the merits of those claims. On the record before it and drawing all inferences in favor of Plaintiffs (as the Court must at this stage), this Court cannot say that no "reasonable jury could return a verdict for [the Myslows]" by concluding that the School Defendants acted with deliberate indifference to Travis' need for services directed at dyslexia. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Myslows have raised genuine issues of material fact regarding both the School Defendants' awareness of the possibility (or likelihood) that Travis might suffer from dyslexia rather than, or in addition to, ADD/ADHD, as well as their repeated failure to respond to the Myslows' concerns about dyslexia and to develop an appropriate plan for addressing Travis' difficulties with reading and writing.

It may be that at trial, the School Defendants' alleged failures in these respects will be shown to be non-existent or to amount to no more than mere negligence or professional misjudgment rather than deliberate indifference.  However, the weighing of evidence required to draw such a distinction is a task for a jury, not this Court. Therefore, the Court will deny summary judgment as to Plaintiffs' Section 504/ADA claims against the District and the Board insofar as they seek damages for the discriminatory denial of a free and appropriate education in Travis' fifth and sixth grades; the Court dismisses Plaintiffs' Section 504/ADA claims against the

District and the Board for all prior years for lack of subject matter jurisdiction.  In addition, the Court enters judgment in favor of the individuals named as School Defendants on all of Plaintiffs' Section 504/ADA claims, because Plaintiffs have conceded that Section 504 and the ADA do not provide for individual liability. *See* Plaintiffs' Omnibus Brief [doc. #136] at 29-30.

B.     Count VI – Section 1983

As a preliminary matter, the Court notes that, although Plaintiffs initially pressed their Section 1983 claim against all School Defendants, during briefing on summary judgment they dropped their Section 1983 claims against the District and the Board (presumably recognizing that they had failed to plead an official custom or policy as required to maintain a § 1983 action against a municipality, *see Monell v. Department of Social Services*, 436 U.S. 658 (1978)), and now proceed only against the various individual School Defendants. *See* Plaintiffs' Supplemental Brief [doc. #151] at 25.

Plaintiffs' Section 1983 claim asserts that they are entitled to damages from individual School Defendants for requiring Travis to be medicated for ADHD in violation of his right to bodily integrity.[3]  In support of their forced-medication argument, Plaintiffs rely on a student-written law review piece opining that "'[f]orcing children to take medication such as Ritalin for the sole purpose of controlling disruptive behavior in school violates their constitutionally

---

[3] The Court notes that in their Second Amended Complaint, Plaintiffs cursorily aver that they are entitled to recover under Section 1983 for the School Defendants' alleged violations of equal protection, procedural due process, the IDEA, and the Connecticut Constitution. *See* Amended Complaint ¶ 160. However, Plaintiffs have subsequently disclaimed reliance on the IDEA, *see* Plaintiffs' Supplemental Brief at 22 ("The claims . . . pleaded before this Court are not claims that are being pursued under IDEA."), and have failed to plead either the elements of an equal protection claim, or any procedural violations. And, of course, Section 1983 is a vehicle for enforcing federal, not state, constitutional rights.   As a consequence, the Court concludes that Plaintiffs intend only to press Section 1983 claims of forced medication. *See* Plaintiffs' Omnibus Brief at 33.

protected liberty interest in privacy and bodily integrity,'" Plaintiffs' Omnibus Brief [doc. #136] at 33 (quoting Note, *Stimulant Drug Therapy for Hyperactive Children*, 11 B.U. Pub. Int. L.J. 97, 100 (Fall 2001)), and a single district court's finding that "[plaintiff's] right to a free appropriate public education could not be premised on the condition that he be medicated without his parents' consent," *Valerie J. v. Derry Co-Op School District*, 771 F. Supp. 483, 490 (D.N.H. 1991).

The arguments advanced in these sources do not help Plaintiffs. As an initial matter, the Myslows do not claim that Travis was forced to take medication for ADHD by means of a condition in his IEP (as was the case in *Valerie J.*) or even that he was medicated without their consent. Rather, the Myslows argue that the School Defendants badgered and coerced them into consenting to medicate Travis, and to keeping him on medications even after the parents had decided that medication was inappropriate. However, although the record reflects that while Travis was taking Ritalin his teachers sent numerous notes home linking ups and downs in Travis' performance to the frequency and timing of his medication, those notes and the Myslows' deposition testimony reflect that this feedback was both expected and encouraged by the Myslows. *See* Notes Home,  Ex. E  to Plaintiffs' Second Amended Complaint [doc. #70] (Note dated 11/22, acknowledged by Mrs. Myslow with a "Thank you;" Note dated 2/10 acknowledged by Mrs. Myslow with "So glad to hear this;" Note dated 12/8 responding to teacher's remark that Travis' behavior was worse on a day when medication had been reduced by noting that "[t]he medication was drop[ped] off today"); *see also* Deposition of Cindy Myslow at 63, attached as Exhibit Y to School Defendants' Reply Memorandum [doc. #141] (acknowledging that she had requested and expected feedback from teachers on the effect of the Ritalin, and had only become "tired of" the commentary in Travis' fourth grade); Deposition of Matthew Myslow at 34-35,

attached as Exhibit H to School Defendants' Memorandum in Support of Summary Judgment [doc. #131] (acknowledging that it was appropriate for the school to provide feedback on Travis' response to the Ritalin).

By Mrs. Myslow's own admission, she was not hostile to the notion of keeping Travis on Ritalin until May 2000, whereupon she stopped giving him Ritalin. Deposition of Cindy Myslow at 63, attached as Exhibit Y to School Defendants' Reply Memorandum [doc. #141]. There is no evidence that School Defendants took any steps to exclude Travis from school after they learned that he was not taking Ritalin, or otherwise attempted to compel the Myslows to re-medicate their son. Although the Myslows have asserted that the School Defendants responded to the decision to take Travis off Ritalin by "direct[ing] the Myslows to have Travis evaluated by Drs. Alshanksy and Kremenitzer," Amended Complaint ¶ 46, both of whom prescribed further medication for ADHD, the record is to the contrary. Although the PPT agreed to pay for a neurological examination and also prepared questions for Dr. Alshansky, IHO Decision ¶ 8, it was the Myslows who requested a neurological evaluation in the first place, *id.* Furthermore, Mrs. Myslow testified at her deposition that *Dr. Rubin* "requested another doctor's input to rule in or rule out [the ADHD diagnosis]" and that she believes the doctor requested was Dr. Alshansky. *See* Deposition of Cindy Myslow, Ex. B to Plaintiffs' Second Amended Complaint [doc. #70] at 169. This is consistent with the fact that Dr. Alshanksy's report is addressed to Dr. Rubin, whom it thanks for making the referral. *See* Report of Dr. Alshansky dated October 27, 2000, Ex. A(E) to Plaintiffs' Second Amended Complaint [doc. #70] at 1.

As to how Travis came to see Dr. Kremenitzer, the record is devoid of evidence other than the conclusory allegations of the Second Amended Complaint. The Hearing Officer's decision does not refer to evaluation by Dr. Kremenitzer at all, and Dr. Kremenitzer's notes state

only that "Travis returns today after a considerable period of time," Notes of Dr. Kremenitzer, M.D., Ex. A(H) to Plaintiffs' Second Amended Complaint [doc. #70]. Similarly, although Plaintiffs have implied that the School Defendants retaliated against them for ceasing Ritalin by requesting a due process hearing to compel psychiatric evaluation for Travis, there is no evidence in the record that the purpose of such an evaluation was to obtain further medication of Travis rather than a psychiatric assessment to explain his continued learning and behavioral difficulties. Furthermore, the Hearing Officer expressly determined that the School Defendants' request for a psychiatric evaluation was reasonable, IHO Conclusions of Law ¶ 5 – a determination that the Myslows have not appealed, and to which this Court, inexpert as it is in matters of education, defers.

On this record, the Court concludes that no reasonable juror could find that the School Defendants forcibly medicated Travis, and summary judgment is therefore appropriate on Plaintiffs' constitutional claim of forced medication in violation of Travis' right to bodily integrity. Furthermore, the Court notes that Plaintiffs' constitutional claim is one for a violation of substantive due process, which requires a showing that School Defendants' conduct "shocks the conscience." *See, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). "[O]nly the most egregious official conduct" can be said to shock the conscience in a constitutional sense and thus violate a party's substantive due process rights. *Id.* at 847 n.8. The School Defendants alleged conduct, even if it could be construed to amount to encouraging medication of Travis, simply does not rise to the level that can be described as conscience-shocking in the constitutional sense. For this reason also, summary judgment must be granted to the School Defendants on Plaintiffs' Section 1983 claim.

C.    <u>Count I – Negligence of School Defendants</u>

Plaintiffs' first remaining state law count against the School District Defendants alleges "negligence in demanding that Travis go on Ritalin, and for failure to provide Travis with a free and appropriate education when [Defendants] knew or should have known that Travis had dyslexia and dysgraphia." Plaintiffs' Supplemental Brief [doc. #151] at 24. As the Court has already observed, it is extremely difficult to distill the nature of Plaintiffs' claims from the pleadings and briefs. Here, although the allegation is disjunctive, appearing to incorporate separate claims about Ritalin on the one hand and the adequacy of Travis' educational program on the other, taking Plaintiffs' Second Amended Complaint, briefs, and oral argument as a whole, it appears to the Court that this first count is in fact a single claim for educational malpractice. Thus, despite Plaintiffs' assertion on October 20, 2005 that they "are essentially suing the district because it required him to be medicated . . . not because it failed to come up with an appropriate IEP," Plaintiffs' Omnibus Brief [doc. #136] at 31, Plaintiffs' submission of January 18, 2006 makes it very clear that the allegation that School Defendants required Travis to be medicated is actually part and parcel of a claim that they failed to provide him with the educational services he needed for his dyslexia. *See, e.g.*, Plaintiffs' Omnibus Brief [doc. #136] at 32 (School Defendants acted in bad faith because they "lazily required [the Myslows] to put Travis on stimulants in order to attend school there, rather than take any meaningful steps to deal with Travis's real difficulties."); Plaintiffs' Supplemental Brief [doc. #151] at 17-18 ("It was bad faith to repeatedly tell the plaintiffs that 'there was no test for dyslexia' . . . to disregard the correct diagnosis, to refuse to pay for the evaluation by Dr. Thies . . . to refuse to change his educational program . . . to refuse Dr. Rubin's request to provide homebound instruction . . . and *to refuse to provide him with appropriate education either in the district or in a private school*.")

27

(emphasis added). And indeed, this is the only sensible way to construe Count I, because while educators clearly have a duty of care with respect to the provision of educational services, as non-medical professionals, they cannot have a duty of care with respect to the diagnosis of psychiatric disorders or the prescription of medication for such disorders. If Plaintiffs wish to assert that School Defendants improperly propounded medical opinions, the proper vehicle for such a claim would be a count for the unlicensed practice of medicine, not negligence. The situation of the school psychologist might be different, and indeed Plaintiffs did originally name Ms. Rositano in connection with Count II, for medical malpractice, but Count II has subsequently been amended to proceed exclusively against Dr. Rubin.

For the foregoing reasons, the Court concludes that Count I sounds solely in educational malpractice.[4] Unfortunately for the Myslows, however, the Supreme Court of Connecticut has previously determined that claims of educational malpractice are not cognizable under Connecticut law.  *See Doe v. Yale University*, 252 Conn. 641, 657 (Conn. 2000) ("We recently joined those courts that have rejected the cognizability of educational malpractice claims."). It is true that although a claim of "breach[] . . . [of] the duty to educate effectively[] is not cognizable," *id.*, Connecticut law does recognize a tort arising from breach of the "duty owed by an educator not to cause physical injury by negligent conduct in the course of instruction," *id.* at 846-47. However, although the Myslows allege that the School Defendants' negligent failure to

---

[4] In an inscrutable footnote to their Omnibus Brief [doc. #136], Plaintiffs' appear to contest the characterization of Count I as a claim of educational malpractice, asserting instead that their claim "is for statutory violations and that  failure to provide a free and appropriate public education effectively discriminated against Travis." *Id.* at 35, n.123. But Plaintiffs' characterization of Count I is belied by the language of paragraph 131 of the Second Amended Complaint, and the Court is in any event at a loss to see how the fact that the duty breached arises from a statute alters the educational malpractice complexion of the claim.

recognize Travis' dyslexia resulted in his being misdiagnosed with ADD/ADHD and prescribed medications that had deleterious physical side-effects, this claim does not involve physical injury "by negligent conduct in the course of instruction," *id.*, such as the infection with AIDS due to inadequate instruction in performing a particular medical procedure that was held actionable by in *Doe*. Because Connecticut law does not recognize the tort of educational malpractice, the School Defendants are entitled to judgment on Plaintiffs' first count.

D.     Count VII - Intentional Infliction of Emotional Distress

Count VII of Plaintiffs' Second Amended Complaint alleges that the School Defendants intentionally inflicted emotional distress on Travis "by not providing appropriate education without discrimination, by unduly delaying provision of appropriate education, and by discriminating against him due to his disabilities," and that such conduct "was extreme and outrageous." Second Amended Complaint ¶ 163a-b.

To the extent that Plaintiff alleges that the Board and the District are liable for any intentional infliction of emotional distress by individual School Defendants, such a claim is precluded by Conn. Gen. Stat. § 52-557n(a)(2)(A), which provides that "a political subdivision of the state shall not be liable for damages to person or property caused by . . . [a]cts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or willful misconduct." Connecticut courts have held that wilful conduct is synonymous with intentional conduct. *See, e.g.*, *Bhinder v. Sun Co.*, 246 Conn. 223, 242 n.14 (1998) ("Wilful misconduct has been defined as intentional conduct . . . While [courts] have attempted to draw definitional boundaries between the terms willful, wanton or reckless, in practice the three terms have been treated as meaning the same thing."). Thus, the municipal School Defendants may not

29

be held liable for any intentional infliction of emotional distress on the part of individual School Defendants.

With respect to Plaintiffs' claim of intentional infliction of emotional distress against individual School Defendants, Plaintiffs are required to establish that: (1) each School Defendant intended to inflict emotional distress, or knew or should have known that the emotional distress was a likely result of his or her conduct; (2) that the conduct was extreme or outrageous; (3) that the conduct was the cause of the Travis' distress; and (4) that the distress suffered by Travis was severe. *See, e.g.*, *DeLaurentis v. City of New Haven*, 220 Conn. 225, 266-67 (1991); *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000). "Liability for intentional infliction of emotional distress requires conduct that is so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind." *Miner*, 126 F. Supp. 2d at 194 (citing *Petyan v. Ellis*, 200 Conn. 243, 254 n.5 (1986); *DeLaurentis*, 220 Conn. at 266-67). Whether School Defendants' conduct rises to this level is a question, in the first instance, for the Court. *See Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 552 (D. Conn. 1996), aff'd,104 F.3d 355 (2d Cir. 1996).

Reviewing the record in the light most favorable to the Plaintiffs, the Court concludes that no reasonable juror could find that the conduct of any of the individual School Defendants went "beyond all possible bounds of decency." Although Plaintiffs' have implied that School Defendants conspired with various doctors to return a diagnosis of ADHD so that the school could have Travis medicated rather than deal with his reading difficulties, there is nothing in the record to support Plaintiffs' suppositions. To the contrary, the record reflects conflicting diagnoses from medical professionals and persistent, even if arguably inadequate, efforts by the

30

School Defendants to provide special education services to address Travis' educational problems. As the Hearing Officer observed: "The Board has concluded that if T's behavior is controlled, he will learn to read. T's Parents believe that if T learns to read, his difficult behaviors will disappear. Both views are overly simplistic. It is uncertain which came first, the academic difficulties or the problem behaviors, but it is clear that they are intertwined and must both be dealt with." IHO Decision, Conclusions of Law ¶ 3. As noted above, the facts leading to the Hearing Officer's conclusion that neither party had a monopoly on wisdom with regard to Travis' difficulties could conceivably lead a reasonable juror to conclude that School Defendants were deliberately indifferent to Travis' need for services directed at dyslexia instead of, or in addition to, services for ADHD. However, these facts surely do not describe "conduct that is so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind." *Miner*, 126 F. Supp. 2d at 194; *compare, e.g, Bartlett*, 156 F.3d at 331 (repeatedly denying reasonable accommodation to learning disabled bar applicant on the basis of an unreliable measure of dyslexia rises to the level of deliberate indifference), *with Bell v. Bd. of Educ. of West Haven*, 55 Conn. App. 400, 411 (1999) (allegations that board of education and principal persisted for two years with a teaching method that subjected children to atmosphere of chaos and violence in which school became a "place of fear" stated a claim for intentional infliction of emotional distress) *and Appleton v. Bd. of Educ. of Stonington*, 254 Conn. 205, 210-11 (2000) (school officials' actions towards teacher, specifically making condescending comments, requiring teacher to undergo two forced psychiatric exams, telling the plaintiff's daughter that the plaintiff was acting 'differently,' forcing the plaintiff to resign, and subjecting the plaintiff to the indignity and humiliation of an

unwanted and unnecessary police escort out of the building, taken together, did not constitute extreme and outrageous conduct). Accordingly, summary judgment must be granted to all School Defendants on Count VII.

E.     Count VIII - Negligent Infliction of Emotional Distress

Count VIII of Plaintiffs' Second Amended Complaint alleges that School Defendants negligently or recklessly inflicted emotional distress on Travis "by not providing evaluation, identification of his disability, by not providing appropriate education without discrimination, by unduly delaying provision of appropriate education, and by discriminating against him due to his disabilities." Second Amended Complaint ¶ 166a-b.

However, as Defendants point out, Plaintiffs' claim of negligent infliction of emotional distress against School Defendants is precluded by common law and statutory immunity for discretionary governmental acts. *See, e.g.*, *Martel v. Metropolitan District Commission*, 275 Conn. 38, 48 (2005); Connecticut General Statutes § 52-557n(a)(2)(B). Plaintiffs concede that state law immunizes discretionary governmental actions, but assert that on the facts of this case such immunity is abrogated by the exception for acts committed maliciously, wantonly, or in an abuse of discretion. *See* Plaintiffs' Omnibus Brief [doc. #136] at 34-35. However, Plaintiffs' argument against immunity is unavailing as to Count VIII because this claim sounds in negligence, and a negligent act is by definition neither malicious nor wanton.

To the extent that Plaintiffs allege recklessness, reckless conduct has been equated to wanton conduct, *see, e.g.*, *Bhinder v. Sun Co.*, 246 Conn. 223, 242 n.14 (1998) ("Wilful misconduct has been defined as intentional conduct . . . [w]hile [courts] have attempted to draw definitional boundaries between the terms willful, wanton or reckless, in practice the three terms have been treated as meaning the same thing."), hence Plaintiffs' claim sounds in intentional

infliction of emotional distress and fails for the reasons explained above. Summary judgment must therefore be granted to School Defendants on Plaintiffs' claim of negligent or reckless infliction of emotional distress.

## IV.

Still pending are School Defendants' and Dr. Rubin's Motions in Limine to Preclude the Testimony of Dr. Breggin [docs. ##124, 125]. As indicated on the record at oral argument on January 4, 2006, and for the reasons stated at that time, the Court disposes of those motions as follows:

1. Dr. Rubin's Motion to Preclude [doc. #125] is DENIED.  Dr. Breggin will be permitted to testify that Dr. Rubin failed to adhere to the relevant standard of care in misdiagnosing Travis Myslow for ADHD and in prescribing Ritalin for Travis. Dr. Breggin also will be permitted to testify that the adverse effects noted on page 26 of his report were caused by Travis' misdiagnosis and use of Ritalin and that Ritalin can cause educational deficits and impairment. The Court notes that Plaintiffs disclaimed any interest in having Dr. Breggin testify about continuing adverse effects from Travis' use of Ritalin.  Accordingly, Dr. Breggin shall not testify about any continuing adverse effects from Travis' use of Ritalin.

2. The School Defendants' Motion to Preclude [doc. #124] is GRANTED IN PART.   As indicated at the conclusion of the hearing on the motion to preclude, Dr. Breggin will not be permitted to give the opinions set forth at paragraphs 2-6 of pages 24-25 of his September 29, 2004 report.  At argument, Plaintiffs represented to the Court that Dr. Breggin would not be called to give any opinions regarding the adequacy of the education plan that the School Defendants devised for Travis.  That resolves opinion # 5 on pages 24-25 of Dr. Breggin's September 29, 2004 report. As to the remaining opinions, ## 1-4 and 6 (which is merely a

restatement of the prior opinions), at the hearing the Court indicated a willingness to allow Dr. Breggin to testify on the following subjects: (a) that Ms. Rositano misdiagnosed Travis Myslow as suffering from ADHD; (b) that to the extent it is established that school officials pressured and/or unduly encouraged the Myslows to medicate Travis with Ritalin or other medications, they improperly crossed into medical areas beyond their educational expertise; and (c) that as a physician, Dr. Breggin would have expected School Defendants to have given Drs. Alshansky and Kreminitzer more and different information about Travis than they did, and that School Defendants' failures in this regard contributed to the continued misdiagnosis and mistreatment of Travis.

In view of the Court's dismissal of Plaintiffs' Section 1983 and state tort claims, it appears that opinion (b) above is no longer relevant to any issue in the case, and is inadmissible for that reason. Opinions (a) and (c) are arguably relevant to Plaintiffs' proof of deliberate indifference under Section 504/ADA. If the Court so rules (and for the moment the Court reserves its ruling), Dr. Breggin will be permitted to provide opinions (a) and (c).

## V.

For the reasons explained above, Dr. Rubin's motion to preclude [doc. #125] is DENIED; School Defendants' motion to preclude [doc. #124] is GRANTED IN PART AND DENIED IN PART; and School Defendants' Motion for Summary Judgment [doc. #130] is GRANTED IN PART AND DENIED IN PART as follows:

1.      Judgment shall enter as to Counts I, VI, VII, and VIII for municipal School Defendants New Milford School District and New Milford Board of Education, and individual School Defendants Raymond Avery, JeanAnn Paddyfote, Thomas

Mulvihill, Paula Kelleher, Denis Dolan, Jean Malcolm, Josephine Rositano, Adele Johnson, Deborah Shelley, and Robyn Viklund.

2.    Judgment shall enter as to Counts IV and V for the individual School Defendants listed above only.

As a result of this Ruling, the following Defendants and claims are left to be tried: Counts IV and V as against New Milford School District and New Milford Board of Education; Counts II and III as against Dr. Rubin.  By separate order, the Court will issue a schedule setting forth the dates for filing the Joint Trial Memorandum and holding the Final Pretrial Conference, jury selection and trial.

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: <u>February 28, 2006</u>.**

35